IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KING PHARMACEUTICALS RESEARCH ) 
AND DEVELOPMENT, INC., ASTELLAS US ) 
LLC, and ASTELLAS PHARMA US, INC. ) 
)
Plaintiffs, )
)
v. )   Civil Action No. 05-337 SLR
)
SICOR INC. and SICOR )
PHARMACEUTICALS, INC. )
)
Defendants. )
)
_____ )

**DEFENDANTS SICOR INC. AND SICOR PHARMACEUTICALS INC.'S
POST TRIAL BRIEF**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
    STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for Defendants SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated:  May 9, 2007

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................ 1

II.   THE '877 PATENT ........................................................................ 2
      A.    Priority Dates ................................................................... 2
      B.    The Asserted Claims ........................................................ 3

III.  ARGUMENT .................................................................................. 4
      A.    The Asserted Claims Are Invalid As Obvious Under 35 U.S.C. § 103 ................. 4
            1.    The Law Of Obviousness ........................................... 4
            2.    Level Of Ordinary Skill In The Art ........................... 7
            3.    Scope And Content Of The Prior Art ......................... 7
                  a.    Pharmacologic Stress MPI Was Known In The Art ..................... 9
                  b.    The Mechanism Of Action Of Dipyridamole Was Known
                        In The Art ................................................ 11
                  c.    Rates Of Continuous Intravenous Infusion Of Adenosine,
                        Sufficient To Cause Vasodilation Without Serious Side
                        Effects Were Known In The Art ...................... 13
                  d.    The Use Of Adenosine For MPI Was Disclosed In The Art ........ 18
            4.    Reason To Make The Claimed Combination ........................... 19
            5.    Expectation Of Success .............................................. 22
            6.    Differences Between The Claimed Invention Of The '877 Patent
                  And The Prior Art .................................................. 24
            7.    The Combination Of Either Gould 1978 Or Albro With Sollevi
                  1986 Renders The Asserted Claims Obvious ........................... 25
            8.    The Combination Of Either Gould 1978 Or Albro With Biaggioni
                  1986 Renders The Asserted Claims Obvious ........................... 27
            9.    Either Gould 1978 Or Albro In Light of The Knowledge In Art
                  Concerning Adenosine Infusion Renders The Asserted Claims
                  Obvious .............................................................. 28
            10.   No Secondary Factors Support Non-Obviousness .................... 29
      B.    The Asserted Claims Are Invalid As Anticipated Under 35 U.S.C. § 102 ......... 34
            1.    The Law Of Anticipation ........................................... 34
            2.    The Asserted Claims Are Invalid In Light Of The '296 Patent ............... 35
                  a.    The Asserted Claims Are Anticipated By The '296 Patent .......... 35
                  b.    The Asserted Claims Are Obvious In Light Of The '296
                        Patent ............................................... 36
            3.    Claims 23(17) And 43 Are Anticipated And/Or Rendered Obvious
                  By The Karolinska Request .......................................... 36
      C.    Plaintiffs Address The Wrong Questions And/Or Apply The Wrong
            Standards ........................................................................ 37
      D.    Evidentiary Issues ............................................................ 40

IV.    CONCLUSION ......................................................................................................... 41

# TABLE OF AUTHORITIES

Page

CASES

*Alza Corp. v. Mylan Labs., Inc.*,
    464 F.3d 1286 (Fed. Cir. 2006) ............................................................... 5-6, 19

*Amazon.com, Inc. v. Barnesandnoble.com*,
    239 F.3d 1343 (Fed. Cir. 2001) ...................................................................... 38

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................... 34-35

*Atofina v. Great Lakes Chemical Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ..................................................................... 35-36

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ...................................................................... 34

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
    229 F.3d 1120 (Fed. Cir. 2000) ..................................................................... 6-7

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
    464 F.3d 1356 (Fed. Cir. 2006) ............................................................... 5-6, 19

*Forest Labs., Inc. v Ivax Pharma, Inc.*,
    237 F.R.D. 106 (D. Del. 2006) ....................................................................... 41

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ............................................................................................. 5

*In re Bigio*,
    381 F.3d 1320 (Fed. Cir. 2004) ..................................................................... 7, 9

*In re Huang*,
    100 F.3d 135 (Fed. Cir. 1996) ........................................................................ 38

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988) .......................................................................... 6

*In re Rouffet*,
    149 F.3d 1350 (Fed. Cir. 1998) ................................................................... 7, 37

*Kridl v. McCormick*,
    105 F.3d 1446 (Fed. Cir. 1997) ...................................................................... 18

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. --- (2007) ................................................................................. Passim

*Mahurkar v. C.R. Bard Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996) ............................................................................ 18

*Medichem, S.A. v. Rolabo, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006) .................................................................... Passim

*Newell Cos., Inc. v. Kenney Manuf. Co.*,
    864 F.2d 757 (Fed. Cir. 1989) ............................................................................ 34

*Novo Nordisk Pharma, Inc. v. Bio-Technology Gen. Corp.*,
    424 F.3d 1347 (Fed. Cir. 2005) .......................................................................... 34

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) .................................................................... Passim

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) .................................................................... Passim

*Richardson-Vicks Inc. v. UpJohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997) ........................................................................... 6

*Sibia Neurosciences, Inc., v. Cadmus Pharma. Corp.*,
    225 F.3d 1349 (Fed. Cir. 2000) .......................................................................... 37

## STATUTES

35 U.S.C. § 102 ....................................................................................... 2, 19, 34

35 U.S.C. § 103 ......................................................................................... 2, 4, 22

## I.     __INTRODUCTION__

Where "a patent 'simply rearranges old elements each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. --- (2007); slip op. at 13 (citation omitted).  Here, very little of what was disclosed in the prior art even needed to be "rearranged" to arrive at the subject matter of the asserted claims of United States Patent No. 5,070,877 (the "'877 patent").  The '877 patent claims nothing more than substituting a direct-acting drug for an indirect-acting drug for the same purpose in the same procedure. What could be more obvious than eliminating the middleman – accomplishing directly the same result that was already being achieved indirectly?

The '877 patent (TX 320) claims a method of diagnosing coronary artery disease using a pharmacologic stress agent rather than exercise stress in connection with myocardial perfusion imaging ("MPI").  Well before even the earliest priority date claimed by Plaintiffs[1] in this case, MPI was known and used to diagnose coronary artery disease.  The use of pharmacologic stress in place of exercise stress for MPI was also known and used prior to the earliest claimed priority date.  The only difference between the asserted claims of the '877 patent and the prior art is the particular pharmacologic stress agent used.  The prior art disclosed use of dipyridamole, which was known to act by blocking adenosine uptake, thereby increasing levels of naturally occurring (endogenous) adenosine.  The '877 patent merely claims the direct infusion of adenosine for the same purpose.

The prior art also disclosed safe, continuous infusion of adenosine to humans at doses sufficient to cause vasodilation.  The '877 patent claims nothing more than the use of known,

---

[1]     "Plaintiffs" as used herein refers to King Pharmaceuticals Research and Development, Inc., Astellas US LLC and Astellas Pharma US, Inc.

safe doses of adenosine to accomplish directly what was already being done indirectly with dipyridamole infusions.

Not only was it obvious to replace dipyridamole with known, safe doses of adenosine for MPI, but the named inventors on the '877 patent were not the only ones to describe doing so. A December 28, 1987 continuation-in-part patent application that led to United States Patent No. 5,731,296 (the "'296 patent") described the use of adenosine in place of dipyridamole for MPI. TX 275, col. 21, ll. 25-61.

In short, the asserted claims of the '877 patent are neither novel nor non-obvious. Accordingly, they are not patentable and should be declared invalid under 35 U.S.C. §§ 102 and 103.

## II.     THE '877 PATENT

### A.     Priority Dates

The application that led to issuance of the '877 patent, Application Serial No. 231,117, was filed on August 11, 1988. TX 59; TX 320. A continuation-in-part application, number 330,156, was later filed on March 29, 1989. The '877 patent issued from application number 330,156 on December 10, 1991. TX 320.

Although the original application that led to the '877 patent was not filed until August 1988, Plaintiffs assert an earlier priority date in an attempt to avoid certain prior art references. In support of their claim of earlier priority, Plaintiffs rely on a protocol entitled "Clinical Utility of Adenosine in Radionuclide Myocardial Imaging" ("the Protocol," TX 57) which appears to have been authored prior to September 15, 1987 (see TX 1194). Plaintiffs' own expert, Dr. Wackers, conceded that TX 57 does not reveal conception of a specific dose of adenosine for use with MPI. Tr. 1013:13-22; 1015:15-1016:1. Yet the asserted claims set forth a specific dose range.

2

The Protocol describes three proposed studies under the heading "contemplated method of approach to the problem." TX 57 at 3. The first proposed study is a comparison of adenosine with exercise stress in 20 normal volunteers, aged 19 to 39 years. *Id.* The proposed dose of adenosine for that study in the normal volunteers involved initiating adenosine infusion at 0.01 mg/kg/min (10 mcg/kg/min) and doubling the dose at 2 minute intervals until one of three things occurred: (1) a maximum dose of .32 mg/kg/min (320 mcg/kg/min) was achieved; (2) the patient developed certain symptoms; or (3) mean arterial blood pressure fell more than 40-50 mmHg. TX 57 at 4. The second proposed study described in the Protocol is a comparison of intravenous adenosine with intravenous dipyridamole for MPI in 20 patients with documented coronary artery disease. TX 57 at 6. The portion of the Protocol concerning this study in patients neither specifies a proposed dosage range nor cross-references section 3.A.d. in which dosing of normal volunteers is described. *Compare* TX 57 at 6 with TX 57 at 3-5; Tr. 1015:4-7. Thus, Plaintiffs have not demonstrated their right to the earlier priority date, as explained in detail below.

