**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KING PHARMACEUTICALS RESEARCH AND | ) | |
| DEVELOPMENT, INC., ASTELLAS U.S. LLC, and | ) | |
| ASTELLAS PHARMA US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-0337-SLR |
| v. | ) | |
| | ) | |
| SICOR INC. and | ) | |
| SICOR PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPENING POST-TRIAL BRIEF:
U.S. PATENT NO. 5,077,877**

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C. 20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research*
*and Development, Inc.*

## TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     STATEMENT OF THE CASE.........................................................................4

III.    FACTUAL BACKGROUND ...........................................................................4

        A.      Diagnosis of Coronary Artery Disease with Myocardial Perfusion
                Imaging .................................................................................................4

        B.      The Asserted Claims of the '877 Patent:  Use of Adenosine in MPI .....................5

        C.      The Prior Art Taught Away from Use of Adenosine in Patients with
                Heart Disease ........................................................................................6

        D.      The Prior Art Taught Away from Use of Adenosine as a
                Pharmacologic Stress Agent ................................................................8

        E.      The Actual Uses of Adenosine in Humans in the Early and Mid-1980s
                Would Have Discouraged Its Use for MPI ........................................12

                1.      Limited Use of Bolus Doses of Adenosine to Treat
                        Arrhythmias ............................................................................12

                2.      Dr. Sollevi's Studies in Surgical Patients ..............................12

                3.      Conflicting Results of Adenosine Studies in Normal
                        Volunteers ...............................................................................14

        F.      Prior to the Invention of the '877 Patent, Nobody in the MPI Medical
                Community Even Mentioned the Possibility of Human Use of
                Adenosine ...........................................................................................15

        G.      The Medical Community Greeted the Invention of the '877 Patent with
                Skepticism and Concern .....................................................................16

        H.      Adenosine Is Preferred as a Pharmacologic Stress Agent Because of Its
                Superior Safety and Speed .................................................................18

        I.      Adenoscan Is a Highly Successful Commercial Product.....................18

IV.     VALIDITY OF THE '877 PATENT ..............................................................20

        A.      Sicor Bears the Burden of Proving Invalidity by Clear and Convincing
                Evidence..............................................................................................20

B.    The Asserted Claims Are Not Invalid for Obviousness..........................................20

    1.    The Law of Obviousness and the Supreme Court's Decision in
*KSR* ...........................................................................................................21

    2.    The Qualifications of the Person of Ordinary Skill in the Art ..................23

    3.    The Scope and Content of the Prior Art.....................................................23

    4.    Differences Between the Claimed Invention and the Prior Art ................23

    5.    The Use of Adenosine in Human MPI Was Not Obvious .........................24

    6.    The Objective Evidence Further Establishes the
Nonobviousness of the Asserted Claims....................................................30

C.    Sicor Failed to Prove the Asserted Claims Are Invalid Based on Dr.
Sollevi's MPI Proposals...........................................................................................34

    1.    Even If They Were Prior Art, Neither Example XIII Nor the
Karolinska Request Anticipates Claim 23(18) of the '877
Patent.........................................................................................................34

    2.    Even If They Were Prior Art, Neither Example XIII Nor the
Karolinska Request Renders Obvious the 140 mcg/kg/min
Dose of Claim 23(18)................................................................................35

    3.    Neither Example XIII Nor the Karolinska Request Are Prior
Art and Thus Cannot Anticipate or Render Obvious the
Asserted Claims .........................................................................................36

V.    EVIDENTIARY OBJECTIONS ........................................................................................40

VI.    CONCLUSION...................................................................................................................41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. U.S.*,
330 F.2d 622 (Ct. Cl. 1964) ................................................................ 20-21

*Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*,
745 F.2d 1 (Fed. Cir. 1984) ................................................................ 22-23

*Atofina v. Great Lakes Chem. Corp.*,
441 F.3d 991 (Fed. Cir. 2006) ................................................................ 35

*Bruckelmyer v. Ground Heaters, Inc.*,
453 F.3d 1352 (Fed. Cir. 2006) ................................................................ 39

*Burlington Indus., Inc. v. Quigg*,
229 U.S.P.Q. 916 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987) ................ 30

*Coalition to Save Our Children v. State Bd. of Educ.*,
90 F.3d 752 (3d Cir. 1996) ................................................................ 40

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989) ................................................................ 39

*In re Dillon*,
919 F.2d 688 (Fed. Cir. 1990) ................................................................ 34

*Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*,
713 F.2d 693 (Fed. Cir. 1983) ................................................................ 30

*Forest Labs., Inc. v. Ivax Pharm., Inc.*,
438 F. Supp. 2d 479 (D. Del. 2006) ................................................ 22, 32, 33

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
365 F.3d 1054 (Fed. Cir. 2004) ................................................................ 20

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ................................................................ 21, 22

*Hobbs v. Beach*,
180 U.S. 383 (1901) ................................................................ 32

*IMX, Inc. v. Lendingtree, LLC*,
No. 03-1067-SLR, 2006 WL 47066 (D. Del. Jan. 10, 2006) ............................ 36

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985)................................................................27, 31

*KSR International Co. v. Teleflex Inc.*,
    No. 04-1350 (Apr. 30, 2007) ..........................................................21, 22, 27

*Ex parte Levengood*,
    28 U.S.P.Q.2d 1300 (Bd. Pat. App. & Int. 1993) .................................22

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
    730 F.2d 1452 (Fed. Cir. 1984)..............................................................22

*Norian Corp. v. Stryker Corp.*,
    363 F.3d 1321 (Fed. Cir. 2004)........................................................36, 39

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000)........................................22, 23, 30, 33

*In re Spiller*,
    500 F.2d 1170 (C.C.P.A. 1974) ........................................................38, 39

*In re Stempel*,
    241 F.2d 755 (C.C.P.A. 1957) .............................................................38

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983)........................................................22, 32

*In re Stryker*,
    435 F.2d 1340 (C.C.P.A. 1971) ......................................................38, 39

*TP Labs., Inc. v. Prof'l Positioners, Inc.*,
    724 F.2d 965 (Fed. Cir. 1984)..............................................................20

*Tec Air, Inc. v. Denso Manufacturing Mich. Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999)............................................................33

*Typeright Keyboard  Corp. v. Microsoft Corp.*,
    374 F.3d 1151 (Fed. Cir. 2004)....................................................... 36-37

*U.S. v. Adams*,
    383 U.S. 39 (1966)........................................................................22, 30

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*,
    208 F.3d 989 (Fed. Cir. 2000)..............................................................34

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
   837 F.2d 1044 (Fed. Cir. 1988)...................................................................21, 22

*Waldemar Link GmbH & Co. v. Osteonics Corp.*,
   32 F.3d 556 (Fed. Cir. 1994)..............................................................................37

## FEDERAL STATUTES

35 U.S.C. § 102.................................................................................3, 34, 37, 39

35 U.S.C. § 103...........................................................................................................21

35 U.S.C. § 112, ¶ 5.....................................................................................................5

35 U.S.C. § 282...........................................................................................................20

Fed. R. Civ. P., Rule 26(a)(2)(B)................................................................................40

Fed., R. Civ. P., Rule 37(c)(1) ...................................................................................40

## I.     INTRODUCTION

The asserted claims of U.S. Patent No. 5,077,877 (the '877 patent) are directed to the use of adenosine as a pharmacologic stress agent to induce significantly increased coronary blood flow during a diagnostic imaging technique known as "myocardial perfusion imaging" (MPI). The technique is used in patients with known or suspected coronary artery disease to diagnose or assess the severity of that disease.

At the time of the development of the MPI technique in the 1970s, the vasodilatory properties of adenosine were well known, but adenosine was passed over as a pharmacologic stress agent for human use.  The literature reflects that adenosine's short half-life (less than 10 seconds), its propensity to interfere with electrical signals in the heart (so-called AV block), and its propensity to cause significant drops in blood pressure that can lead to "ischemia" (deprivation of blood flow) in portions of the heart served by diseased arteries dissuaded investigators from proposing use of adenosine as a coronary vasodilator in human patients with known or suspected heart disease.

For use in human MPI, the art turned instead to adenosine analogs, like "ethyl adenosine," thought to avoid the negative properties of adenosine itself, or to different chemicals altogether.  By 1978, the field had adopted "dipyridamole" as the standard pharmacologic stress agent.  Unlike adenosine, dypridamole had a much longer duration of action, was thought to slowly raise endogenous adenosine levels by preventing the breakdown of adenosine, was thought not to significantly affect blood pressure, and had been used safely in a large number of heart patients.

The '877 patent inventors were the first to conceive of and the first to conduct testing in actual human patients to answer the question of whether diagnostically reliable MPI images could be obtained at an adenosine dose that could be tolerated by the older, less mobile, and

more infirm heart patient population for which pharmacologic stress testing was indicated. They determined in their experiments that useable adenosine infusion rates did exist and that an infusion rate of 140 mcg/kg/min gave diagnostically reliable images with tolerable side effects.

The invention of the '877 patent has been commercialized by plaintiffs Astellas U.S. LLC and Astellas Pharma US, Inc. (Astellas) and their predecessors as Adenoscan® — adenosine for use in conjunction with MPI at an infusion rate of 140 mcg/kg/min.[1] Upon commercial introduction of Adenoscan, cardiologists of ordinary skill initially resisted using the product due to continuing concerns about the ability of adenosine to induce heart block. As the invention of the '877 patent came to be adopted and used, however, it became clear that adenosine is in fact safer, faster, and easier to use than dipyridamole. As a result of its technical superiority, Adenoscan is now preferred over dipyridamole by a ratio of nearly 2 to 1 even though Adenoscan is 7 to 10 times more expensive than generic dipyridamole.

From the foregoing, it is clear that the subject matter of the asserted claims of the '877 patent has all the hallmarks of a nonobvious invention. The prior art affirmatively discouraged use of adenosine in patients with suspected coronary artery disease. Despite knowledge of adenosine, its properties, and the MPI technique, the field failed to develop the invention for a decade. The invention was met with initial skepticism but came to replace the prior art (dipyridamole) as the pharmacologic stress agent of choice because of its technical superiority.

