**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KING PHARMACEUTICALS RESEARCH AND DEVELOPMENT, INC., ASTELLAS US LLC, and ASTELLAS PHARMA US, INC., | ) ) ) ) |
| **Plaintiffs**, | ) ) |
| v. | ) ) ) |
| SICOR INC. and SICOR PHARMACEUTICALS, INC., | ) ) ) |
| **Defendants**. | ) ) ) |

Civil Action No. 05-337-SLR

**PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW CONCERNING U.S. PATENT NO. 5,070,877**

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs
Astellas US LLC and
Astellas Pharma US, Inc.*

Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY  10017
(212) 326-3939

*Attorneys for Plaintiff
King Pharmaceuticals Research
and Development, Inc.*

## TABLE OF CONTENTS

PLAINTIFFS' PROPOSED FINDINGS OF FACT..................................................................1

I.    THE PARTIES...........................................................................................................1

      A.    Plaintiffs........................................................................................................1

      B.    Defendants .....................................................................................................2

II.   NATURE OF THE CASE ...........................................................................................2

III.  FACTUAL BACKGROUND .......................................................................................4

      A.    Diagnosis of Coronary Artery Disease with Myocardial Perfusion
            Imaging ..........................................................................................................4

      B.    The Asserted Claims of the '877 Patent ..................................................6

      C.    The Prior Art Taught Away from Use of Adenosine in Patients With
            Coronary Artery Disease..............................................................................8

      D.    The Prior Art Taught Away from Use of Adenosine as a
            Pharmacologic Stress Agent .....................................................................11

            1.    Researchers Used Anything But Adenosine for Pharmacologic
                  Stress Tests......................................................................................11

            2.    The Actual Uses of Adenosine In Humans in the Early and
                  Mid-1980s Would Have Discouraged Its Use for Myocardial
                  Perfusion Imaging...........................................................................16

                  a.    Limited Use of Bolus Doses of Adenosine to Treat
                        Arrhythmias ..........................................................................16

                  b.    Dr. Sollevi's Studies In Surgical Patients.......................18

                  c.    Conflicting Results of Studies of Adenosine in Normal
                        Volunteers .............................................................................21

      E.    Prior to the Invention of the '877 Patent Nobody In the MPI Medical
            Community Even Mentioned the Possibility of Using Adenosine .......23

      F.    The Medical Community Greeted the Invention of the '877 Patent with
            Skepticism and Concern ............................................................................25

i

      1.      Contemporaneous Documents Capture the Concern of the Medical Community ...................................................................................25

      2.      Sicor's Expert, Dr. Strauss, Admitted that He Was Reluctant to Administer Adenosine at 140 mcg/kg/min ................................................27

      3.      Unresolved Concerns Regarding Ischemia, AV Block, and Hypotension Kept Adenosine Out of the Clinic .......................................27

G.     Adenosine Is Now Preferred as a Pharmacologic Stress Agent Because of Its Superior Safety and Speed.......................................................................28

H.     Adenoscan is a Highly Successful Commercial Product ......................................28

      1.      Adenoscan Went From Newcomer To Market Leader..............................29

      2.      Sales of Adenoscan Were Driven by the Attributes of the Claimed Invention, Not Marketing and Promotion ..................................30

I.     Sicor Copied Every Aspect of Adenoscan and the Patented Invention in its Abbreviated New Drug Application and Subsequently Admitted Infringement of the Asserted Claims of the '877 Patent.......................................31

J.     Sicor's Contrary Contentions Are Unmeritorious .................................................32

      1.      Contentions Regarding Availability of Adenosine ....................................32

      2.      Contentions Regarding the State of the Art ................................................33

            a.      Sicor's Characterization of the Sollevi Prior Art...........................33

            b.      Sicor's Untimely New Contentions ...............................................35

      3.      Arguments Regarding Commercial Success................................................36

            a.      Adenoscan's Promotion Was Typical In The Industry.................37

            b.      Sicor's Economic Expert Was Unreliable And His Theories Not Supported By The Record.......................................38

K.     Dr. Sollevi's Proposals to Use Adenosine as a Pharmacologic Stress Agent Are Not Prior Art and Do Not Disclose the Dose of 140 mcg/kg/min ........................................................................................................41

      1.      Example XIII Does Not Disclose or Suggest an Adenosine Infusion at About 140 mcg/kg/min ..........................................................41

      2.      Example XIII Disclosed No More Than What the Inventors Had Previously Disclosed in the Inventors' Own Protocols.....................42

3.      The "Creighton Protocols" Set Forth a Titration Method for Determining the Appropriate Adenosine Dose for Imaging ....................43

4.      Balancing Tolerability and Reliability: the Unexpected Discovery of 140 mcg/kg/min .................................................................45

5.      The Inventors Displayed "Remarkable" Diligence .................................48

6.      The Karolinska Request Proposed Using Adenosine at a Dose Well Below 140 mcg/kg/min .....................................................................49

L.      Subsequent Experience Has Validated 140 mcg/kg/min as the Ideal Adenosine Infusion Rate for MPI ...........................................................50

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ...........................................................52

I.      CONTROLLING AUTHORITY ...................................................................................52

II.      VALIDITY OF THE '877 PATENT .............................................................................52

A.      Patent Claims ...................................................................................................52

B.      Sicor Bears the Burden of Proving Invalidity by Clear and Convincing Evidence ...........................................................................................................52

C.      The Asserted Claims Are Not Invalid for Obviousness .........................................53

1.      The Law of Obviousness and the Supreme Court's Decision in *KSR* ......................................................................................................53

2.      The Qualifications of the Person of Ordinary Skill in the Art ..................55

3.      The Scope and Content of the Prior Art .......................................................56

4.      Differences Between the Claimed Invention and the Prior Art ................57

5.      The Use of Adenosine In Human MPI Was Not Obvious .........................57

        a.      The Prior Art Taught Away from Administration of Adenosine to Patients with Coronary Artery Disease ...................57

        b.      The Dose of about 140 mcg/kg/min in Claim 23(18) Was Unpredictable in View of the Prior Art .................................58

6.      The Objective Evidence Further Establishes the Nonobviousness of the Asserted Claims ....................................................59

        a.      The Claimed Invention Was Met with Skepticism and Surprise ...........................................................................................59

   b. The Lack of Any Suggestion to Use Adenosine For Imaging for Nearly 10 Years After the Publication of the Use of Dipyridamole Evidences Nonobviousness ..................60

   c. Sicor's Copying Demonstrates Nonobviousness ..........................61

   d. Adenoscan's Outstanding Commercial Success is Strong Evidence of Nonobviousness ...............................................62

    (1) Commercial Success Generally .........................................62

    (2) Dr. Leffler's Contrary Opinions Are Not Credible...............................................................................62

     (a) There is a Nexus Between the Sales of Adenoscan and the Claims of the Patent................63

     (b) Sicor Failed To Prove that Sales of Adenoscan Are Not Driven by the Attributes of the Claimed Method ........................65

     (c) Clinical Attributes Determine Success of Pharmacologic Stress Agents, Not Promotion....................................................................66

     (d) Dr. Leffler's Opinion Is Contrary To The Evidence .........................................................67

D. Sicor Failed to Prove the Asserted Claims Are Invalid Based On Dr. Sollevi's MPI Proposals............................................................................68

  1. Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Anticipates Claim 23(18) of the '877 Patent..............................................................................................68

  2. Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Renders Obvious the 140 mcg/kg/min Dose of Claim 23(18).................................................................69

  3. Neither Example XIII Nor the Karolinska Request Are Prior Art and Thus Cannot Anticipate or Render Obvious the Asserted Claims ...............................................................................69

   a. Sicor Failed to Prove that Example XIII of the '296 Patent is Prior Art.........................................................70

   b. The Karolinska Request is Not a Printed Publication...................72

III.    Evidentiary Objections......................................................................................73

        A.      Expert Testimony and Exhibits Not Disclosed In Expert Reports ........................73

        B.      The Karolinska Request........................................................................74

IV.     CONCLUSION......................................................................................75

This matter was tried before the Court on February 20, 2007 through February 28, 2007. Being duly advised, the Court now issues its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).  To the extent that any of the findings of fact set forth below is a conclusion of law, it is hereby adopted as a conclusion of law.  To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I.     THE PARTIES

#### A.     Plaintiffs

1.     Plaintiffs Astellas US LLC and Astellas Pharma US, Inc. (collectively "Astellas") are corporations engaged in the business of research, development, and sale of pharmaceutical products throughout the world.  (D.I. 1 ¶ 4.)  Both corporations are organized and existing under the laws of the State of Delaware, with their principal places of business at Three Parkway North, Deerfield, Illinois 60015-2548.  (D.I. 133, Ex. 1, ¶ 1.)

2.     Astellas was formed from a merger between two pharmaceutical companies, Fujisawa Pharmaceutical Co., Ltd. and Yamanouchi Pharmaceutical Co., Ltd. (White 1227:15-17.)

3.     Plaintiff King Pharmaceuticals Research and Development, Inc. ("King") is a corporation organized and existing under the laws of the State of Delaware having a principal place of business at 7001 Weston Parkway, Suite 300, Cary, North Carolina 27513. (D.I. 133, Ex. 1, ¶ 2.)

B.    **Defendants**

4.    Defendants Sicor Pharmaceuticals Inc. and Sicor Inc. (collectively "Sicor") are in the business of making and selling generic drugs, which they distribute in Delaware and throughout the United States. (D.I. 1 ¶ 13.) Both corporations are organized and existing under the laws of the State of Delaware having principal places of business at 19 Hughes, Irvine, California 92618. (D.I. 133, Ex. 1, ¶¶ 3-4, 14.)

5.    Sicor Pharmaceuticals Inc. is a wholly owned subsidiary of Sicor Inc. (D.I. 133, Ex. 1, ¶ 5.)

## II.    NATURE OF THE CASE

6.    Plaintiffs Astellas and King brought this suit against (i) Sicor and (ii) Teva Pharmaceuticals USA (a Delaware corporation) and Teva Pharmaceutical Industries, Ltd. (an Israeli corporation) (collectively "Teva") for infringement of King's United States Patent No. 5,070,877 ("the '877 patent"). (D.I. 1 ¶¶ 30-31.)

7.    The '877 patent is entitled "Novel Method of Myocardial Imaging" and lists Syed Mohiuddin and Daniel Hilleman as the inventors. (*See* TX-320.) The '877 patent issued in 1991 and was assigned on its face to Medco Research, Inc. ("Medco"). The '877 patent is now assigned to King. (D.I 133, Ex. 1, ¶¶ 6-7, 9.) The '877 patent claims generally, methods of using adenosine in connection with diagnostic coronary artery imaging. (*See generally* TX-320.)

8.    Astellas is the exclusive licensee of certain rights under the '877 patent. (D.I. 133, Ex. 1, ¶ 10.) Pursuant to those rights, Astellas markets a product known as Adenoscan®.[1] (D.I. 133, Ex. 1, ¶ 12.)

--------

[1] Adenoscan® (hereinafter "Adenoscan") is a registered trademark of Astellas.

9.      Adenoscan was approved by the United States Food and Drug Administration (the "FDA") in 1995.  Adenoscan is an adenosine solution administered to patients undergoing cardiac stress tests who are unable to exercise adequately on a treadmill. (D.I. 133, Ex. 1, ¶ 12; TX-75.)  As such, Adenoscan is known as a "pharmacologic stress agent." Adenoscan is the most widely prescribed pharmacologic stress agent on the market today.  (*See* TX-21; Hay 1731:23-1733:3; DTX-2031.)

10.     On December 6, 2004, Sicor filed Abbreviated New Drug Application No. 77-425 ("ANDA") under the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585 (popularly known as the Hatch-Waxman Act), seeking approval to market generic copies of Astellas's Adenoscan product after expiration of the '877 patent.  (TX-4.)  On April 16, 2005, Sicor amended its ANDA to allow it to market its product prior to expiration of the '877 patent and to include a certification that (i) its proposed product would not infringe the '877 patent and/or (ii) the '877 patent was invalid or unenforceable.  (TX-7.)  King and Astellas then filed suit against Sicor and Teva alleging infringement of the '877 patent under 35 U.S.C. § 271(e)(2)(A).  (D.I. 1 ¶¶ 24-26, 28-29.)[2]

11.     This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271(b), (c), and (e)(2).  The Court has subject matter jurisdiction over this case under the Hatch Waxman Act and 28 U.S.C. §§ 1331, 1338(a), 2201, 2202.

12.     Plaintiffs seek an order (i) prohibiting FDA approval of the Defendants' generic adenosine product for use in myocardial perfusion imaging prior to the expiration of the

---

[2] Astellas is also exclusive licensee of rights under U.S. Patent No. 5,731,296 (the '296 patent), which is owned by Item Development AB.  Item and Astellas also filed suit against Sicor in the parallel action copending in this Court.  *See* CV No. 05-0336-SLR.

'877 patent, in accordance with 35 U.S.C. § 271(e)(4)(A); and (ii) enjoining the defendants from the commercial manufacture, use, offer to sell, sale, or importation of their adenosine product labeled for use in myocardial perfusion imaging, in accordance with 35 U.S.C. § 271(e)(4)(B). (*E.g.*, D.I. 1.)

13.     The parties filed a Stipulation of Dismissal of Complaint as to Teva, in which Teva agreed to be bound by the decision of the Court herein, and the Court entered an order approving this Stipulation on August 9, 2005.  (D.I. 10 ¶ 1.)

14.     While Sicor initially contended that its product did not infringe the claims of the '877 patent, Sicor later conceded infringement.  (D.I. 137 ¶ 2.)  Sicor admitted "that making, using, offering to sell, importing, or selling Sicor's Adenosine Injection USP in the United States would infringe asserted claim 23 as read through claim 17, claim 23 as read through claim 18, and claim 43 of the '877 patent."  (D.I. 137.)

## III.   FACTUAL BACKGROUND

### A.   Diagnosis of Coronary Artery Disease with Myocardial Perfusion Imaging

15.     Patients with coronary artery disease usually do not have symptoms when resting because the coronary arteries, even when partially blocked, deliver sufficient blood flow to supply oxygen to the resting heart muscle.  (TX-138 at 295; Wackers 882:4-883:15.)  When such patients exercise or exert themselves, however, the workload on the heart increases and coronary blood flow has to increase to meet the increased oxygen demand.  (Wackers 882:4-883:15.)  If the blocked arteries are unable to deliver enough blood to meet the heart's need for oxygen, the heart muscle becomes starved for oxygen, a condition called "ischemia," and the patient feels chest pain, commonly referred to as "angina."  (TX-138 at 295; Wackers 882:4-883:15, 890:1-14; DTX-2022.)

16.    Chest pain or discomfort is the main reason patients are referred for the cardiac diagnostic method termed "myocardial perfusion imaging" (MPI). (Wackers 883:9-15.) Typical MPI diagnostic protocols pair exercise (usually walking on a treadmill) with injection of a radioactive tracer that allows physicians to visualize blood flow in the heart and evaluate the presence and severity of coronary artery disease or other heart dysfunction. (TX-138 at 298-300; Wackers 883:9-886:8; DTX-2003; DTX-2023.)

17.    The exercise stress usually begins at a low level and is increased slowly because the physician does not know when the patient will "run into trouble." (Wackers 885:14-18.) The patient typically continues to exercise until he or she experiences symptoms (such as chest pain, an abnormal electrocardiogram) or is too fatigued to continue. (Wackers 885:14-886:3.) Obtaining a sufficient level of exercise and a corresponding increase in blood flow is critical to the diagnostic accuracy of the test. (Wackers 901:2-22; DTX-2018.) For instance, if there is not sufficient increase in blood flow, the patient's coronary artery disease may not be detected. (Wackers 901:2-22; DTX-2018.)

18.    While exercise stress testing remains a preferred method for diagnosing coronary artery disease, forty to fifty percent (40-50%) of patients referred for stress testing are unable to perform adequate physical exercise. (TX-138 at 300; Wackers 886:8-887:11.) These patients are usually older and manifest a variety of risk factors for heart disease, such as deconditioning, peripheral artery disease (claudication), diabetes, or obesity. (Wackers 887:25-888:11.)

19.    In patients referred for pharmacological stress testing, nearly half have known coronary artery disease and one-quarter have already had a myocardial infarction (heart attack). (TX-103 at 386; Strauss 834:3-836:1.) Consequently, a need exists for stressors other

than exercise for this sizeable "at risk" segment of the population.  (TX-168 at 1344; *see* Wackers 887:25-888:11.)  For such patients, "pharmacologic stress testing" is a way to increase blood flow in the heart to allow effective imaging without the need for exercise.  (Wackers 889:7-891:12; DTX-2022.)

20.    Sometimes referred to as a "lazy man's stress test," pharmacologic stress testing allows a patient to lie prone while a pharmacologic stress agent is administered through an intravenous tube.  (Wackers 888:12-889:6; DTX-2006.)  The stress agent dilates the coronary resistance vessels (small arteries), causing an increase in blood flow of 3 to 5 times (300% to 500%) in the case of adenosine.  (Wackers 890:15-891:12.)  A radioactive tracer is then injected and pictures are taken of the blood flow in the heart muscle so that the presence and severity of coronary artery disease can be evaluated as in the exercise stress test.  (Wackers 888:12-889:6; DTX-2006.)