### B.    The Asserted Claims

The '877 patent describes and claims the use of adenosine, as well as various adenosine derivatives and analogues, as pharmacologic stress agents in connection with diagnostic procedures such as MPI. *See, e.g.,* TX 320, col. 3, ll. 6-11. At trial, Plaintiffs asserted dependent claim 23, as read through claims 17 and 18, and independent claim 43 of the '877 patent.

Claim 17 claims:

> A method of detecting the presence and assessing the severity of coronary artery disease in a human comprising the steps of:
>
> (a) administering by an intravenous route to said human about 20 mcg/kg/minute to about 200 mcg/kg/minute of an adenosine receptor agonist sufficient to provide coronary artery dilation
> (b) administering a radiopharmaceutical agent into said human; and

> (c) performing radiopharmaceutical myocardial perfusion imaging on said human in order to detect the presence and assess the severity of coronary artery disease.

TX 320, col. 8, ll. 53-65.  Dependent claim 18 claims "[t]he method of claim 17 wherein said adenosine receptor agonist is administered by intravenous infusion in a dosage of about 140 mcg/kg/minute."  *Id.* at col. 8, ll. 66-68.  Claim 23 claims "[t]he method of claim 17, 19 or 18, wherein said adenosine receptor agonist is adenosine."  *Id.* at col. 9, ll. 34-35.

Claim 43 claims:

> A method of detecting the presence and assessing the severity of coronary artery disease in a human comprising the steps of:
> (a) administering to said human by intravenous infusion about 20 mcg/kg/min to about 200 mcg/kg/min of adenosine in order to provide coronary artery dilation;
> (b) administering thallium-201 to said human; and
> (c) performing the scintigraphy on said human in order to detect the presence and assess the severity of coronary artery disease.

TX 320, col. 10, l. 66 - col. 11, l. 9.

## III.    ARGUMENT

### A.    The Asserted Claims Are Invalid As Obvious Under 35 U.S.C. § 103

#### 1.    *The Law Of Obviousness*

A claimed invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains."  35 U.S.C. § 103(a); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006).  Obviousness is a legal conclusion, based on underlying factual findings.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

4

The factual inquiries underlying the legal determination of obviousness include (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) differences between the claimed invention and the prior art; and (4) any relevant secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

The obviousness inquiry should also address question of whether there was "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, slip op at 15. The Supreme Court recently clarified the appropriate standard for this inquiry, and expressly rejected a rigid application of the "teaching-suggestion-motivation" ("TSM") test that the Federal Circuit has previously employed. *Id.* The appropriate, flexible test for considering whether a combination of elements is obvious "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, slip op at 14. This analysis "cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 15.

Even before the Supreme Court handed down the decision in *KSR*, the Federal Circuit also sought to clarify that the "suggestion test is not a rigid categorical rule. The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Dystar,* 464 F.3d at 1361; *see also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006) ("We do not have a rigid test that requires an actual teaching to combine before

concluding that one of ordinary skill in the art would know to combine the references."). The "suggestion, teaching or motivation to combine the relevant prior art teachings *does not have to be found explicitly in the prior art . . . .*" *Alza*, 464 F.3d at 1290 (emphasis in original). Moreover, the Federal Circuit noted that the suggestion test "not only permits, but *requires*, consideration of common knowledge and common sense." *Dystar*, 464 F.3d at 1367 (emphasis in original).

A second subsidiary question necessary to the obviousness inquiry is whether a person of ordinary skill in the art would have had a reasonable expectation that the combination of references would succeed for its intended purpose. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). The standard here is not "absolute predictability," but instead is whether a person of ordinary skill in the art would have a "reasonable expectation" of success. *In re O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988). Indeed, the "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

In considering obviousness, relevant secondary considerations must also be considered if they are present. Secondary considerations do not, however, control the obviousness determination. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks Inc. v. UpJohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997). Moreover, for secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention. *See Ormco*, 463 F.3d at 1311-12.

Obviousness is determined from the point of view of a hypothetical person of ordinary skill in the art to which the patent pertains, who is presumed to have access to all prior art

references in the field of the invention.  *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

The person of ordinary skill in the art is also presumed to have ordinary creativity and common

sense.  *KSR,* slip op at 17.

To establish obviousness, Sicor has the burden of proving any disputed underlying facts

by clear and convincing evidence.  *See Brown & Williamson*, 229 F.3d at 1124.  The Court must

then make the ultimate legal conclusion as to obviousness based on the evidence presented.  *Id.;*

*see also Pfizer*, 480 F.3d at 1359.

2.      *Level Of Ordinary Skill In The Art*

There is no dispute about the relevant field of art of the '877 patent.  The '877 patent

concerns the use of vasodilators as pharmacological stress agents in connection with MPI.  Tr.

644:12-17.  The experts agree that the relevant fields of art include cardiology, nuclear

cardiology, and nuclear medicine.  Tr. 644:12-21; 898:12-14.

There is also no real dispute as to the level of training of a person of ordinary skill in the

art.  Tr. 898:12-:899:1.  The person of ordinary skill in the art at the time would have been a

practicing physician who either was trained in cardiology, with additional training in nuclear

cardiology, or was trained in nuclear medicine, with additional training in cardiology.  Tr.

898:15-20; 646:4-14.

3.      *Scope And Content Of The Prior Art*

As noted above, there is no disagreement that the relevant fields of art include cardiology,

nuclear cardiology and nuclear medicine.  Tr. 644:12-21; 898:12-14.  Prior art may be drawn

from any of these relevant fields or from other fields so long as the reference in another field is

related to the problem that the inventor was trying to solve.  *See In re Bigio*, 381 F.3d 1320, 1325

(Fed. Cir. 2004) ("Two separate tests define the scope of analogous prior art: (1) whether the art

is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference

is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.")  In determining what is relevant prior art, it is improper to assume that "a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *KSR*, slip op. at 16.

The references on which Sicor's expert Dr. Strauss relied in his analysis all either fall within the field of cardiology, nuclear cardiology and/or nuclear medicine, or are otherwise pertinent to the question of using a pharmacologic stress agent for MPI.  In fact, Plaintiffs' expert Dr. Wackers testified that the 1986 article titled *Cardiovascular Effects of Adenosine in Man; Possible Clinical Implications*, by A. Sollevi ("Sollevi 1986," TX 1171) was "pertinent" (Tr. 927:11-15), and he did not dispute the relevance of any of the other references on which Dr. Strauss relied.

There can be no reasonable dispute that the references at issue are either within the relevant art or "pertinent" to the problem at hand.  Several of the references on which Dr. Strauss relied, such as the 1984 Sollevi reference, *Controlled Hypotension with Adenosine in Cerebral Aneurysm Surgery* ("Sollevi 1984," TX 112); the 1987 Owall reference, *Clinical Experience with Adenosine for Controlled Hypotension during Cerebral Aneurysm Surgery* ("Owall," TX 1169); and the 1987 Fuller reference, *Circulatory and respiratory effects of infused adenosine in conscious man* ("Fuller," TX 1208), were identified by the inventors in the references section of their own study Protocol (TX 57 at 9-10).[2]  Named inventor Dr. Hilleman testified that his

---

[2]    Notably for purposes of the obviousness analysis, several of the references cited by the inventors in the reference section of their Protocol (TX 57 at 9-10) were not cited during prosecution of the '877 patent.  These include Albro et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation,* ("Albro", TX 93); Gould et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation,* ("Gould 1978", TX 38); Sollevi 1984 (TX 112); Fuller (TX 1208); and Owall (TX 1169).

general practice was to cite articles that are relevant to the research being conducted. Tr. 2128:15-19; 2129:9-23. Accordingly, each of these references is "reasonably pertinent to the particular problem" that the inventors addressed. *See In re Bigio*, 381 F.3d at 1325.

a.     Pharmacologic Stress MPI Was Known In The Art

MPI is an imaging technique that provides images of the distribution of blood flow to the heart. Tr. 647:12-17. "Stress" is used with MPI because it creates a disparity in blood flow between healthy vessels, which are able to dilate, and stenosed or blocked vessels, which cannot dilate or expand to accommodate greater demand for blood. Tr. 648:10-649:2. Radioactive tracer is injected into the patient at stress and at rest to "image" the flow. Tr. 649:16-651:6; DTX 3068-70. Comparison of the rest and stress images will reveal disparity in tracer distribution if there is stenosis and therefore enables determination of the location and severity of stenosis. *Id.*

A February 1978 article by K. Lance Gould, M.D., *et al.*, ("Gould 1978") described MPI during pharmacologic coronary vasodilatation. TX 38; Tr. 662:2-663:5. As stated in the article's introduction, Gould 1978 described a "new technique utiliz[ing] myocardial imaging of thallium-201 during coronary vasodilatation induced with intravenously administered dipyridamole (Persantine®)." TX 38 at 279; *see also* Tr. 662:2-663:6. More specifically, Gould 1978 describes continuous intravenous infusion of dipyridamole to patients for a period of four minutes. TX 38 at 280; *see also* Tr. 663:10-20. Gould further describes injection of thallium-201 after completion of the dipyridamole infusion, and the use of a gamma camera to obtain scintigraphic[3] images. *Id.* at 280-81; *see also* Tr. 662:17-22.

Gould 1978 also describes the expected increase in coronary blood flow caused by dipyridamole infusion. TX 38 at 284. Gould 1978 discusses an earlier study that reported

---

[3]     Scintigraphy, which applies generally to the technique of obtaining images of radiotracer distribution, encompasses MPI, which applies only to imaging the myocardium. Tr. 652:22-653:5; 647:12-17.

changes in coronary blood flow from dipyridamole infusion in twenty-eight patients. *Id.* The average increase in coronary flow was four times baseline control values. *Id.* However, there was a "wide standard deviation" because three of the twenty-eight patients showed an increase of less than three times baseline blood flow. *Id.*

In short, Gould 1978 described the safe and effective continuous intravenous infusion of dipyridamole to patients, in order to cause vasodilatation and the resultant increased blood flow, for purposes of MPI. TX 38; Tr. 663:10-664:4. In light of Gould 1978, a person of ordinary skill in the art would understand that the technique of vasodilator stress works in human patients. Tr. 665:9-20. That person of ordinary skill in the art would also understand that one could cause a prolonged coronary vasodilation by continuous infusion of the vasodilator agent, and that the prolonged vasodilation was important to allow the tracer to clear while the arteries were dilated. Tr. 665:21-666:7.