This record reflects that only two scientific groups were considering the possible use of adenosine in MPI during the fall of 1987 — the inventors of the '877 patent and Dr. Alf Sollevi. Dr. Sollevi, who is one of the world's leading experts on adenosine, filed a patent application on December 28, 1987, in which he proposed use of adenosine in lieu of dipyridamole in MPI. He

---

[1] Adenoscan® (hereinafter "Adenoscan") is a registered trademark of Astellas.

proposed to determine an effective dose by a titration experiment.  The inventors of the '877

patent, however, had already submitted their protocols to conduct adenosine titration

experiments to the U.S. Food and Drug Administration (FDA) on December 9, 1987.

　　　While Dr. Sollevi did not follow through with his proposal, the inventors of the '877

patent did.  They proceeded diligently to conduct those titration experiments, in which they

discovered that the dose of 140 mcg/kg/min, though often uncomfortable, both yielded

diagnostically reliable images and could be tolerated by patients with coronary artery disease.

Because the inventors of the '877 patent were the first to conceive of the idea of doing these

experiments and proceeded diligently to demonstrate that the technique was operable for its

intended purpose, the idea described in the December 28, 1987, Sollevi patent application is

simply not "prior art" in this case.  The associated "Karolinska Request" (Dr. Sollevi's request to

do such an experiment) is not prior art because it reflects acts outside the United States that do

not qualify as a "printed publication" under 35 U.S.C. § 102(a).  Even if they were prior art, they

do not disclose or suggest the 140 mcg/kg/min dose specified in asserted claim 23(18).  That

dose and its ability to provide diagnostically reliable MPI images could only be ascertained by

actual testing in human heart patients.

　　　The following discussion of the issues to be resolved in this case will focus first on

Sicor's obviousness allegations based on publications that qualify as prior art (§ IV.B.), followed

by analysis of the Sollevi proposals, which are not prior art (§ IV.C.).  The detailed factual and

legal support for plaintiffs' contentions is compiled in Plaintiffs' Proposed Findings of Fact and

Conclusions of Law filed concurrently herewith.  Reference herein to those findings and

conclusions will be to "PFF ___" and "PCL __," respectively.

## II.    STATEMENT OF THE CASE

This suit was spurred by the filing on behalf of Sicor Inc. and Sicor Pharmaceuticals, Inc. (Sicor) of an abbreviated new drug application (ANDA) with the FDA for approval to market a generic copy of Astellas's branded drug, Adenoscan.  (D.I. 1 ¶¶ 24-26, 28-29; TX-4; TX-7.) Adenoscan is an adenosine solution administered to patients undergoing cardiac stress tests who are unable to exercise adequately on a treadmill.  (D.I. 133, Ex. 1, ¶ 12; TX-75.)  Astellas manufactures and sells Adenoscan in the United States pursuant to an exclusive license from plaintiff King Pharmaceuticals Research and Development, Inc. (King) under the '877 patent.[2] (D.I. 133, Ex. 1, ¶ 10-12.)  Infringement is conceded.  (D.I. 137 ¶ 2.)  Sicor's challenge to the validity of the asserted claims of the '877 patent was tried to the Court beginning on February 20, 2007.

## III.    FACTUAL BACKGROUND

### A.    Diagnosis of Coronary Artery Disease with Myocardial Perfusion Imaging

The evidence describing the basic MPI technique is assembled at PFF 15-21.  Briefly, typical MPI diagnostic protocols pair exercise (usually walking on a treadmill) with injection of a radioactive tracer that allows physicians to take a picture of blood flow in the heart and evaluate the presence and severity of coronary artery disease or other heart dysfunction. (TX-138 at 298-300; Wackers 883:9-886:7; DTX-2003; DTX-2023.)  The objective is to cause dilation of the coronary arteries, whereby restricted blood flow in diseased arteries can be visualized.  (Wackers 901:2-22; DTX-2018.)  Forty to fifty percent (40-50%) of patients referred for stress testing, however, are unable to perform adequate physical exercise.  (TX-138 at 300;

---

[2] Astellas is also exclusive licensee of rights under U.S. Patent No. 5,731,296 (the '296 patent), which is owned by Item Development AB (Item) and also covers use of Adenoscan. Item and Astellas also filed suit against Sicor on the '296 patent in the parallel action copending in this Court.  (*See* CV No. 05-0336-SLR.)

Wackers 886:8-887:11.)  These patients are usually older and manifest a variety of risk factors for heart disease.  (Wackers 887:25-888:11.)  Nearly half have known coronary artery disease, and one-quarter have already had a myocardial infarction (heart attack).  (TX-103 at 386; Strauss 834:3-836:1.)

For such patients, pharmacologic stress testing is a way to increase blood flow in the coronary arteries to allow diagnostically reliable imaging without the need for exercise. (Wackers 889:7-891:12; DTX-2022.)  The administered stress agent dilates the coronary resistance vessels (small arteries) causing a significantly increased blood flow of 3 to 5 times (300% to 500%) in the case of adenosine.  (Wackers 890:15-891:12.)

### B.    The Asserted Claims of the '877 Patent:  Use of Adenosine in MPI

The three claims asserted in this litigation, claims 23(17), 23(18), and 43, concern use of adenosine as the pharmacologic stress agent in MPI.  (*See* TX-320.)  Claim 23 is a multiple dependent claim dependent on any one of claims 17, 18, or 19.  (TX-320, col. 9, ll. 34-35.)  It is legally equivalent to three individual dependent claims, one dependent on claim 17, one dependent on claim 18, and one dependent on claim 19.  Consequently, claim 23 must be read with respect to the particular claim in relationship to which it is being considered.[3]  "Claim 23(18)," for example, refers to claim 23, as it depends from claim 18, and is read to narrow the terms set forth in claim 18 (which itself is a dependent claim based on claim 17) as follows:

---

[3] "A multiple dependent claim shall be construed to incorporate by reference the limitations of the particular claim in relation to which it is being considered."  35 U.S.C. § 112, ¶ 5 (2000); M.P.E.P. § 608.01(n) 600-86 (explaining that multiple dependent claims "must be considered in the same manner as a plurality of single dependent claims"); H.R. Rep. No. 94-592, at 1241 (1975) ("A multiple dependent claim, as such, does not contain all the limitations of all the claims to which it refers, but rather, contains at any one time only those limitations of the particular claim under consideration.").

**23(18).** A method of detecting the presence and assessing the severity of coronary artery disease in a human comprising the steps of:

(a) administering by an intravenous route to said human about **140 mcg/kg/minute** of **adenosine** sufficient to provide coronary artery dilation

(b) administering a radiopharmaceutical agent into said human; and

(c) performing radiopharmaceutical myocardial perfusion imaging on said human in order to detect the presence and assess the severity of coronary artery disease.

(TX-320, col. 8, l. 53 - col. 9, l. 35.)

Claim 23(17) is read as a narrowing of only claim 17 and therefore specifies use of an effective amount of adenosine in the range of 20 to 200 mcg/kg/min[4]. (TX-320, col. 8, l. 53-col. 9, l. 35; Wackers 897:9-13.)

Claim 43 similarly recites use of adenosine in the range of 20 to 200 mcg/kg/min and additionally specifies the radiopharmaceutical agent as thallium-201. (TX-320, col. 10, l. 66-col. 11, l. 9; Wackers 897:20-898:2.)

## C.    The Prior Art Taught Away from Use of Adenosine in Patients with Heart Disease

Adenosine was long thought to be too dangerous and too short-lived to be useful as a coronary vasodilator in patients, particularly patients suffering from coronary artery disease. (*See*, *e.g.*, TX-48 at 2229.) Adenosine is a naturally-occurring compound that has been known since at least the late 1920s. (*See* TX-35; Strauss 765:12-766:1.) Despite its early discovery, and its natural presence in the body, adenosine was quickly recognized to be capable of severe negative effects on the beating heart. (*See* TX-36 at 1254; Strauss 765:17-766:1.) Specifically,

---

[4] The units of micrograms per kilogram per minute may alternately be written "μg/kg/min."

in pharmacologic and animal studies, adenosine lowered heart rate and impeded the transmission of electrical signals that caused the heartbeat, a condition termed "AV block." (*See generally* TX-36; Strauss 765:17-766:1, 796:5-9; PFF 28-30.)

In addition to its effects on electrical conduction, adenosine also had a well-documented risk of systemic effects, particularly its capacity to cause hypotension (a major decrease in blood pressure), which discouraged its use. (TX-217 at 430; Wackers 909:19-910:7.) These systemic effects were considered particularly risky for patients with coronary artery disease, as the dilation of relatively healthy arteries could "steal" blood away from partially blocked arteries, triggering myocardial ischemia. (TX-240 at 439; Wackers 910:8-17; *see* PFF 31-42.)

Consequently, for many years, adenosine was primarily considered a laboratory tool without practical use in humans. This history is recounted in a variety of third-party scientific articles published during the 1980s and 1990s. (*See, e.g.*, TX-48; TX-46.)

For example, a 1986 article by Biaggioni, reported:

> Adenosine was first administered to human subjects in 1930 and 1933 to treat cardiac arrhythmias. The development of serious side effects with large boluses of the drug (temporary cardiac arrest) led the authors to conclude that adenosine was not "a useful therapeutic preparation for the treatment of heart disease," a view which discouraged further research.

(*See* TX-48 at 2229; Strauss 797:22-798:9.)

Similarly, a 1990 publication by Wilson, a recognized authority in this field, stated:

> Despite the widespread use of adenosine in animal studies, concern over adenosine induced hypotension and heart block have hampered its use in humans.

(*See* TX-46 at 1596; Strauss 803:11-804:8, 852:1-10.)

Thus, "[d]espite [its] interesting characteristics, adenosine never achieved clinical usefulness; rather it found a staid but secure role over the years as a short-acting vasodilating

agent in experimental animal studies, especially those involving the coronary circulation." (*See* TX-47 at 1854; Strauss 805:6-22.)