21.    In this regard, the pharmacologic stress causes "heterogeneity" in the blood flow between healthy and diseased vessels, which allows effective myocardial perfusion imaging, and consequently accurate diagnosis of coronary artery disease.  (Wackers 890:15-891:12.)

**B.    The Asserted Claims of the '877 Patent**

22.    The three claims asserted in this litigation, claims 23(17), 23(18), and 43, concern cardiac diagnostic methods.  (*See* TX-320.)  In the claimed methods, adenosine is administered to cause vasodilation, a radioactive tracer is administered to allow imaging, and the heart is imaged by MPI to allow diagnosis of coronary artery disease.  (*See* TX-320.)

23.    Claim 23 is a multiply dependent claim dependent on any one of claims 17, 18, or 19.  (TX-320, col. 9, ll. 34-35.)  Thus, claim 23 is legally equivalent to three individual dependent claims, one dependent on claim 17, one dependent on claim 18, and one dependent on

claim 19.  Consequently, claim 23 must be read with respect to the particular claim "in

relationship to which it is being considered."[3]

      24.    "Claim 23(18)," for example, refers to claim 23, as it depends from claim

18, and is read to narrow the terms set forth in claim 18 (which itself is a dependent claims based

on claim 17) as follows:

> **23(18).**  A method of detecting the presence and assessing the
> severity of coronary artery disease in a human comprising the steps
> of:
>
>   (a) administering by an intravenous route to said human about
> **140 mcg/kg/minute** of **adenosine** sufficient to provide coronary
> artery dilation
>
>   (b) administering a radiopharmaceutical agent into said human;
> and
>
>   (c) performing radiopharmaceutical myocardial perfusion
> imaging on said human in order to detect the presence and assess
> the severity of coronary artery disease.

(TX-320, col. 8, l. 53-col. 9, l. 35.)

      25.    Claim 23(18) recites use of an intravenous adenosine infusion at a dose of

140 mcg/kg/min.  (TX-320; Wackers 896:25-897:7.)

      26.    Claim 23(17) is read as a narrowing of only claim 17 and therefore

specifies use of an effective amount of adenosine in the range of 20 to 200 mcg/kg/min, which is

alternately written as 20-200 mcg/kg/min.  (TX-320, col. 8, l. 53-col. 9, l. 35; Wackers 897:9-

13.)

---

[3] As set forth in Proposed Conclusion of Law 2, *infra*, "[a] multiple dependent claim shall be construed to incorporate by reference the limitations of the particular claim in relation to which it is being considered."  35 U.S.C. § 112, ¶ 5 (2000); M.P.E.P. § 608.01(n) 600-86 (explaining that multiple dependent claims "must be considered in the same manner as a plurality of single dependent claims"); H.R. Rep. No. 94-592, at 1241 (1975) ("A multiple dependent claim, as such, does not contain all the limitations of all the claims to which it refers, but rather, contains at any one time only those limitations of the particular claim under consideration.").

27.    Claim 43 similarly recites use of an effective amount of adenosine in the range of 20-200 mcg/kg/min, and additionally specifies the radiopharmaceutical agent as thallium-201.  (TX-320, col. 10, l. 66-col. 11, l. 9; Wackers 897:20-898:2.)

## C.    The Prior Art Taught Away from Use of Adenosine in Patients With Coronary Artery Disease

28.    Although recognized today as a safer and faster vasodilator than dipyridamole, adenosine was long thought to be too dangerous and too short-lived to be useful as a coronary vasodilator in patients, particularly patients suffering from coronary artery disease. (*See, e.g.*, TX-48 at 2229.)

29.    Adenosine is a naturally-occurring compound that has been known since at least the late 1920s.  (*See* TX-35; Strauss 765:12-766:1.)  Despite its early discovery and its natural presence in the body, adenosine was quickly recognized to be capable of severe negative effects on the beating heart.  (*See* TX-36 at 1254; Strauss 765:17-766:1.)  Specifically, in pharmacologic and animal studies, adenosine lowered heart rate and impeded the transmission of electrical signals that caused the heartbeat, a condition termed "AV block."  (*See generally* TX-36; Strauss 765:17-766:1, 796:5-9.)

30.    AV block is classified by degrees according to the severity of its effect. First degree AV block is merely a "lengthening" of the propagation time of the electrical impulses of the heartbeat, although it presents a concern as a potential precursor to other problems.  (Wackers 894:13-895:14.)  By contrast, complete AV block results in a sudden "flat line" on the electrical cardiogram as the heartbeat ceases.  (Wackers 895:2-14, 895:25-896:12.) Complete AV block was recognized as a serious side effect.  According to Dr. Wackers, "when you see it [in a patient] for the first time, your own heart stops beating as well."  (Wackers 895:21-896:12.)

31.     In addition to its effects on electrical conduction, adenosine also had a well-documented risk of systemic effects, particularly its capacity to cause hypotension (a major decrease in blood pressure) and myocardial "steal" (in which blood is "stolen" from one arterial pathway to another), which discouraged its use.  (TX-217 at 430; Wackers 909:19-910:7.)  These systemic effects were considered particularly risky for patients with coronary artery disease, as the dilation of relatively healthy arteries could "steal" blood away from partially blocked arteries, triggering myocardial ischemia similar to that resulting from inadequate blood flow during exercise.  (TX-240 at 439; Wackers 910:8-17.)  Even if initially mild, such ischemia presented a concern because it could lead to a worsening of conditions.  As Dr. Wackers explained, "ischemia may beget ischemia," producing "a spiral that may be hard to get out of."  (Wackers 955:10-956:16.)

32.     Consequently, for many years adenosine was primarily considered a laboratory tool without practical use in humans.  This history is recounted in a variety of third-party scientific articles published during the 1980s and 1990s.  (*See, e.g.*, TX-46; TX-48.)

33.     For example, a 1986 article by Biaggioni reported:

> Adenosine was first administered to human subjects in 1930 and 1933 to treat cardiac arrhythmias.  The development of serious side effects with large boluses of the drug (temporary cardiac arrest) led the authors to conclude that adenosine was not 'a useful therapeutic preparation for the treatment of heart disease,' a view which discouraged further research.

(TX-48 at 2229; Strauss 797:22-798:9.)

34.     Similarly, a 1990 publication by Wilson, a recognized authority in the field, and his coworkers stated:

> Despite the widespread use of adenosine in animal studies, concern over adenosine induced hypotension and heart block have hampered its use in humans.

(TX-46 at 1596; Strauss 803:11-804:8, 852:1-10.)

35.     Therefore, "[d]espite [its] interesting characteristics, adenosine never achieved clinical usefulness; rather it found a staid but secure role over the years as a short-acting vasodilating agent in experimental animal studies, especially those involving the coronary circulation." (*See* TX-47 at 1854; Strauss 805:6-22.)

36.     Even as of 1990, the "use of adenosine in humans has been limited mainly because of side effects reported by patients and the AV node block produced." (TX-47 at 1855; Strauss 805:23-806:8.)  This record of publications confirms that the short-acting nature of adenosine and its tendency to cause sharp decreases in blood pressure in animal studies also led away from its use in humans.  (*See* TX-47 at 1854.)

37.     Dr. Wackers explained that the short-acting nature of adenosine complicates the question of how much adenosine should be administered.  (Wackers 954:24-955:9.)  Adenosine has an ultrashort half-life in humans of about 2-10 seconds.  (TX-240 at 1038.)  As explained by Dr. Wackers, "if you consider that if you inject a drug in an arm vein, it takes at least 17, 20 seconds to arrive at the heart, which would mean if you inject a certain amount, when it gets to the heart, it's only half the dose."  (Wackers 955:1-955:9.)

38.     In an effort to avoid the long-running concerns about adenosine described above, scientists worked to develop chemical analogs of adenosine that lacked its negative effects on the heart and blood pressure while extending the duration of its beneficial effects.  (Strauss 769:18-770:20.)  The medical literature of the time reflects the concerns that led to such efforts:

> The use of adenosine in cardiovascular therapy has been precluded both by the transitory nature of its vasodilator effects and by its toxic actions on the heart.  It would seem feasible however that certain analogs of adenosine may be found which have the

coronary vasodilatory activity of adenosine, but which have greater
duration of action in vivo and which lack the cardiac depressant
action of the parent compound.

(TX-214 at 415; *see, e.g.*, Strauss 770:5-20.)

39.     Ethyl adenosine 5-carboxylate hydrochloride ("ethyl-adenosine") was one
of the most promising of these synthetic chemical analogs of adenosine.  (Strauss 771:6-772:10.)
Studies in dogs showed that ethyl-adenosine was more potent and more selective in dilating
coronary arteries than adenosine, and that ethyl-adenosine also had a prolonged duration of
action.  (*See* TX-176 at 419.)  Unlike adenosine, however, intravenous administration of
ethyl-adenosine to animals did not slow heart rate or decrease systemic arterial blood pressure.
(*See* TX-176 at 419; Strauss 772:3-14.)

40.     Highlighting the unpredictability of extrapolating animal testing to human
patients, subsequent human clinical trials showed that ethyl-adenosine induced ischemia and
anginal pain in patients with coronary artery disease, leading to the cessation of further clinical
studies.  (*See* TX-259; Strauss 773:14-21.)

**D.     The Prior Art Taught Away from Use of Adenosine as a Pharmacologic
Stress Agent**

**1.     Researchers Used Anything But Adenosine for Pharmacologic
Stress Tests**

41.     By the late 1970s, researchers began to explore pharmacologic alternatives
to exercise stress for MPI.  In the first article concerning tests in animals of such a
pharmacologic alternative, Dr. Strauss, Sicor's technical expert in this case, and his colleague,
Dr. Pitt, described administering a bolus injection of ethyl-adenosine, not a continuous infusion
of adenosine, to dogs.  (*See* TX-1184.)  Strauss and Pitt used ethyl-adenosine, not adenosine,
stating that they had selected ethyl-adenosine because it caused coronary vasodilation "with a
relatively small change in systemic arterial pressure."  (TX-1184 at 406; Strauss 772:19-773:5.)

A large drop in systemic pressure was considered undesirable in the context of diagnostic cardiac imaging and could potentially lead to ischemia and other ill effects. (Wackers 910:8-17, 922:7-9.)

42.    They also noted based on their earlier animal studies, that ethyl-adenosine did not cause ischemia. (TX-1184 at 405; Strauss 773:6-13.) By contrast, they cautioned readers regarding the use of systemic vasodilators, stating that those drugs might result in a "'myocardial steal syndrome' and myocardial ischemia." (TX-1184 at 406.)

43.    Of course, as discussed above, the hypothesis that ethyl-adenosine would retain adenosine's vasodilating activity without causing ischemia in humans turned out to be false, and ethyl-adenosine was discarded as a potential pharmacologic stress agent for humans. (*See* TX-259 at 472; Strauss 773:14-21.)

44.    Notably, neither Dr. Strauss nor anyone else suggested in the late 1970s that adenosine should be used instead of ethyl-adenosine as a pharmacologic stress agent in humans. (Strauss 774:2-18.)

45.    The perceived requirements for a pharmacologic stress agent were reflected in the literature of the day. Dr. Lance Gould and colleagues, for example, stated in 1978 that an appropriate pharmacologic stress agent must be "selective for the coronary arteries," have "insignificant systemic effects," and have "an effect for at least 3 minutes until thallium-201 is removed from the systemic circulation." (TX-391 at 275.) Adenosine did not fit this profile, as it was associated with systemic hypotension, was known to cause AV block, was associated with ischemia, and had an extremely short duration of effect. (*See*, *e.g.*, TX-36 at 1254; TX-217 at 430; TX-259 at 470; Strauss 790:3-23; Wackers 909:9-910:17.)

46.     Accordingly, when Dr. Gould and colleagues published a series of papers following up on Dr. Strauss's preliminary studies on the use of ethyl-adenosine as a pharmacologic stress agent, they did not turn to adenosine but instead turned to a different drug, dipyridamole.  (*See* TX-38 (*Gould 1978*); TX-93 (*Albro*); Wackers 902:25-903:16, 907:1-20.)  Dipyridamole was known to act, at least in part, by preventing the breakdown of adenosine -- but dipyridamole was considered to be "quite nontoxic."  (TX-39 at 822; Wackers 913:3-12, 907:25-908:24.)  Unlike adenosine, dipyridamole was believed to selectively induce coronary vasodilation, *i.e.*, its effects were expected to be limited to coronary arteries as opposed to the systemic vascular beds that regulate blood pressure.  (*See* TX-391 at 275; Strauss 790:3-23.)  Most importantly, dipyridamole had been used safely in patients with coronary artery disease, alleviating concerns about hypotension and ischemia.  (TX-391 at 275; Wackers 913:3-12.)

47.     *Gould 1978* reported the use of intravenous dipyridamole as a pharmacological stress agent in a group of patients also undergoing exercise stress testing for suspected coronary artery disease.  (*See* TX-38.)  The article reported that dipyridamole had a "potent, selective" effect on the coronary arteries, increasing coronary flow four hundred percent (400%) over baseline levels.  (TX-38 at 279, 284; Wackers 924:3-6.)  The diagnostic reliability of MPI images obtained with a 400% increase in blood flow was reported to compare favorably with the results of exercise stress tests.  (*See* TX-38 at 279, 284.)  *Gould 1978* further stated that the sensitivity of the imaging technique could be improved by using other coronary vasodilators that were more potent than dipyridamole, but did not identify any specific compounds and noted that such vasodilators would also carry an increased risk of inducing ischemia or myocardial steal, depriving the heart of needed oxygen.  (TX-38 at 285; Wackers 905:6-19.)

13

48.    In a companion paper to *Gould 1978*, Albro and coworkers compared the sensitivity of myocardial perfusion imaging using dipyridamole versus exercise.  (*See* TX-93; Wackers 907:1-13.)  *Albro* specifically stated that dipyridamole was thought to induce vasodilation by preventing the inactivation of adenosine, but nowhere taught, suggested, or even mentioned the possibility of direct administration of adenosine instead of dipyridamole.  (*See* TX-93 at 758; Wackers 907:18-908:18.)

49.    Following the publication of *Gould 1978* and *Albro*, others became interested in dipyridamole as a pharmacologic stress agent.  (*See*, *e.g.*, TX-229; TX-232; TX-258; TX-373.)  Yet, no one tested or even suggested the possibility of using adenosine instead of dipyridamole for that purpose.  As reported in 1982, when Dr. Strauss, Sicor's expert and the author of the ethyl-adenosine study described above, performed pharmacologic stress imaging in humans, he too reached for dipyridamole, not adenosine.  (TX-258; Strauss 777:14-778:1.)

50.    No one considered adenosine as a realistic substitute for dipyridamole because adenosine was viewed as too dangerous.  (*See, e.g.*, TX-46; TX-47; Strauss 803:11-804:8, 805:23-806:8.)  Dr. Melvin Marcus, acknowledged by Sicor as an expert in the field, wrote in a well-regarded treatise in 1983 that intravenous administration of adenosine into animals caused "marked systemic hypotension and reflex tachycardia [abnormally rapid heart beat]."  (TX-217 at 430; Strauss 799:19-800:2; Wackers 909:9-910:25.)  Dr. Marcus stressed that "[b]ecause of the hypotensive effects of adenosine, it is not utilized clinically to produce maximal coronary dilation."  (TX-217 at 430; Wackers 909:19-910:7.)  Even Sicor's technical expert acknowledged that hypotension was "undesirable" during MPI.  (Strauss 799:9-13.)

51.    In contrast to the potent hypotensive effects associated with adenosine, the prior art described dipyridamole as a "relatively selective coronary dilator" with only "modest effects on systemic pressure."  (TX-217 at 432.)  The Marcus treatise chapter continued as follows:

> Dipyridamole has two specific advantages when used to produce maximal coronary dilation in human beings.  First, the coronary dilation produced is reasonably well sustained (half-life = 33 min) [sic].  Therefore, maximal coronary flow in response to drug administration is sufficiently sustained to be measured with a washout technique [sic].  Second, the safety of intravenous dipyridamole in doses that produce intense coronary dilation is based on experience with hundreds of patients with heart disease.

(TX-217 at 432; Wackers 911:15-913:12.)

52.    The Marcus chapter underscores the perceptions of adenosine and dipyridamole in the mid-1980s.  (*See* TX-217.)  Adenosine was perceived as a short-acting systemic vasodilator and barred from the clinic, capable of causing dangerous decreases in blood pressure and interfering with the electrical conduction of the beating heart.  (*See* TX-217; Wackers 909:9-910:25.)  In contrast, dipyridamole was viewed as a relatively selective coronary vasodilator, with sustained activity, proven safe through testing in numerous actual patients with heart disease.[4]  (*See* TX-258; TX-391; Wackers 911:15-913:12.)

53.    The factors that taught away from the use of adenosine as a pharmacologic stress agent persisted throughout the mid-1980s.  Even ten years after Dr. Strauss's publication, a

---

[4] On cross examination, Sicor raised the issue that the adenosine studies described in the Marcus chapter were based on animal data.  (Wackers 1006:3-6.)  Yet, the human adenosine publications relied on by Sicor also showed that adenosine was a powerful hypotensive agent capable of causing systemic vasodilation.  *See* § III.D.2.b., *infra*.  Moreover, to the extent publications described tests in healthy normal volunteers, they failed to establish the safety of adenosine in the relevant patient population.  *See* § III.D.2.c., *infra*.