Gould 1978 also teaches that other vasodilators can be used in place of dipyridamole. Tr. 664:13-18; 686:1-6. Gould 1978 expressly states that "[a]ny other coronary vasodilator that was more potent than dipyridamole would further increase the sensitivity of imaging techniques for identifying coronary disease." TX 38 at 285. Gould 1978 notes that the potential for ischemia[4] may also increase with a more potent vasodilator, but the reference also teaches that ischemia is inherent in coronary vasodilation, and that ischemia is less likely to develop with pharmacologic stress than with exercise stress. TX 38 at 285. For example, Gould 1978 states that "because myocardial oxygen demands are not increased as much by dipyridamole as by exercise, an imaging method using a coronary vasodilator will permit greater coronary dilatation and greater

---

[4]    Ischemia is inadequate blood flow to the heart muscle. Tr. 688:19-21. As described in Gould 1978, because exercise stress increases oxygen demand more than pharmacologic stress does, using a coronary vasodilator is more likely to create the necessary increase in blood flow before ischemia develops than is exercise stress. TX 38 at 285.

differences in regional myocardial blood flow before ischemia develops as compared with exercise stress." TX 38 at 285.  Gould 1978 further teaches that "[f]or imaging purposes the major point is that coronary vasodilators provide greater differences in regional perfusion before ischemia develops as compared with exercise . . . ." TX 38 at 286.

A second reference also published in 1978 further elucidates the efficacy of pharmacologic coronary vasodilatation for MPI. Tr. 666:14-667:7; TX 93.  That reference, Albro (TX 93), "demonstrates that pharmacologic coronary vasodilatation is as effective as maximal treadmill exercise in creating myocardial perfusion abnormalities detectable with thallium-201 imaging in man." TX 93 at 751.  Like Gould 1978, Albro describes continuous intravenous infusion of dipyridamole as pharmacologic stress agent for use with MPI. TX 93 at 752; Tr. 667:15-22.  As in Gould 1978, the radio tracer used in Albro is thallium-201.  Albro also describes the mechanism by which dipyridamole causes vasodilation – through adenosine. *See* TX 93 at 758-59.

                        b.     The Mechanism Of Action Of Dipyridamole Was Known In The Art

Albro expressly sets forth the relationship between dipyridamole infusion and vasodilation caused by adenosine.  *See* TX 93 at 758-59.  Under the heading "mechanism, safety and optimal dose of dipyridamole infusion," Albro states:

> Dipyridamole may induce coronary vasodilatation by several mechanisms. Adenosine, a product of adenine nucleotide utilization in myocardial tissue, has vasodilator activity and has been proposed as a coronary vasoregulator. Dipyridamole prevents inactivation of adenosine by adenosine deaminase in the red blood cells and lung and myocardial tissues, either by inhibiting adenosine deaminase or by preventing the uptake of adenosine into these tissues.  Dipyridamole also has a direct effect of sensitizing coronary vascular tissue to the vasodilating effects of a given concentration of adenosine.

TX 93 at 758-59 (internal citations omitted). As Dr. Strauss testified, a person of ordinary skill in the art would understand from this portion of Albro that "if dipyridamole is selected as the vasodilator, that the effector drug, if you will, is adenosine . . . ." Tr. 670:12-18.

Other references in the prior art likewise show that dipyridamole was known to act primarily, if not exclusively, through adenosine. For example, the 1985 edition of Goodman & Gilman included the following statement concerning dipyridamole:

> The actions of dipyridamole seem to be linked, at least in part, to the metabolism and transport of adenosine and adenine nucleotides; in particular, dipyridamole inhibits the uptake of adenosine by erythrocytes and other cells. Adenosine, which is released from the hypoxic myocardium, is a coronary vasodilator and appears to be an important signal for the autoregulation of coronary blood flow.

TX 39 at 822. Goodman & Gilman is a pharmacology textbook that is commonly used by physicians today, and was commonly used by physicians in the mid-1980s. Tr. 678:24-679:12. Based on this portion of Goodman & Gilman, a person of skill in the art would understand that when dipyridamole is infused, it is acting through adenosine to cause vasodilation. Tr. 680:8-22.

In addition, a March 1987 article *Cardiovascular effects of infused adenosine in man: potentiation by dipyridamole*, by Conradson *et al.* ("Conradson") states that "[d]ipyridamole inhibits the cellular update of adenosine which results in a potentiation of the cardiovascular actions of adenosine." TX 220 at 387 (internal citations omitted). Conradson goes on to state that:

> Dipyridamole itself caused cardiovascular effects similar to those recorded after adenosine. Our observations therefore support the hypothesis that the cardiovascular effects of dipyridamole are mediated (at least in part) by elevated endogenous plasma adenosine.

*Id.* at 390 (citation omitted). Accordingly, a person of skill in the art would understand from Conradson that dipyridamole acts through adenosine. Tr. 683:8-13.

The '296 patent sums up the state of knowledge in the art in 1987 concerning dipyridamole's mechanism of action. TX 275; Tr. 684:12-685:6. According to the '296 patent, "[m]ost data concerning the mechanism of action of dipyridamole's vasodilatory effect in fact support the view that it is *solely* due to adenosine vasodilation." TX 275, col. 21, ll. 49-51 (emphasis added).[5]

          c.      Rates Of Continuous Intravenous Infusion Of Adenosine, Sufficient To Cause Vasodilation Without Serious Side Effects Were Known In The Art

By the middle of 1987, a number of investigators had reported continuous infusion of adenosine to human subjects and/or patients at different rates for different purposes. *See, e.g.,* TX 48; 112; 220; 1171 and 1208. These references created a body of knowledge in the art that showed both the safety and the effect of adenosine infusion at the reported rates. Tr. 738:16-739:2; 747:18-748:13. Certain specific references, and the body of knowledge as a whole, teach a person of ordinary skill in the art a range of adenosine infusion that (1) is sufficient to cause vasodilation; (2) is not sufficient to cause the undesirable (for purposes of MPI) effect of hypotension; and (3) is unlikely to result in serious side effects such as AV block.[6] Tr. 747:10-749:20.

One reference, Sollevi 1984, describes continuous intravenous infusion of adenosine for the purpose of inducing controlled hypotension in anesthetized patients undergoing cerebral aneurysm surgery. TX 112; Tr. 692:1-23. The article discusses doses of adenosine infusion necessary to induce controlled hypotension both with and without pretreatment with

---

[5]     In addition, in the IND seeking approval to use adenosine for MPI in humans, the Patient's Informed Consent to be used by Dr. Mario Verani's group at Baylor states that "[a]lthough the drug dipyridamole is used to dilate the coronary vessels, the ultimate substance that effectively causes the vasodilation is called adenosine, which is made available in higher amounts by dipyridamole administration." TX 52 at AST0009469.

[6]     AV block is a slowing or failure of the electrical conductance signal to the heart which can occur in varying degrees. Tr. 696:12-697:4.

dipyridamole.[7]  TX 112 at 403.  According to Sollevi 1984, doses of 200 to 300 mcg/kg/min induced controlled hypotension in those patients who were not pretreated with dipyridamole.  TX 112 at 403 n. ++.  The person of skill in the art would therefore have understood from Sollevi 1984 that doses of adenosine infusion above 200 mcg/kg/min would likely achieve controlled hypotension.  Tr. 695:6-696:1.  Accordingly, a person of skill in the art would understand 200 mcg/kg/min to be an upper boundary of any dosage range likely to be useful for MPI.  Tr. 699:1-13.[8]

Sollevi 1984 also describes several advantages adenosine.  TX 112.  These desirable properties include "rapidity of onset and termination, stability of action, [and] maintenance of cardiac output . . . ."  TX 112 at 404.  A person of skill in the art would have understood from Sollevi 1984 that continuous intravenous infusion of adenosine would result in a stable state of coronary vasodilatation.  Tr. 693:15-694:7; 695:6-696:1.

Notably, even at the doses used to achieve controlled hypotension, Sollevi 1984 does not report any instances of AV block, a known effect of bolus injections of adenosine.  Tr. 696:2-697:11; 698:13-15; TX 112.  Accordingly, based on Sollevi 1984, a person of skill in the art would have understood that continuous intravenous infusion of adenosine is relatively safe, even at doses exceeding 200 mcg/kg/min.  Tr. 699:4-17.

A 1986 reference also authored by Dr. A. Sollevi, *Cardiovascular Effects of Adenosine In Man; Possible Clinical Implications*, ("Sollevi 1986") provides a review of the then-known cardiovascular effects of adenosine.  TX 1171; Tr. 700:8-18.  Like Sollevi 1984, Sollevi 1986

---

[7]   Sollevi 1984 notes that pretreatment with the adenosine uptake inhibitor dipyridamole was used in the clinical study to reduce infusion rates of adenosine.  TX 112 at 403.

[8]   The upper boundary of about 200 mcg/kg/min for MPI, based on the doses likely to cause hypotension, is further supported by the Owall reference, TX 1169.  Owall describes continuous intravenous infusion of adenosine at rates up to 530 mcg/kg/min, with a mean dose requirement of 210 mcg/kg/min, to induce hypotension in anesthetized patients.  TX 1169 at 230, 232; Tr. 721:12-22; 723:3-7; 724:20-725:5.

14

describes that a dose of 200-300 mcg/kg/min induced controlled hypotension in anesthetized patients.  TX 1171 at 333; Tr. 701:4-9.  Also like Sollevi 1984, Sollevi 1986 reports no incidence of AV block in connection with the infusion rates used to induce controlled hypotension.  Tr. 702:2-6; TX 1171.