In an effort to avoid the long-running concerns about adenosine, scientists worked to develop chemical analogs of adenosine that lacked its negative effects on the heart and blood pressure while extending the duration of its beneficial effects. (Strauss 769:18-770:20.) The medical literature of the time reflects the concerns that led to such efforts:

> The use of adenosine in cardiovascular therapy has been precluded both by the transitory nature of its vasodilator effects and by its toxic actions on the heart. It would seem feasible however that certain analogs of adenosine may be found which have the coronary vasodilatory activity of adenosine, but which have greater duration of action in vivo and which lack the cardiac depressant action of the parent compound.

(*See* TX-214 at 415; Strauss 770:5-20.)

Ethyl-adenosine was one of the most promising of these synthetic chemical analogs. (Strauss 771:6-772:10.) Studies in dogs showed that ethyl-adenosine was more potent and more selective in dilating coronary arteries than adenosine and had a longer duration of action. (*See* TX-176 at 419; Strauss 772:3-14.) Unlike adenosine, however, intravenous administration of ethyl-adenosine to animals did not slow heart rate or decrease systemic arterial blood pressure. (*See* TX-176 at 419.) Highlighting the unpredictability of extrapolating animal testing to human patients, subsequent human clinical trials showed that ethyl-adenosine induced ischemia and anginal pain in patients with coronary artery disease, leading to the cessation of further clinical studies. (*See* TX-259; Strauss 773:14-21.)

### D.     The Prior Art Taught Away from Use of Adenosine as a Pharmacologic Stress Agent

By the late 1970s, researchers began to explore pharmacologic alternatives to exercise stress for MPI. In the first article concerning tests in animals of such a pharmacologic

alternative, Dr. Strauss, Sicor's technical expert in this case, and his colleague, Dr. Bertram Pitt, described administering a bolus injection of ethyl-adenosine, not a continuous infusion of adenosine, to dogs.  (*See* TX-1184.)  Strauss and Pitt stated that they had selected ethyl-adenosine because it caused coronary vasodilation "with a relatively small change in systemic arterial pressure."  (TX-1184 at 1406; Strauss 772:19-773:5.)  They also noted (based on the earlier animal studies) that ethyl-adenosine did not cause ischemia.  (TX-1184 at 405; Strauss 773:6-13.)  By contrast, they cautioned readers regarding the use of systemic vasodilators, stating that those drugs might result in a "'myocardial steal syndrome' and myocardial ischemia." (TX-1184 at 1406.)

Of course, as discussed above, the hypothesis that ethyl-adenosine would retain adenosine's vasodilating activity without causing ischemia in humans turned out to be false, and ethyl-adenosine was discarded as a potential pharmacologic stress agent for humans.  (TX-259 at 472; Strauss 773:14-21.)  Notably, neither Dr. Strauss nor anyone else suggested in the late 1970s that adenosine should be used instead of ethyl-adenosine as a pharmacologic stress agent in humans.  (Strauss 774:2-18.)

The perceived requirements for a pharmacologic stress agent were reflected in the literature of the day.  Dr. Lance Gould, for example, stated in 1978 that an appropriate pharmacologic stress agent must be "selective for the coronary arteries," have "insignificant systemic effects," and have "an effect for at least 3 minutes until thallium-201 is removed from the systemic circulation."  (TX-391 at 275.)  Adenosine did not fit this profile, as it was associated with systemic hypotension, caused AV block, had an extremely short duration of effect, and was associated with ischemia.  (*See*, *e.g.*, TX-36 at 1254; TX-217 at 430; TX-259 at 470; Strauss 790:3-23; Wackers 909:9-910:17.)

Accordingly, when Dr. Gould published a series of papers following up on Dr. Strauss's preliminary studies on the use of ethyl-adenosine as a pharmacologic stress agent, he also did not turn to adenosine; he turned to a different drug — dipyridamole.  (*See* TX-38 (*Gould 1978*); TX-93 (*Albro*); Wackers 902:25-903:16, 907:1-20.)  *Gould 1978* reported the use of intravenous dipyridamole as a pharmacologic stress agent in a group of patients undergoing exercise stress testing for suspected coronary artery disease.  (*See* TX-38.)  The article reported that dipyridamole had a "potent, selective" effect on the coronary arteries, increasing coronary flow four hundred percent (400%) over baseline levels.  (TX-38 at 279, 284; Wackers 924:3-6.)  Adenosine was passed over as a candidate pharmacologic stress agent even though dipyridamole was then believed to act, at least in part, by preventing the breakdown of adenosine.  (*See* TX-39 at 822; TX-93 at 758; Wackers 907:3-908:18.)

No one considered adenosine as a realistic substitute for dipyridamole because adenosine was viewed as dangerous.  (*See, e.g.*, TX-46; TX-47; Strauss 803:11-804:8, 805:23-806:8.)  Dr. Melvin Marcus, acknowledged by Sicor as an expert in the field, wrote in a well-regarded treatise in 1983 that intravenous administration of adenosine into animals caused "marked systemic hypotension and reflex tachycardia [abnormally rapid heart beat]."  (TX-217 at 430; Strauss 799:19-800:2; Wackers 909:9-910:25.)  Dr. Marcus stressed that "[b]ecause of the hypotensive effects of adenosine, it is not utilized clinically to produce maximal coronary dilation."  (TX-217 at 430; Wackers 909:19-910:7.)  Dr. Strauss acknowledged that hypotension was "undesirable" during MPI.  (Strauss 799:9-13.)

In contrast to the potent hypotensive effects associated with adenosine, the prior art described dipyridamole as a "relatively selective coronary dilator" with only "modest effects on systemic pressure."  (TX-217 at 432.)  The Marcus treatise continued as follows:

> Dipyridamole has two specific advantages when used to produce
> maximal coronary dilation in human beings. First, the coronary
> dilation produced is reasonably well sustained (half-life = 33 min)
> [sic]. Therefore, maximal coronary flow in response to drug
> administration is sufficiently sustained to be measured with a
> washout technique. Second, the safety of intravenous
> dipyridamole in doses that produce intense coronary dilation is
> based on experience with hundreds of patients with heart disease.

(TX-217 at 432 (internal citations omitted); Wackers 911:15-913:12.)

The factors that taught away from the use of adenosine as a pharmacologic stress agent

persisted throughout the mid-1980s. Even ten years after Strauss and Pitt's publication, a

February 1988 review article reiterated perceived requirements for a pharmacologic stress agent

that adenosine simply did not meet:

> It appears that the specific type of coronary vasodilator does not
> appear to be of critical importance as long as the agent has a
> selective action on the coronary arteries, has an insignificant
> systemic effect, and has an effect that lasts for at least 3 minutes to
> permit thallium extraction from the systemic circulation.

(TX-229 at 432; Strauss 813:3-24.)

The objective fact is that adenosine was passed over as a potential pharmacologic stress

agent for a decade after adoption of dipyridamole even though dipyridamole was thought to work

by raising endogenous adenosine levels. Dr. Mario Verani, acknowledged by Dr. Strauss as a

leader in the field of pharmacologic stress imaging, retrospectively summarized the concerns.

(*See* TX-240 at 1038-39; Strauss 806:9-11.) He wrote in 1995 that the long interval between

animal experiments and clinical investigations using adenosine may have resulted from concern

with the ultrashort half-life of exogenous adenosine (2-10 seconds), concerns regarding the

safety of large intravenous doses of a drug that could trigger severe myocardial ischemia in

patients with coronary artery disease, and the potential for slowing atrioventricular conduction

(*i.e.*, AV block).  (*See* TX-240 at 439-40; Strauss 806:15-809:14; *see also* TX-47 at 1855 (stating that fear of AV block and hypotension limited adenosine use in patients); Strauss 805:23-806:8.)

### E.    The Actual Uses of Adenosine in Humans in the Early and Mid-1980s Would Have Discouraged Its Use for MPI

#### 1.    Limited Use of Bolus Doses of Adenosine to Treat Arrhythmias

The first legitimate human medical use of adenosine was reported in 1983 and involved administration of bolus doses (*i.e.*, rapid injections) of adenosine to treat patients suffering from an abnormal heart rhythm known as PSVT (paroxysmal supraventricular tachycardia).  (TX-36; Strauss 795:6-13; *see also* TX-45.)  These studies took advantage of adenosine's potent ability to interrupt electrical conduction in the beating heart to stop the irregular heart beat.  (*See* TX-45; Wackers 914:3-22.)  In this use, in this unique group of patients, the toxic actions of adenosine could be harnessed to beneficial effect. (*See* TX-45; Wackers 918:17-919:3.)

This clinical use specifically required a careful consideration of adenosine's powerful and potentially harmful effects:  "Overdosage might lead to prolonged asystole [cessation of heart beat], hypotension [low blood pressure], or other tachyarrhythmias [abnormal heart beats]."  (TX-45 at 423; Wackers 916:12-16, 917:10-22.)

Thus, while the bolus injection of small amounts of adenosine proved useful for treating PSVT, these studies reinforced concerns regarding adenosine's toxic effects, overdosage, and systemic effects.  (TX-45; Wackers 918:17-919:3.)

#### 2.    Dr. Sollevi's Studies in Surgical Patients

Sicor relies on three publications by Dr. Sollevi from the mid-1980s to suggest that an ordinary cardiologist would have believed adenosine appropriate for use in patients with coronary artery disease and likely to succeed as a pharmacologic stress agent.  (TX-112;

TX-1169; TX-1171; Strauss 699:4-20, 708:10-709:20, 725:12-726:6.)  In fact, these articles would have taught just the opposite.