February 1988 review article reiterated perceived requirements for a pharmacologic stress agent that adenosine simply did not meet:

> It appears that the specific type of coronary vasodilator does not appear to be of critical importance as long as the agent has a selective action on the coronary arteries, has an insignificant systemic effect, and has an effect that lasts for at least 3 minutes to permit thallium extraction from the systemic circulation.

(TX-229 at 432; Strauss 813:3-24.)

54.     Moreover, even after the Adenoscan product was introduced by the predecessor of Astellas in the 1990s, cardiologists initially resisted using the product for pharmacologic stress testing for fear of inducing AV block.  (Klose 1516:3-14.)

### 2.     The Actual Uses of Adenosine In Humans in the Early and Mid-1980s Would Have Discouraged Its Use for Myocardial Perfusion Imaging

#### a.     Limited Use of Bolus Doses of Adenosine to Treat Arrhythmias

55.     In 1983, physician-scientists at the University of Virginia published studies showing that, when administered in bolus doses (*i.e.,* rapid injections), adenosine could be used to treat patients suffering from an abnormal heart rhythm known as PSVT (paroxysmal supraventricular tachycardia).  (TX-36; Strauss 795:6-13.)  PSVT is a condition where a patient experiences a very rapid, or abnormal, heartbeat that is perceived as very unpleasant, and may lead to other complications.  (Wackers 914:3-14.)  These studies took advantage of adenosine's potent ability to interrupt electrical conduction in the beating heart, as bolus doses of adenosine appeared to interrupt electrical conduction sufficiently to "reset" the normal rhythm of the heart.  (*See* TX-45; Wackers 914:9-22.)

56.     Thus, these University of Virginia clinicians discovered that in this unique group of patients, the toxic effects of adenosine could be harnessed to beneficial effect.  (*See*

TX-45.)  However, this clinical situation was very different from the situation of a patient

undergoing myocardial imaging.  As Dr. Wackers explained, "it's a completely different

situation" when a patient is in need of an urgent cardiac therapeutic intervention, as compared to

a patient who may need to undergo a stress test.  The two groups of patients are "totally

different."  (Wackers 915:4-18.)

      57.    These researchers cautioned that clinical use specifically required a careful

consideration of adenosine's powerful and potentially harmful effects:

> Overdosage might lead to prolonged asystole [cessation of heart
> beat], hypotension [low blood pressure], or other tachyarrhythmias
> [abnormal heart beats].  Even though the direct effects of
> adenosine are quite brief, their duration seems to be proportional to
> the dose in each patient and these side effects could be serious in
> certain patients.

(TX-45 at 423; Wackers 916:12-16; 917:10-22.)

      58.    In addition to expressing concern regarding serious adverse effects and the

consequences of overdosage, the authors noted a seven-fold variation in dosages required to

achieve a therapeutic response, leading the authors to recommended that the physician should

individualize the adenosine dosage for each patient.  (TX-45 at 422; Wackers 916:17-917:9.)

The authors emphasized that "the need to individualize dosage for each patient is an important

factor that must be considered before adenosine is widely used clinically."  (TX-45 at 423.)  As

Dr. Wackers recognized, no patient is the same and each may have different sensitivities

regarding the electrical effects of adenosine on the heart.  (Wackers 915:23-916:16.)

      59.    The University of Virginia  physicians also commented on adenosine's

unsuitability for more extended treatments and the efforts to develop analogs lacking its negative

effects:

> The development of longer-acting adenosine analogs might permit
> chronic therapy, but unless an analog specific for the AV nodal

> adenosine receptor is developed, the chronic adenosine-like
> activity of the analog in the many organs in which adenosine plays
> an important physiologic role would have to be considered.

(TX-45 at 423.)

60.    Thus, while the bolus injection of small amounts of adenosine proved useful for treating PSVT, these studies reinforced concerns regarding adenosine's toxic effects, overdosage, systemic effects, and short-half life.  (*See* TX-45; Wackers 918:17-919:3.)

### b.    Dr. Sollevi's Studies In Surgical Patients

61.    Sicor relies on three publications by Dr. Sollevi from the mid-1980s to suggest that an ordinary cardiologist would have believed adenosine appropriate for use in patients with coronary artery disease and likely to succeed as a pharmacologic stress agent.  (*See* TX-112; TX-1169; TX-1171; Strauss 699:4-20, 708:10-709:20, 725:12-726:6.)  In fact, these articles would have taught just the opposite.

62.    Dr. Sollevi pioneered the development of continuous intravenous infusions of adenosine in anesthetized patients undergoing surgery.  Contrary to Sicor's allegations, Dr. Sollevi's publications do not teach or suggest the use of adenosine as a pharmaceutical stress agent for myocardial perfusion imaging.  (*See* TX-112; TX-1169; TX-1171; Wackers 921:5-922:9.)

63.    From 1984 to 1987, Dr. Sollevi published a series of scientific papers characterizing the effects of various dosages of adenosine, including *Sollevi 1984b* (TX-112), *Sollevi 1986* (TX-1171), and *Owall 1987* (TX-1169).[5]  These publications contained several important common elements:  (1) the publications disclosed adenosine's utility in producing profound systemic hypotension, a condition that both Plaintiffs' and Defendants' experts agree

---

[5] Sollevi I (TX-1170), while mentioned in Dr. Strauss's expert report, was not referenced by Dr. Strauss at trial in support of his opinion on obviousness.

was sought to be avoided during MPI (*see* Strauss 768:22-769:2; Wackers 910:8-17), 922:7-9; (2) they lacked any systematic study of patients with coronary artery disease, generally excluding or expressly cautioning against the administration of adenosine infusions to such patients; (3) they did not explicitly or impliedly suggest the use of adenosine as a pharmacologic stress agent for MPI, particularly at a dose of 140 mcg/kg/min; and (4) they did not include any data regarding a safe and efficacious dose for producing maximal coronary vasodilation in patients with suspected coronary artery disease. (*See, e.g.*, TX-112; TX-1169; TX-1171; Wackers 921:5-931:6; *see* DTX-2027.)

64.     In the *Sollevi 1984b* article, Dr. Sollevi described the use of intravenous infusions of adenosine in ten patients to induce major reductions of blood pressure. (TX-112; Strauss 797:7-21.) The studies involved patients without any known history of cardiopulmonary disease. (TX-112 at 400; Wackers 922:10-15.) *Sollevi 1984b* reported that a continuous intravenous infusion of adenosine of 140 mcg/kg/min following dipyridamole pretreatment could be used to decrease blood pressure by forty percent (40%), a drop which Sicor's expert characterized as "quite significant," and which would have been highly undesirable in a patient undergoing a pharmacologic stress test. (*See* TX-112 at 400; Strauss 797:7-21, 768:22-769:2.)

65.     The *Sollevi 1986* review article entitled "Cardiovascular effects of adenosine in man; possible clinical implications," reported that approximately 20,000 studies had been performed regarding the effects and formation of adenosine since Drury and Szent-Gyorgi first characterized the cardiovascular effects of adenosine in 1929. (TX-1171 at 319.) Despite this recognition of the enormous scientific experience with adenosine and the expressly stated purpose of the article to set forth "possible clinical implications" of adenosine administration,

adenosine is nowhere suggested as a candidate pharmacologic stress agent for myocardial

perfusion imaging.  (*See* TX-1171; Strauss 774:13-18.)

66.    Like *Sollevi 1984b*, *Sollevi 1986* disclosed the hypotensive effect of

adenosine, describing the dramatic decreases in blood pressure that result from intravenous

infusions of adenosine.  (*See* TX-1171.)  In particular, *Sollevi 1986* stated that adenosine induced

an "extremely rapid" fall in blood pressure, mediated by "a profound decrease in the systemic

vascular resistance."  (TX-1171 at 332.)

67.    Particularly significant among these publications was *Owall 1987*, in

which two of the patients receiving adenosine to induce hypotension during brain surgery had a

history of myocardial infarction 9 and 13 years before surgery.  (TX-1169 at 229; Wackers

927:16-928:3.)  Both of those patients experienced adverse side effects from the adenosine

infusion.  Indeed, one of these patients developed a potentially dangerous abnormal heart rhythm

called ventricular tachycardia shortly after the induction of hypotension, requiring termination of

the adenosine infusion and treatment with an intravenous injection of lidocaine.  (TX-1169 at

231; Wackers 928:4-929:9.)  The other developed atrial flutter, a type of supraventricular

tachycardia, and required intravenous administration of a separate cardiac drug.  (TX-1169 at

231; Wackers 929:10-17.)

68.    In view of these side effects, the authors of Owall 1987 explicitly

cautioned against using adenosine in patients with a history of heart disease, stating that "[t]he

use of adenosine hypotension should be carefully considered in patients with ischemic heart

disease because in this clinical study, dysrhythmias occurred in the two subjects with earlier

history of myocardial infarction."  (TX-1169 at 233; Wackers 929:18-930:2.)

c.     **Conflicting Results of Studies of Adenosine in Normal Volunteers**

69.     Subsequent to Dr. Sollevi's hypotension studies, several groups published papers investigating the effects of adenosine infusions in normal, conscious volunteers.  These papers included *Biaggioni 1986* (TX-48), *Conradson I* (TX-1211), *Conradson II* (TX-220), *Fuller 1987* (TX-1208), and *Biaggioni 1987* (TX-226).  (Wackers 933:4-18; DTX-2017.)  None of these papers mentioned MPI.  (Wackers 933:22-934:5.)  These publications again contain a number of important common elements: (1) the studies dealt with normal, healthy subjects, not heart patients; (2) the number of subjects studied was small, usually no more than seven; (3) no measures of coronary blood flow were reported; (4) no mention was made of MPI; (5) no medical use for adenosine in humans was proposed; (6) dose-limiting negative side effects were reported; and (7) the dose at which side effects were reported to be intolerable was as low as 70 mcg/kg/min and varied widely.  (*See generally*, TX-48; TX-220; TX-226; TX-1208; TX-1211; Strauss 826:24-831:6.)

70.     These publications were scientific investigations of the molecular mechanism by which adenosine exerted its effects combined with a description of certain physiological responses.  (*See* TX-48; TX-220; TX-226; TX-1208; TX-1211.)

71.     As detailed in DTX-2017, these publications disclosed tests of 35 normal, healthy volunteers spread across 5 different studies.  The subjects received adenosine infusions according to a variety of different protocols, and consequently the results are not directly comparable.  (Wackers 933:4-934:8; *see* DTX-2017.)

72.     The subjects that received adenosine infusions exhibited a wide range of maximal tolerable dosages, with intolerable side effects occurring at doses as low as 70

21

mcg/kg/min.  (*See* TX-1211 at 527; TX-1208 at 311; Strauss 826:24-831:6; Wackers 936:5-937:2, 937:15-938:2; DTX-2017.)

73.     None of these normal volunteer articles provided any suggestion to use adenosine in MPI or sufficient information to determine what adenosine dose, if any, would be useful for that purpose.  Nor did any of these articles indicate that the effect of adenosine on coronary blood flow was sufficient for diagnostically reliable MPI.  (Strauss 826:24-831:6; Wackers 934:25-935:5, 937:14-939:1.)

74.     Additionally, none of these studies taught a safe dose for administration to patients with coronary artery disease, because the studies specifically excluded such patients.  (Wackers 938:19-939:1.)  This is an important omission, as the patient population requiring pharmacologic stress imaging was known to suffer from numerous adverse circulatory and coronary conditions.  (TX-168 at 1344.)  In fact, a subsequent publication reported that 50% of over 9,000 patients receiving pharmacologic stress testing had a history of coronary artery disease and nearly 25% of those patients had suffered a heart attack.  (TX-103 at 300; Strauss 835:1-836:1.)

75.     The normal volunteer studies also examined a patient population ranging in age from 23-40.[6]  In contrast, more than half of the patients that are in need of pharmacological stress imaging are typically older with a mean age of 65.  (TX-103 at 386; Strauss 835:1-11.)  This age difference may be important, as age can influence the response to a given pharmaceutical.  (Wackers 934:9-20.)

76.     The normal volunteer studies produced conflicting results regarding tolerable dosing, and provided no information about the safety of adenosine infusions in patients

---

[6] *Biaggioni 1986* (TX-48) did not report the age of the 7 subjects tested.

with coronary artery disease.  (Strauss 826:24-831:6; Wackers 934:21-935:5, 938:19-939:1.)

Moreover, the normal volunteer studies nowhere proposed using adenosine as a pharmacologic

stress agent, nor did they even suggest that adenosine satisfied the perceived requirements for a

pharmacologic stress agent.  None of these studies characterized adenosine as a more potent

coronary vasodilator than dipyridamole.  (*See* TX-48; TX-220; TX-226; TX-1208; TX-1211.)

### E.    Prior to the Invention of the '877 Patent Nobody In the MPI Medical Community Even Mentioned the Possibility of Using Adenosine

77.    While both sides agree that dipyridamole was known to carry out its

effects, at least in part, by modulating internal adenosine levels, the prior art was noticeably

devoid of suggestions to substitute adenosine for dipyridamole in human patients.  A series of

articles reviewing developments in MPI, including publications by both Plaintiffs' expert, Dr.

Wackers, and Sicor's expert, Dr. Strauss, were published in the late 1980s.  (*See, e.g.*, TX-168;

TX-170; TX-373.)  None of these articles discussed or even proposed adenosine as an alternative

pharmacologic stressor.  (*See*, *e.g.*, TX-168; TX-170; TX-373.)

78.    For example, Dr. Strauss published a review article in 1986 entitled

"Myocardial Perfusion Studies:  Lessons from a Decade of Clinical Use" discussing

dipyridamole imaging, but not mentioning adenosine.  (TX-373 at 577, 581; Strauss 779:4-8.)

Indeed, an inspection of Dr. Strauss's CV reveals that prior to 1988, Dr. Strauss had never used

adenosine in humans.  (*See* TX-246; Strauss 774:2-7.)  Significantly, not withstanding that he

was the developer of the pharmacologic MPI stress test technique, Dr. Strauss acknowledged that

none of his publications explicitly mentioned using adenosine as a pharmacological stress agent,

and that he was not aware of a single publication prior to 1988 that suggested using adenosine

for MPI.  (Strauss 774:2-18.)

23

79.     Similarly, Dr. Wackers wrote a review article in 1987 entitled "Clinical Assessment of Myocardial Perfusion with Thallium-201."  Like Dr. Strauss's article, Dr. Wackers's included a section on MPI using dipyridamole, but nowhere mentioned even the possibility of using adenosine.  (*See* TX-170 at 60, 70; Wackers 939:7-943:19.)  Notably, the review article by Dr. Wackers included a description of cutting edge techniques that were not yet commercially available.  (TX-170 at 72; Wackers 942:12-943:10.)  When asked why he did not discuss adenosine in this section, Dr. Wackers stated, "Nobody talked about it.  Nobody wrote about it."  (Wackers 943:11-19.)

80.     Dr. Wackers also stated that as of 1987, he had not thought of using adenosine as a pharmacologic stress agent, and had never heard anyone discuss using adenosine for MPI in human patients.  (Wackers 943:11-19.)

81.     Dr. Wackers also authored a book chapter on MPI that was published in 1988.  (TX-171; Wackers 943:22-944:11.)  This chapter was included in a textbook that nuclear cardiology residents and fellows read as part of their training.  (Wackers 944:12-19.)  As with the Strauss and Wackers review articles, the book chapter discussed dipyridamole as a pharmacologic stress agent for MPI, noting that dipyridamole is a potent dilator of the coronary arteries.  (TX-171 at 45; Wackers 944:20-945:18.)  The book chapter did not mention adenosine. (*See* TX-171; Wackers 945:19-23.)

82.     A 1989 review of "Alternatives to Exercise Stress Testing" by Stratmann and Kennedy, published during the prosecution of the '877 patent, is particularly enlightening. (*See* TX-168.)  After reviewing 210 recent publications in the field, the article included a list of alternatives to exercise stress for evaluating coronary artery disease.  (TX-168 at 1345.)  The list included 11 alternatives, including 5 different pharmacologic stress agents.  (TX-168 at 1345;

Strauss 814:14-815:9.)  While this list included dipyridamole, it failed to include adenosine.

Indeed, the article nowhere mentioned adenosine.  (*See* TX-168; Strauss 815:6-18.)

> **F.     The Medical Community Greeted the Invention of the '877 Patent with Skepticism and Concern**

83.     Drs. Daniel Hilleman and Syed Mohiuddin, the inventors of the methods

claimed in the '877 patent, were researchers at Creighton University when they overturned

conventional wisdom by conceiving and conducting experiments to determine if adenosine could

be safely and effectively used as a pharmacologic stress agent for MPI.  (*See* Mohiuddin

1855:21-1857:14; Hilleman 2106:3-21.)  Dr. Mohiuddin was trained as a cardiologist, Dr.

Hilleman as a pharmacologist.  (Mohiuddin 1856:4-13; Hilleman 2106:19-2108:3.)  In the mid-

1980s, both were participating in clinical trials funded by Medco, the predecessor in interest to

Plaintiff King, relating to the treatment of tachycardia (PSVT) with small, bolus doses of

adenosine.  (Salzberg 1839:1-11; Mohiuddin 1857:17-24; Hilleman 2109:13-2110:7.)