Sollevi 1986 also describes the effects of continuous infusion of adenosine at lower doses.  TX 1171.  According to Sollevi 1986, intravenous infusion of adenosine at 80 mcg/kg/min results in a near doubling of coronary blood flow.  TX 1171 at 335; Tr. 702:21-703:14.  In addition, adenosine infused at a rate of 30-50 mcg/kg/min induces a 100% increase in graft flow.  TX 1171 at 335, Tr. 704:22-705:5.[9]  The summary chart at the end of Sollevi 1986 describes a "low dose" of 20-50 mcg/kg/min as inducing "preferential myocardial vasodilation."  TX 1171 at 345.

A person of ordinary skill in the art would have understood from Sollevi 1986 that there was a range of doses of adenosine from about 20 mcg/kg/min at the low end to about 200 mcg/kg/min at the high end that would cause vasodilation and the related increased blood flow, but would not result in hypotension.  Tr. 708:10-709:12; 705:19-707:2; 747:10-748:13; 748:22-749:20.

Additional prior art references disclose safe, tolerable doses of continuous intravenous infusion of adenosine to conscious humans.  Tr. 710:2-11.  One such reference is a 1986 publication entitled *Cardiovascular effects of adenosine infusion in man and their modulation by dipyridamole*, by Biaggioni et al. ("Biaggioni 1986").  TX 48.  Biaggioni 1986 describes continuous intravenous infusion of adenosine to seven conscious healthy volunteers at rates of

_____

[9]     During Dr. Strauss's testimony concerning Sollevi 1986, Plaintiffs objected "to this whole line not being in the report."  As discussed in more detail in section E, below, Dr. Strauss cited and relied on Sollevi 1986 in his initial expert report (TX 246), and his testimony at trial was both consistent with and within the scope of his previously expressed opinions.

10, 20, 40, 60, 80, 100 and 140 mcg/kg/min for 15 minutes each. Tr. 711:1-14; 712:14-16; TX 48 at 2230. Five of the seven conscious subjects described in Biaggioni 1986 tolerated the 140 mcg/kg/min dose of adenosine, while the other two subjects tolerated the 100 mcg/kg/min dose. Tr. 712:14-713:1; TX 48 at 2231. The duration of infusion of each dose is significant because even the 15 minute duration of one of the doses is longer than would be necessary to perform MPI. Tr. 711:20-712:13. Rather than the few minutes that would be necessary to continue infusion of adenosine for MPI, the subjects studied in Biaggioni 1986 were infused with adenosine for a total of either 1-1/2 or 1-3/4 hours. Tr. 711:20-712:13; Tr. 717:2-15.

Biaggioni 1986 also describes the side effects experienced by the conscious subjects at the highest tolerated infusion rates. According to Biaggioni 1986, those side effects, which included headache, subjective flushing in the head and neck, nervousness and an urge to breathe deeply, "disappeared immediately after discontinuation of the infusion." TX 48 at 2233; Tr. 715:4-8.[10]

According to Biaggioni 1986, the study shows "that adenosine administered by infusion over the range of 60 to 140 µg/kg/min to healthy conscious human subjects, lowers diastolic blood pressure but raises heart rate, systolic blood pressure and levels of plasma norepinephrine." TX 48 at 2234. The increase in systolic blood pressure coupled with the decrease in diastolic blood pressure reported in Biaggioni 1986 indicates that the subjects had a "very significant vasodilation response to the adenosine infusion." Tr. 718:4-719:2; TX 48. A person of ordinary skill in the art would understand from Biaggioni 1986 that adenosine could be

---

[10] Biaggioni 1986 notes in the results section of the article that one of the seven subjects experienced a prolonged PR interval of 0.16 to 0.22 seconds, or first degree AV block. Tr. 715:12-18; TX 48 at 2231. First degree AV block is the first of three possible levels of AV block which, by itself, is not necessarily dangerous. Tr. 715:23-716:21.

16

safely, continuously infused to conscious humans for extended periods of time at rates up to 140 mcg/kg/min and that the adenosine infusion would cause vasodilation. Tr. 718:4-719:18.

Additional prior art references likewise describe the safe, continuous infusion of adenosine to conscious humans. Conradson, published in March 1987, describes stepwise increases of the dose of adenosine infusion from 20 mcg/kg/min to a maximum of 100 mcg/kg/min in eight normal volunteers. Tr. 726:7-727:5; TX 220 at 388. Each dose was administered for six minutes. Tr. 727:6-15. As reported in Conradson, all eight subjects tolerated 70 mcg/kg/min; six of eight tolerated 90 mcg/kg/min; and three of the eight tolerated 100 mcg/kg/min. TX 220 at 388. Similar to Biaggioni 1986, various side effects were reported, and such side effects "completely vanished within 2 min after stopping the adenosine infusion." TX 220 at 389; Tr. 728:15-729:3.

Fuller, published in September 1987, also describes continuous intravenous infusion of adenosine to conscious humans. TX 1208; Tr. 729:13-18. The infusion rates in Fuller begin at 12 mcg/kg/min and increase to 25, 50, and 100 at 6 to 7 minute intervals for each dose. TX 1208 at 310; Tr. 729:19-730:4. Two of the six subjects described in Fuller tolerated 200 mcg/kg/min for 1 and 2 minutes, respectively. TX 1208 at 311; Tr. 730:16-22.

Yet another reference from 1987, *Cardiovascular and respiratory effects of adenosine in conscious man* ("Biaggioni 1987") also describes continuous intravenous infusion of adenosine to conscious humans. TX 226; Tr. 731:17-732:2. Biaggioni 1987 describes, *inter alia*, increasing doses of adenosine from 80 to 180 mcg/kg/min with each dose administered for 15 minutes. TX 226 at 780; Tr. 732:20-733:6. All eight subjects in Biaggioni 1987 tolerated a dose of 140 mcg/kg/min. TX 226 at 781-82; Tr. 733:17-22. Biaggioni 1987 shows that adenosine can be safely, continuously infused for extended periods of time, that doses up to 140 mcg/kg/min

are tolerable in conscious humans, and that adenosine has a predictable vasodilatory action.  Tr. 735:4-12.

As Dr. Strauss summarized in his testimony and in demonstrative exhibits 3091 and 3112, the prior art references showed a range of adenosine infusions rates that had been safely used in humans.  Tr. 738:16-739:22; DTX 3091; DTX 3112.  That range substantially overlapped with and provided the outer limits for the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43 of the '877 patent.  Tr. 739:2-740:18; 748:22-750:22.  The prior art also expressly describes the continuous intravenous infusion of 140 mcg/kg/min of adenosine to conscious humans.  Tr. 748:2-13; TX 48; TX 226.

>              d.       The Use Of Adenosine For MPI Was Disclosed In The Art

Plaintiffs argue that they are entitled to a priority date of no later than September 1987 based on "conception" by at least that date.  Plaintiffs have the burden offering evidence showing conception of the claimed invention prior to the August 11, 1988 filing date of the '877 patent. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996).  Plaintiffs have not established "conception" of the subject matter of the asserted claims until at least March of 1988.

"Conception is the formation 'in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is therefore to be applied in practice.'" *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (citation omitted).  "Conception must include every feature or limitation of the claimed invention."  *Id.*  Dr. Wackers conceded that the evidence of "conception" on which Plaintiffs rely, the Protocol (TX 57), does not show conception of a specific dose of adenosine for use with MPI.  Tr. 1013:13-22; 1015:15-1016:1.  Accordingly, Plaintiffs cannot establish an earlier conception date based on the Protocol.

Example XIII of the '296 patent was added in a continuation-in-part patent application filed on December 27, 1987.  Statement of Admitted Facts, ¶ 17.  December 27, 1987 is prior to

18

the filing date of the '877 patent, and prior to any date by which Plaintiffs' can establish

conception of the claimed subject matter. Example XIII is therefore prior art to the '877 patent

pursuant to 35 U.S.C. § 102(e). *See* 35 U.S.C. § 102(e).

Example XIII of the '296 patent discloses "adenosine in the diagnosis of coronary heart

disease by radionucleide (sic) scintigraphy." TX 275, col. 21, ll. 25-61. More specifically,

Example XIII begins by describing the use of dipyridamole in connection with MPI using

thallium 201. *Id.* Example XIII further explains the relationship of dipyridamole's action with

adenosine's vasodilatory properties, and teaches that adenosine can be used in place of

dipyridamole as a pharmacologic stress agent for MPI. *Id.* Example XIII also teaches a dosage

range of 10 to 150 mcg/kg/min of adenosine for MPI. Tr. 750:12-22; TX 275, col. 21, ll. 59-61.

The use of adenosine as a pharmacologic stress agent with MPI is also taught in a

proposal that was submitted to the Karolinska Institute in Sweden in or around February of 1988

(the "Karolinska Request"). TX 1193 at SIC010940. Like example XIII of the '296 patent, the

Karolinska Request discloses that adenosine could be used to replace dipyridamole as the

pharmacologic stress agent for MPI. TX 1193 at SIC010943-44; Tr. 754:9-13. The dose

described in the Karolinska Request is 60 mcg/kg/min. TX 1193 at SIC010944; Tr. 755:6-14.

4.    *Reason To Make The Claimed Combination*

Even before the Supreme Court's recent decision in *KSR*, the case law was clear that a

reason to combine could be found in any of the art as a whole, the knowledge of persons skilled

in the art, or with the application of common sense. *See Alza*, 464 F.3d at 1290; *Dystar*, 464

F.3d at 1367. Now, after *KSR*, there can be no question that is the applicable standard. "[T]he

analysis need not seek out precise teachings directed to the specific subject matter of the

challenged claim, for a court can take account of the inferences and creative steps that a person

of ordinary skill in the art would employ." *KSR*, slip op. at 14. In other words, far from

requiring that the art explicitly state "use adenosine for MPI," the obviousness inquiry must take into account not only the teachings in the art, but also the ordinary creativity and common sense of the person of skill in the art.  Common sense alone provides a reason to use a direct acting agent in place of an indirect acting agent that causes the same effect.