Dr. Sollevi pioneered the development of continuous intravenous infusions of adenosine in anesthetized patients undergoing surgery.  He published a series of scientific articles on this and his related work between 1984 and 1987, including *Sollevi 1984b* (TX-112), *Sollevi 1986* (TX-1171), and *Owall 1987* (TX-1169).  These publications contained several important common elements:  (1) the publications disclosed adenosine's utility in producing profound systemic hypotension, a condition that both Plaintiffs' and Defendants' experts agree was sought to be avoided during MPI (*see* Strauss 768:22-769:2; Wackers 910:8-17, 922:7-9);  (2) they lacked any systematic study of patients with coronary artery disease, generally excluding or expressly cautioning against the administration of adenosine infusions to such patients;  (3) they did not explicitly or impliedly suggest the use of adenosine as a pharmacologic stress agent for MPI, particularly at a dose of 140 mcg/kg/min; and (4) they did not include any data regarding a safe and efficacious dose for producing maximal coronary vasodilation in patients with suspected coronary artery disease.  (*See, e.g.*, TX-112; TX-1169; TX-1171; Wackers 921:5-931:6; DTX-2027; PFF 61-68.)

Particularly significant among these publications was *Owall 1987* (TX-1169), in which two of the patients receiving adenosine to induce hypotension during brain surgery had a history of myocardial infarction.  (TX-1169 at 229; Wackers 927:16-928:3.)  Both of those patients experienced adverse side effects from the adenosine infusion.  One developed a potentially dangerous abnormal heart rhythm called ventricular tachycardia shortly after the induction of hypotension, requiring termination of the adenosine infusion and treatment with an intravenous injection of lidocaine.  (TX-1169 at 231; Wackers 928:4-929:9.)  The other developed atrial

13

flutter, a type of supraventricular tachycardia, and required intravenous administration of a

separate cardiac drug.  (TX-1169 at 231; Wackers 929:10-17.)  In view of these side effects, the

authors of *Owall 1987* explicitly cautioned against using adenosine in patients with a history of

heart disease, stating that "[t]he use of adenosine hypotension should be carefully considered in

patients with ischemic heart disease because in this clinical study, dysrhythmias occurred in the

two subjects with earlier history of myocardial infarction."  (TX-1169 at 233; Wackers

929:18-930:2.)

### 3.    Conflicting Results of Adenosine Studies in Normal Volunteers

Subsequent to Dr. Sollevi's hypotension studies, several groups published papers

investigating the effects of adenosine infusions in normal volunteers.  These papers included

*Biaggioni 1986* (TX-48), *Conradson I* (TX-1211), *Conradson II* (TX-220), *Fuller 1987*

(TX-1208), and *Biaggioni 1987* (TX-226).  (Wackers 933:4-18; DTX-2017.)  These publications

again contain a number of important common elements:  (1) the studies dealt with normal,

healthy subjects, not heart patients; (2) the number of subjects studied was small, usually no

more than 7; (3) no measures of coronary blood flow were reported; (4) no mention was made of

MPI; (5) no medical use for adenosine in humans was proposed; (6) dose-limiting negative side

effects were reported; and (7) the dose at which those side effects were reported to be intolerable

to healthy subjects was as low as 70 mcg/kg/min and varied widely.  (*See generally* DTX-2017;

Strauss 826:24-831:6; PFF 69-76.)

These publications were scientific investigations of the mechanism by which adenosine

exerted its effects combined with a description of certain physiological responses.  (*See* TX-48;

TX-220; TX-226; TX-1208; TX-1211.)  They did not provide any suggestion to use adenosine in

MPI in heart patients or sufficient information to determine what adenosine dose, if any, would

be safe, tolerable, and effective for that purpose.  (Strauss 826:24-831:6; Wackers 934:21-935:5, 938:19-939:1.)

**F.**      **Prior to the Invention of the '877 Patent, Nobody in the MPI Medical Community Even Mentioned the Possibility of Human Use of Adenosine**

While both sides agree that dipyridamole was believed to carry out its effects, at least in part, by modulating endogenous adenosine levels, the prior art was noticeably devoid of suggestions to substitute adenosine for dipyridamole in human patients.  A series of articles reviewing developments in MPI, including publications by both Plaintiffs' expert, Dr. Wackers, and Defendants' expert, Dr. Strauss, were published in the late 1980s.  (*See, e.g.,* TX-168; TX-170; TX-373.)  None of these articles discussed or even proposed adenosine as an alternative pharmacologic stress agent.  (*See generally* PFF 77-82.)  Significantly, notwithstanding that he was the developer of the pharmacologic stress MPI technique, Dr. Strauss acknowledged that none of his publications mentioned using adenosine as a pharmacologic stress agent, and he admitted that he was not aware of a single publication prior to 1988 that suggested using adenosine for MPI.  (Strauss 774:2-18.)

A 1989 review of "Alternatives to Exercise Stress Testing" by Stratmann and Kennedy, published during the prosecution of the '877 patent, is particularly enlightening.  (*See* TX-168.) After review of more than 200 recent publications in the field, that article included a list of 11 alternatives to exercise stress for evaluating coronary artery disease, including 5 different pharmacologic stress agents.  (TX-168 at 1345; Strauss 814:14-815:18.)  The article nowhere mentioned even the possibility of using adenosine as a pharmacologic stress agent.  (*See* TX-168; Strauss 815:6-18.)

The circumstances surrounding conception of the invention of the '877 patent confirm that use of adenosine for MPI was simply never contemplated by cardiologists of ordinary skill.

Drs. Daniel Hilleman and Syed Mohiuddin, the inventors of the methods claimed in the '877

patent, were researchers at Creighton University when they overturned conventional wisdom by

conceiving and conducting experiments to determine if adenosine could be safely and effectively

used as a pharmacologic stress agent for MPI.  (*See generally* PFF 83-84, 137-146.)  In the mid-

1980s, both were participating in clinical trials funded by Medco Research, the predecessor in

interest to King, relating to the treatment of PSVT with small, bolus doses of adenosine.

(Salzberg 1839:1-11; Mohiuddin 1857:17-24; Hilleman 2109:13-2110:7.)

In the summer of 1987, Gail Salzberg, an employee of Medco Research responsible for

coordinating the clinical trials on adenosine as a treatment for PSVT, met with Drs. Hilleman

and Mohiuddin during a site visit at Creighton University.  They told her about their idea to use

adenosine as a pharmacologic stress agent for MPI.  (Salzberg 1838:3-24.)  Ms. Salzberg

testified that, prior to this meeting, she had never heard anyone discuss the possibility of using

adenosine for MPI — despite having met with approximately 20 cardiology groups working with

Medco's adenosine.  (Salzberg 1839:12-1840:11.)

### G.      The Medical Community Greeted the Invention of the '877 Patent with Skepticism and Concern

The invention of the '877 patent was greeted with skepticism and concern by the medical

community.  For example, upon hearing that Drs. Hilleman and Mohiuddin planned to test

adenosine in MPI, the Director of Clinical Cardiology at the University of Minnesota wrote, "I

am not certain how effective and safe adenosine would be as a coronary vasodilator for this

purpose. . . ."  (*See* TX-53; Salzberg 1844:11-23.)

After a 1989 presentation on the use of adenosine for MPI, Dr. Marcus, a leader in the

field, stood up and cautioned that adenosine "was not a benign drug" and that you have to "watch

out for heart block."  (Wackers 946:11-947:11.)

16

Letters to the editor, editorials, and scientific articles in contemporaneous scientific journals further reflect this concern. (*See*, *e.g.*, TX-169.) Following a 1989 publication by the inventors describing the use of adenosine as a pharmacologic stress agent, the Journal of Radiology published a letter to the editor written by a cardiologist named Dr. Spiegler. (*See* TX-67; TX-169; Wackers 948:22-949:19.) Dr. Spiegler stated that he was "particularly disturbed by the electrocardiographic changes noted during the adenosine infusion" and observed that two patients developed asymptomatic transient second degree or complete heart block. (TX-169; Strauss 816:16-818:6; Wackers 947:24-948:21.) The letter concluded that "[o]nly further investigation will determine whether this will ultimately preclude routine use of adenosine as a pharmacologic stress agent." (TX-169; Strauss 816:16-818:6; Wackers 947:24-948:21.)

A 1990 editorial published in *Circulation*, one of the premier journals in the field of cardiology, explained that the safety of infusions of adenosine at 140 mcg/kg/min *still needed to be established*, as did the effectiveness and safety of infusing adenosine in people with a variety of heart conditions, including significant coronary obstructions, left ventricular dysfunction, ventricular hypertrophy, predisposition to arrhythmias, and SA or AV node disease. (TX-47 at 1856; Strauss 818:19-819:3; Wackers 950:3-14.) In *Circulation*, such editorials were written by experts in the field by invitation of the Editor-in-Chief of the journal. (Wackers 950:15-951:6.)

These concerns persisted even after the Adenoscan product was introduced by the predecessor of Astellas in the 1990s. Cardiologists initially resisted using the product for pharmacologic stress testing for fear of inducing AV block. (Klose 1516:3-14.) Even Sicor's expert, Dr. Strauss, who did not begin using adenosine as a pharmacologic stress agent until the

early 1990s, initially administered adenosine at doses lower than that recommended by the manufacturer out of concern over possible AV block.  (*See* PFF 90-91.)

### H.    Adenosine Is Preferred as a Pharmacologic Stress Agent Because of Its Superior Safety and Speed

Today, both adenosine and dipyridamole are used as clinical alternatives to exercise in connection with MPI.  (TX-138 at 300; Wackers 891:13-892:1.)  While both drugs are considered acceptable vasodilators, adenosine has proven to have clear clinical advantages in terms of its rapid onset of action and short half-life, which make it safer, particularly in high risk patients.  (TX-138 at 300; Wackers 892:2-13, 893:1-894:3.)  Sicor's expert, Dr. Strauss, admitted that he uses adenosine because of the rapidity and safety of the procedure.  (Strauss 786:3-6.)  Dr. Strauss also agreed that a "major advantage" of adenosine in terms of both ease of use and safety is that adverse side effects can be terminated quickly merely by stopping the infusion, whereas reversal of the effects of dipyridamole requires administration of an antidote drug called aminophylline.  (Strauss 784:12-785:13.)  Moreover, because dipyridamole has a longer half-life than the antidote aminophylline, the antidote can wear off too soon — before the effects of dipyridamole have ceased.  Consequently, patients treated with dipyridamole and aminophylline can experience "a recurrence of their ischemia and go on to infarct or die."  (Strauss 785:14-786:2.)