84.     In the summer of 1987, Gail Salzberg, an employee of Medco responsible

for coordinating the clinical trials on adenosine as a treatment for PSVT, met with Drs. Hilleman

and Mohiuddin during a site visit at Creighton University.  They told her about their idea to use

adenosine as a pharmacologic stress agent for MPI.  (Salzberg 1838:3-24.)  Ms. Salzberg

testified that prior to this meeting, she had never heard anyone discuss the possibility of using

adenosine for MPI—despite having met with approximately 20 cardiology groups at many

different sites who were also working with Medco's adenosine.  (Salzberg 1839:12-1840:11.)

> **1.     Contemporaneous Documents Capture the Concern of the Medical Community**

85.     The invention of the '877 patent was greeted with skepticism and concern

by the medical community.  For example, upon hearing that Drs. Hilleman and Mohiuddin

planned to test adenosine in myocardial perfusion imaging, the Director of Clinical Cardiology at

25

the University of Minnesota wrote, "I am not certain how effective and safe adenosine would be as a coronary vasodilator for this purpose. . . ." (*See* TX-53; Salzberg 1844:11-23.)

86.     After a 1989 presentation on the use of adenosine for myocardial perfusion imaging, Dr. Marcus, an acknowledged leader in the field, stood up and cautioned that adenosine "was not a benign drug" and that you have to watch out for heart block. (Wackers 946:11-947:11.)

87.     Letters to the editor, editorials, and scientific articles in contemporaneous journals further reflected this concern. (*See, e.g.*, TX-169.)

88.     Following a 1989 publication of the inventors describing the use of adenosine as a pharmacologic stress agent, the Journal of Radiology published a letter to the editor written by a cardiologist named Dr. Spiegler. (*See* TX-67; TX-169; Wackers 948:22-949:19.) Dr. Spiegler stated that he was "particularly disturbed by the electrocardiographic changes noted during the adenosine infusion," and observed that two patients developed asymptomatic transient second degree or complete heart block. (TX-169; Strauss 816:16-818:6; Wackers 947:24-948:21.) The letter concluded that "[o]nly further investigation will determine whether this will ultimately preclude routine use of adenosine as a pharmacological stress agent." (TX-169; Strauss 816:16-818:6; Wackers 947:24-948:21.)

89.     A 1990 editorial published in *Circulation*, one of the premier journals in the field of cardiology, explained that the safety of infusions of adenosine at 140 mcg/kg/min *still needed to be established*, as did the effectiveness and safety of infusing adenosine in people with a variety of heart conditions, including significant coronary obstructions, left ventricular dysfunction, ventricular hypertrophy, predisposition to arrhythmias, and SA or AV node disease. (TX-47 at 1856 (emphasis added); Strauss 818:19-819:3; Wackers 950:3-14.) In *Circulation*,

26

such editorials were written by experts in the field by invitation of the Editor-in-Chief of the journal.  (Wackers 950:15-951:6.)

### 2.    Sicor's Expert, Dr. Strauss, Admitted that He Was Reluctant to Administer Adenosine at 140 mcg/kg/min

90.    Sicor's Dr. Strauss did not begin using adenosine as a pharmacologic stress agent until the early 1990s, well after the filing date of the '877 patent.  When Dr. Strauss finally used adenosine, he initially administered the drug not at the manufacturer recommended dose of 140 mcg/kg/min, but at a much lower dose that he gradually titrated upwards.  (*See* TX-314; Strauss 779:9-13; 779:21-780:19.)

91.    At trial, Dr. Strauss testified that the decision to use the stepwise protocol had "nothing to do with the AV block."  (Strauss 780:7-781:5.)  But he was impeached by his flatly contradictory prior deposition testimony.  He previously testified that he used the stepwise protocol "because adenosine had been used to treat arrhythmias where the onset of [AV] block is intentional that this could be a significant problem with infusion."  (Strauss 782:17-783:18.)  He was concerned that adenosine at 140 mcg/kg/min would induce heart block.  (Strauss 782:17-783:18.)

### 3.    Unresolved Concerns Regarding Ischemia, AV Block, and Hypotension Kept Adenosine Out of the Clinic

92.    Dr. Mario Verani, acknowledged by Dr. Strauss as a leader in the field of pharmacologic stress imaging, wrote in 1995 that the long interval between animal experiments and clinical investigations using adenosine may have resulted from concern with the ultrashort half-life of exogenous adenosine (2-10 seconds), concerns regarding the safety of large intravenous doses of a drug that could trigger severe myocardial ischemia in patients with coronary artery disease, and the potential for slowing antrioventricular conduction (*i.e.,* AV

block).  (*See* TX-240 at 1038-39; *see also* TX-47 at 1855 (stating that fear of AV block and

hypotension had limited adenosine use in patients); Strauss 805:23-809:14.)

### G.    Adenosine Is Now Preferred as a Pharmacologic Stress Agent Because of Its Superior Safety and Speed

93.    Today, both adenosine and dipyridamole are used as clinical alternatives

to physical exercise in connection with myocardial perfusion imaging.  (*See* TX-138 at 300;

Wackers 891:13-892:1.)  While both drugs are considered acceptable vasodilators, adenosine has

proven to have clear clinical advantages in terms of its rapid onset of action and short half-life,

which makes it safer, particularly in high risk patients.  (TX-138 at 300; Wackers 892:2-13,

893:13-894:3.)

94.    Sicor's expert, Dr. William Strauss, admitted that he uses adenosine

because of the rapidity and safety of the procedure.  (Strauss 786:3-6.)  He also agreed that a

"major advantage" of adenosine in terms of both ease of use and safety is that adverse side

effects can be terminated by merely stopping the infusion of adenosine, whereas reversal of the

effects of dipyridamole requires administration of an antidote drug, such as aminophylline.

(Strauss 784:12-785:13.)  However, this poses serious risks to the patient because dipyridamole

has a longer half-life than the antidote aminophylline.  So in many instances, the antidote can

wear off too soon—before the effects of dipyridamole have ceased.  Consequently, patients

treated with dipyridamole and aminophylline can experience "a recurrence of their ischemia and

go on to infarct or die."  (Strauss 785:14-786:2.)

### H.    Adenoscan is a Highly Successful Commercial Product

95.    The increased safety of adenosine over dipyridamole as a pharmacologic

stress agent translates into the market place as well.  Sales of Astellas's adenosine product,

Adenoscan, outpace sales of dipyridamole by approximately 2 to 1 notwithstanding that

Adenoscan is seven to ten times more expensive than dipyridamole. (*See* TX-21; Hay 1731:23-1733:3; DTX-2030; DTX-2031.)

### 1.     Adenoscan Went From Newcomer To Market Leader

96.     Astellas's Adenoscan product is an adenosine solution for use as a pharmacologic stress agent in connection with MPI. (TX-75; White 1231:4-7.) Adenoscan was launched in 1995. (TX-21; White 1232:11-15.) Adenoscan faced the challenge of entering a market dominated by dipyridamole, the market leader at that time. (TX-21; White 1232:13-24; Hay 1732:9-25.) Astellas itself was new to the pharmacologic stress market, never having sold a product in that market before. (White 1232:13-24.) Despite its newcomer status, Adenoscan's sales, both unit sales and sales revenue, experienced substantial and sustained growth after its launch. (TX-19; TX-21; Hay 1733:11-1734:22, 1714:13-1716:9; DTX-2032; DTX-2014.) Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005. (TX-19; Hay 1714:13-1716:9; DTX-2014.) Adenoscan sales continued these substantial increases despite facing competition from generic dipyridamole beginning in late 1996. (TX-19; White 1244:9-1247:15; Hay 1738:12-1740:1.) Adenoscan went on to amass almost $1.7 billion in sales revenue in less than ten years. (TX-19; Hay 1716:14-18.)

97.     In concert with its substantially increasing sales, Adenoscan gained significant market share over time, both in terms of sales revenue and scans performed. (TX-21; White 1243:20-1244:8, 1729:7-19, 1730:24-1731:10, 1733:4-1734:22, 1738:12-1739:7; DTX-2032.) Adenoscan's increases in market share came at the expense of its main competitor, dipyridamole. (TX-21; Hay 1731:11-1733:3; DTX-2029; DTX-2030; DTX-2031.) Ultimately, Adenoscan displaced dipyridamole as the market leader. In December of 1995 Adenoscan held 16.5% of the market share of scans and dipyridamole held 76%. (TX-21; Hay 1731:11-22; DTX

2029.)  By June of 2005 Adenoscan's market share had grown to 61.4% of scans and

dipyridamole's market share had fallen to 32%.  (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-

21; DTX-2031.)

98.    Adenoscan's increases in share of sales revenue, its portion of the dollars

spent on pharmacologic stress agents in the market, were even more dramatic.  Adenoscan

revenues grew from 10% of the pharmacologic stress market at the end of 1995 to over 90% by

the end of 2004.  (TX-21; Hay 1738:12-21.)  Adenoscan has gained market share not just from

doctors switching from dipyridamole but also by taking an increasingly larger share of the

growing market.  (Hay 1733:4-1734:11, 1739:20-1740:1; *see* Klose 1528:18-1529:22;

DTX-2032.)

### 2.    Sales of Adenoscan Were Driven by the Attributes of the Claimed Invention, Not Marketing and Promotion

99.    Sales of Adenoscan were driven by the characteristics of the invention

claimed in the '877 patent.  (Hay 1712:17-1713:20, 1738:22-1740:1; 1754:10-1757:19;

1796:22-1798:1.)  Sicor's proposed adenosine product is a generic version of Adenoscan, which

is identical to the branded drug in every way, including the labeled indications.  (TX-4 at

SIC004148-4159; TX-75; Hernandez 2058:21 -2064:1; Lea 2038:6-11; .)  Having conceded that

its own product is covered by the '877 patent claims, Sicor can hardly deny that those claims also

cover Adenoscan.  (*See* D.I. 137 at ¶2.)  Thus, success of Adenoscan is success of the claimed

invention.

100.    Adenoscan's sales grew because clinicians recognized significant

advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; *see also* Hay

1754:10-1757:15.)  Sicor's expert, Dr. Strauss, testified that he uses Adenoscan in his own

practice because he perceives its attributes of increased safety and ease of use as major

advantages over dipyridamole. (Strauss 784:6-786:6.) Plaintiffs' expert, Dr. Wackers, also pointed to Adenoscan's rapid onset of action and rapid cessation of action as attributes making Adenoscan safer and, therefore, his preferred stress agent. (Wackers 892:2-13; *see also* White 1353:19-1354:16.)

101.    Plaintiff's economic expert, Dr. Hay, testified that Adenoscan's sales performance demonstrates that doctors must recognize advantages in Adenoscan to choose it over generic dipyridamole— a product that is seven to ten times cheaper. (Hay 1738:22-1740:1, 1754:10-1757:19.) Indeed, Adenoscan's market share is nearly twice that of dipyridamole because physicians prefer Adenoscan to dipyridamole. (*See*, *e.g.*, TX-21; Hay 1731:23-1733:3; White 1353:19-1354:16.)

**I.    Sicor Copied Every Aspect of Adenoscan and the Patented Invention in its Abbreviated New Drug Application and Subsequently Admitted Infringement of the Asserted Claims of the '877 Patent**

102.    Sicor filed its ANDA on December 6, 2004, proposing to make a generic copy of Adenoscan. (TX-4 at SIC004124, 35.) Sicor admitted that its drug product would have "the same active and inactive ingredients, dosage form, route of administration, and conditions of use" as Adenoscan, the listed drug product, and provided comparison charts intended to establish that Sicor's generic product "is the same" as Adenoscan. (TX-4 at SIC004140.)

103.    Sicor initially certified to the FDA that it did not intend to market their generic adenosine drug product until after the expiration of the '877 patent. However, Sicor subsequently amended its ANDA to certify that the '877 patent was invalid, unenforceable, or will not be infringed. (*See* TX-7 at SIC005360.) As required by law, Sicor thereafter notified King and Astellas of this amendment. (*See* Rosenberg 2049:10-2051:17.)

104.    Sicor admits that making, using, offering to sell, importing, or selling its generic adenosine product would infringe the asserted claims of the '877 patent. (D.I. 137 ¶ 2.)

### J.     Sicor's Contrary Contentions Are Unmeritorious

#### 1.     Contentions Regarding Availability of Adenosine

105.     Sicor's assertion that adenosine would have been a readily apparent substitute for dipyridamole are deeply undercut by the fact that cardiologists in the field were aware of both dipyridamole and adenosine for years but never even suggested substituting adenosine for dipyridamole.  Sicor asserts that this failure occurred because adenosine was not available as a pharmaceutical grade product.  (*See, e.g*., Strauss 670:24-671:21.)  That adenosine availability was not an impediment is clear from the fact that at least 6 separate research groups published one or more prior art articles describing their work administering adenosine to humans.  (*See* DTX-2016.)

106.     In fact, adenosine was readily available from several major U.S. and British chemical manufacturers.  For example, DiMarco and coworkers at the University of Virginia and Biaggioni and coworkers at Vanderbilt reported that they purchased their adenosine from Sigma, a U.S. chemical manufacturer, while Fuller and coworkers and Conradson and coworkers reported that they purchased their adenosine from Fluorochem, a British manufacturer.  (*See* TX-36 at 1256; TX-48 at 2233; TX-1208 at 310; TX-1211 at 388; Strauss 822:7-823:22.)

107.     Sicor's expert, Dr. Strauss, acknowledged that these groups differentiated themselves from other researchers in having an interest in using adenosine in humans and in their belief that there might be a benefit in doing so, as virtually any academic institution was equipped to take chemical grade material and turn it into a pharmaceutical grade drug.  (*See* Strauss 823:23-824:14.)  Dr. Strauss further admitted that people in the field were not shy about commenting when materials they wanted were not available.  (Strauss 824:15-19.)

108.    While numerous groups commented on the lack of availability of intravenous dipyridamole, Dr. Strauss could not identify a single publication prior to December 1987 that explicitly bemoaned the unavailability of adenosine.  (*See* TX-1192 and TX-129 (commenting on the lack of intravenous dipyridamole for purposes of diagnostic imaging); Strauss 825:4-14, 825:19-826:12.)

109.    Also demonstrating that lack of commercial availability was no impediment to researchers in the field, a 1979 article authored by Sicor's expert, Dr. Strauss, recommended the use of dipyridamole or ethyl-adenosine, but not adenosine itself, as pharmacologic stress agents in humans even though neither was then commercially available. (TX-232 at 247-48; *see also* TX-129; TX-1192; Strauss 774:19-776:4, 824:22-826:12.)  Indeed, a 1986 review article authored by Dr. Strauss did not even mention adenosine as part of the "State of the Art" of myocardial imaging, even though an adenosine infusion had been used in dogs for this purpose in 1981.  (TX-373; Strauss 778:18-779:8; *see*, *e.g.*, TX-245; Strauss 776:13-777:1.)

### 2.    Contentions Regarding the State of the Art

#### a.    Sicor's Characterization of the Sollevi Prior Art

110.    Sicor contends that the adverse effects observed by Sollevi in heart patients resulted from hypotensive doses of adenosine, and that one of ordinary skill would not have concluded that lower, non-hypotensive doses of adenosine caused similar side effects.  (*See* Strauss 724:20-725:11.)  Yet, the mean dose reported in *Owall 1987* for the induction of hypotension was only 214 mcg/kg/min, and the specific dose administered to the two cardiac patients was not reported.  (TX-1169 at 232; Wackers 1019:20-1020:5.)  Moreover, Sicor can point to no data from *Owall 1987*, or any other prior art source, suggesting that lower doses could have been safely administered to these patients.  Indeed, the scientific literature taught that

different people had very different sensitivities to adenosine, making it impossible to predict whether merely lowering the dose would avoid the reaction. (*See* TX-45 at 422-23 (stating that the "variability of response [to adenosine] makes prediction of a uniform optimal dose for all patients difficult").)

111.    Sicor further contends that the *Owall 1987* publication would indicate to a person of ordinary skill that doses of 200 mcg/kg/min or less would be useful for MPI. (*See* Strauss 725:12-726:1.) However, the *Owall 1987* publication was directed to decreasing blood pressure in anesthetized patients, a purpose antithetical to that of diagnosing coronary artery disease in conscious patients, where hypotension should be avoided. (TX-1169; Strauss 768:22-769:2; Wackers 910:8-17.) Moreover, the authors of *Owall 1987* specifically cautioned against using adenosine in patients with heart disease, and the only patients with histories of cardiac disease both experienced adverse events requiring medical intervention. (*See* TX-1169 at 233; Wackers 929:18-930:2.) The *Owall 1987* publication taught away from using adenosine for detecting and assessing coronary artery disease.

112.    Sicor seeks to undercut Dr. Verani's observations on the reasons why adenosine was not earlier used in MPI by pointing out that he stated in his editorial that he was speculating on the reasons for the long interval between the animal experiments and the clinical studies. (*See* Wackers 1021:7-1022:15.) Yet, Dr. Wackers testified that the concerns articulated by Dr. Verani were "real concern[s]" that would have been known to one of ordinary skill in the art prior to December, 1987. (Wackers 954:18-957:6.) Moreover, Sicor does not and cannot deny that a delay of nearly a decade occurred between the animal studies of Drs. Strauss and Pitt and the clinical studies of Drs. Hilleman and Mohiuddin.