A person of ordinary skill in the art in 1987 would have known that dipyridamole acts indirectly, and that adenosine is the direct acting agent.  *See, e.g.,* TX 93; TX 275.  In fact, the Albro reference, which describes the use of dipyridamole for MPI, spells out the relationship between infusion of dipyridamole and vasodilation by adenosine.  TX 93 at 758; Tr. 668:18-670:11.  A person of ordinary skill in the art would have reason to substitute adenosine for dipyridamole in connection with MPI because that person would have known that the actual agent causing the vasodilation was adenosine.  Tr. 670:12-671:12.  Even if there were no such suggestion in the art, common sense alone would spark a person of ordinary skill to eliminate the middleman and directly infuse the drug that is actually having the desired effect in a known procedure.

Here, however, much more than simple common sense provided a reason for a person of ordinary skill in the art to use adenosine in place of dipyridamole for MPI.  The very first published account of pharmacologic stress for MPI in humans, Gould 1978, teaches that "[a]ny other coronary vasodilator that was more potent than dipyridamole would further increase the sensitivity of imaging techniques for identifying coronary disease."  TX 38 at 285; Tr. 664:15-18.  Moreover, Gould 1978 discusses imaging methods using "a coronary vasodilator" generally, further suggesting that other vasodilators could be used instead of dipyridamole.  TX 38 at 285.

A person of skill in the art would also have had reason to replace dipyridamole with adenosine based on the knowledge of adenosine's shorter duration of action.  Dipyridamole was

known to have a relatively long duration of action. Tr. 673:17-674:11. Because of the long duration of dipyridamole, it is not possible to turn off negative side effect by simply turning off the infusion. *Id.*; *see also* Tr. 674:18-675:12. Instead, use of a reversal agent may be necessary. Tr. 673:17-674:11; 674:12-17; *see also* TX 38 at 283 (describing use of reversal agent aminophylline in two patients – five percent of the study population).

Adenosine, in contrast, has a very short duration of action. Tr. 673:17-674:11. A person of ordinary skill in the art at the time would have known of adenosine's short duration, and would have expected the effects of adenosine to be far more easily controlled than dipyridamole. Tr. 672:17-673:2; 673:17-674:11; 675:13-21; 742:2-18; *see also* TX 1171 at 345 (adenosine's "effect is easy to control due to the extremely short plasma half life."). A person of ordinary skill in the art would have understood that adenosine could be continuously infused to maintain a stable effect for the duration of time needed to perform the MPI, but that the effects could then be turned off almost immediately upon termination of the infusion. Tr. 676:9-678:2; 692:12-694:7. Indeed, it was generally known that a drug with a shorter duration of action would be preferable in terms of side effects. Tr. 2137:22-2139:7.

A person of ordinary skill in the art would therefore have recognized at least two advantages of adenosine over dipyridamole: (1) it would allow almost immediate termination of negative side effects, and (2) it would eliminate the extended effect of the drug past its usefulness for the procedure. Tr. 673:17-674:11; 674:18-675:12; 676:9-677:8; 687:11-688:2. Knowledge in the art of these advantages provided more than adequate incentive to substitute adenosine for dipyridamole as a pharmacologic stress agent for MPI. Tr. 673:17-674:11; 687:11-688:2; 688:22-690:9.

Whether one looks to the extensive knowledge in the art concerning adenosine or merely applies common sense to the teachings of Gould 1978 and Albro, it is clear that the single change from using adenosine indirectly, through dipyridamole infusion, to using adenosine directly was "the product not of innovation but of ordinary skill and common sense," and is obvious under § 103. *See KSR*, slip op. at 17.

5.     *Expectation Of Success*

A person of ordinary would have reasonably expected adenosine to work as a coronary vasodilator for pharmacologic stress for MPI. As noted above, Gould 1978 expressly suggests the use of other, more potent coronary vasodilators. TX 38 at 285; Tr. 664:15-18. Such a strong suggestion that any other more potent coronary vasodilator is likely to work is more than adequate to suggest that the known coronary vasodilator adenosine will work as a pharmacologic stress agent for MPI. *See Pfizer*, 480 F.3d at 1365 (finding that a prior art patent "contained a strong suggestion that any and all pharmaceutically-acceptable anions would form non-toxic acid addition salts and would work for their intended purpose . . . .").

Moreover, a person of skill in the art at the time would have known that adenosine was already working as a pharmacologic stress agent for MPI through the mechanism of action of dipyridamole infusion in the method described in Gould 1978 and Albro. *See* TX 93 at 285; Tr. 670:12-671:21; 687:11-688:2. Certainly, then, a person of skill in the art employing common sense would have reasonably expected that the direct infusion of adenosine would work for the same purpose. Indeed, the named inventors expected adenosine to work for MPI precisely for this reason. *See* Tr., 1864:12-1865:6; Tr. 2125:15-1216:15. Accordingly, as was the case in *Pfizer*, the reasonable expectation of success is "amply reflected" in the inventors' testimony. *See Pfizer*, 480 F.3d at 1364. While these facts alone would make the expectation of success

reasonable, there were even more teachings in the art to provide further guidance as to a range of adenosine doses that would likely succeed.

It was widely known in the art that adenosine was a potent vasodilator.  Tr. 705:19-706:4; *see also* Tr., 1858:5-12; Tr. 2131:4-8.  Moreover, the prior art disclosed a range of doses of adenosine that would cause vasodilation without causing hypotension or other severe side effects.  For example, based on Sollevi 1986, a person of skill in the art would have known that a dose of about 20-30 mcg/kg/min would cause vasodilation.  Tr. 704:22-705:15; TX 1171 at 335, 345.  Sollevi 1986 further teaches that a dose of 30-50 mcg/kg/min caused a doubling of graft flow, and a dose of 80 mcg/kg/min caused a near doubling of myocardial blood flow.  Tr. 702:21-703:14; 704:22-705:16; TX 1171 at 335.  A person of skill in the art would have expected, based on Sollevi 1986 alone, that doses beginning as low as 30 mcg/kg/min would likely be effective to cause vasodilation.  Tr. 704:22-705:15; *see also* 739:2-22.  The person of ordinary skill in the art would have also expected the upper range of useful doses for MPI to be around 200 mcg/kg/min because each of Sollevi 1984, Sollevi 1986 and Owall teach that continuous infusion of adenosine at levels greater than 200 mcg/kg/min result in hypotension. Tr. 695:6-16; 700:19-701:9; 723:3-7; TX 112, TX 1169, TX 1171.  Moreover, a person of skill in the art would be aware that an effective dose would also have to be tolerable in most conscious humans.  In light of the teachings of Biaggioni 1986, Conradson,  Fuller and/or Biaggioni 1987, a person of skill in the art would have expected that most conscious patients would be able to tolerate doses somewhere between 90 and 140 mcg/kg/min.  Tr. 719:3-18; 728:15-729:3; 731:1-12: 735:4-12; TX 220; TX 226; TX 1169; TX 1208.  Accordingly, a person of ordinary skill in the art would have expected that doses in the range of 20-200 mcg/kg/min, and more likely doses above 50 mcg/kg/min but less than 200 mcg/kg/min would be very likely

to work for MPI. Tr. 738:16-740:18. At a minimum, a person of ordinary skill would have had good reason to pursue the finite number of doses in the range between 20 mcg/kg/min and 200 mcg/kg/min and would have anticipated that a dose or doses of adenosine within this range would be effective to cause sufficient vasodilation for MPI.

Under these circumstances, arriving at any particular dose or range of doses is nothing more than routine and does not render any claim patentable. *See KSR*, slip op. at 17 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.") Even if the dose(s) were claimed to be optimal, which is not the case in the '877 patent, arriving at the dose would still have been obvious under the circumstances. *Pfizer*, 480 F.3d at 1368 ("discovery of an optimum value of a variable in a known process is usually obvious.")

      6.     *Differences Between The Claimed Invention Of The '877 Patent And The Prior Art*

There is a single difference between the Gould 1978 and Albro references and the claims of the '877 patent – substituting adenosine within the specified dosage ranges for dipyridamole. Everything else in the asserted claims of the '877 patent is disclosed in each of Gould 1978 and Albro. In particular, Gould 1978 and Albro disclose a method for detecting and assessing coronary artery disease. Tr. 663:10-20; 665:9-20; 667:15-22; TX 38, TX 93. Both disclose administering a pharmacologic stress agent by intravenous route, and administering enough of the stress agent to cause vasodilation. Tr. 663:10-20; 667:15-22; 668:18-669:1; TX 38; TX 93. Both disclose administering a radiopharmaceutical agent, specifically thallium-201, into the human. Tr. 667:15-22; TX 38; TX 93. Both references disclose performing MPI (scintigraphy)

to detect and assess the severity of coronary artery disease.  Tr. 664:23-665:2; 667:15-22; TX 38; TX 93.  Finally, Gould 1978 suggests use of other coronary vasodilators, while Albro expressly sets forth the relationship between dipyridamole coronary vasodilation and adenosine.  Tr. 664:13-18; 669:2-670:11; TX 38 at 285; TX 93 at 758-59.  The only remaining question is whether it would have been obvious to a person of ordinary skill in the art at the time to use adenosine directly, at the doses stated in the asserted claims of the '877 patent, in place of indirect use of adenosine through dipyridamole.  The clear and convincing answer is that it would have been obvious.