### I.    Adenoscan Is a Highly Successful Commercial Product

The increased safety of adenosine over dipyridamole as a pharmacologic stress agent translates into the market place as well.  (*See* PFF 96-98.)  Sales of Astellas's adenosine product, Adenoscan, outpace sales of dipyridamole by approximately 2 to 1 notwithstanding that Adenoscan is 7 to 10 times more expensive than dipyridamole.  (*See*, *e.g.*, TX-21; Hay 1731:23-1733:3, 1738:22-1740:1; 1754:10-1757:19; DTX-2031.)

Adenoscan was launched in 1995, and faced the challenge of entering a market dominated by dipyridamole, the market leader at that time.  (TX-21; Hay 1732:9-1733:3; White 1231:4-7, 1232:13-24.)  Despite its newcomer status, Adenoscan's sales, both unit sales and sales revenue, experienced substantial and sustained growth after its launch.  (TX-19; TX-21; Hay 1714:13-1716:9, 1733:11-1734:22; DTX-2014; DTX-2032.)  Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005.  (TX-19; Hay 1714:13-1716:9; DTX-2014.)  These substantial sales increases continued despite facing competition from generic dipyridamole beginning in late 1996.  (TX-19; White 1244:9-1247:15; Hay 1738:12-1740:1.)  Adenoscan went on to amass almost $1.7 billion in sales revenue in less than ten years.  (TX-19; Hay 1716:14-18.)

In concert with its substantially increasing sales, Adenoscan gained significant market share over time, both in terms of sales revenue and scans performed.  (TX-21; White 1243:20-1244:8, 1729:7-19, 1730:24-1731:10, 1733:4-1734:22, 1738:12-1739:7; DTX-2032.)  Adenoscan's increases in market share came at the expense of its main competitor, dipyridamole, until Adenoscan displaced dipyridamole as market leader.  (TX-21; Hay 1731:11-1733:3; DTX-2029; DTX-2030; DTX-2031.)  In December of 1995, Adenoscan held 16.5% of the market share of scans and dipyridamole held 76%.  (TX-21; Hay 1731:11-22; DTX 2029.)  By June of 2005, adenosine's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%.  (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2031.)

Adenoscan's increases in share of sales revenue, its portion of the dollars spent on pharmacologic stress agents in the market, were even more dramatic.  Adenoscan revenues grew from 10% of the pharmacologic stress market at the end of 1995 to over 90% by the end of 2004.  (TX-21; Hay 1738:12-21.)  Adenoscan has gained market share not just from doctors switching

19

from dipyridamole but also by taking an increasingly larger share of the growing market. (Hay 1733:4-1734:11, 1739:20-1740:1; *see* Klose 1528:18-1529:22; DTX-2032.)

## IV.    VALIDITY OF THE '877 PATENT

### A.    Sicor Bears the Burden of Proving Invalidity by Clear and Convincing Evidence

The '877 patent is presumed valid pursuant to 35 U.S.C. § 282. To overcome the presumption of validity, Sicor bears the burden of proving invalidity by clear and convincing evidence. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061-62 (Fed. Cir. 2004). That burden is "constant and remains throughout the suit on the challenger" and "does not shift at any time to the patent owner." *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984).

### B.    The Asserted Claims Are Not Invalid for Obviousness

Sicor cannot succeed in proving obviousness with the eclectic mixture of contradictory references upon which it relies. Indeed, the combined teachings of these publications would have discouraged one of ordinary skill in the art from using adenosine for MPI, particularly at a dose of 140 mcg/kg/min.

At trial, Sicor's obviousness contentions were based on unspecified combinations of 11 references, which generally fall into four categories: references concerning the use of dipyridamole for MPI (TX-38; TX-93); references concerning the use of adenosine in anesthetized surgical patients (TX-112; TX-1169; TX-1171); references examining the effects of adenosine infusions in normal, conscious volunteers (TX-48; TX-220; TX-226; TX-1208); and references that are not prior art, including the '296 patent (TX-275) and the Karolinska Request (TX-1193). The sheer volume of references cited by Sicor points in this case toward the nonobviousness of the invention. *See Adams v. U.S.*, 330 F.2d 622, 624 (Ct. Cl. 1964) (stating

that "[i]t has been frequently held that voluminous prior art indicates that none of the prior art is in point or indicates that prior attempts to solve the problem have not met with success.")

### 1.    The Law of Obviousness and the Supreme Court's Decision in *KSR*

Obviousness under 35 U.S.C. § 103 is a conclusion of law based on the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), which include consideration of (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed subject matter as a whole, (3) the level of skill in the art, and (4) objective evidence of nonobviousness.  The claimed invention must be viewed in the state of the art that existed at the time of invention, and it is improper to use hindsight to reconstruct the claimed invention from the prior art.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).

The Supreme Court recently addressed the standard for obviousness in the context of a simple mechanical "combination" invention, noting  that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, slip op. at 12 (Apr. 30, 2007).  By contrast, the Court noted, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *Id.* Furthermore, prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness.  *Id.*  The Supreme Court in *KSR* acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id*.

Under *KSR*, fact finders must still avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."  *Id.* at 17 (citing *Graham*, 383 U.S. at 36).  Moreover, while prior art combinations resulting in  "predictable solutions" leading to

"anticipated success" are clear indicators of obviousness, where those combinations "work together in an unexpected and fruitful manner" they are not obvious. *See id.* at 12, 17.

It is well settled in patent law that, in assessing obviousness, the mere fact that a method utilizes a known scientific principle does not alone make that method obvious. *Uniroyal,* 837 F.2d at 1053. "That one can *reconstruct* and/or explain the theoretical mechanism of an invention by means of logic and sound scientific reasoning does not afford the basis for an obviousness conclusion…." *See Ex parte Levengood*, 28 U.S.P.Q.2d 1300, 1302 (Bd. Pat. App. & Int. 1993) (emphasis in original).

The Federal Circuit, following the mandate of *Graham,* has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness"). This evaluation must be made during a court's consideration of whether the claimed invention is obvious, not after such a determination is complete. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984).

Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others. *Graham*, 383 U.S. at 17-18; *see U.S. v. Adams*, 383 U.S. 39, 51-52 (1966); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 496 (D. Del. 2006). Objective evidence is often the best and clearest evidence bearing on the issue of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

The defendants have the burden of proof with respect to *all* of the *Graham* factors, including objective evidence of nonobviousness. *See Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 8 (Fed. Cir. 1984) (holding that burden is not on the patentee to prove

new and surprising results, but is on the patent challenger to establish the lack of new and surprising results).

### 2.    The Qualifications of the Person of Ordinary Skill in the Art

The determination of the level of skill in the art is an integral part of the obviousness analysis. *Ruiz*, 234 F.3d at 666-667.  Both parties' experts essentially agree on the educational qualifications of the person of ordinary skill in the art:  a physician trained in cardiology with an additional 1-2 years training in nuclear cardiology, or a physician trained in nuclear medicine with at least 1 year of additional training in nuclear cardiology.  (Strauss 646:4-14; Wackers 898:15-899:1, 899:7-11.)

### 3.    The Scope and Content of the Prior Art

The scope and content of the prior art is set forth in § III., *supra*.  The disclosures of the Sollevi MPI documents, which are not prior art, are described in § IV.C., *infra*.  Briefly, dipyridamole, thought to work by raising endogenous adenosine levels, had been used in humans as a pharmacologic stress agent for a decade prior to the invention of the '877 patent.  Adenosine was used in humans only to drop blood pressure during surgery or to interrupt electrical impulses in the heart to stop arrhythmias — both antithetical to use in human MPI.  (*See* Wackers 910:8-17, 915:4-18, 922:7-9.)  Adenosine had also been used in studies of its physiologic effects in a small number of normal human volunteers, where it caused a number of ill effects and in which no medical use of adenosine was proposed.  (Strauss 826:24-831:6; DTX-2017.)

### 4.    Differences Between the Claimed Invention and the Prior Art

The fundamental difference between the claimed invention and the prior art was that dipyridamole was used as a pharmacologic stress agent in human MPI and adenosine was not.  It is the myriad of reasons apparent from the prior art for excluding adenosine from use in human

MPI that made the decision of the '877 patent inventors to do so legally nonobvious. (*See* § III., *supra*.)

**5.    The Use of Adenosine in Human MPI Was Not Obvious**

**a.    The Prior Art Taught Away from Administration of Adenosine to Patients with Coronary Artery Disease**

Prior to the work of the inventors, practitioners adopted an "anything but adenosine" approach to pharmacologic stress imaging. (*See* § III.D., *supra*.) Adenosine was viewed as too toxic, too short-lived, and dangerously non-selective, causing hypotension, ischemia, and slowing or interruption of the heartbeat through AV block. *Id*. Additionally, the pharmacologic profile of adenosine (10 second half-life and effects on systemic blood pressure) was fundamentally at odds with the perceived requirements for a stress agent. *Id*. Sicor attempts to downplay this abundant record. As it must, for consideration of the wealth of clear contemporaneous evidence overwhelmingly shows that the invention was far from obvious.

According to Sicor, because it was known that dipyridamole worked, at least in part, through modulation of endogenous levels of adenosine, and because various groups had administered adenosine infusions in normal volunteers and surgical patients, it would have been obvious to replace dipyridamole with adenosine. (*See* Strauss 679:16-680:22, 745:10-746:8.) But Sicor's theory fails because clinicians and researchers had long harbored serious safety concerns regarding adenosine in heart patients and, far from diminishing those concerns, the references relied on by Sicor would have validated them. (TX-112; TX-1169; TX-1171; *see* PFF 61-76.)

For example, Dr. Sollevi's studies of adenosine infusion in surgical patients demonstrated that intravenous infusions of adenosine caused huge drops in blood pressure. (*See, e.g.,* TX-112 at 400; TX-1169 at 229; TX-1171 at 332.) One of ordinary skill in the art would have viewed

24

the reduction in blood pressure as antithetical to the use of adenosine as a pharmacologic stress agent in patients with ischemic heart disease.  (*See* Wackers 910:8-17; Strauss 768:22-769:2.)