### b.    Sicor's Untimely New Contentions

113.    In a previously undisclosed argument not present in either of his expert reports and introduced for the first time at trial, Sicor's expert, Dr. Strauss, contended that Section 7.2.1 of *Sollevi 1986* showed that an adenosine infusion of 80 mcg/kg/min produced a doubling in coronary blood flow during anesthesia, leading Dr. Strauss to allege that a person of ordinary skill would have concluded that this dose of adenosine could be used for MPI. (TX-1171 at 335; Strauss 702:21-704:9; *see* TX-70; TX-246.)

114.    The contention is not only untimely, but also without merit.  The data cited by Dr. Strauss represented measurements taken from only a single patient.  (TX-1171 at 335; Wackers 923:20-23.)  That single patient was anesthetized and undergoing surgery, not awake and preparing to undergo MPI.  (TX-1171 at 335.)  Most importantly, the figure illustrating the data from this patient (Fig. 11), showed that the alleged "doubling" of coronary blood flow was in actuality an increase of only 70%, and that this increase was associated with a reduction of blood pressure (hypotension) of about 20%.  (TX-1171 at 335; Wackers 923:24-924:2.)  In contrast, Gould had previously reported that the dipyridamole dose used for myocardial imaging produced a 400% increase in blood flow with little to no decrease in blood pressure.  (TX-1171 at 335; TX-38 at 284, Fig. 8; Wackers 924:3-17.)  Thus, the results from this single anesthetized patient would have confirmed what had already been described by Dr. Sollevi, that adenosine was a potent vasodilator that caused significant systemic hypotension at doses below what would be required for myocardial imaging.  (TX-1171 at 335; Wackers 923:24-924:17.)

115.    In a second argument introduced for the first time at trial, Dr. Strauss contended that *Sollevi 1986* described a 100% increase in blood flow in a coronary bypass graft following an adenosine infusion of 30-50 mcg/kg/min.  (Strauss 704:22-706:16.)  Dr. Strauss

alleged that this result would suggest to a person of ordinary skill that an adenosine dose of 60-100 mcg/kg/min would produce "double or double again" the coronary blood flow, assuming a "general S-shaped curve of effectiveness of the drug." (Strauss 706:17-707:8.) This argument is similarly untimely and unmeritorious.

116. The "general S-shaped curve of effectiveness of the drug" and the "double or double again" coronary blood flow described by Dr. Strauss are not anywhere mentioned in *Sollevi 1986* or Dr. Strauss's expert reports. (Objection at 707:9-12; Strauss 846:8-849:6.)

117. The 30-50 mcg/kg/min adenosine infusion in *Sollevi 1986* described testing surgical grafts in anesthetized, open-chest heart patients prior to closure of the thorax. This testing represented a form of surgical "quality control"—a context that is "totally different" from MPI, a diagnostic procedure performed on conscious patients. (*See* TX-1171 at 335; Wackers 926:5-24.) Moreover, the article explicitly described the 30 to 50 mcg/kg/min doses as "non-hypotensive infusion rates" as compared to the higher infusion rates that definitely induced hypotension. (TX-1171 at 335; Wackers 925:7-926:24.) Thus, despite Dr. Strauss's contrary opinion, the statement plainly does not suggest the appropriateness of higher doses of adenosine for MPI where hypotension would have been expected.

### 3. Arguments Regarding Commercial Success

118. Sicor argues that the combined factors of Astellas's marketing campaign, the presence of only one other significant competitor (dipyridamole) in the market, that competitor's lack of promotion due to availability of a generic product, and the growth in demand for pharmacological stress testing are responsible for the outstanding sales performance of Adenoscan, rather than the merits of Adenoscan itself. (Leffler 1579:13-1582:13.) These arguments, however, are in conflict with the strong evidence that doctors recognized significant therapeutic advantages in Adenoscan and used it because of those advantages. They also ring

hollow given that Sicor has been selling dipyridamole for years, but is now going to considerable trouble to obtain market approval for generic adenosine as well.  (Lea 2035:22-2036:9.)

119.    Sicor overstates the impact of promotion and fails to acknowledge that pharmacologic stress agents are sold to expert consumers, cardiologists and nuclear medicine specialists, who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (White 1231:22-1232:7; Hay 1712:17-1713:25, 1797:2-1798:1.)  The record reflects that once clinicians learned about the benefits of Adenoscan and gained experience with the drug, the sales of Adenoscan boomed.  (Klose 1516:3-14, 1529:7-14.)  In addition, adenosine and dipyridamole are used in clinics and hospitals multiple times each day, and their effects in patients are fully observed and taken into account by the physicians who make purchasing decisions.  (Hay 1712:17-1713:25.)  As mentioned above, Adenoscan is seven to ten times more expensive than generic dipyridamole, and it must demonstrate specific beneficial attributes for these expert consumers to continue to purchase it.  (White 1245:17-25; Hay 1797:9-1798:1.)

### a.    Adenoscan's Promotion Was Typical In The Industry

120.    Astellas promoted Adenoscan using a marketing program that was very typical in the pharmaceutical industry at that time.  At most, Astellas spent what was an average amount of money by industry standards on the promotion of Adenoscan.  (TX-1165; Hay 1712:6-16.)  As a percentage of gross sales, these promotion costs were less than 6% of gross sales revenue for most of the years between 1996-2005, and dropped to about 3% by 2005.  (TX-19; Hay 1747:17-1748:2; DTX-2041.)  The combination of average promotional expenditures and anything but average sales made Adenoscan a very profitable product for Astellas.  (TX-19; Hay 1749:2-20, 1754:2-9; DTX-2040.)

121.    Astellas's promotion efforts were focused on education and had a high "informational" quotient directed to the attributes of Adenoscan.  (White 1229:23-1231:3; Klose 1533:13-18.)

122.    Astellas provided free trials of Adenoscan so that doctors could learn about Adenoscan and get experience with it.  (White 1274:21-1275:23; Klose 1518:1-13.)  As many pharmaceutical companies did at the time, Astellas also had an educational program that was focused on the pharmacologic stress market in general as opposed to a particular product.  (TX-92; White 1252:17-1255:2; Hay 1751:13-1752:19.)  Astellas supported research and clinical trials involving pharmacologic stressors to advance the knowledge in the field.  (White 1251:13-1252:16.)

123.    Astellas participated, along with the American Heart Association and many other companies, in the Her Heart campaign, an effort to increase the awareness of womens' cardiovascular health issues.  (TX-222; TX-359; White 1259:20-1261:19; Klose 1531:8-1532:8.)

124.    As a company, Astellas was focused on safety as well as on education.  Since a pump is necessary for the safe and effective administration of Adenoscan, Astellas instituted a pump program to make pumps available at no charge to those using Adenoscan.  (White 1264:24-1265:9, 1266:8-17.)  This too was not unusual in the industry because it enabled the safe and proper use of the product.  (Hay 1752:21-1754:1.)

### b.    Sicor's Economic Expert Was Unreliable And His Theories Not Supported By The Record

125.    Sicor relies heavily on its economic expert, Dr. Keith Leffler.  Dr. Leffler offered the opinion that Adenoscan's "sales pattern is extremely well explained by the circumstances that existed in the marketplace."  (Leffler 1632:12-14.)  However, in arriving at

this opinion, Dr. Leffler never consulted any physicians about the reasons why they purchase adenosine versus dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents. (Leffler 1683:6-21.) Dr. Leffler did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1631:5-11.) Dr. Leffler also did not provide any information about what percentage of sales were due to Adenoscan's merits and what percentage were due to promotion and advantageous market circumstances. (Leffler 1683:6-1684:12.) Despite not having considered or tried to find out what doctors actually believe and the substantial evidence that doctors purchase Adenoscan based on its merits, Dr. Leffler purports to be able to tell that physicians are purchasing Adenoscan based on promotion and market circumstances. (Leffler 1683:6-1684:12.) The contention is not credible.

126.     Dr. Leffler's opinions were also fraught with outright mistakes and inaccuracies. Dr. Leffler relied on a demonstrative (DTX-3131) during his testimony that incorrectly reported the number of dipyridamole scans as increasing from about 1 million in 1996 to over 3 million in 2004 and used that demonstrative to support his opinion concerning increases in sales of dipyridamole. (*See* Leffler 1577:25-1578:23.) In fact, even in 2004, there were only 1.34 million dipyridamole scans, not 3 million. (TX-21; Leffler 1653:19-1654:23.) Nevertheless, Dr. Leffler doggedly stuck to his opinion that the demonstrative showed "the general trend of the scan data." (Leffler 1654:24-1655:5.)

127.     Dr. Leffler also misstated the sales growth of Adenoscan by asserting that sales growth "leveled off" between 1998 and 2001. (Leffler 1575:24-1576:18, 1592:14-24, 1595:1-25.) In reality, sales continued to grow substantially and steadily in the years 1998 to 2001, and there was no "leveling off" of sales. On cross-examination, however, Dr. Leffler

himself disavowed the existence of any "plateau" in sales and changed his testimony to assert merely that there was "a slowing in the growth." (Leffler 1662:22-1663:23.) Indeed, the annual report for Astellas's Japanese parent reported "double digit growth in sales" over the same period that Dr. Leffler had characterized as a "leveling off." (TX-331; *see* Leffler 1664:23-1667:9.) Rather than using the data in TX-19 that was reported by Astellas's finance department, Dr. Leffler chose to use the annual sales of Adenoscan as reported in yen in Astellas's Annual Reports. (TX-330; TX-331; Leffler 1657:10-1659:10, 1665:18-1670:23.) Dr. Leffler's claim that sales "leveled off" or "slowed" is nothing more than an artifact of his choice to convert the Adenoscan sales in the Annual Reports using the exchange rate from one day of the corresponding year, despite the clear disclaimer in Astellas's Annual Reports. (TX-330; TX-331; Hay 1725:12-1728:8; DTX-2043; DTX-2047.) When the annual Adenoscan sales in yen reported in Astellas's Annual Reports are converted to dollars using the IMF annual average exchange rate, a rate Dr. Leffler has previously described as the "official" exchange rate, they match the sales figures in TX-19 within 0.37%. (Hay 1719:5-1723:20; DTX-2036; DTX-2042; DTX-2047.) Dr. Leffler also admitted that "depending on how one uses the exchange rate, you will get more or less of a slowing of growth." (Leffler 1663:13-15.) Dr. Leffler, of course, used the form of exchange that maximized the appearance of slowing. (Leffler 1662:11-1664:22.)

128.    Additionally, Dr. Leffler used unit data from IMS, which he acknowledged to be incomplete and inappropriate for many uses, including his calculation of the market shares of Adenoscan and dipyridamole. (Leffler 1671:1-1673:12.) IMS data understates Adenoscan's actual market share because IMS data does not capture all of the sales of pharmacologic stress agents and reports only the number of vials sold. (TX-142; Hay 1735:16-1736:18.) As a result, IMS cannot provide reliable information about the sales amounts

of any pharmacologic stress product and cannot provide any information about the number of times a product is selected for a procedure. (TX-142; Hay 1736:25-1737:17; Leffler 1590:14-1593:4, 1671:9-1672:4.)

129.     This is not the first time that Dr. Leffler has relied upon dubious evidence to support his opinions or used evidence in an inappropriate fashion. (Leffler 1644:17-1653:18.) Courts have criticized Dr. Leffler for his use of erroneous data and opinions contradicted by the evidence several times before.

130.     For example, in *F.T.C. v. Freeman Hospital*, 911 F.Supp. 1213, 1219 (W.D. Mo. 1995), the court declined to adopt Dr. Leffler's analysis of the relevant geographic market, determining it to be flawed because it was based on incomplete data. In *Howerton v. Grace Hospital*, 1995 WL 787529 (W.D.N.C. 1995), the court rejected Dr. Leffler's opinion concerning market power and monopolization because it was refuted by Plaintiffs' own evidence and not supported by the record. *See also In re Methionine Antitrust Litigation*, 2003 WL 22048232 (N.D.Cal.) (decertifying a class because Dr. Leffler did not perform the proposed analysis that the Court relied upon when granting the Plaintiffs' motion for class certification).

### K.     Dr. Sollevi's Proposals to Use Adenosine as a Pharmacologic Stress Agent Are Not Prior Art and Do Not Disclose the Dose of 140 mcg/kg/min

131.     The only other suggestion to do the experiment done by Drs. Hilleman and Mohiuddin was made by Dr. Sollevi. He added an Example XIII to his patent application on December 28, 1987, proposing the use of adenosine in lieu of dipyridamole in the conventional myocardial perfusion imaging protocol. (TX-275.)

### 1.     Example XIII Does Not Disclose or Suggest an Adenosine Infusion at About 140 mcg/kg/min

132.     Example XIII of the '296 patent consisted of a half column prophetic suggestion on the use of adenosine in connection with myocardial imaging. (TX-275 at cols.

21-22.)  Example XIII did not identify adenosine doses that were both tolerable and effective for reliable MPI diagnosis.  (TX-275.)  Nor did it describe a dose of about 140 mcg/kg/min.  (Wackers 959:14-22.)  It stated instead that "[t]he exact dose will normally have to be titrated individually" and went on to speculate that the dose "should lie in the range of 10 to 150 [mcg/kg/min]."  (TX-275 at col. 21, ll. 59-61.)  While titration was proposed, the endpoint of titration was not defined.  (TX-275; Wackers 957:14-958:13.)

133.    Dr. Strauss testified that he "presume[d]" that this omitted endpoint referred to adequate vasodilation for an MPI scan, but acknowledged that this information was not available prior to the work of the inventors and would involve testing "a lot of patients" and taking "a lot of images."  (*See* Strauss 839:8-840:9, 842:20-843:14.)

134.    Nothing in the '296 patent would lead one of ordinary skill to the dose of 140 mcg/kg/min.  (Wackers 959:17-22.)  To the contrary,  Dr. Strauss acknowledged that the '296 patent taught that infusing adenosine above 100 mcg/kg/min caused risk of heart block in conscious patients.  (TX-275 at col. 3, lines 23-26; Strauss 738:2-15, 864:23-865:12.)

135.    Example XIII also failed to acknowledge the differences in the protocol that would be necessitated by adenosine's short half-life.  Dr. Strauss admitted that if dipyridamole was replaced with adenosine according to standard procedures (in which the infusion was stopped several minutes before administration of the tracer), the adenosine would disappear before the tracer was even administered.  (TX-275 at col. 21, lines 52-53; Strauss 838:10-839:7.)

**2.    Example XIII Disclosed No More Than What the Inventors Had Previously Disclosed in the Inventors' Own Protocols**

136.    Critically, Example XIII is not even prior art to the '877 patent, because Example XIII provided no more information to one of ordinary skill about the use of adenosine

for MPI than did the inventors themselves in the protocols they adopted to test their idea. (*Compare* TX-57 at 4 *with* TX-275 at cols. 21-22; Wackers 971:11-973:11.)  Example XIII was not added to Dr. Sollevi's patent application until December 28, 1987—after the December 9, 1987 submission to the FDA by Drs. Hilleman and Mohiuddin of protocols for their own experiments with adenosine for use in MPI.  (*See* TX-52 at AST0009417; TX-275; Wackers 973:24-974:14; DTX-2028.)  While Example XIII merely provided instructions to titrate and a speculative dose range, the inventors had previously described a titration protocol with defined starting and ending points.  (*See* TX-57; Wackers 971:11-973:11.)

### 3. The "Creighton Protocols" Set Forth a Titration Method for Determining the Appropriate Adenosine Dose for Imaging

137.    Excited by the idea of Drs. Hilleman and Mohiuddin, Medco asked them to develop protocols detailing their proposed course of research for examining adenosine as a pharmacological stressor.  On September 15, 1987, Dr. Hilleman mailed Ms. Salzberg the adenosine imaging protocols ("Creighton Protocols").  (*See* TX-1194; Salzberg 1841:11-1842:13.)

138.    The Creighton Protocols are set forth in TX-57, and were submitted to the Creighton University Institutional Review Board (IRB) in the fall of 1987.  (Mohiuddin 1860:4-1861:24.)

139.    The first protocol detailed investigating thallium uptake and clearance in normal volunteers following a continuous intravenous infusion of adenosine, and was designed to determine whether or not one could actually image the heart using adenosine.  (*See* TX-57; Mohiuddin 1866:3-1867:1; Hilleman 2132:5-22.)  This "normal volunteer" protocol proposed initiating an adenosine infusion at 10 mcg/kg/min, and then doubling the dose at regular intervals until any one of three endpoints was achieved: 1) a maximum dose of 320 mcg/kg/min; 2) the

43

patient developed disabling side effects such as chest pain or shortness of breath; or 3) the patient experienced a marked decrease in blood pressure of 40-50 mm Hg.  (TX-57 at 4; Hilleman 2133:9-2134:4; Wackers 972:14-973:3.)  Consequently, while the protocol did not set forth a specific dose for imaging, it provided a titration method and relevant end points for determining such a dose.  (*See* TX-57.)