> 7.   *The Combination Of Either Gould 1978 Or Albro With Sollevi 1986 Renders The Asserted Claims Obvious*

Each of Gould 1978 and Albro discloses every element of the claims of the asserted claims of the '877 patent except the specific use of adenosine at the claimed dosages ranges. Moreover, both Gould 1978 and Albro disclose the use of dipyridamole as a pharmacologic stress agent with MPI.  A person of ordinary skill in the art at the time would have known that dipyridamole actually worked through increasing endogenous adenosine.  Tr. 680:17-22; 682:17-683:13; 684:12-685:6.  The person of skill in the art would have known that dipyridamole had a much longer duration than adenosine, and that the effects of adenosine infusion could be more readily controlled than could the effects of dipyridamole infusion.  Tr. 672:17-25; 673:17-674:11.  In particular, the person of ordinary skill in the art would have known that, because of its short duration, any side effects from adenosine infusion could be terminated almost immediately upon termination of the infusion.  Tr. 715:4-8; 742:2-18; TX 48 at 2233; TX 220 at 389; *see also* TX 52 at AST0009482 ("Because adenosine's effects last only seconds, if side effects should occur, they would be very transient.")  Accordingly, the person of skill in the art

would have had ample reason to substitute the direct acting agent, adenosine, for the indirect

acting agent, dipyridamole.

Sollevi 1986 teaches a range of doses of adenosine that can be safely, continuously

infused to humans.  Even at the low end of the range disclosed in Sollevi 1986, 20-50

mcg/kg/min, Sollevi 1986 states that "preferential myocardial vasodilation" is achieved.  TX

1171 at 345; *see also* TX 1171 at 335 (describing 100% graft flow increase at doses of 30-50

mcg/kg/min).  Sollevi 1986 further teaches that a dose of 80 mcg/kg/min caused a near doubling

of myocardial blood flow in one patient.  Tr. 702:21-704:11; TX 1171 at 335.  Sollevi also

provides a high end of the likely effective range of doses for MPI by disclosing that doses of

200-300 mcg/kg/min resulted in controlled hypotension, an undesirable effect when performing

MPI.  Tr. 702:7-20; TX 1171 at 333.  In light of the teachings of Sollevi 1986, a person of

ordinary skill in the art would have expected continuous infusion of adenosine within the range

of doses disclosed in Sollevi 1986 as sufficient to cause coronary vasodilation, but not sufficient

to cause hypotension, to be "very likely to work for myocardial perfusion imaging as a

vasodilator."  Tr. 708:10-709:20.  Specifically, in light of Sollevi 1986, a person of skill in the art

would have expected a dose in the range of 20 to 200 mcg/kg/min to work for MPI.  *See id.*; *see

also* TX 1171.  Moreover, in light of the teachings of Sollevi 1986, the specific dose of 140

mcg/kg/min as claimed in dependent claim 18 is one of the doses that would have been "very

likely to work."  Tr. 748:2-13.

In short, adenosine was known to be the active agent causing vasodilation in

dipyridamole stress MPI.  In addition, a range of doses of direct infusion of adenosine sufficient

to cause coronary vasodilation – a range that overlaps and includes the range claimed in the '877

patent – was also known in the art.  Accordingly, the asserted claims are obvious in light of

either Gould 1978 or Albro in combination with Sollevi 1986. *See Ormco*, 463 F.3d at 1311

("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption

of obviousness."); *Medichem*, 437 F.3d at 1167 (selecting a narrow range from within a

somewhat broader range disclosed in a prior art reference is no less obvious than identifying a

range that simply overlaps a disclosed range). Moreover, even if the claimed range of adenosine

doses sufficient to cause vasodilation without causing hypotension were not disclosed in the art,

the process of arriving at a useful value of a single variable is nothing more than routine and the

claims are obvious on that basis as well. *See KSR*, slip op. at 17; *Pfizer*, 480 F.3d at 1368.

        8.    *The Combination Of Either Gould 1978 Or Albro With Biaggioni 1986 Renders The Asserted Claims Obvious*

For the same reasons described above, a person of ordinary skill in the art would have

had reason to combine Biaggioni 1986 with either Gould 1978 or Albro to arrive at the subject

matter of the asserted claims.

Biaggioni 1986 discloses continuous intravenous infusion of adenosine to seven

conscious subjects at increasing rates at successive 15 minutes intervals. TX 48 at 2230. Two of

the seven subjects tolerated a dose of 100 mcg/kg/min, and the other five subjects tolerated a

dose of 140 mcg/kg/min for 15 minutes. Tr. 711:1-713:1; TX 48 at 2231. Biaggioni 1986 states

that the results show "that adenosine administered by infusion over a range of 60 to 140

µg/kg/min to healthy conscious human subjects, lowers diastolic blood pressure but raises heart

rate, [and] systolic blood pressure . . . ." TX 48 at 2234. These results are indicative of

significant vasodilation. Tr. 718:4-719:2. Moreover, the duration of infusion of adenosine in

Biaggioni 1986 lasted much longer than is necessary to carry out an MPI procedure, indicating

that the effect could be safely maintained for at least as long is necessary for MPI. Tr. 711:20-

712:13. Biaggioni 1986 teaches that doses from 60 to 140 mcg/kg/min cause vasodilation and

can be tolerated by conscious humans. Tr. 718:4-719:18; TX 48 at 2231. A person of skill in the art would have reason to use these known doses of adenosine infusion as the pharmacologic stress agent for MPI. *See, e.g.,* Tr. 670:12-671:12; 687:11-688:3. Accordingly, the asserted claims of the '877 patent are obvious in light of Gould 1978 or Albro in combination with Biaggioni 1986. *See KSR*, slip op. at 13-15; *Pfizer*, 480 F.3d at 1364-68.

> 9.    *Either Gould 1978 Or Albro In Light of The Knowledge In Art Concerning Adenosine Infusion Renders The Asserted Claims Obvious*

Also for the reasons discussed above, a person of ordinary skill in the art would have had reason to modify either Gould 1978 or Albro, in light of the knowledge in the art concerning continuous intravenous infusion of adenosine, to arrive at the subject matter of the asserted claims.

It was widely known prior to 1987 that adenosine was a potent vasodilator. Tr. 705:23-706:4. Moreover, by 1987 the art expressly taught that different doses of adenosine would result in different effects. For example, Sollevi 1986 states that preferential myocardial vasodilation can be induced at low doses of 20-50 mcg/kg/min. TX 1171 at 345; *see also* Tr. at 704:22-705:15. At the other end of the spectrum, each of Sollevi 1984, Sollevi 1986 and Owall teach that controlled hypotension can be induced at doses of 200 mcg/kg/min and above. TX 112, TX 1169; TX 1171; Tr. 695:6-16; 700:19-701:9; 723:3-7. Accordingly, a person of ordinary skill in the art would reasonably expect an effective dose to cause sufficient vasodilation for MPI, without inducing hypotension, to lie somewhere between 20 and 200 mcg/kg/min. Tr. 708:10-709:20; 738:16-740:18; TX 1171. A person of skill in the art, would have had "good reason" to pursue these options, which would have been well "within his or her technical grasp" and which, when tried, lead to the anticipated success. *See KSR* slip op. at 17.

Other references in the art provide still more guidance for a range of doses that was very likely to be effective for MPI. In particular, one must consider that MPI is performed in conscious patients. Accordingly, as previously discussed a dose must not only be effective but tolerable to someone who is conscious and able to complain of uncomfortable side effects. In Biaggioni 1986, each of the seven conscious subjects was able to tolerate a dose of 100 mcg/kg/min, and five of the seven tolerated 140 mcg/kg/min for 15 minutes. TX 48 at 2231. In Conradson, two subjects tolerated only 70 mcg/kg/min; three tolerated up to 90 mcg/kg/min, and three tolerated 100 mcg/kg/min for six minutes. TX 220 at 388. In Fuller, six subjects tolerated 100 mcg/kg/min, and although one of the six tolerated the 100 mcg/kg dose for only one minute, the other five tolerated it for 12 minutes and two of the six subjects tolerated a further increase to 200 mcg/kg/min for 1 and 2 minutes, respectively. TX 1208 at 311. In Biaggioni 1987, all eight subjects tolerated a dose of 140 mcg/kg/min for 15 minutes. TX 226 at 781, 784. Finally, the '296 patent states that the appropriate dose of adenosine for MPI "should lie in the range of 10 to 150 micrograms per kilogram per minute." The asserted claims of the '877 patent claim the use of adenosine, within these known dosages ranges, in a known technique. *See* DTX 3091; 3112. A person of ordinary skill in the art would have reasonably expected success using adenosine within these ranges for MPI. Tr. 747:10-750:22. The asserted claims are therefore obvious. *See Pfizer*, 480 F.3d at 1364-68; *see also KSR*, slip op. at 13-15.

10.    *No Secondary Factors Support Non-Obviousness*

To rebut defendants' *prima facie* case of obviousness, Plaintiffs have suggested a number of so-called secondary considerations of non-obviousness, including unexpected results, long-felt need, skepticism, and commercial success of its commercial Adenoscan® product. The scant evidence that Plaintiffs provided is hardly sufficient to overcome Defendants' *prima facie* case

29

of obviousness.  Indeed, the evidence actually contradicts most of Plaintiffs' purported secondary considerations.

Plaintiffs appear to suggest that the safety of adenosine infusion is a superior property that was unexpected.  To properly evaluate whether a particular property was unexpected, the Court must first consider what properties were expected.  *Pfizer*, 480 F.3d at 1371.  Adenosine's safety is a direct result of its short duration of action – a fact that was well known prior to 1987.  Tr. 675:19-21.  Far from being unexpected, a person of ordinary skill in 1987 would have used adenosine in place of dipyridamole precisely because that person would have known that adenosine's short duration of action would allow immediate relief from side effects upon termination of the infusion.  *See, e.g.,* Tr. 672:17-673:2; 673:17-674:11; 687:11-688:2.  Indeed, as Dr. Hilleman testified, it was generally known that a shorter-acting drug would be preferable to a longer-acting drug in terms of side effects.  Tr. 2138:19-2139:7.