The *Owall 1987* study expressly cautioned against using adenosine in patients with a history of heart disease after observing potentially dangerous disruptions in heart rhythm in such patients.  (TX-1169 at 229-233; Wackers 929:18-930:2 ).  None of the references cited by Sicor involved a systematic study of patients with coronary artery disease that would have given an ordinary physician reason to believe that adenosine could be used safely to achieve coronary vasodilation in such patients sufficient to yield diagnostically reliable MPI images.  (Wackers 920:9-13, 938:3-18; DTX-2017.)

In addition to safety concerns, one of ordinary skill would also have had concerns about achieving sufficient efficacy using adenosine.  (Wackers 938:3-18; DTX-2017.)  Dr. Sollevi's studies taught away from the idea that adenosine could be administered at a dose that would lead to coronary vasodilation sufficient for diagnostically reliable MPI without causing intolerable side effects.  Gould had observed that a 400% increase in coronary blood flow after dipyridamole administration was sufficient for reliable imaging.  (TX-38 at 284; Wackers 903:14-905:24.)  Yet, the *Sollevi 1986* reference, portions of which were newly relied on by Sicor at trial to show that adenosine could adequately increase myocardial blood flow in humans, showed that an adenosine dose of 80 mcg/kg/min produced only a mild 70% increase in coronary blood flow — and did so while simultaneously producing a host of systemic effects, including a 20% decrease in arterial blood pressure.  (*See* TX-1171 at 335; Wackers 922:16-924:17.)  Thus, *Sollevi 1986* would have demonstrated to one of ordinary skill (1) that a dose of 80 mcg/kg/min would likely *not* cause a sufficient increase in coronary flow to obtain diagnostically reliable images (a fact

later confirmed by Wilson in 1990) (TX-46) and (2) higher doses would likely have induced even bigger drops in blood pressure.  (*See* Wackers 922:16.)

Studies in *normal* volunteers had shown that many people suffered intolerable side effects at doses of only 100 mcg/kg/min or less.  The idea of doubling the dose of 80 mcg/kg/min to 160 mcg/kg/min in hopes of obtaining greater coronary blood flow would have run counter to the clear teaching of the normal volunteer studies about the intolerability of higher doses of adenosine.  (*See* PFF 69-76.)  Moreover, cardiologists of ordinary skill would have been concerned that patients with coronary artery disease would suffer much more serious effects from continuous adenosine infusions than healthy volunteers, including AV block, hypotension, or ischemia.  (*See* PFF 28-40, 67-68.)  Many cardiologists had such concerns even *after* adenosine had already been demonstrated to work in initial MPI studies.  (*See* PFF 54, 85-89.)  The contention that one of ordinary skill would have ignored such concerns prior to the date of the invention can be advanced only with the aid of hindsight.

Sicor also asserts that one of ordinary skill would have been motivated to substitute adenosine for dipyridamole because adenosine's short half-life would make it more controllable. (Strauss 672:17-674:11.)  While adenosine was recognized as having a much shorter half-life than dipyridamole, this was widely viewed as a *liability* for purposes of imaging, not an advantage.  Thus, prior art articles such as *Gould 1978*, *Strauss and Pitt*, and *Iskandrian* described a *prolonged* period of activity as a requirement for a pharmacologic stress agent.  (*See* TX-229 at 432; TX-391 at 275; TX-1184.)  Adenosine, which was known to have an *in vivo* half-life of less than 10 seconds, was thus perceived as manifestly unfit for myocardial perfusion studies.  (*See* TX-240 at 1038; Wackers 954:24-955:9.)

Sicor asserts that one of ordinary skill would have predicted that the short half-life of adenosine would have been considered very desirable for MPI, because "if things really get bad, you can shut [the adenosine infusion] off." (Strauss 743:8-13.) Yet, as discussed above, it is only through later experience gained using the invention that adenosine gradually came to be appreciated as the safer drug and the drug of choice for high risk patients as a result of its short half-life. (*See* PFF 93-95.) Sicor's assertion that the superior safety of adenosine would have been recognized in the prior art is also a blatant hindsight reconstruction. It is in conflict with the express teachings of the prior art and the evidence of how people initially reacted to the invention. (Klose 1516:3-14; *see* PFF 85-89.) *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985) ("Recognizing the difficulty of casting one's mind back to the state of technology at the time the invention was made, courts have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention.").

*KSR* confirmed that "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, slip op. at 12. That is the case here.

### b.    The 140 mcg/kg/min Dose in Claim 23(18) Was Unpredictable in View of the Prior Art

None of Sicor's various unspecified combinations of prior art references would have rendered obvious the use of adenosine for MPI at the 140 mcg/kg/min dose recited in claim 23(18). Sicor asserts through Dr. Strauss that one of ordinary skill in the art could have simply titrated to find the proper dose for MPI, and that the dose could be maintained or lowered when side effects were mild or just beginning. (*See* Strauss 850:11-851:5.)[5] The inclinations of

---

[5] Dr. Strauss's view of the obviousness of an effective MPI dose was fatally infected with hindsight. His views were predicated on an understanding that a dose of 90 to 100 mcg/kg/min

(continued…)

persons actually working with adenosine at that time were even more extreme.  When Dr. Sollevi

submitted a plan to test adenosine in MPI (the so-called "Karolinska Request") he proposed

using an adenosine dose that would have *no* palpable side effects.  (TX-1193 at 3.)  The claimed

140 mcg/kg/min dose is not, however, such a dose.  Indeed, the evidence shows that such rote

experimentation would *not* have led to the claimed dose of 140 mcg/kg/min and would not have

shown one of ordinary skill that adequate coronary vasodilation had been achieved.  (*See* PFF

148-150.)

Reliable diagnosis using a pharmacological stress agent depends on obtaining a maximal

increase in coronary blood flow.  Without it, less severe obstructions in the coronary arteries may

go undetected.  (Strauss 660:18-661:13.)  Dipyridamole, the prior art pharmacologic stress agent

that had favorably compared to exercise stress in terms of the reliability of its images, attained a

400% increase in coronary blood flow.  (TX-38 at 284; Wackers 903:14-905:24.)  Experience

with adenosine after the invention of the '877 patent shows that a 140 mcg/kg/min dose achieves

maximal coronary blood flow in most patients, increasing blood flow 300% to 500%.  (Wackers

890:23-25.)

There are only two ways to determine that an increase in blood flow adequate for reliable

diagnosis has been achieved.  (Strauss 839:13-840:3.)  The first is by actually taking MPI images

and confirming that the results agree with the results of invasive imaging methods such as

coronary angiography.  (*Id*.)  This is what the '877 patent inventors did in their original

experiments.  (*See* PFF 143-146.)  Even Sicor's expert, Dr. Strauss, concedes that this technique

requires taking lots of images.  (Strauss 843:2-9.)  The other technique involves actually

_____

(…continued)
was the threshold for obtaining near maximal coronary vasodilation.  He conceded, however, that
his views in this regard were based on the 1990 Wilson study (*See* TX-46; Strauss 843:15-
845:20), which was not in the prior art.

measuring blood flow in the coronary arteries by invasive techniques. This is what Dr. Wilson did in his 1990 publication confirming the adequacy of the 140 mcg/kg/min dose. (Strauss 839:23-840:3, 843:2-9.)

Simply titrating an adenosine infusion to the appearance of side effects provides no information as to whether adequate coronary vasodilation and maximal coronary flow have been achieved. (Strauss 842:20-843:9, 850:11-851:5.) Indeed, we now know that these side effects can appear at doses between 70 and 100 mcg/kg/min but that diagnostically reliable images may not be obtained at those doses because of cyclic variations in blood flow at those doses. (TX-46; *see generally* PFF 161-162.) Thus, doing the experiment Sicor proposes would not establish that a dose where side effects first appear would achieve a sufficient increase in coronary blood flow to permit diagnostically reliable imaging.

Beyond the foregoing, simply titrating the adenosine dose to the point where side effects are just beginning would not reach the 140 mcg/kg/min dose. (*See* TX-46; Strauss 850:11-23.) Dr. Strauss admitted that while many patients can tolerate 100 mcg/kg/min, at doses of 140 mcg/kg/min patients may "sit up and yell 'Stop!'" because of pain and discomfort. (Strauss 850:24-851:5.) This frank admission is consistent with the normal volunteer studies cited by Sicor, which reported wide variability in the maximal tolerable adenosine dose, including many patients who tolerated doses of only 100 mcg/kg/min and some who could tolerate only doses below 70 mcg/kg/min. (DTX-2017; *see* PFF 69-76.)

The dose of about 140 mcg/kg/min in claim 23(18) was both unexpected and unpredictable. It would not have been arrived at through the allegedly obvious course of routine experimentation aimed at protecting heart patients from discomfort. A particularly nonobvious aspect of the 140 mcg/kg/min dose was that some degree of patient discomfort is required to

29

ensure that vasodilation was sufficient to allow accurate diagnostic imaging. This "no pain no gain" aspect of the invention was also completely unforeseen.

> 6.    **The Objective Evidence Further Establishes the Nonobviousness of the Asserted Claims**
>
>> a.    **The Claimed Invention Was Met with Skepticism and Surprise**

Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *U.S. v. Adams*, 383 U.S. 39, 52 (1966); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Ruiz*, 234 F.3d at 668 ("Proceeding contrary to the accepted wisdom. . . is strong evidence of unobviousness.") (internal citations omitted). This is particularly true where "the skepticism is expressed at the time of the invention, in a nonadversarial setting." *Burlington Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987).