140.  The second protocol developed by Drs. Hilleman and Mohiuddin was designed to compare the safety and efficacy of adenosine versus dipyridamole in patients with documented coronary artery disease.  (*See* TX-57; Mohiuddin 1870:21-1871:3.)  Drs. Hilleman and Mohiuddin selected this patient population because it constituted the ultimate "target population" for pharmacologic stress imaging.  (Mohiuddin 1871:11-15.)  The inventors intended that the comparative study use the same adenosine dose regimen as the normal volunteer study.  (Mohiuddin 1872:19-1873:3.)  This intent was implicit in that the protocol for the comparative study was adjacent to and repeatedly referenced the normal volunteer study. (*See* TX-57 at AST0001048; Hilleman 2171:17-2172:9.)  Indeed, neither the Creighton IRB nor the FDA objected to the patient protocol as lacking a dosing scheme.  (*See* TX-54; TX-60; Wackers 976:4-10; Hilleman 2171:17-2172:9.)  Significantly, the ability of the selected dose to yield diagnostically reliable images was to be ascertained by comparison of the adenosine MPI results to the results of invasive coronary angiography tests on the same patients.  (TX-57 at AST0001048; H.)

141.  Creighton's IRB approved the adenosine imaging protocols on October 22, 1987.  (TX-60; Wackers 973:12-23; Hilleman 2113:21-2114:12.)

142.  Shortly thereafter, on December 9, 1987, Medco Research submitted an Investigational New Drug application (IND) to the FDA requesting to study the use of adenosine

in the diagnosis of coronary artery disease.  (*See* TX-52 at AST0009417; Wackers 973:24-974:14; DTX-2028.)  The IND included the Creighton Protocols, as well as an additional patient protocol authored by Dr. Verani, a consultant brought in by Medco after learning of the idea of using adenosine for MPI from the inventors.  (*See* Wackers 973:24-974:23; Salzberg 1843:5-23.)

          **4.**       **Balancing Tolerability and Reliability:  the Unexpected Discovery of 140 mcg/kg/min**

143.     Following a mandatory waiting period for government review of the IND, Drs. Hilleman and Mohiuddin initiated their groundbreaking studies in February 1988.  (*See* TX-54; TX-295; Wackers 976:2-977:17; DTX-2028.)  This study was referred to as the "C1A Study."  (TX-295.)  According to the records submitted to the FDA, the first normal volunteers were examined on February 16, 1988.  (TX-295.)  On February 18, 1988, the first volunteer was examined following exercise stress.  (TX-295.)

144.     On March 14, 1988, the inventors conducted the first ever adenosine stress test in a normal volunteer.  (*See* TX-295.)  This subject received a maximum adenosine dose of 140 mcg/kg/min—an adenosine dose arrived at experimentally as the maximum dose that the patient could tolerate while producing satisfactory perfusion images.  (Wackers 978:18-979:13; Mohiuddin 1878:11-24; DTX-2028.)

145.     The "C1B Study" corresponded to the Drs. Hilleman and Mohiuddin's patient study, which began soon thereafter.  (*See* TX-296; Wackers 979:21-980:12.)  The first patient with coronary artery disease was examined on April 26, 1988.  (*See* TX-296; Wackers 980:9-16; DTX-2028.)  The first dipyridamole stress test for this comparative study was conducted on April 26, 1988.  (*See* TX-296; Wackers 981:17-25.)

146.    Less than two months later, on May 3, 1988, the inventors conducted their first adenosine stress test in a patient with coronary artery disease.  (*See* TX-296; Wackers 981:3-11.)  This patient also received a maximum adenosine infusion of 140 mcg/kg/min, the experimentally derived dose that balanced image quality and patient tolerance.  (*See* TX-296; Wackers 981:3-14; Mohiuddin 1882:8-15 (stating that the dose of 140 mcg/kg/min was a "compromise" between tolerance and what was best for imaging).)  On May 10, 1988, the inventors confirmed by coronary angiography that this patient had coronary artery disease, proving for the first time that adenosine could be used as a pharmacological stress agent to diagnose coronary artery disease.  (TX-296; Wackers 981:4-982:19; DTX-2028.)

147.    Reliable diagnosis using MPI depends on obtaining a maximal increase in coronary blood flow.  Without it, less severe obstructions in the coronary arteries may go undetected.  (Wackers 901:2-22; DTX-2018.)  Dipyridamole, the prior art pharmacologic stress agent that had favorably compared to exercise stress in terms of the reliability of its images, attained a 400% increase in coronary blood flow.  (TX-38; Wackers 902:25-905:5.)  Experience with adenosine after the invention of the '877 patent shows that a 140 mcg/kg/min dose achieves maximal coronary blood flow in most patients, increasing blood flow 300% to 500%.  (*See* TX-46; Wackers 890:23-25, 963:8-964:7.)

148.    There are only two ways to determine that an increase in blood flow adequate for reliable diagnosis has been achieved.  (Strauss 839:15-840:3.)  The first is by actually taking MPI images and confirming that the results agree with the results of invasive imaging methods such as coronary angiography.  (Strauss 839:15-840:3.)  This is what the '877 patent inventors did in their original experiments.  (Strauss 839:15-840:9.)  Even Sicor's expert, Dr. Strauss, concedes that this technique requires taking lots of images.  (Strauss 843:2-9.)  The

other technique involves actually measuring blood flow in the coronary arteries by invasive techniques. This is what Dr. Wilson did in his 1990 publication confirming the adequacy of the 140 mcg/kg/min dose. (Strauss 839:23-840:3, 843:2-9.)

149. Simply titrating an adenosine infusion to the appearance of side effects provides no information as to whether adequate coronary vasodilation and maximal coronary flow have been achieved. (Strauss 842:20-843:9, 850:11-851:5.) Indeed, we now know that these side effects can appear at doses between 70 and 100 mcg/kg/min but that diagnostically reliable images may not be obtained at those doses because of cyclic variations in blood flow at those doses. (*See* TX-46; *see generally* PFF 161-162, *infra*.) Thus, doing the experiment Sicor proposes would not identify the 140 mcg/kg/min dose or establish that such a dose achieved a sufficient increase in coronary blood flow to permit diagnostically reliable imaging.

150. Beyond the foregoing, simply titrating the adenosine dose to the point where side effects are just beginning would not reach the 140 mcg/kg/min dose. (*See* TX-46; Strauss 850:11-23.) Dr. Strauss admitted that while many patients can tolerate 100 mcg/kg/min, at doses of 140 mcg/kg/min patients may "sit up and yell 'Stop!'" because of pain and discomfort. (Strauss 850:24-851:5.) This frank admission is consistent with the normal volunteer studies cited by Sicor, which reported wide variability in the maximal tolerable adenosine dose, including many patients who tolerated doses of only 100 mcg/kg/min and some who could tolerate only doses below 70 mcg/kg/min. (*See* PFF 69-76, *supra*; DTX-2017.)

151. Sicor asserts through Dr. Strauss that one of ordinary skill in the art could have simply titrated to find the proper dose for MPI, and that the dose could be maintained or lowered when side effects were mild or just beginning. (Strauss 839:8-17, 849:21-850:11.) Dr. Strauss's view of the obviousness of an effective MPI dose was fatally infected with hindsight.

47

His views were predicated on an understanding that a dose of 90 to 100 mcg/kg/min was the
threshold for obtaining near maximal coronary vasodilation.  (*See* TX-46; Strauss
843:15-845:20.)  He conceded, however, that his views in this regard were based on the 1990
Wilson study (*See* TX-46; Strauss 843:15-845:20), which was not in the prior art.

> 152.    The '877 patent inventors discovered that adenosine could be used for
imaging and that the dose of 140 mcg/kg/min, though often uncomfortable, could be used safely
to obtain reliable images.  The nonobviousness of this invention is revealed in the frank
testimony of Sicor's expert, Dr. Strauss, who stated that while many patients tolerate 100
mcg/kg/min, there are some patients "who at 140 microgram per kilogram per minute *sit up and
yell stop*."  (Strauss 850:24-851:5 (emphasis added).)

> 153.    Thus, part of the invention of Drs. Hilleman and Mohiuddin was the
recognition that significant discomfort may accompany the use of adenosine as a pharmacologic
stress agent.  As documented below, even Dr. Sollevi, who had a wealth of experience
administering adenosine, selected a much lower dose for his imaging studies because he wanted
to increase coronary blood flow "without producing other palpable effects."  (*See* TX-1193 at 3;
Wackers 960:1-15.)  As experimentally proven by the '877 patent inventors, however, successful
imaging often required tolerating these palpable effects.  (*See* Strauss 850:24-851:5.)

> **5.    The Inventors Displayed "Remarkable" Diligence**

> 154.    The inventors of the '877 patent proceeded diligently from at least mid-
December 1987 to the reduce their invention to practice and file their patent application.
(Wackers 983:9-20.)  As noted above, the protocols reflected conception of the experiments
leading to the '877 patent invention, and were filed with the FDA in early December 1987.
(Wackers 974:9-14, 969:12-18, 971:13-973:3; DTX-2028.)  Experiments showing that the
technique worked for its intended purpose of detecting coronary artery disease in heart patients

were completed five months later, on May 10, 1988. (Wackers 982:15-19; DTX-2028.) The inventors assigned their rights in the invention to Medco, which filed U.S. Application No. 07/231,217 on August 11, 1988. (*See* TX-63; TX-320.) Medco filed a continuation-in-part application on March 29, 1989, which matured into the '877 patent. (*See* TX-320.)

155.    The details regarding the reduction to practice and diligence observed by Drs. Hilleman and Mohiuddin were summarized at DTX-2028 and in the testimony of Dr. Wackers. (Wackers 958:14-983:20.)

156.    Dr. Wackers characterized the diligence exhibited by Drs. Hilleman and Mohiuddin as "remarkable," noting that it typically takes much longer to conduct such clinical studies. (Wackers 983:9-20.)

157.    Critically, Sicor offered no contrary evidence on the issues of conception and diligence. Indeed, when asked whether or not he dealt at all with the issue of the date of invention, Dr. Strauss stated that he "did not." (*See* TX-246; Strauss 864:17-22.)

> **6.    The Karolinska Request Proposed Using Adenosine at a Dose Well Below 140 mcg/kg/min**

158.    The Karolinska Request purports to represent Dr. Sollevi's actual proposal to the Ethics Committee at the Karolinska Institute in Stockholm, Sweden for testing the use of adenosine in connection with MPI. (*See* TX-1193.)[7] Tellingly, Dr. Sollevi proposed a dose of 60 mcg/kg/min in order to avoid side effects and discomfort. (TX-1193; Wackers 960:1-25.) The distinction between the 140 mcg/kg/min dose and these lower doses is significant. Dr.

---

[7] Plaintiffs' object to TX-1193 on authenticity and hearsay grounds. As discussed at PCL 64, *infra* defendants have offered *no foundational testimony* concerning this document, despite the availability of Dr. Sollevi at trial. Despite asking Dr. Sollevi detailed questions about the exhibit at his deposition, Sicor strategically chose not to offer that testimony at trial and actively resisted allowing Dr. Sollevi to testify at all.

Wilson reported that doses of 70-100 mcg/kg/min resulted in "cyclic" coronary flow that could lead to false negative results.  (*See* TX-46; Wackers 963:8-964:7.)

159.    The Karolinska Request suffers from another critical deficiency.  Because it reflects activity outside the United States, it is not "prior art" under 35 U.S.C. § 102(a) unless it was sufficiently publicly accessible to be a "printed publication."  (*See* PCL 57-61, *infra*.)  This requires, at a minimum, some form of indexing that would allow persons interested in its subject matter to locate it.  (*See* PCL 58, *infra*.)

160.    The record is devoid of foundational testimony authenticating the document or indicating how, if it all, the Karolinska Request was disseminated or stored.  Sicor, pointing to an attorney argument in a cover letter submitting the request to the European Patent Office, asserts that requests such as the Karolinska Request were generally publicly available.[8] (*See* TX-1193 at SIC010937; TX-Court 11.)  However, no witness testified at trial concerning this statement or equating it with any particular form of indexing or dissemination.  To the contrary, the record reflects that the standard for "public availability" under the European Patent Convention, in contrast to the "printed publication" standard under U.S. law, would not require a particular type of indexing, or any indexing at all.  (*See* TX-Court 11, ¶¶ 9-11.)

## L.    Subsequent Experience Has Validated 140 mcg/kg/min as the Ideal Adenosine Infusion Rate for MPI

161.    Drs. Hilleman and Mohiuddin empirically determined 140 mcg/kg/min as the optimal adenosine infusion rate for MPI.  (*See* PFF 146-148.)  Subsequent work by Wilson and colleagues validated this finding, demonstrating that the vast majority of patients achieve

---

[8] The cover letter to the Karolinska Request was drafted by Lennart Fogelberg, an advocate writing on behalf of Dr. Sollevi to the European Patent Office.  (TX-1193 at SIC010937.)  This letter states that requests of this type are "generally available to the public in Sweden."  (TX-1193 at SIC010937.)

sustained maximal coronary hyperemia at an infusion rate of 140 mcg/kg/min. (*See* TX-46; Strauss 854:13-22; Wackers 965:17-25.) In contrast, "submaximal" adenosine infusion rates of 70-100 mcg/kg/min produced an oscillating blood flow, in which blood flow velocity rises and falls in a cyclical pattern. (*See* TX-46 at 1600; Wackers 963:20-964:7.)

162.    Wilson warned that, with such submaximal doses, "the injection of thallium at the low ebb of coronary hyperemia may result in falsely normal findings." (TX-46 at 1603; Strauss 852:11-23; Wackers 963:20-964:7.) Thus, while a positive result with a lesser adenosine dose could provide an accurate diagnosis, a negative result would have little diagnostic merit. Because of the risk of false negatives, Wilson and co-workers recommended using an infusion rate of 140 mcg/kg/min, the same rate of infusion identified by Drs. Hilleman and Mohiuddin and claimed in asserted claim 23(18) of the '877 patent. (*See* TX-46 at 1595; TX-320, col. 8, l. 53-col. 9, l. 35; Wackers 963:12-964:7.)

163.    The result in *Sollevi 1986* (TX-1171), showing a 70% increase in coronary flow at a dose of 80 mcg/kg/min, would not have informed one of ordinary skill whether any safe dose of adenosine could be administered that would lead to a 400% increase in coronary flow, such as was reported to result from use of dipyridamole. (Wackers 923:10-924:17.)

164.    Moreover, the "general S-shaped curve of effectiveness of the drug" and the "double or double again" coronary blood flow described by Dr. Strauss (Strauss 706:5-707:8) are not anywhere mentioned in *Sollevi 1986* (*see* TX-1171), Dr. Strauss's expert reports (*see* TX-246; TX-70), or any of the references cited by Dr. Strauss, but instead were introduced only as surprise testimony at trial. (Objection at 707:9-11.)

# PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

## I.    CONTROLLING AUTHORITY

1.    Any appeal in this action, which arises under the patent laws of the United States, must be to the U.S. Court of Appeals for the Federal Circuit, 28 U.S.C. § 1295(a), whose precedent, therefore, governs matters of substantive patent law in this Court.  The Federal Circuit has adopted decisions of the Court of Customs and Patent Appeals ("C.C.P.A.") as its own precedent, making those decisions binding on this Court with respect to substantive patent law. *Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 562 (D. Del. 1985) (citing *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed Cir. 1982) (en banc)).

## II.    VALIDITY OF THE '877 PATENT

### A.    Patent Claims

2.    Multiple dependent claims "must be considered in the same manner as a plurality of single dependent claims."  (M.P.E.P. § 608.01(n) 600-86.)  Multiple dependent claims shall be construed to incorporate by reference the limitations of the particular claim in relation to which it is being considered.  35 U.S.C. § 112, ¶ 5 (2000); H.R. Rep. No. 94-592, at 1241 (1975) ("A multiple dependent claim, as such, does not contain all the limitations of all the claims to which it refers, but rather, contains at any one time only those limitations of the particular claim under consideration.").

### B.    Sicor Bears the Burden of Proving Invalidity by Clear and Convincing Evidence

3.    The '877 patent is presumed valid.  Each claim within a patent is independently presumed valid, even if other claims within the patent are held invalid.  35 U.S.C. § 282.

4.   To overcome the presumption of validity, Sicor bears the burden of proving invalidity by clear and convincing evidence. *Golden Blount, Inc. v. Robert H. Peterson Co*., 365 F.3d 1054, 1061-62 (Fed. Cir. 2004). That burden is "constant and remains throughout the suit on the challenger" and "does not shift at any time to the patent owner." *TP Labs., Inc. v. Prof'l Positioners, Inc*., 724 F.2d 965, 971 (Fed. Cir. 1984).

### C.     The Asserted Claims Are Not Invalid for Obviousness

5.   At trial, Sicor relied in support of its obviousness contentions on unspecified combinations of 11 references, which generally fall into four categories: (1) references concerning the use of dipyridamole for MPI (TX-38, TX-93); (2) references concerning the use of adenosine  in anesthetized surgical patients (TX-112, TX-1171, TX-1169); (3) references examining the effects of adenosine infusions in normal, conscious volunteers (TX-48, TX-226, TX-1208, TX-220); and (4) references that are not prior art, including the '296 patent (TX-275) and the Karolinska Request (TX-1193). The sheer volume of references cited by Sicor points in this case toward the nonobviousness of the invention. *See Adams v. U.S.*, 330 F.2d 622, 624 (Ct. Cl. 1964) (stating that "[i]t has been frequently held that voluminous prior art indicates that none of the prior art is in point or indicates that prior attempts to solve the problem have not met with success").

### 1.     The Law of Obviousness and the Supreme Court's Decision in *KSR*

6.   Obviousness under 35 U.S.C. § 103 is a conclusion of law based on the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), which include consideration of (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed subject matter as a whole, (3) the level of skill in the art, and (4) objective evidence of nonobviousness.