Plaintiffs also appear to suggest that there was a long-felt need for another pharmacologic stress agent in 1987.  Again, the evidence is to the contrary.  The first pharmacologic stress for MPI in humans was described in Gould 1978.  TX 38; Tr. 665:9-20.  Plaintiffs' expert, Dr. Wackers, testified that there was no particular need for pharmacologic stress MPI around that time.  Tr. 1000:8-1001:4; 1002:7-9.  Instead, the primary interest in the field in the late 1970s was a focus on thallium as an imaging agent, not on the use of pharmacologic stress agents.  Tr. 1000:8-13.  In fact, interest in pharmacologic stress MPI did not become widespread until at least 1985 after the publication of an article by Boucher.  Tr. 997:10-14.

Plaintiffs further assert that there was teaching away or skepticism in the art.  In an attempt to support this position, Plaintiffs look first to references that were published prior to the body of art that demonstrated safe, continuous intravenous infusion of adenosine to humans.

*See, e.g.,* Tr. 914:2-8; 1004:20-1005:6.  The earlier references, which involved much larger doses and/or bolus injections, would not have discouraged a person of skill in the art from using continuous adenosine infusion for MPI in 1987.  Tr. at 759:6-761:13.  Moreover, even if some of the teachings in the art could be construed as "teaching away," or supporting Plaintiffs' assertions of skepticism – which Sicor does not concede – Plaintiffs cannot pick and choose just those teachings and statements.  Rather, "the prior art must be considered *as a whole* for what it teaches."  *Medichem*, 437 F.3d at 1166 (emphasis in original).  Considered as a whole, the prior art shows that, far from being discouraged from using adenosine, investigators were continuously infusing adenosine to patients and healthy subjects at varying rates to study various effects, including cardiovascular effects.  *See, e.g.,* TX 48; TX 112; TX 220; TX 226; TX 1171; TX 1208.

In an attempt to support "skepticism," Plaintiffs also rely on after-the-fact articles that are not prior art.  Particularly telling is Plaintiffs' reliance on a 1995 reference in which Dr. Mario Verani speculated as to why adenosine usage evolved as it did.  Tr. 953:17-24; 954:13-17.  This *ex post facto* article is not persuasive when placed in context.  In 1987, Dr. Verani himself was not at all dissuaded from using adenosine for MPI.  Rather, he thought that, given "present knowledge" of adenosine by December 1987, the benefits from investigating adenosine for MPI "clearly outweigh the unlikely possibilities of side effects or complications."  Tr. 1023:6-7; 1024:24-1025:11.

Finally, Plaintiffs have failed to demonstrate the required nexus between the '877 patent claimed invention and the alleged commercial success of their Adenoscan® product.  *See Ormco*, 463 F.3d at 1311-12 ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.")

The sales levels achieved by Adenoscan® are explained, not by any perceived superiority of the claimed invention, but by the interplay of four economic factors:

> (a) There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

> (b) Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

> (c) Extensive marketing and promotion of Adenoscan® by Fujisawa; and

> (d) Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

Tr. 1579:3-1582:13; DTX 3133.

When Adenoscan® entered the market in August 1995, its only real competition was dipyridamole, marketed by DuPont as Persantine®. Tr. 1577:10-16, 1580:4-7; Tr. 1577:13-16; Tr. 1307:14-16; DTX 3133. The small number of products made the pharmacological stressor market unique as compared to most pharmaceutical markets, which generally have many competitors engaged in promotional activity. Tr. 1580:4-6. Thus, the pharmacological stressor market was an ideal market for a new entrant such as Fujisawa, seeking to achieve sales. Tr. 1602:11-1603:4.

The market situation rapidly improved for Fujisawa and Adenoscan.®. Shortly after its entry Adenoscan® became the *only promoted product* in the pharmacological stress testing market. Tr. 1580:14-21; DTX 3133. In anticipation of the 1997 expiration of the patent on Persantine®, DuPont launched an authorized generic product in November 1996 in an advance attempt to capture generic dipyridamole sales. Tr. 1603:17-21. DuPont ceased its promotion of Persantine® when generic dipyridamole entered the market because it was no longer in its economic interest promote the branded product. Tr. 1603:21-1604:2; 1580:16-1581:7, 1603:14-16; 1307:17-1308:5. Adenoscan® found itself in the fortunate situation of being the only product

32

advertising itself to the prescribers of pharmacological stress tests. Tr. 1604:7-11. This advantage has continued to the present day. Tr. 1604:12-22; 1308:1-11.

Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture the pharmacological stressor market. Tr. 1620:12-20; Tr. 1263:1-10, 1283:7-14. Fujisawa's traditional marketing activities included, *e.g.*, detailing, or the visiting of doctors by pharmaceutical sales representatives; advertising; and sampling. Tr. 1605:13-1606:14, 1610:19-20; 1263:1-10. Despite the concentration of the pharmacological stress test market, Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the Adenoscan® product. Tr. 1609:20-22. The sales force employed by Fujisawa (86 sales representatives) was <u>twice</u> the size of the sales force DuPont had dedicated to the detailing of Persantine® to the same set of institutions and service providers (42 sales representatives). Tr. 1609:4-1610:3; Tr. 1294:22-25, 1303:22-1305:17; TX 1226 at AST0065741; TX 1242 at AST0185350.

Apart from Fujisawa's marketing efforts, the sales of Adenoscan® benefited from the growth in demand for pharmacological stress testing unrelated to the asserted inventions. Tr. 1581:19-20; DTX 3133. In the late 1990s and early 2000s, demographic changes, among them the increased aging of the American population and the rise in American obesity, stimulated a growing concern about cardiovascular disease and sparked changes in diagnostic and treatment guidelines with respect to cardiovascular disease. Tr. 1581:21-1582:4. Combined with increased efforts to expand the target population for stress tests, e.g., by seeking to include more women and minorities and to use the test more than before, these social and demographic factors fueled a growth in demand for pharmacological stress agents that has been very fortuitous for

sales of Adenoscan®.  Tr. 1582:5-8.  In short, commercial sales levels of Plaintiffs' Adenoscan®

product have been due to sales, promotion and other economic factors.

Finally, even if the commercial sales of Plaintiffs' product were not a product of

promotion and market forces, commercial success is not sufficient to overcome the strong case

of obviousness here.  *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 769 (Fed. Cir.

1989) ("[A]lthough the record shows a highly successful product, the record also establishes

such a strong case of obviousness . . . that the objective evidence of nonobviousness does not

persuade us to reach a contrary conclusion.")

### B.    The Asserted Claims Are Invalid As Anticipated Under 35 U.S.C. § 102

#### 1.    *The Law Of Anticipation*

A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every limitation of

the claim was contained, either expressly or inherently, in a single prior art reference.  *See* 35

U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374

(Fed. Cir. 2001).

To anticipate, a prior art reference "must also be enabling, such that one of ordinary skill

in the art could practice the invention without undue experimentation."  *Novo Nordisk Pharma,*

*Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).  Disclosures in a prior

art patent, such as the '296 patent, are presumed to be enabled.  *Amgen Inc. v. Hoechst Marion*

*Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) ("[A] presumption arises that both the

claimed and unclaimed disclosures in a prior art patent are enabled.").  A patentee bears the

burden of proving non-enablement of an asserted prior art patent.  *Id.*

2.      *The Asserted Claims Are Invalid In Light Of The '296 Patent*

a.      The Asserted Claims Are Anticipated By The '296 Patent

As described in detail above, the asserted claims describe the continuous intravenous infusion of sufficient adenosine to cause vasodilation, the injection of a radiopharmaceutical (more specifically thallium 201), and performing MPI (or more generally scintigraphy) to detect the presence and assess the severity of coronary artery disease.

Example XIII of the '296 patent discloses every element of the asserted claims. Specifically, example XIII of the '296 patent describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease.  TX 275, col. 21, ll. 29-61; Tr. 751:11-753:11.  Example XII further discloses that, while the dose of adenosine should be titrated individually, it should lie in the range of 10 to 150 mcg/kg/min.  TX 275, col. 21, ll. 59-61.  The range of 10 to 150 mcg/kg/min substantially overlaps with, and is narrower than, the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43.  The "species" of 10 to 150 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min.  *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) ("[A]n earlier species reference anticipates a later genus claim"). Moreover, "a very small genus can be a disclosure of each species within the genus."  *Id.*  Here, the '296 patent states that the dose should be titrated individually, effectively disclosing each dose within the range of 10 to 150 mcg/kg/min.  Because the claimed dose of 140 mcg/kg/min is within the disclosed range of 10 to 150 mcg/kg/min, it too is anticipated.

As a prior art patent disclosure, the '296 patent is presumed to be enabled.  *See Amgen*, 314 F.3d at 1355.

b.    The Asserted Claims Are Obvious In Light Of The '296 Patent

If the Court determines that Example XIII does not anticipate the asserted claims of the '877 patent, at a minimum it renders those claims obvious. Example XIII of the '296 patent expressly instructs that adenosine can be substituted for dipyridamole as the pharmacologic stress agent for MPI. TX 275. It discloses every element of the asserted claims of the '877 patent, including a dosage range that substantially overlaps the range of 20 to 200 mcg/kg/min and encompasses the specific dose of 140 mcg/kg/min. The asserted claims are therefore obvious in light of Example XIII alone. *See Ormco*, 463 F.3d at 1311 ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *Medichem*, 437 F.3d at 1168 ("Selecting a narrow range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range.") (citation omitted).

3.    *Claims 23(17) And 43 Are Anticipated And/Or Rendered Obvious By The Karolinska Request*

The Karolinska Request discloses every element of claim 23 as read through claim 17 and claim 43 of the '877 patent. Like Example XIII of the '296 patent, the Karolinska Request describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease. TX 1193 at SIC10942. The Karolinska Request further discloses a dose of 60 mcg/kg/min of adenosine, continuously infused. TX 1193 at 10944; Tr. at 755:6-20. The dose of 60 mcg/kg/min is narrower than and within the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43. The "species" of 60 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min. *See Atofina*, 441 F.3d at 999.