There is an abundance of evidence documenting the skepticism that greeted the claimed inventions. Upon learning that Drs. Hilleman and Mohiuddin planned to test adenosine in MPI, the Director of Clinical Cardiology at the University of Minnesota wrote "I am not certain how effective and safe adenosine would be as a coronary vasodilator for this purpose. . . ." (*See* TX-53; Salzberg 1844:11-23.) Following the publication of the inventors work in 1990, the Journal of Radiology published a letter to the editor describing the changes in heart block induced by adenosine as "particularly disturb[ing]." This letter further suggested that these side effects may "ultimately preclude routine use of adenosine as a pharmacologic stress agent." (TX-169; Strauss 816:16-818:6; Wackers 947:24-948:21.) Several 1990 publications further questioned the safety of adenosine infusions, particularly upon administration into patients with coronary artery disease. (*See* TX-46 at 1605; TX-47 at 1855-56.) Indeed, cardiologists initially

resisted use of Adenoscan upon its commercial introduction for fear of causing heart block. (Klose 1516:3-14.)  Not surprisingly, Dr. Verani, an acknowledged expert in the field, published an editorial in 1995 proposing that safety concerns regarding heart block and myocardial ischemia in patients with coronary artery disease kept adenosine out of the clinic.  (*See* TX-240 at 1038-39; Strauss 806:9-14, 808:5-809:14.)

The skepticism expressed in these letters, articles, editorials, and commercial experiences reflects the long term concerns of persons of skill in the art regarding the administration of adenosine to patients with coronary artery disease.  It also firmly buttresses a finding of nonobviousness.  *See Interconnect*, 774 F.2d at 1143 (best evidence on obviousness issue is contemporaneous attitude toward invention).

> **b.      The Lack of Any Suggestion to Use Adenosine for Human Imaging for Nearly 10 Years After the Publication of the Use of Dipyridamole Evidences Nonobviousness**

Sicor's basic premise is that it would have been obvious to substitute adenosine for dipyridamole in MPI.  (*See* Strauss 679:16-680:22.)  Yet, the use of dipyridamole as a pharmacologic stress agent, along with reports of its supposed mechanism of action through increasing endogenous adenosine levels, was published in 1978.  (TX-93.)  For nearly 10 years thereafter, no one even suggested that adenosine would be an effective alternative.  This long gap is reflected in the review articles and book chapters written by Dr. Strauss, Dr. Wackers, and others in the field.  (*See* PFF 77-82.)  Although Sicor asserts that the primary impediment to testing adenosine was its lack of availability, the record shows that adenosine had been administered to humans in the 1930s, adenosine had been administered to humans by numerous groups in the 1980s, and its availability was no impediment to those actually interested in studying it.  (*See* PFF 105-109.)

The MPI literature confirms that authors were not shy about commenting on the unavailability of materials they were interested in using. (*See* Strauss 824:15-825:14 (commenting on unavailability of intravenous dipyridamole).) If adenosine were the obviously desirable alternative to dipyridamole that was denied to the art by lack of commercial availability, as Sicor now contends, somebody would have mentioned it. Nobody did.

The lack of any suggestion to substitute adenosine for dipyridamole for nearly a decade is strong objective evidence in this case of the nonobviousness of the invention. As observed by the Supreme Court more than a century ago in *Hobbs v. Beach*, 180 U.S. 383, 392 (1901):

> It appears from the testimony that several of these addressing machines, of which that of Dennis and York is a type, and which are now claimed to have inspired the Beach patent, had been upon the market for many years, and yet it never seems to have occurred to any one engaged in the manufacture of paper boxes that they could be made available for the purpose of attaching strips to the corners of such boxes. This very fact is evidence that the man who discovered the possibility of their adaptation to this new use was gifted with the prescience of an inventor.

### c.     Sicor's Copying Demonstrates Nonobviousness

Sicor has plainly copied the Adenoscan product in developing its proposed generic substitute. (*See* PFF 102-104.) Copying of the claimed invention by the accused infringer may carry substantial weight in a court's analysis of the evidence bearing on the issue of obviousness. *Stratoflex,* 713 F.2d at 1541 (stating that "[a]n alleged infringer's lauding of all the available prior art may, for example, in some cases have a hollow ring when played against its disregard of that art and its copying of the invention."). Evidence of copying by the infringer is particularly telling where, as here, a generic drug manufacturer is copying the claimed invention despite already marketing the closest prior art competitor. *Forest Labs.,* 438 F. Supp. 2d at 496 ("In the Court's view, the copying of others is particularly telling in this case, because citalopram is currently available as a generic drug. Indeed, citalopram is sold generically by Defendants, yet

Defendants seek to copy and sell Lexapro®.").  Sicor already markets generic dipyridamole, which it argues would render adenosine obvious, and yet it is seeking to copy and sell Adenoscan.  (Lea 2035:22-2036:9.)

> **d.    Adenoscan's Outstanding Commercial Success is Strong Evidence of Nonobviousness**

Adenoscan's performance in the pharmacologic stress market shows all the hallmarks of an enormous commercial success, and this commercial success strongly indicates the nonobviousness of the invention of the asserted claims of the '877 patent.  (*See* Hay 1710:23-1712:16; *see also* PFF 95-101.)  All measures of Adenoscan's sales have shown substantial and sustained increases since it was launched in 1995, a strong indicator of commercial success.  *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999).  Adenoscan has achieved almost 1.7 billion dollars in sales revenue over ten years, an amount of great commercial significance for a product in the pharmacologic stress agent market. (TX-19; Hay 1716:14-1717:2.)  In addition, Adenoscan's share of the pharmacologic stress agent market, measured in both number of scans and dollars, has experienced substantial and sustained growth along with Adenoscan's sales.  (*See* PFF 96-98.)  The combination of increasing sales and increasing market share is powerful evidence of commercial success.  *Tec Air,* 192 F.3d at 1360-61.

Further evidence of commercial success is that Adenoscan displaced dipyridamole, the earlier product in the market, and went from newcomer to market leader.  (*See* PFF 98.)  *See Ruiz*, 234 F.3d at 668.  Even more compelling, Adenoscan's sales continued their substantial increases even when faced with competition from significantly cheaper generic dipyridamole. (*See* PFF 101.)  *Forest Labs.,* 438 F. Supp. 2d at 494-495 (finding commercial success of Lexapro® based on large sales despite the availability of a generic competitor at lower prices).

Having copied the patented invention in order to share in the economic fruit of its success, having conceded that its copy infringes the '877 patent, and having retained a technical expert (Dr. Strauss) who admitted he uses the invention because it is technically superior to the prior art, Sicor has nonetheless offered expert testimony from Dr. Leffler that adenosine's commercial success is not due to the merit of the invention.  Dr. Leffler made no attempt to determine why doctors prefer adenosine.  (Leffler 1683:6-21.)  His testimony attempting to attribute adenosine's success to marketing is simply incredible under these circumstances.  If more is required to reject these contentions, a detailed refutation of them is provided at PFF 118-130.

### C.     Sicor Failed to Prove the Asserted Claims Are Invalid Based on Dr. Sollevi's MPI Proposals

#### 1.     Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Anticipates Claim 23(18) of the '877 Patent

Claim 23(18) recites a method of diagnosing coronary artery disease by MPI using intravenous adenosine infusion at a dose of about 140 mcg/kg/min.  (TX-320, cols. 8-9; Wackers 896:25-897:7.)  A party seeking to invalidate a patent under § 102 for anticipation must show that the allegedly invalidating prior art contains each and every element of the claimed invention. *Union Oil Co. of Cal. v. Atl. Richfield Co*., 208 F.3d 989, 994-95 (Fed. Cir. 2000); *In re Dillon*, 919 F.2d 688, 715 (Fed. Cir. 1990).  Neither Example XIII of the '296 patent nor the Karolinska Request discloses infusing adenosine at a dose of about 140 mcg/kg/min, as is recited in claim 23(18).

Example XIII of the '296 patent contains a half column prophetic discussion on the use of adenosine in connection with myocardial imaging.  (TX-275, col. 21.)  Example XIII does not contain an explicit teaching of an intravenous infusion of adenosine in a dosage of about 140

mcg/kg/min, as is recited in claim 23(18). (*See* TX-275.) Indeed, Sicor's expert admitted that a dose of 140 mcg/kg/min was not described in Example XIII. (Strauss 842:7-13.)

Instead, Example XIII teaches individual titrations on a case-by-case basis, suggesting that the exact dose "should lie in the range of 10 to 150 [µg/kg/min]." (TX-275, col. 21, ll. 59-61.) Sicor's expert based his opinion on anticipation on the fact that 140 mcg/kg/min was encompassed within this hypothetical range. (Strauss 842:14-19.) But the disclosure of a broad numerical range in a prior art reference is not sufficient to anticipate a claim reciting a point within that range. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1000 (Fed. Cir. 2006) ("The disclosure is only that of a range, not a specific temperature in that range, and the disclosure of a range is no more a disclosure of the end points of the range than it is of each of the intermediate points.").

The Karolinska Request, which purports to represent Dr. Sollevi's actual proposal for testing the use of adenosine in conjunction with MPI, also failed to disclose the adenosine dose of about 140 mcg/kg/min recited in claim 23(18). (*See* TX-1193; Strauss 755:6-14; Wackers 961:13-24.) Instead, the Karolinska Request recommended an adenosine infusion at 60 mcg/kg/min in order to avoid side effects and discomfort. (TX-1193 at 3, 5 Wackers 960:12-15.)

### 2. Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Renders Obvious the 140 mcg/kg/min Dose of Claim 23(18)

Example XIII does not state what the end point of the titration experiment there proposed should be to identify an adenosine dose for use in MPI. (TX-275; Wackers 957:14-958:13.) Dr. Strauss has opined that he would titrate to the point where side effects were just beginning. (Strauss 849:21-850:23.) But Dr. Sollevi's contemporaneous proposal for the experiment, the Karolinska Request, proposes to use a dose with *no* palpable side effects. (TX-1193 at 3, 5.) As noted in § IV.B.5.b., *supra*, titrating to this level of no or low side effects would not result in the

140 mcg/kg/min dose at which many patients experience discomfort.  (Strauss 842:20-843:1, 850:11-851:5.)  Nor would such an experiment demonstrate that sufficient coronary vasodilation had occurred to obtain diagnostically reliable MPI images.  (*Id*.)  Accordingly, neither Example XIII nor the Karolinska Request render use of this dose obvious.  (Wackers 966:1-25.)