7.    The claimed invention must be viewed in the state of the art that existed at the time of invention, and it is improper to use hindsight to reconstruct the claimed invention from the prior art. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).

8.    The Supreme Court recently addressed the standard for obviousness in the context of a simple mechanical "combination" invention, noting that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, slip op. at 12 (Apr. 30, 2007). By contrast, the Court noted, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* Furthermore, prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness. *Id.*

9.    Fact finders must avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *Id.* at 17 (citing *Graham*). The Supreme Court in *KSR* acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* at 14.

10.    While prior art combinations resulting in "predictable solutions" leading to "anticipated success" are clear indicators of obviousness, where those combinations "work together in an unexpected and fruitful manner" they are not obvious. *See id.* at 12.

11.    It is well settled in patent law that in assessing obviousness, the mere fact that a method utilizes a known scientific principle does not alone make that method obvious. *Uniroyal,* 837 F.2d at 1053. That one can *reconstruct* and/or explain the theoretical mechanism

54

of an invention by means of logic and sound scientific reasoning does not afford the basis for an obviousness conclusion. *See Ex parte Levengood*, 28 U.S.P.Q.2d 1300, 1302 (Bd.Pat.App & Interf. 1993) (emphasis in original).

        12.    The Federal Circuit, following the mandate of *Graham,* has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness). This evaluation must be made during a court's consideration of whether the claimed invention is obvious, not after such a determination is complete. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co*., 730 F.2d 1452, 1461 (Fed. Cir. 1984).

        13.    Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others. *Graham*, 383 U.S. at 17-18 (1966); *see U.S. v. Adams*, 383 U.S. 39, 51-52 (1966); *Forest Labs., Inc. v. Ivax Pharm., Inc*. 438 F. Supp. 2d 479, 496 (D. Del. 2006). Objective evidence is often the best and clearest evidence bearing on the issue of obviousness. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed. Cir. 1983).

        14.    The defendants have the burden of proof with respect to *all* of the *Graham* factors, including objective evidence of nonobviousness. *See Am. Hosp. Supply Corp. v. Travenol Labs., Inc.,* 745 F.2d 1, 8 (Fed. Cir. 1984) (holding that burden is not on the patentee to prove new and surprising results, but is on the patent challenger to establish the lack of new and surprising results).

### 2.    The Qualifications of the Person of Ordinary Skill in the Art

        15.    The determination of the level of skill in the art is an integral part of the obviousness analysis. *Ruiz*, 234 F.3d at 667. Both parties' experts essentially agree on the

educational qualifications of the person of ordinary skill in the art:  a physician trained in cardiology with an additional 1-2 years training in nuclear cardiology, or a physician trained in nuclear medicine with at least 1 year of additional training in nuclear cardiology.  (Strauss 646:3-13; Wackers 898:15-899:1, 899:7-11.)

### 3.    The Scope and Content of the Prior Art

16.    The scope and content of the prior art is set forth in PFF §§ III.A.-E. and J.1.-2., *supra*.  The disclosures of the Sollevi MPI documents, which are not conceded by Plaintiffs to be prior art, are described in PFF § III.K., *supra*.  Briefly, dipyridamole, thought to work by raising endogenous adenosine levels, had been used in humans as a pharmacologic stress agent for a decade.  (*See* PFF § III.D.1., *supra*.)  Adenosine was used in humans to drop blood pressure during surgery or to interrupt electrical impulses in the heart to stop arrhythmias—both antithetical to use in human MPI.  (*See* PFF §§ III.D.2.a. and b., *supra*.)  Adenosine had also been used in studies of its physiologic effects in a small number of normal human volunteers, where it caused a number of ill effects and in which no medical use of adenosine was proposed.  (*See* PFF § III.D.2.c., *supra*.)  A number of potentially adverse effects arising from adenosine administration are also reported in the literature, including AV block, systemic blood pressure effects leading to ischemia.  (*See* PFF §§ III.C. and D., *supra*.)

17.    Example XIII of the Sollevi '296 patent proposed substitution of adenosine for dipyridamole in the conventional MPI protocol.  The dose is said to be determined by titration, although no endpoint for the titration is disclosed.  Doses over 100 mcg/kg/min in conscious patients are said to pose a risk of AV block.  The Karolinska Request proposes using an adenosine dose of 60 mcg/kg/min to avoid any palpable side effects.  (*See* PFF § III.K., *supra*.)

56

#### 4.    Differences Between the Claimed Invention and the Prior Art

18.    The fundamental difference between the claimed invention and the prior art was that dipyridamole was used as a pharmacologic stress agent in human MPI and adenosine was not.  (*See* § III.D.1., *supra*.)  With respect to the Sollevi MPI documents, the 140 mcg/kg/min dose of '877 patent claim 23(18) is not disclosed, and no information is given as to what doses will sufficiently increase coronary blood flow to obtain diagnostically reliable MPI images.  (*See* § III.K.1., 4., and 6., *supra*.)

#### 5.    The Use of Adenosine In Human MPI Was Not Obvious

##### a.    The Prior Art Taught Away from Administration of Adenosine to Patients with Coronary Artery Disease

19.    Sicor has failed to prove by clear and convincing evidence that the subject matter of the asserted claims of the '877 patent would have been obvious to a person of ordinary skill in the art as of the December 28, 1987, effective filing date of Example XIII of the '296 patent.  35 U.S.C. § 103(a).  For reasons noted above, the prior art would have affirmatively discouraged use of adenosine as a pharmacologic stress agent in MPI.  Adenosine was viewed as too toxic, too short-lived, and dangerously non-selective, causing hypotension, ischemia, and slowing or interruption of the heartbeat through AV block.  Additionally, the pharmacologic profile of adenosine (10 second half-life and effects on systemic blood pressure) was fundamentally at odds with the perceived requirements for a stress agent, and use of adenosine in heart patients was explicitly discouraged.  (*See* PFF §§ III.C. and D., *supra*.)

20.    Obviousness is not established simply because it was known that dipyridamole worked, at least in part, through modulation of endogenous levels of adenosine, and because various groups had administered adenosine infusions in normal volunteers and surgical patients.  Clinicians and researchers had long harbored serious safety concerns regarding

57

use of exogenous adenosine in heart patients and, far from diminishing those concerns, the references relied on by Sicor would have validated them.  (*See* PFF §§ III.C. and D., *supra*.)

21.    In addition to safety concerns, one of ordinary skill would also have had concerns about achieving sufficient efficacy using adenosine.  Dr. Sollevi's studies in surgical patients taught away from the idea that adenosine could be administered at a dose that would lead to coronary vasodilation sufficient for diagnostically reliable MPI without causing undesirable drops in blood pressure or other intolerable side effects.  (*See* PFF § III.J.2., *supra*.)

22.    Sicor's contentions that one of ordinary skill would have been motivated to substitute adenosine for dipyridamole because adenosine's short half-life would make it safer to use and more controllable must be rejected as hindsight reconstructions reached only in light of positive experience with the invention after it was made.  (*See* PFF §§ III.D., F., and G., *supra*.)  These contentions are in conflict with the express teachings of the prior art and the evidence of how people initially reacted to the invention.  *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985) ("Recognizing the difficulty of casting one's mind back to the state of technology at the time the invention was made, courts have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention.").  *KSR* confirmed that "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  That is the case here.

### b.    The Dose of about 140 mcg/kg/min in Claim 23(18) Was Unpredictable in View of the Prior Art

23.    None of Sicor's various combinations of prior art references would have rendered obvious the use of adenosine for MPI at the dose about 140 mcg/kg/min recited in claim 23(18).  Even if the adenosine dose were titrated to avoid side effects or to the point where

side effects were first beginning, as suggested in the Karolinska Request and by Sicor's expert Dr. Strauss, respectively, the 140 mcg/kg/min dose, where side effects are often uncomfortable, would not have been identified. Nor would simply titrating to the onset of side effects provide any reasonable expectation of success in attaining a sufficient increase in coronary flow to yield diagnostically reliable MPI images. The correlation between adenosine dose and coronary blood flow could only be determined by testing in human heart patients. (*See* PFF §§ III.K. and L., *supra*.)

24.     Dr. Strauss's view of the obviousness of an effective MPI dose was fatally infected with hindsight. His views were predicated on an understanding that a dose of 90 to 100 mcg/kg/min was the threshold for obtaining near maximal coronary vasodilation. He conceded, however, that his views in this regard were based on the 1990 Wilson study (TX-46), which was not in the prior art. (*See* PFF § III.K.4., *supra*.)

### 6.     The Objective Evidence Further Establishes the Nonobviousness of the Asserted Claims

#### a.     The Claimed Invention Was Met with Skepticism and Surprise

25.     Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *U.S. v. Adams*, 383 U.S. 39, 52 (1966); *Envtl. Designs, Ltd. v. Union Oil of Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Ruiz*, 234 F.3d at 668 ("Proceeding contrary to the accepted wisdom. . . is strong evidence of unobviousness.") (internal citations omitted). This is particularly true where "the skepticism is expressed at the time of the invention, in a nonadversarial setting." *Burlington Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987).

26.    In this case, there is an abundance of evidence documenting the skepticism that greeted the claimed invention extending from the time workers in the field found out about the experiments being planned by the inventors until well after the Adenoscan product embodying the invention was on the market.  (*See* PFF § III.F., *supra.*)

27.    The skepticism expressed in letters, articles, editorials, and commercial experiences reflects the long term concerns of persons of skill in the art regarding the administration of adenosine to patients with coronary artery disease.  It also firmly buttresses a finding of nonobviousness.  *See Interconnect*, 774 F.2d at 1143 (best evidence on obviousness issue is contemporaneous attitude toward invention).

### b.    The Lack of Any Suggestion to Use Adenosine For Imaging for Nearly 10 Years After the Publication of the Use of Dipyridamole Evidences Nonobviousness

28.    Additional evidence of nonobviousness is provided by the fact that (1) the use of dipyridamole as a pharmacologic stress agent, along with reports of its supposed mechanism of action through increasing endogenous adenosine levels, was published in 1978, and (2) for nearly 10 years thereafter, no one even suggested that adenosine would be an effective alternative.  (*See* PFF § III.E., *supra.*)  Sicor's assertion that this long delay is explained by the lack of availability of adenosine can not be accepted.  The record shows that adenosine had been administered to humans in the 1930s, adenosine had been administered to humans by numerous groups in the 1980s, and its availability was no impediment to those actually interested in studying it.  (*See* PFF § III.J.1., *supra.*)  If adenosine were the obviously desirable alternative to dipyridamole that was denied to the art by lack of commercial availability, as Sicor now contends, somebody would have mentioned it.  Nobody did.

29.    The lack of any suggestion to substitute adenosine for dipyridamole for nearly a decade is strong objective evidence in this case of the nonobviousness of the invention.

As observed by the Supreme Court more than a century ago in *Hobbs v. Beach*, 180 U.S. 383,

392 (1901):

> It appears from the testimony that several of these addressing machines, of which that of Dennis and York is a type, and which are now claimed to have inspired the Beach patent, had been upon the market for many years, and yet it never seems to have occurred to any one engaged in the manufacture of paper boxes that they could be made available for the purpose of attaching strips to the corners of such boxes.  This very fact is evidence that the man who discovered the possibility of their adaptation to this new use was gifted with the prescience of an inventor.

### c.    Sicor's Copying Demonstrates Nonobviousness

30.    Copying of the claimed invention by the accused infringer (*see*

PFF § III.I., *supra*.) may carry substantial weight in a court's analysis of the evidence bearing on

the issue of obviousness.  *Stratoflex,* 713 F.2d at 1541 (stating that "[a]n alleged infringer's

lauding of all the available prior art may, for example, in some cases have a hollow ring when

played against its disregard of that art and its copying of the invention.").  Evidence of copying

by the infringer is particularly telling where, as here, a generic drug manufacturer is copying the

claimed invention despite already marketing the closest prior art competitor.  *Forest Labs.,* 438

F. Supp.2d at 496 ("In the Court's view, the copying of others is particularly telling in this case,

because citalopram is currently available as a generic drug.  Indeed, citalopram is sold

generically by Defendants, yet Defendants seek to copy and sell Lexapro$^{®}$.").  Sicor already

markets generic dipyridamole, which it argues would render adenosine obvious, and yet it is

seeking to copy and sell Adenoscan.  (Lea 2035:22-2036:2.)  This is additional evidence of

nonobviousness.

**d.    Adenoscan's Outstanding Commercial Success is Strong Evidence of Nonobviousness**

**(1)    Commercial Success Generally**

31.    Adenoscan's performance in the pharmacologic stress market shows all the hallmarks of commercial success (*see* PFF §§ III.H. and J.3., *supra*), and this commercial success strongly indicates the nonobviousness of the invention of the asserted claims of the '877 patent.  All measures of Adenoscan's sales have shown substantial and sustained increases since it was launched in 1995, a strong indicator of commercial success.  *Tec Air, Inc. v. Denso Mfg. Michigan, Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999).  The combination of Adenoscan's increasing sales and increasing market share is very powerful evidence of commercial success.  *Id*.

32.    Further evidence of commercial success is that Adenoscan displaced dipyridamole, the earlier product in the market, and went from newcomer to market leader.  (TX-21.)  *See Ruiz*, 234 F.3d at 668.

33.    That Adenoscan's sales continued their substantial increases even when faced with competition from significantly cheaper generic dipyridamole also evidences nonobviousness.  *Forest Labs.,* 438 F. Supp. 2d at 495-496 (finding commercial success of Lexapro® based on large sales despite the availability of a generic competitor at lower prices).

**(2)    Dr. Leffler's Contrary Opinions Are Not Credible**

34.    Having copied the patented invention in order to share in the economic fruit of its success (*see* PFF § III.J., *supra*), having conceded that its copy infringes the '877 patent (*see* PFF § II., *supra*), and having retained a technical expert (Dr. Strauss) who admitted he uses the invention because it is technically superior to the prior art (*see* PFF § III.G., *supra*),

Sicor's reliance on the expert testimony from Dr. Leffler that adenosine's commercial success is not due to the merit of the invention can not be accepted. (*See* § III.J.3., *supra*.)

35.    Sicor's economic expert Dr. Leffler, asserts that in order for a product to be commercially successful it must "quickly dominate" the market, (Leffler 1632:8-11), but courts have consistently refused to impose such additional requirements on commercial success. *See Medtronic, Inc. v. DAIG Corp.*, 789 F.2d 903, 907 (Fed. Cir. 1986) (rejecting economic expert's definition of commercial success as "aggressive growth in market share" because such a definition could lead to the conclusion that a product innovation was per se not a commercial success despite having a profound influence on the market and industry); *Takeda Chem.*, 417 F. Supp. 2d. at 386 (S.D.N.Y. 2006) ("There is no requirement that the invention be the only successful product in its market niche or the most successful."). Dr. Leffler's comparisons of Adenoscan's sales performance to that of Lipitor® or other top selling pharmaceuticals (Leffler 1630:25-1631:4; 1632:8-11) also miss the point because the use of benchmarks from other markets is unhelpful in assessing commercial success of the patented product. *See Eli Lilly and Co. v. Teva Pharm., USA Inc.*, No. IP 02-0512-C-B/S, 2004 WL 1724632 at *22 (S.D. Ind. 2004) (rejecting Defendant's expert's sales comparison to Lipitor® as unhelpful since it lowers cholesterol and has nothing to do with PMS).

### (a)    There is a Nexus Between the Sales of Adenoscan and the Claims of the Patent

36.    The nexus between the commercial success of Adenoscan and the merits of the claimed invention is seen in multiple and varied ways. (*See* § III.H., *supra*.) A prima facie case of nexus is made out when the patentee shows both that there is commercial success and that the product that is commercially successful is the invention disclosed and claimed in the patent. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir.

1988).  If the patentee has presented a prima facie case of nexus, the burden of coming forward

with evidence in rebuttal shifts to the party challenging the validity of the patent.  *Demaco*, 851

F.2d at 1392.

37.    The record evidence clearly shows a prima facie case of nexus.  (*See*

§ III.H., *supra.*)  Sicor itself has conceded that the claims of the '877 patent cover Adenoscan's

use in MPI.  Sicor admits that use of its Adenosine Injection USP infringes the asserted claims of

the '877 patent (D.I. 137 ¶ 2) and that it copied its Adenosine Injection USP from Adenoscan.

(Hernandez 2061:24 -2063:14; TX 75.)  Sicor can hardly argue that the claims do not cover

Adenoscan.  Moreover, Adenoscan is a single ingredient product, and Adenoscan's use as

labeled is what is claimed in the '877 patent.  TX75.  Thus, commercial success due to the merits

of Adenoscan is commercial success of the claimed invention.

38.    Further support for nexus can be found in the significant evidence that the

commercial success of Adenoscan is due to the merits of the Adenoscan product.  *See R.R.*

*Dynamics, Inc. v. A. Stucki Co.*, 579 F. Supp. 353, 366-67 (E.D. Pa. 1983) (testimony as to the

advantage of the spaced structure with the biasing spring easily supports inference that the

claimed invention itself was responsible for the commercial success).  As the testimony of both

Plaintiffs' and Defendants' witnesses established, Adenoscan's attributes of rapid onset of

action, safety, and ease of use are bona fide product advantages doctors recognize. (*See*

PFF §§III.G. and H.1., *supra.*)  The practical advantages of a process with increased speed and

savings in labor are product advantages courts have relied on in finding commercial success.