36

At a minimum, the Karolinska Request renders claims 23(17) and 43 of the '877 patent obvious. *See Ormco*, 463 F.3d at 1311; *Medichem*, 437 F.3d at 1168.

### C.    Plaintiffs Address The Wrong Questions And/Or Apply The Wrong Standards

Plaintiffs have raised a number of points in an effort to convince this Court that no practicing physician with the appropriate training in cardiology and nuclear medicine would have ever thought of using adenosine in place of dipyridamole, despite the extensive teachings in the art that would suggest doing just that. Sicor anticipates responding to Plaintiffs' specific argument in the second round of post-trial briefing. However, certain of Plaintiffs' themes warrant at least brief mention here.

Among other things, Plaintiffs have focused on the fact that actual physicians who served as experts in this case did not specifically describe the use of adenosine with MPI prior to 1987. However, whether these particular experts in the field described, or even thought of, the claimed invention is irrelevant. The "fundamental issue is whether the ***hypothetical*** person of ordinary skill in the art, when confronted with the problem . . . would have been motivated" to make the connection. *Sibia Neurosciences, Inc. v. Cadmus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) (emphasis added). The clear and convincing evidence is that a person of ordinary skill in the art would have been so motivated and would have made the obvious connection.

In addition, Dr. Wackers, the only expert on whom Plaintiffs relied in response to Dr. Strauss's opinion of obviousness, did not engage in the appropriate inquiry. The caselaw is clear that obviousness must be determined from the point of view of a hypothetical person of ordinary skill in the art, and the hypothetical person is presumed to have access to all relevant art. *See Rouffet*, 149 F.3d at 1357. Dr. Wackers, however, does not "deal with hypothetical persons" and thinks the appropriate legal standard "sounds not very reasonable." Tr. 989:7-12; 988:24-989:6.

37

Moreover, although Dr. Wackers testified that he considered all of the prior art references on which Dr. Strauss relied, it is clear that Dr. Wackers did not view all such references as though they would have been available to the person of ordinary skill in the art. Among other things, Dr. Wackers' testified that his person of ordinary skill would not have been aware of anything published in a "second-rate" journals or anything published outside of the United States. Tr. 992:12-15; Tr. 993:21-994:2. In short, Plaintiffs' expert testimony fails even to challenge Sicor's clear and convincing evidence of invalidity.

It also appears that Plaintiffs are trying to avoid obviousness by improperly importing additional elements into the claims. Plaintiffs questioned Dr. Strauss as to whether person of skill in the art at the relevant time would have known that 140 mcg/kg/min would cause "maximal" coronary vasodilatation. *See, e.g.,* Tr 843:23-844:18. There are several critical errors with this line of thought. First, none of the asserted claims require "maximal" vasodilatation or an "optimal" dose. TX 320; Tr. 1032:24-1033:24. Rather, the asserted claims require nothing more than that there be enough adenosine "to provide coronary artery dilation." TX 320, col. 8, ll. 58-59; col. 11, ll. 3-4. Whether any particular dose is "optimal" or provides "maximal" vasodilation is simply irrelevant to the obviousness analysis here. *See In re Huang*, 100 F.3d 135, 138 (Fed. Cir. 1996) ("[O]ur obviousness analysis focuses on the invention *as claimed*.") (emphasis in original); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.* 239 F.3d 1343, 1360 (Fed. Cir. 2001).

Second, Plaintiffs' questions reveal that Plaintiffs have applied the wrong standard for obviousness. For obviousness, it is not necessary that a person of skill in the art would **know** a result would occur, but that the person of ordinary skill has a "reasonable expectation" of

success.  *Pfizer*, 480 F.3d at 1364 ("[O]nly a reasonable expectation of success, not a guarantee, is needed.")

Third, the evidence does not support Plaintiffs' irrelevant assertion that 140 mcg/kg/min is an optimal dose.  Dr. Wackers conceded that the named inventors' first uses of adenosine in patients showed that doses from 60-120 mcg/kg/min also worked.  Tr. 1017:14-21; 1018:2-17; *see also* TX 296.  In fact, the inventors infused 140 mcg/kg/min in only two of the first 15 patients to whom they administered adenosine for MPI.  TX 296 at AST0004357.  Plaintiffs' attempt to rely on a study by Dr. Robert F. Wilson to support their "optimal" dose theory, but Dr. Wilson is not an inventor on the '877 patent, and the named inventors neither identified a dose that produced maximized blood flow (Tr. 1901:15-22) nor claimed any such dose.  TX 320. Finally, even if there were evidence that 140 mcg/kg/min is an optimal dose, and even if the unclaimed limitation of "optimal" were somehow relevant, mere optimization of a dose within an obvious range of doses is not inventive, but rather common practice in science and therefore is obvious.  *See Pfizer*, 480 F.3d at 1368.

Plaintiffs have repeatedly argued that the idea of using adenosine in place of dipyridamole is obvious only when the inquiry is tainted by impermissible hindsight.  That argument does not withstand scrutiny in view of the evidence of the scope and content of the prior art.  As discussed in detail above, the prior art is replete with information that suggests that continuous infusion of direct-acting adenosine could be used in place of dipyridamole for MPI.

Plaintiffs, not Sicor, repeatedly resort to hindsight.  Beginning with their description of MPI, for which they relied on publications – such as a 2003 edition of a publication by Dr. Wackers – which do not reflect the state of the art in 1987 or 1988 (Tr. 986:9-23), Plaintiffs used information that was only available after the fact to attempt to support non-obviousness of the

claimed invention. As another example, Plaintiffs rely on comments in a 1995 article by Dr. Verani in an attempt to support the argument that there was skepticism prior to 1987 (*see* Tr., 1021:20-24), but ignore Dr. Verani's comments from 1987 about the likely benefits and safety of replacing dipyridamole with adenosine for MPI. Tr. 1022:21-1025:11; TX 52 at AST0009464-68.

Finally, Plaintiffs have tried to suggest that the lack of availability of pharmaceutical grade adenosine – adenosine that is purified such that it can be administered to humans – is an unimportant factor. Yet named inventor Dr. Hilleman told Medco in September 1987 that his group "would obviously like to ask for intravenous adenosine supplies to meet our needs to complete these studies." TX 1194. Why was this request obvious? Because "that would be the only way [the named inventors] would have access to the drug" as Medco was the only source of pharmaceutical grade adenosine at the time. Tr. 1854:22-1855:16; *see also* Tr., 2119:13-2120:10. Indeed, obtaining adenosine in pharmaceutical grade was sufficiently valuable that it was the *only* consideration either named inventor received for assigning all rights to the '877 patent to Medco. Tr. 1896:9-18; 1897:9-14; 2148:5-23.[11]

### D.     Evidentiary Issues

In light of certain objections made at trial, Sicor expects Plaintiffs to object to Dr. Strauss's testimony concerning the Sollevi 1986 reference.[12] There is no basis for any such objection. The Sollevi 1986 reference was cited and discussed in Dr. Strauss's initial expert report as one of the references on which Dr. Strauss relied in forming his opinion that the claims

---

[11]    In addition Dr. Verani stated in a 1987 document that was included in Plaintiffs' Investigational New Drug Application that "[r]ecently, adenosine has become available for intravenous administration." TX52 at AST009465; Tr. 1023:22-1024:4.

[12]    Plaintiffs' objection appears to be that, although Dr. Strauss cited and expressly relied on Sollevi 1986 in support of his opinions, one of the particular pages of the articles that he discussed at trial was not expressly referenced in the report as a basis for his opinion.

of the '877 patent are obvious. TX 246 at ¶¶ 32, 51, 56-57, 63, 65. In fact, Plaintiffs identified Sollevi 1986 as one of the references on which Sicor relies in Plaintiffs' own pre-trial disclosure of issues to be litigated. *See* D.I. 133, Exhibit 2 (Plaintiffs' Statement of Issues of Fact that Remain to be Litigated) at 2-3. At trial, Dr. Strauss merely elaborated on how the disclosures in Sollevi 1986 supported the same opinion that he had expressed in his expert report – that the claims were obvious to a person of skill in the art in light of Sollevi 1986 in combination Gould 1978 or Albro. This opinion was adequately disclosed, and there is no basis for its exclusion. *See Forest Labs., Inc. v Ivax Pharm., Inc.*, 237 F.R.D. 106, 113 (D. Del. 2006) (allowing expert testimony that was a "permissible elaboration on the opinions set out in the expert report").

Sicor expects that additional evidentiary issues may be raised by Plaintiffs' opening pre-trial briefs, and Sicor will respond to any such issues as appropriate.

## IV.    <u>CONCLUSION</u>

The '877 patent claims nothing more than substituting a direct acting drug – adenosine – for a drug known to act indirectly through adenosine. Plaintiffs made this substitution at a time when pharmaceutical grade adenosine was available to them, and after several other researchers had shown that adenosine could be safely infused to conscious humans for extended periods of time – periods far longer than what would be needed to conduct an MPI test. Moreover, Plaintiffs did not conceive of their own claimed dosage range until after another patent application disclosing the very same procedure had been filed with the United States Patent Office. Accordingly, claims 23(17), 23(18) and 43 of the '877 are invalid as both obvious and anticipated.

Respectfully submitted,

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
   STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated:  May 9, 2007

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on May 9, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Paul Crawford, Esquire
Connolly Bove Lodge & Hutz
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207

Richard K. Herrmann, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306

I further certify that on May 9, 2007, I caused copies of the foregoing document to be served by hand on the above-listed counsel and on the following in the manner indicated:

### BY E-MAIL ON MAY 9, 2007 AND FEDERAL EXPRESS ON MAY 10, 2007

Charles E. Lipsey, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675

Susan H. Griffen, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

Brian M. Poissant, Esquire
Jones Day
222 East 41st Street
New York, NY 10017

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*