To the extent that the Sollevi '296 patent and the Karolinska Request are to be considered on the issue of patentability, they actually teach away from the invention of claim 23(18).  The '296 patent states that heart block may be a concern in conscious patients at doses over 100 mcg/kg/min.  (TX-275, col. 3, ll. 23-26; TX-1193 at 5; Strauss 738:2-15, 864:23-865:12.)  Consistent with this disclosure, the Karolinska Request proposed a dose of only 60 mcg/kg/min.  There is a significant difference between the 140 mcg/kg/min dose of claim 23(18) and these lower doses arguably suggested by Sollevi.  Dr. Wilson reported in 1990 that doses of 70-100 mcg/kg/min resulted in "cyclic" coronary blood flow that could lead to false negative results.  (TX-46; Wackers 963:8-964:7.)

### 3.    Neither Example XIII Nor the Karolinska Request Are Prior Art and Thus Cannot Anticipate or Render Obvious the Asserted Claims

It is part of Sicor's burden to prove by clear and convincing evidence that the references it is relying on are part of the prior art.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) (affirming district court's JMOL on the basis of lack of adequate proof that alleged prior art was a printed publication). If a document is not prior art, it cannot anticipate or render obvious patent claims.  *IMX, Inc. v. Lendingtree, LLC*, No. 03-1067-SLR, 2006 WL 47066, at *1 (D. Del. Jan. 10, 2006) (denying reconsideration of its prior ruling that patentee presented sufficient evidence that it invented the subject matter of its asserted patent before the filing date of an alleged prior art patent, and therefore that alleged prior art patent could not be used as the basis for an anticipation or obviousness challenge); *see also Typeright Keyboard*

36

*Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004). Neither Example XIII nor the Karolinska Request is prior art. Thus, neither can invalidate the asserted claims.

> **a.      Sicor Failed to Prove that Example XIII of the '296 Patent Is Prior Art**

Example XIII cannot anticipate or render obvious the claims of the '877 patent because Drs. Hilleman and Mohiuddin conceived of equivalent subject matter prior to the effective filing date of Example XIII and thereafter diligently reduced the invention to practice. The chronology of events relating to conception of the invention, reduction to practice through testing in actual patients, and the intervening diligence of the inventors is set forth at PFF 83-84, 136-146. There is no doubt that the '877 patent inventors had the idea to use adenosine in MPI in the United States before Sollevi's filing of Example XIII. The dispute as to priority is centered on the fact that nobody, including the '877 patent inventors, could know what the operable adenosine dose would be before the inventors conducted their clinical trial. Instead, the inventors proposed a testing protocol to titrate the adenosine dose upward until one of a variety of effects was observed, followed by imaging and confirmation of the diagnostic reliability of the images by comparison to the results of other diagnostic techniques. (TX-57 at 4; Hilleman 2133:9-2134:4; Wackers 972:14-973:3.) Because Sollevi's Example XIII was also no more than a proposal to conduct a titration experiment, the '877 patent inventors have shown prior possession of as much of the invention as the alleged reference shows and are, therefore, entitled to remove it from the prior art. (*See* PFF 136.)

A patentee may overcome an allegation of invalidity based on 35 U.S.C. § 102(e) by showing a date of invention prior to the effective filing date of the patent cited as a reference. *See, e.g., Waldemar Link GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994). The parties agree that for purposes of anticipation and obviousness, Example XIII is entitled to

the filing date of December 28, 1987.  (D.I. 133, Ex. 1 at ¶ 17.)  When the prior art reference

does not disclose every element of the claimed invention, the applicant need not show prior

possession of the complete invention to prevail on priority grounds.   "[A]ll the applicant can be

required to show is priority with respect to so much of the claimed invention as the reference

happens to show.  When he has done that he has disposed of the reference."  *In re Stempel*, 241

F.2d 755, 759 (C.C.P.A. 1957).  Consequently, the plaintiffs need not show prior possession of

the 140 mcg/kg/min dose in claim 23(18) because that dose is not disclosed in Example XIII.

        The record here amply demonstrates that the '877 patent inventors had conceived of the

use of adenosine for MPI long before December 28, 1987.  Like Example XIII, the protocols

prepared by the '877 patent inventors suggested titrating the dose of adenosine to determine a

suitable dose.  (TX-57 at 4; Hilleman 2133:9-2134:4; Wackers 972:14-973:3.)  They also

included specific endpoints for the titration — a feature not found in Example XIII.  (Wackers

973:1-11.)  It is undisputed that these protocols were submitted to the FDA on December 9,

1987 — nearly three weeks before the effective filing date of Example XIII.  (*See* PFF 136.)

        The record also shows that the '877 patent inventors worked diligently from at least

December 28, 1987, the priority date of the '296 patent, to their actual reduction to practice of

the invention in May 1988.  (*See* PFF 154-157.)  As Dr. Wackers opined, this schedule

represented "remarkable" diligence, as it typically takes much longer to conduct such clinical

studies.  (Wackers 983:9-20.)

        The *Stempel* rationale has been extended by subsequent decisions to permit pre-filing

activities to be antedated by showing prior possession of subject matter sufficient to render the

invention, as claimed, obvious.  *See In re Stryker*, 435 F.2d 1340, 1341 (C.C.P.A. 1971); *In re

Spiller*, 500 F.2d 1170, 1176 (C.C.P.A. 1974).  Thus, if the Court determines that the subject

matter disclosed in Example XIII would not have rendered obvious the 140 mcg/kg/min dose of claim 23(18), it is irrelevant whether the '877 patent inventors also had priority as to that claim. If, on the other hand, the Court determines that the 140 mcg/kg/min dose of claim 23(18) *would* have been rendered obvious by the titration disclosure of Example XIII, then the holdings of *Stryker* and *Spiller* confirm that the prior conception of equivalent subject matter by the '877 patent inventors is sufficient to antedate the Sollevi proposals.

### b.     The Karolinska Request Is Not a Printed Publication

The Karolinska Request is not prior art under 35 U.S.C. § 102(a) because it reflects activity outside the United States and is not a "printed publication." A "printed publication" under U.S. law must have been "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it . . . ." *Bruckelmyer v. Ground Heaters, Inc.*, 453 F.3d 1352, 1354 (Fed. Cir. 2006). The ability to locate a printed publication is critical and, in the case of single-copy documents like doctoral theses and the Karolinska Request, requires some form of indexing. *Id.* at 1379; *see also In re Cronyn*, 890 F.2d 1158, 1160-61 (Fed. Cir. 1989) (holding that theses kept in a university library along with an index of cards containing the students' names and the theses' titles but no indication of the subject matter were not meaningfully indexed or catalogued and therefore insufficient to qualify as printed publications). Sicor must prove these underlying facts by clear and convincing evidence. *See Norian Corp.*, 363 F.3d at 1330.

At trial, however, Sicor failed to offer *any* foundational testimony concerning the Karolinska Request, much less prove by clear and convincing evidence that the request is a "printed publication" under 35 U.S.C. § 102(a) and, therefore, prior art. Instead, Sicor offered only the out of court hearsay statement of the patent attorney submitting the request to the European Patent Office that such requests were "generally available to the public." (*See*

TX-1193 at SIC010937.)  This statement is irrelevant to the question of whether the Karolinska

Request is a printed publication under U.S. law.  (*See* TX-1193 at SIC010937.)  As set forth in

the Stipulation of Mr. Mattsson, a partner in the international law firm of Awapatent AB, the

statement in question referred not to any aspect of U.S. law, but to public availability under the

European Patent Convention.  (TX-Court11 at ¶¶ 8-9.)  Under that convention, a document

would be considered publicly available even if the document was not indexed or catalogued in a

way that a member of the public could look it up or that would raise a presumption that the

public concerned with the art would know of it.  (*See* TX-Court11 at ¶¶ 10-12.)  Accordingly,

Sicor has not proven that the Karolinska Request was sufficiently indexed to constitute a "printed

publication" under U.S. law and has thus failed to carry its burden in proving that the Karolinska

Request is prior art.

## V.    EVIDENTIARY OBJECTIONS

At trial, Sicor displayed the classic symptom of a patent challenger who has prepared an

unmeritorious case by repeatedly eliciting from its expert witnesses new opinions that were not

set forth in their expert reports.  This is improper under Rule 26(a)(2)(B), Fed. R. Civ. P.  The

appropriate sanction is to strike the testimony.  Rule 37(c)(1), Fed. R. Civ. P.; *Coalition to Save*

*Our Children v. State Bd. of Educ.*, 90 F.3d 752, 775 (3d Cir. 1996).

The opinions expressed in Dr. Strauss's expert report failed to address how the prior art,

rather than the later 1990 publication of Dr. Wilson, provided any assurance that coronary

vasodilation sufficient for diagnostically reliable MPI images could be attained at tolerable

adenosine doses.  (*See* TX-46; Strauss 843:15-845:20.)  Sicor proceeded improperly to illicit

from Dr. Strauss detailed testimony about how two surgical experiments described in the *Sollevi*

*1986* article (TX-1171) allegedly filled the void.  (Strauss 702:21-709:11.)  Plaintiffs objected.

(*Id*. at 707:9-11.)  Review of Dr. Strauss's expert report (TX-246), shows those new opinions are

not there.  While the new opinion testimony is without merit for reasons noted above, Plaintiffs

request it be stricken nonetheless.

Plaintiffs' also maintain their objection to the admission of the Karolinska Request on

grounds of hearsay and authenticity.  (Objections at 1364:14-18, 1813:21-24.)  The copy of the

Karolinska Request was produced and relied on by Sicor without any foundational witness

testimony that would support admissibility under either Fed. R. Evid. 803(6) or 901(b)(1) as

asserted by Sicor.

## VI.    CONCLUSION

For the foregoing reasons, Sicor has failed to prove by clear and convincing evidence that

the asserted claims of the '877 patent are invalid.  Plaintiffs respectfully request, therefore, that

judgment in their favor be entered.

Dated:  May 9, 2007

_____/s/ Mary B. Matterer_____
Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

_____/s/ Paul E. Crawford_____
Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY  10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research and*
*Development, Inc.*

42