*Nt'l Dairy Prods. Corp. v. Swiss Colony, Inc.*, 364 F. Supp. 134, 141 (D.C. Wis. 1972).

**(b)**     **Sicor Failed To Prove that Sales of Adenoscan Are Not Driven by the Attributes of the Claimed Method**

39.     The party challenging the validity of the patent bears the burden of proving that commercial success is *not* due to the patented invention but is due instead to extraneous factors other than the patented invention.  *Demaco,* 851 F.2d at 1394.  Sicor has failed to rebut the prima facie case of nexus with clear and convincing evidence that the commercial success of Adenoscan was due to extraneous factors other than the patented invention.  (*See* §§ III.H. and J.3., *supra*)

40.     Sicor's argument that the circumstances of the marketplace explain the commercial success of the product is an argument that has been previously rejected.  *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1382 (Fed. Cir. 1986)*; Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 757 (N.D. W. Va. 2004).  Indeed, Sicor's specific argument that increasing levels of obesity are responsible for product sales has been rejected by courts.  *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341, 386 (S.D.N.Y. 2006) (rejecting defendants' argument that much of the commercial success of Actos® is due to a rise in obesity with an accompanying increase in the incidence of diabetes).

41.     Even genuinely advantageous market circumstances will not sever a proper nexus between a product's commercial success and its merits.  Courts have found that a product can be commercially successful even in the absence of viable competitors in its market.  *Insight Tech. Inc. v. Surefire, LLC*, 447 F. Supp. 2d 120, 134 (D.N.H. 2006) (rejecting argument that patented products were only successful because there were no viable competing products after competitor voluntarily withdrew from the market).

**(c)     Clinical Attributes Determine Success of Pharmacologic Stress Agents, Not Promotion**

42.     The courts have held repeatedly that with medical inventions, the promotion of a product does not mean that the product was purchased because of that promotion rather than because of its merit. *Hybritech*, 802 F.2d at 1382 [The] record shows that advertising makes those in the industry-hospitals, doctors, and clinical laboratories-aware of the diagnostic kits but does not make these potential users buy them; the products have to work . . . ."); *Ortho-McNeil Pharm.,* 348 F. Supp. 2d at 757 ("The ultimate success of a prescription antibiotic hinges on its clinical properties."). The record in this case confirms that the attributes of Adenoscan are far more determinative of the demand for it than promotion.

43.     Courts have relied on relatively low ratios of promotion expenses to sales and modest budgets for promotion of the sort presented here in rejecting commercial success challenges based on excessive marketing. *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP 99-38-C H/K, 2001 WL 1397304, at *12 (S.D. Ind. 2001) ("… the evidence shows that Lilly's marketing and advertising budgets for AXID (nizatidine) have been relatively modest by industry standards."); *Ortho-McNeil Pharm.,* 348 F. Supp. 2d at 757 ("LEVAQUIN also maintained a relatively low ratio of total sales to promotional expenditures as compared to competing respiratory anti-infectives.").

44.     Sicor's own actions in seeking market approval for a generic version of Adenoscan and provoking this lawsuit under the Hatch-Waxman Act also contradict its arguments that the product is not a commercial success, particularly when it is already selling the only competing compound in the market. (Lea 2035:22-2036:2.) *See Ortho-McNeil Pharm.,* 348 F. Supp. 2d at 759; *Forest Labs.,* 438 F. Supp. 2d at 496 ("In the Court's view, the copying of others is particularly telling in this case, because citalopram is currently available as a generic

66

drug.  Indeed, citalopram is sold generically by Defendants, yet Defendants seek to copy and sell Lexapro®."); *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, at *12 ("Strong evidence of commercial success is not surprising in a case under the Hatch-Waxman Act, of course.  If the patented drug were not a commercial success, generic manufacturers would have little interest in offering their own versions of the drug.").

> (d)    **Dr. Leffler's Opinion Is Contrary To The Evidence**

45.    Dr. Leffler never consulted any physicians about the reasons why they are buying adenosine versus dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmacologic stressors, and he did not even have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product.  (Leffler 1683:6-21.)  Dr. Leffler also did not provide any information about what percentage of sales were due to Adenoscan's merits and what percentage were due to marketing and advantageous market circumstances.  These are all factors that courts consider in weighing an economic expert's opinion about a products' lack of commercial success.  *Forest Labs.,* 438 F. Supp. 2d at 495 (court unpersuaded by Defendant's expert's testimony that success of Lexapro® was the direct result of Plaintiffs' aggressive marketing campaign when expert had not consulted with any physicians or conducted any surveys demonstrating why doctors chose Lexapro®, had no opinion about the efficacy of Lexapro® and could not state what percentage of its sales were the result of its qualities as a drug).

D. **Sicor Failed to Prove the Asserted Claims Are Invalid Based On Dr. Sollevi's MPI Proposals**

1. **Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Anticipates Claim 23(18) of the '877 Patent**

46.     Claim 23(18) recites a method of diagnosing coronary artery disease by MPI using intravenous adenosine infusion at a dose of 140 mcg/kg/min.  A party seeking to invalidate a patent under § 102 for anticipation must show that the allegedly invalidating prior art contains each and every element of the claimed invention.  *Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 994-95 (Fed. Cir. 2000);  *In re Dillon*, 919 F.2d 688, 715 (Fed. Cir. 1990).  Neither Example XIII of the '296 patent nor the Karolinska Request discloses infusing adenosine at a dose of about 140 mcg/kg/min, as is recited in claim 23(18).  (*See* PFF § III.K., *supra*.)

47.     Instead, Example XIII teaches individual titrations on a case-by-case basis, suggesting that the exact dose "should lie in the range of 10 to 150 [mcg/kg/min]." (TX-275, col. 21, ll. 59-61.)  But the disclosure of a broad numerical range in a prior art reference is not sufficient to anticipate a claim reciting a point within that range.  *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1000 (Fed. Cir. 2006) ("The disclosure is only that of a range, not a specific temperature in that range, and the disclosure of a range is no more a disclosure of the end points of the range than it is of each of the intermediate points.").

48.     The Karolinska Request, which purports to represent Dr. Sollevi's actual proposal for testing the use of adenosine in conjunction with MPI, also failed to disclose the adenosine dose of about 140 mcg/kg/min recited in claim 23(18), suggesting instead an adenosine infusion at 60 mcg/kg/min, in order to avoid side effects and discomfort.  (*See* PFF § III.K.6., *supra*.)

### 2. Even If They Were Prior Art, Neither Example XIII Nor the Karolinska Request Renders Obvious the 140 mcg/kg/min Dose of Claim 23(18)

49.     Neither Example XIII nor the Karolinska Request render obvious use of the 140 mcg/kg/min required by '877 patent claim 23(18).  Example XIII does not state what the end point of the titration experiment there proposed should be to identify an adenosine dose for use in MPI.  Dr. Strauss has opined that he would titrate to the point where side effects were just beginning.  But Dr. Sollevi's contemporaneous proposal for the experiment, the Karolinska Request, proposes to use a dose with *no* palpable side effects.  As noted in PFF § III.K.4., *supra*, titrating to this level of no or low side effects would not result in the 140 mcg/kg/min dose at which many patients experience discomfort.  Nor would such an experiment demonstrate that sufficient coronary vasodilation had occurred to obtain diagnostically reliable MPI images.

50.     The Sollevi '296 patent and the Karolinska Request actually teach away from the invention of '877 patent claim 23(18).  The '296 patent states that heart block may be a concern in conscious patients at doses over 100 mcg/kg/min.  Consistent with this disclosure, the Karolinska Request proposed a dose of only 60 mcg/kg/min.  (*See* PFF §§ III.K.1. and 6., *supra*.) The distinction between the 140 mcg/kg/min dose and these lower doses is significant.  Dr. Wilson reported that doses of 70-100 mcg/kg/min resulted in "cyclic" coronary blood flow that could lead to false negative results.  (*See* PFF § III.K.6. and L., *supra*.)

### 3. Neither Example XIII Nor the Karolinska Request Are Prior Art and Thus Cannot Anticipate or Render Obvious the Asserted Claims

51.     It is part of Sicor's burden to prove by clear and convincing evidence that the references it is relying on are part of the prior art.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) (affirming district court's JMOL on the basis of lack of adequate proof that alleged prior art was a printed publication). If a document is not prior art, it

cannot anticipate or render obvious patent claims.  *IMX, Inc. v. Lendingtree, LLC*, No. 03-1067-SLR, 2006 WL 47066, *1 (D. Del. Jan. 10, 2006) (denying reconsideration of its prior ruling that patentee presented sufficient evidence that it invented the subject matter of its asserted patent before the filing date of an alleged prior art patent, and therefore that alleged prior art patent could not be used as the basis for an anticipation or obviousness challenge); *see also Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004).  Neither Example XIII nor the Karolinska Request is prior art, and thus cannot invalidate the asserted claims.

> **a.  Sicor Failed to Prove that Example XIII of the '296 Patent is Prior Art**

52.  Example XIII cannot anticipate or render obvious the claims of the '877 patent because Drs. Hilleman and Mohiuddin conceived as much of the invention as Example XIII discloses prior to the effective filing date of Example XIII and thereafter diligently reduced the invention to practice.  (*See* PFF § III.K., *supra*.)  The '877 patent inventors proposed a testing protocol to titrate the adenosine dose upward until one of a variety of effects was observed, followed by imaging and confirmation of the diagnostic reliability of the images by comparison to the results of other diagnostic techniques.  Because Sollevi's Example XIII was also no more than a proposal to conduct a titration experiment, the '877 patent inventors have shown prior possession of as much of the invention as the alleged reference shows and are, therefore, entitled to remove it from the prior art.

53.  A patentee may overcome an allegation of invalidity based on 35 U.S.C. § 102(e) by showing a date of invention prior to the effective filing date of the patent cited as a reference.  *See, e.g., Waldemar Link GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).  For purposes of anticipation and obviousness, Example XIII is entitled to the filing date of December 28, 1987.  When the prior art reference does not disclose every element of the

claimed invention, the applicant need not show prior possession of the complete invention to prevail on priority grounds.   "[A]ll the applicant can be required to show is priority with respect to so much of the claimed invention as the reference happens to show.  When he has done that he has disposed of the reference."  *In re Stempel*, 241 F.2d 755, 759 (C.C.P.A. 1957). Consequently, the plaintiffs need not show prior possession of the 140 mcg/kg/min dose in claim 23(18) because that dose is not disclosed in Example XIII.  (*See* PFF § III.K.1., *supra*.)

54.     The record here amply demonstrates that the '877 patent inventors had conceived of the use of adenosine for MPI long before December 28, 1987.  Like Example XIII, the protocols prepared by the '877 patent inventors suggested titrating the dose of adenosine to determine a suitable dose.  They also included specific endpoints for the titration—a feature not found in Example XIII.  It is undisputed that these protocols were submitted to the FDA on December 9, 1987—nearly three weeks before the effective filing date of Example XIII.  (*See* PFF § III.K.3., *supra*.)

55.     The record also shows that the '877 patent inventors worked diligently from at least December 28, 1987, the priority date of the '296 patent, to their actual reduction to practice of the invention in May 1988.  As Dr. Wackers opined, this schedule represented "remarkable" diligence, as it typically takes much longer to conduct such clinical studies.  (*See* PFF § III.K.5., *supra*.)

56.     The *Stempel* rationale has been extended by subsequent decisions to permit pre-filing activities to be antedated by showing prior possession of subject matter sufficient to render the invention, as claimed, obvious.  *See In re Stryker*, 435 F.2d 1340, 1341 (C.C.P.A. 1971); *In re Spiller*, 500 F.2d 1170, 1176 (C.C.P.A. 1974).  Thus, if the Court were to determine that the subject matter disclosed in Example XIII *would not* have rendered obvious the

140 mcg/kg/min dose of claim 23(18), it is irrelevant whether the '877 patent inventors also had

priority as to that claim. If, on the other hand, the Court were to determine that the 140

mcg/kg/min dose of claim 23(18) *would* have been rendered obvious by the titration disclosure

of Example XIII, then the holdings of *Stryker* and *Spiller* confirm that the prior conception of

equivalent subject matter by the '877 patent inventors is sufficient to antedate the Sollevi

proposals. Example XIII is, therefore, irrelevant to the validity of the '877 patent claim 23(18).

### b.    The Karolinska Request is Not a Printed Publication

57.    The Karolinska Request is not prior art under 35 U.S.C. § 102(a) because

it reflects activity outside the United States and is not a "printed publication." (*See*

PFF § III.K.6., *supra*.) A "printed publication" under U.S. law must have been "disseminated or

otherwise made available to the extent that persons interested and ordinarily skilled in the subject

matter or art, exercising reasonable diligence, can locate it . . . ." *Bruckelmyer v. Ground

Heaters, Inc.*, 453 F.3d 1352, 1354 (Fed. Cir. 2006).

58.    The ability to locate a printed publication is critical and, in the case of

single-copy documents like doctoral theses and the Karolinska Request, require some form of

indexing. *Id.* at 1379; *see also In re Cronyn*, 890 F.2d 1158, 1160-61 (Fed. Cir. 1989) (holding

that theses kept in a university library along with an index of cards containing the students'

names and the theses' titles but no indication of the subject matter were not meaningfully

indexed or catalogued and therefore insufficient to qualify as printed publications).

(PFF § III.K.6., *supra.)*

59.    Sicor must prove these underlying facts by clear and convincing evidence.

*See Norian Corp.*, 363 F.3d at 1330. It failed to offer *any* foundational testimony concerning the

Karolinska request, much less prove by clear and convincing evidence that the request is a

"printed publication" under 35 U.S.C. §102(a) and, therefore, prior art.  (*See* PFF § III.K.6., *supra*.)

60.     The letter written by a European patent attorney submitting the request to the European Patent Office stating that such requests were "generally available to the public" is inadmissible hearsay.  (*See* TX-1193 at SIC010937.)

61.     This statement is also irrelevant to the question of whether the Karolinska Request is a printed publication under U.S. law.  (*See* TX-1193 at SIC010937.)  As set forth in the Stipulation of Mr. Mattsson, a partner in the international law firm of Awapatent AB, the statement in question referred not to any aspect of U.S. law, but to public availability under the European Patent Convention.  (TX-Court11, ¶¶ 8-9.)  Under that convention, a document would be considered publicly available even if the document was not indexed or catalogued in a way that a member of the public could look it up or that would raise a presumption that the public concerned with the art would know of it.  (*See* TX-Court11, ¶¶ 10-12.)  Accordingly, Sicor has not proven that the Karolinska Request was sufficiently indexed to constitute a "printed publication" under U.S. law and has thus failed to carry its burden in proving that the Karolinska Request is prior art.

## III.     Evidentiary Objections

### A.     Expert Testimony and Exhibits Not Disclosed In Expert Reports

62.     Sicor improperly illicited from Dr. Strauss detailed testimony about two surgical experiments described in the Sollevi 1986 article (TX-1171).  (Strauss 702:20-709:11.)  Plaintiffs objected.  (*Id*.)  Review of Dr. Strauss's expert report (TX-246), shows those new opinions are not there.  While the new opinion testimony is without merit for reasons noted above, plaintiffs request that it be stricken is granted.

63.    An expert report must contain a complete statement of all opinions to be expressed. Fed. R. Civ. P. 26(a)(2)(B).  A party that fails to meet the disclosure requirements of Rule 26 shall not be permitted to use the information it has failed to disclose as evidence at a trial, provided that such failure is not harmless.  (Fed. R. Civ. P. 37(c)(1).)  Sicor failed to meet the obligations of Rule 26 and this failure was most certainly not harmless.  Sicor withheld information relating to a theory of invalidity, which ultimately resulted in an unfair surprise at trial.  Thus, the testimony of Dr. Strauss that is beyond the scope of his expert report should be excluded from evidence. *See Coalition To Save Our Children v. State Bd. of Educ.,* 90 F.3d 752, 775 (3d Cir. 1996); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-1371-JJF, slip. op. at 13 (D. Del. Sept. 20, 2006) (addressing several motions in limine, Judge Farnan acknowledged that as "the court stated previously, opinions not disclosed by an expert in his report will not be permitted at trial"); *Inline Connection Corp. v. AOL Time Warner Inc.*, No. 02-272-MPT, slip. op. at 16-17 (D. Del. Feb. 5, 2007) (granting motion to preclude an expert from testifying on subject outside the scope of his deposition and expert report, citing the party's failure to supplement the expert's report prior to trial).

## B.    The Karolinska Request

64.    Plaintiffs' also maintain their objection to the admission of the Karolinska Request on grounds of hearsay and authenticity.  (Objections at 1364:14-18, 1813:23-24.)  The copy of the Karolinska Request was produced and relied on by Sicor without any foundational witness testimony that would support admissibility under either F.R.E. 803(6) or 901(b)(1) as asserted by Sicor.  Plaintiffs request to exclude the Karolinska Request as prior art is granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that defendants have failed to prove by clear and convincing evidence that the asserted claims of the '877 patent are invalid. Judgment will be entered accordingly.

Dated: May 9, 2007

_____/s/ Mary B. Matterer_____
Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

_____/s/ Paul E. Crawford_____
Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY  10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research and*
*Development, Inc.*