IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KING PHARMACEUTICALS RESEARCH AND DEVELOPMENT, INC., ASTELLAS US LLC, and ASTELLAS PHARMA US, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-337 SLR |
| SICOR INC. and SICOR PHARMACEUTICALS, INC. | ) ) ) | **REDACTED –** **PUBLIC VERSION** |
| Defendants. | ) ) ) ) | |

**DEFENDANTS SICOR INC. AND SICOR PHARMACEUTICALS INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

John W. Shaw (No. 3362)
Josy W. Ingersoll (No. 1088)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
  STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for Defendants SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated:  May 9, 2007

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PROPOSED FINDINGS OF FACT ................................................................ 1

    A.    The Parties ................................................................................................ 1

    B.    The '877 Patent ........................................................................................ 2

    C.    The Asserted Claims Would Have Been Obvious In Light Of The Prior Art ........................................................................................................... 5

        1.    Level Of Ordinary Skill In The Art ............................................ 5

        2.    Scope And Content Of The Prior Art .......................................... 5

            a.    Myocardial Perfusion Imaging ...................................... 6

            b.    Pharmacologic Stress With MPI Was Known In The Art ............. 7

            c.    That Dipyridamole Acts Through Adenosine Was Known In The Art .......................................................................... 8

            d.    Safe Doses For Continuous Intravenous Infusion Of Adenosine To Humans Were Known In The Art ....................... 10

                i.    Sollevi 1986 .................................................... 11

                ii.    Sollevi 1984 .................................................... 12

                iii.    Owall ............................................................... 13

                iv.    Biaggioni 1986 ................................................ 14

                v.    Conradson ....................................................... 15

                vi.    Fuller .............................................................. 16

                vii.    Biaggioni 1987 ................................................ 16

                viii.    The '296 Patent ............................................... 17

            e.    The Use Of Adenosine For MPI Was Known In The Art ........... 17

        3.    There Was Ample Reason To Use Adenosine In Place of Dipyridamole As A Pharmacologic Stress Agent For MPI ..................... 19

        4.    A Person Of Ordinary Skill In The Art Would Have Had A Reasonable Expectation That Adenosine Would Work For MPI ............ 21

        5.    The Difference Between The Asserted Claims And The Prior Art ......... 23

        6.    No Secondary Indicia Weigh Against the Strong Showing of Obviousness .......................................................................... 24

            a.    No Unexpected Results ................................................ 24

            b.    No Long Felt Need ...................................................... 25

            c.    No Skepticism or Teaching Away .................................. 25

            d.    Any Commercial Success Of Adenoscan® Is Not Due To Any Alleged Superiority Of The Claimed Invention .................. 25

                i.    There Was Only One Other FDA-Approved Competitor In The Pharmacological Stress-Testing Market At The Time Of Adenoscan® Entry ..................... 26

                ii.    Adenoscan® Became The Only Promoted Product In The Pharmacological Stress Testing Market Shortly After Its Entry ...................................... 27

                iii.    Extensive Marketing And Promotion of Adenoscan® By Fujisawa ................................... 28

                    (1)    A Concentrated Market ........................ 28

    

(2)     Substantial Detailing Efforts.................................. 29

(3)     Support Of The ASNC ..................................... 29

(4)     Physician Advocacy Program............................. 30

(5)     Financial Incentives: Trial Support And Pumps .................................................. 31

(6)     Educational Initiatives: The Chest Pain Initiative And The Her Heart Initiative ............... 31

(7)     Combining Adenosine With Exercise ................. 32

(8)     Fujisawa's Marketing And Promotion Was Extensive ........................................... 33

iv.     Growth In Demand For Pharmacological Stress Testing Unrelated To The Asserted Inventions................ 34

v.     The Four Economic Factors Explain The Sales Levels Achieved By Adenoscan®, Irrespective Of Any Claimed Superiority Of The Product ....................... 38

D.     The '296 Patent And/Or The Karolinska Request Disclose The Elements Of The Asserted Claims .................................................. 39

1.     The '296 Patent And The Karolinska Request Are Prior Art................... 39

a.     Priority Date Of The '877 Patent Claims ..................................... 39

b.     The Priority Date Of Example XIII Of The '296 Patent ............. 40

c.     The Priority Date Of The Karolinska Request............................. 40

2.     Every Element Of The Asserted Claims Is Disclosed In The '296 Patent.................................................. 41

3.     Every Element Of Claims 23(17) and 43 Is Disclosed In The Karolinska Request ................................................... 42

II.     PROPOSED CONCLUSIONS OF LAW ................................................. 42

A.     Claims 23(17), 23(18) and 43 of the '877 Patent Are Invalid As Obvious.......... 42

1.     The Law Of Obviousness................................................ 42

2.     Scope Of The Prior Art ................................................ 45

3.     The Combination Of Either Gould 1978 Or Albro And Sollevi 1986 Renders The Asserted Claims Obvious.......................... 46

4.     The Combination Of Either Gould 1978 Or Albro And Biaggioni 1986 Renders The Asserted Claims Obvious.......................... 48

5.     Either Gould 1978 Or Albro In Light Of Knowledge In Art Concerning Adenosine Infusion Renders The Asserted Claims Obvious ................................................ 49

6.     Plaintiffs Present No Persuasive Secondary Indicia ................................ 50

B.     Claims 23(17), 23(18) and 43 of the '877 Patent Are Invalid As Anticipated.................................................. 51

1.     Legal Standard.................................................. 51

2.     The '296 Patent Anticipates And/Or Renders Obvious The Asserted Claims .................................................. 52

3.     The Karolinska Request ................................................ 53

III.     CONCLUSION.................................................................. 53

# TABLE OF AUTHORITIES

Page

## CASES

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) ........................................................................ 43

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........................................................................ 45

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ............................................................... 45, 51-52

*Atofina v. Great Lakes Chemical Corp.*,
441 F.3d 991 (Fed. Cir. 2006) ...................................................................... 52-53

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) ........................................................................ 51

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*,
229 F.3d 1120 (Fed. Cir. 2000) ............................................................... 44-45, 51

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ..................................................................... 42-44

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ............................................................................................. 42

*In re Bigio*,
381 F.3d 1320 (Fed. Cir. 2004) ........................................................................ 46

*In re Huang*,
100 F.3d 135 (Fed. Cir. 1996) ......................................................................... 45

*In re O'Farrell*,
853 F.2d 894 (Fed. Cir. 1988) ......................................................................... 44

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998) ........................................................................ 45

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. -- (2007) ..................................................................................... Passim

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) .............................................................. 42, 47, 53

*Newell Cos., Inc. v. Kenney Manuf. Co.*,
    864 F.2d 757 (Fed. Cir. 1989) ......................................................................44, 51

*Novo Nordisk Pharm, Inc. v. Bio-Technology Gen. Corp.*,
    424 F.3d 1347 (Fed. Cir. 2005) ........................................................... 51

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ............................................... Passim

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ............................................... Passim

*Richardson-Vicks Inc. v. UpJohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997) ...................................................44, 51

*Sibia Neurosciences, Inc. v. Cadus Pharm. Corp.*,
    225 F.3d 1349 (Fed. Cir. 2000) ........................................................ 45

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991) ........................................................ 45

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ........................................................ 51

## STATUTES

21 U.S.C. § 355 .................................................................................... 2

35 U.S.C. § 102 ..............................................................51, 52, 53

35 U.S.C. § 103(a).................................................................... 42

DB01:2085107.1                                                                        058956.1016

# I.  PROPOSED FINDINGS OF FACT

## A.  The Parties

1.  Plaintiff King Pharmaceuticals Research and Development, Inc. ("King") is a Delaware corporation having a principal place of business in Cary, NC.  (Joint Statement of Admitted Facts No. 2, D.I. 133.)

2.  Plaintiff Astellas US LLC is a limited liability Delaware corporation having a principal place of business in Deerfield, IL.  Plaintiff Astellas Pharma US, Inc. is a Delaware corporation having a principal place of business in Deerfield, IL.  (Collectively, "Astellas"). (Joint Statement of Admitted Facts No. 1, D.I. 133.)

3.  Defendant Sicor Inc. is a Delaware corporation having a principal place of business in Irvine, CA.  Defendant Sicor Pharmaceuticals, Inc. is a Delaware corporation having a principal place of business in Irvine, CA.  (Collectively, "Sicor").  (Joint Statement of Admitted Facts Nos. 3-4, D.I. 133.)

4.  Sicor Pharmaceuticals, Inc. is a wholly-owned subsidiary of Sicor Inc.  (Joint Statement of Admitted Facts No. 5, D.I. 133.)

5.  Adenoscan® (Adenosine Injection, USP) is an adenosine-based product.  (Joint Statement of Admitted Facts No. 12, D.I. 133.)

6.  Astellas manufactures Adenoscan® (Adenosine Injection, USP) pursuant to NDA No. 20-059.  (Joint Statement of Admitted Facts No. 11, D.I. 133.)

7.  Astellas markets Adenoscan®, as a pharmacologic stress agent for use with myocardial perfusion imaging ("MPI").  (Joint Statement of Admitted Facts Nos. 11-12, D.I. 133.)

1

8.     The United States Patent 5,070,877 (the "'877 patent") is assigned on its face to MedCo Research, Inc.  (Joint Statement of Admitted Facts Nos. 6-7, D.I. 133.)  King is the current assignee of the '877 patent.  (Joint Statement of Admitted Facts No. 9, D.I. 133.).

9.     Astellas is the exclusive licensee of certain rights under the '877 patent.  (Joint Statement of Admitted Facts No. 10, D.I. 133.)

10.     Pursuant to the Hatch-Waxman Act, Sicor filed an Abbreviated New Drug Application with the U.S. Food and Drug Administration ("FDA") seeking approval to market generic adenosine for use with MPI on December 6, 2004.  (Joint Statement of Admitted Facts No. 14, D.I. 133.)

11.     Sicor later amended its ANDA to incorporate a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV certification"), asserting that the '877 patent is invalid, unenforceable or would not be infringed by Sicor's generic product.  (D.I. 1.)

12.     On April 16, 2005, Sicor provided a notice of its Paragraph IV certification to King and Astellas (collectively "Plaintiffs") in accordance with 21 U.S.C. § 355 (j).  (D.I. 1.)

13.     Plaintiffs brought suit for infringement of the '877 patent in this Court on May 26, 2005.  (D.I. 1.)

**B.     The '877 Patent**

14.     U.S. Patent 5,070,877 ("the '877 patent") issued on December 10, 1991. (TX 320.)

15.     The original application leading to issuance of the '877 patent was filed on August 11, 1988.  (TX 320 at col.1, ll.4-6.)  A continuation-in-part application, number 330,156, was filed on March 29, 1989, and the '877 issued from from application number 330,156 on Dec. 10, 1991.  (TX 320.)

2

16.    The '877 patent relates to use of the adenosine, and adenosine derivatives and analogues, as pharmacologic stress agents in connection with MPI.  (Strauss, Tr.642:17-643:2; TX 320.)

17.    The named inventors on the face of the '877 patent are Syed M. Mohiuddin and Daniel E. Hilleman.  (TX 320.)

18.    The '877 patent includes 47 claims.  (TX 320.)  At trial, Plaintiffs asserted three claims:  claim 23 as read through claim 17 ("claim 23(17)"); claim 23 as read through claim 18 ("claim 23(18)"); and claim 43.  (Tr. 600:7-13.)

19.    Claim 17 states:

A method of detecting the presence and assessing the severity of coronary artery disease in a human comprising the steps of:

(a) administering by an intravenous route to said human about 20 mcg/kg/minute to about 200 mcg/kg/minute of an adenosine receptor agonist sufficient to provide coronary artery dilation;

(b) administering a radiopharmaceutical agent into said human; and

(c) performing radiopharmaceutical myocardial perfusion imaging on said human in order to detect the presence and assess the severity of coronary artery disease.

(TX 320 at col.8, ll.53-65.)

20.    Claim 18 states:

The method of claim 17 wherein said adenosine receptor agonist is administered by intravenous infusion in a dosage of about 140 mcg/kg/minute.

(TX 320 at col.8, ll.66-68.)

21.    Claim 23 states:

The method of claim 17, 19 or 18, wherein said adenosine receptor agonist is adenosine.

3

(TX 320 at col.9, ll.34-35.)

22.     Claim 43 states:

A method of detecting the presence and assessing the severity of coronary artery disease in a human comprising the steps of:

(a) administering to said human by intravenous infusion about 20 mcg/kg/minute to about 200 mcg/kg/minute of adenosine in order to provide coronary artery dilation;

(b) administering thallium-201 to said human ; and

(c) performing scintigraphy on said human in order to detect the presence and assess the severity of coronary artery disease.

(TX 320 at col.10, l.66-col.11, l.9.)

23.     Asserted claims 23(17) and 43 recite doses of adenosine in the range of about 20-200 mcg/kg/minute.  (TX 320 at claims 17, 43.)

24.     Asserted claim 23(18) recites a dose of adenosine of about 140 mcg/kg/minute. (TX 320 at claim 18.)

25.     On its face, the priority date of the '877 patent is August 11, 1988.  The priority date of the '877 patent is no earlier than March 14, 1988.  (Wackers, Tr. 1010:12-23, 1012:2-5, 1013:1-12, 1015:23-1016:1.)

26.     The named inventors had not conceived of using a dose of adenosine in the range of 20-200 mcg/kg/minute prior until at least March 14, 1988. (Wackers, Tr. 1010:12-15, 1013:1-12, 1015:23-1016:1; *see also* TX 57.)

27.     The named inventors had not conceived of using a dose of 140 mcg/kg/minute until at least March 14, 1988.  (Wackers, Tr. 1010:16-18, 1012:2-5, 1015:23-1016:1; *see also* TX 57.)

### C.    The Asserted Claims Would Have Been Obvious In Light Of The Prior Art

#### 1.    *Level Of Ordinary Skill In The Art*

28.    The fields of art relevant to the '877 patent include cardiology, nuclear cardiology, and nuclear medicine.  (Strauss, Tr. 644:12-21; Wackers, Tr. 898:12-14.)

29.    A person of ordinary skill in the art at the relevant time would have been a practicing physician who either was trained in cardiology, with additional training in nuclear cardiology, or was trained in nuclear medicine, with additional training in cardiology.  (Strauss, Tr. 646:4-14; Wackers, Tr. 898:15-20.)

#### 2.    *Scope And Content Of The Prior Art*

30.    The relevant prior art includes references within the fields of cardiology, nuclear cardiology and/or nuclear medicine, or that are otherwise pertinent to the question of using a pharmacologic stress agent for MPI.  (Strauss, Tr. 644:12-21; Wackers, Tr. 898:12-14.)

31.    Dr. Wackers testified that the 1986 article titled *Cardiovascular Effects of Adenosine in Man; Possible Clinical Implications*, by A. Sollevi ("Sollevi 1986," TX 1171) was "pertinent."  (Wackers, Tr. 927:11-15.)

32.    Dr. Wackers did not dispute the relevance of any of the other references on which Dr. Strauss relied in his obviousness analysis.  (Wackers, Tr. 900:21-24.)

33.    Several of the references on which Dr. Strauss relied in his analysis, such as the 1984 Sollevi reference, *Controlled Hypotension with Adenosine in Cerebral Aneurysm Surgery* ("Sollevi 1984," TX 112); the 1987 Owall reference, *Clinical Experience with Adenosine for Controlled Hypotension during Cerebral Aneurysm Surgery* ("Owall," TX 1169); and the 1987 Fuller reference, *Circulatory and respiratory effects of infused adenosine in conscious man* ("Fuller," TX 1208), were identified by the inventors in the references section of their own study Protocol.  (TX 57 at 9-10.)

34.     Named inventor Dr. Hilleman testified that his general practice was to cite articles that are relevant to the research being conducted, and he assumed that he followed his general practice in connection with the Protocol.  (Hilleman, Tr. 2128:15-19, 2129:9-23.)

35.     Several of the references cited by the inventors in the reference section of their Protocol (TX 57 at 9-10) were not cited during prosecution of the '877 patent (TX 320).  These include Albro et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation,* ("Albro", TX 93); Gould et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation*, ("Gould 1978", TX 38); Sollevi 1984 (TX 112); Fuller (TX 1208); and Owall (TX 1169) (compare TX 57 at 9-10 with TX 320).

a.     Myocardial Perfusion Imaging

36.     MPI is an imaging technique that provides images of the distribution of blood flow to the heart.  (Strauss, Tr. 647:12-17.)  MPI is performed by injecting a tracer (also referred to as a radiotracer or radionuclide) into a patient at conditions of rest and stress then comparing the images to identify any areas of reduced blood flow.  (Strauss, Tr. 635:13-22, 647:12-17.)

37.     MPI requires the patient to experience "stress" because it creates a disparity in blood flow between healthy vessels, which are able to dilate, and stenosed or blocked vessels, which cannot dilate or expand to accommodate greater demand for blood.  (Strauss, Tr. 648:10-649:2.)

38.     The radioactive tracer is injected into the patient in order to capture an image of the differential in flow between the vessels.  (Strauss, Tr. 649:16-651:6; DTX3068-70.)

39.     MPI is used to identify the presence and severity of coronary artery disease in humans by comparison of the difference in flow between conditions of rest and stress.  (Strauss, Tr. 635:10-22.)

6

         b.      Pharmacologic Stress With MPI Was Known In The Art

40.      In February 1978, K. Lance Gould, M.D., *et al.*, published a seminal work entitled, *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilation* ("Gould 1978"), describing MPI during pharmacologic coronary vasodilatation.  (Strauss, Tr. 662:2-663:6; TX 38.)

41.      Gould 1978 describes the clinical feasability and methodology of performing MPI by continuous infusion of a pharmacological stress agent.  (Strauss, Tr. 663:10-664:4; TX 38 at 279.)

42.      Gould 1978 uses dipyridamole as the pharmacological stress agent.  (Strauss, Tr. 664:13-18; TX 38 at 279.)

43.      The method described in Gould 1978 includes a continuous infusion of dipyridamole to human patients for a period of four minutes to dilate the coronary vessels and increasing coronary blood flow to aid in detecting coronary artery disease.  (Strauss, Tr. 662:23-663:5, 663:10-20, 665:3-666:7; TX 38 at 280-81.)

44.      Gould 1978 further describes injection of thallium-201 after completion of the dipyridamole infusion, and the use of a gamma camera to obtain scintigraphic images.  (Strauss 662:17-22, 664:23-665:2; TX 38 at 280-81.)

45.      Gould 1978 describes the expected increase in coronary blood flow caused by the dipyridamole infusion.  (Strauss, Tr. 665:3-13; TX 38 at 284.)

46.      Gould 1978 discusses an earlier study that reported changes in coronary blood flow from dipyridamole infusion in 28 patients.  According to Gould 1978, the average increase in coronary flow shown in the study was four times baseline control values.  However, there was a "wide standard deviation" because three of the 28 patients showed an increase of less than three times baseline blood flow.  (TX 38 at 284; *see also* Strauss, Tr. 663:10-20.)

7

47.     Gould 1978 describes the safe and effective continuous intravenous infusion of a pharmacologic stress agent to patients, in order to cause vasodilatation and the resultant increased blood flow, for purposes of using MPI as a diagnostic tool.  (Strauss, Tr. 663:10-20, 664:5-12, 665:21-666:7; TX 38 at 279.)

48.     In 1978 a publication entitled, *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilation*, by Albro et al. ("Albro") describes the continuous intravenous infusion of dipyridamole as a pharmacologic stress agent for use with MPI in humans.  (Strauss, Tr. 667:15-22; TX 93 at 752.)

49.     The radio tracer used in Albro is thallium-201.  (Strauss, Tr. 667:15-22; TX 93 at 752.)

50.     Albro demonstrated that pharmacologic coronary vasodilatation is as effective as treadmill exercise in creating myocardial perfusion abnormalities detectable with thallium-201 imaging in humans.  (Strauss, Tr. 667:15-22; TX 93 at 751.)  Albro states:

> However, sensitivity and specificity in identifying significant coronary stenoses were identical for dipyridamole and exercise images.

(TX 93 at 759.)

c.     That Dipyridamole Acts Through Adenosine Was Known In The Art

51.     Prior to 1987, the mechanism of dipyridamole was known in the art.  (Wackers, Tr. 908:19-24.)

52.     Albro describes the mechanism of dipyridamole as preventing the inactivation of adenosine by adenosine deaminase in the red blood cells and the lung and myocardial tissues, leading to an increase in endogenous adenosine.  (Strauss, Tr. 669:10-670:1; TX 93 at 758-59.)

53.     Specifically, Albro states that:

8

> Dipyridamole may induce coronary vasodilatation by several mechanisms. Adenosine, a product of adenine nucleotide utilization in myocardial tissue, has vasodilator activity and has been proposed as a coronary vasoregulator. Dipyridamole prevents inactivation of adenosine by adenosine deaminase in the red blood cells and lung and myocardial tissues, either by inhibiting adenosine deaminase or by preventing the uptake of adenosine into these tissues.

(TX 93 at 758.)

54.    A person of ordinary skill in the art at the time would understand from this portion of Albro that "if dipyridamole is selected as the vasodilator, that the effector drug, if you will, is adenosine . . . ." (Strauss, Tr. 670:12-18.)

55.    The 1985 edition the textbook of pharmacology commonly used by students and physicians in 1985, Goodman and Gilman, states that dipyridamole acts, at least in part, through the metabolism and transport of adenosine and adenosine nucleotides. In particular, dipyridamole inhibits the uptake of adenosine by erythrocytes and other cells. (Strauss, Tr. 679:16-680:7; TX 39 at 822.)

56.    Goodman and Gilman states of dipyridamole:

> The actions of dipyridamole seem to be linked, at least in part, to the metabolism and transport of adenosine and adenine nucleotides; in particular, dipyridamole inhibits the uptake of adenosine by erythrocytes and other cells. Adenosine, which is released from the hypoxic myocardium, is a coronary vasodilator and appears to be an important signal for the autoregulation of coronary blood flow.

(TX 39 at 822.)

57.    Based on this portion of Goodman & Gilman, a person of skill in the art at the time would understand that when dipyridamole is infused, it is acting through adenosine to cause vasodilation. (Strauss, Tr. 680:8-22.)

58.    A March 1987 article entitled, *Cardiovascular effects of infused adenosine in man: potentiation by dipyridamole*, by Conradson et al. ("Conradson"), describes how the

cardiovascular effects of dipyridamole in man, at least in part, are mediated by the the potentiation of the cardiovascular actions of the increased endogenous adenosine. (Strauss, Tr. 682:17-24, 683:8-13; TX 220 at 387.)

59. Conradson states that:

Dipyridamole inhibits the cellular update of adenosine which results in a potentiation of the cardiovascular actions of adenosine … [t]here is also evidence that the cardiovascular effects of dipyridamole in man, at least in part, are mediated by endogenous adenosine.

(TX 220 at 387 (internal citations omitted).)

60. A person of skill in the art would understand from Conradson that dipyridamole acts through adenosine. (Strauss, Tr. 683:8-13.)

61. United States Patent No. 5,731,296 (the "'296 patent") states that, "[m]ost data concerning the mechanism of action of dipyridamole's vasodilatory effect in fact support the view that it is solely due to adenosine vasodilation." (TX 275, col.21, ll.49-51; *see* Strauss, Tr. 684:12-685:2.)

62. The statement concerning dipyridamole's mechanism of action, as set forth in the '296 patent, reflects the state of knowledge in the art in 1987. (Strauss, Tr. 684:12-685:6.)

63. A 1987 "Patient's Informed Consent" form to be used by Dr. Mario Verani and his group at Baylor College of Medicine in connection with use of adenosine for MPI states that "[a]lthough the drug dipyridamole is used to dilate the coronary vessels, the ultimate substance that effectively causes the vasodilation is called adenosine, which is made available in higher amounts by dipyridamole administration." (TX 52 at AST0009469.)

                d.       Safe Doses For Continuous Intravenous Infusion Of Adenosine To Humans Were Known In The Art

64. By mid-1987, safe doses of adenosine that could be administered by continuous infusion and that would result in vasodilation were known in the art.

10

65.     In 1987, pharmaceutical grade adenosine for intravenous administration to humans had only recently become available.  TX52 at AST009465; Tr. 1023:22-1024:4.) Medco, the original assignee of the '877 patent, was the only source of pharmaceutical grade adenosine at the time.  Tr. 1854:22-1855:16; *see also* Tr., 2119:13-2120:10.)

66.     The ability to obtain adenosine in pharmaceutical grade from Medco was sufficiently valuable that it was the only consideration either named inventor received for assigning all rights to the '877 patent to Medco.  Tr. 1896:9-18; 1897:9-14; Hilleman, Tr. 2148:5-23.)

67.     Absent a source of pharmaceutical grade adenosine, anyone wishing to use intravenous adenosine in humans would have to purify chemical grade adenosine and qualify it as suitable for intravenous infusion to humans.  *See* Strauss, Tr. 671:6-672:16.)

i.     Sollevi 1986

68.     A November1986 publication entitled, *Cardiovascular Effects of Adenosine in Man; Possible Clinical Implications*, by Dr. A. Sollevi ("Sollevi 1986") describes infusing adenosine at a rate of 80 mcg/kg/minute.  (TX 1171 at 335.)  Sollevi 1986 further states that this infusion rate was associated with a "doubling of the myocardial blood flow."  (Strauss, Tr. 702:21-703:14, 704:3-9; TX 1171 at 335, Fig.11.)  Sollevi 1986 also states that "[t]his study is additional evidence for adenosine being an extremely effective coronary vasodilator in man." (TX 1171 at 335).

69.     Sollevi 1986 states that a dose of 30-50 mcg/kg/minute caused a 100 percent increase in graft flow.  (Strauss, Tr. 704:22-705:5; TX 1171 at 335.)  Sollevi 1986 further states that the "data demonstrate that intravenously administered adenosine can produce preferential coronary vasodilation in man."  (TX 1171 at 335; *see also* Strauss, Tr. 704:22-705:5.)

11

70.     Sollevi 1986 describes adenosine infusion doses greater than 200 mcg/kg/minute as inducing controlled hypotension in anesthetized patients.  (Strauss, Tr. 701:4-9; TX 1171 at 333.)

71.     Sollevi 1986 did not report any instances of AV block in connection to the doses required to produce controlled hypotension.  (Strauss, Tr. 702:2-6; TX 1171.)

72.     The summary chart at the conclusion of Sollevi 1986 states that a property of the "low dose" of 20-50 mcg/kg/minute of adenosine is "preferential myocardial vasodilation." (TX 1171 at 345, Table 6.)

73.     The summary chart at the conclusion of Sollevi 1986 also describes a "mean dose" of 50-150 mcg/kg/minute and a "high dose" of 150-350 mcg/kg/min.  (TX 1171 at 345, Table 6.)

74.     Sollevi 1986 states that "adenosine may be used in many clinical situations as a vasodilator, antiaggregatory compound as well as an antiarrythmic agent.  Its effect is easy to control due to the extremely short plasma half-life."  (TX 1171 at 345.)

75.     A person of ordinary skill in the art would have understood from Sollevi 1986 that there was a range of doses of adenosine from about 20 mcg/kg/min at the low end to about 200 mcg/kg/min at the high end that would cause vasodilation and the related increased blood flow, but would not result in hypotension.  (Strauss, Tr. 708:10-709:12; 705:19-707:2; 747:10-748:13; 748:22-749:20.)

ii.     Sollevi 1984

76.     A 1984 article entitled, *Controlled Hypotension with Adenosine in Cerebral Aneurysm Surgery*, by Dr. A. Sollevi ("Sollevi 1984") describes continuous intravenous infusion of adenosine for the purpose of inducing controlled hypotension in anesthetized patients undergoing cerebral aneurysm surgery.  (Strauss, Tr. 692:12-23; TX 112.)

12

77. Sollevi 1984 describes adenosine doses of 200-300 mcg/kg/minute as causing hypotension in anesthetized patients without an initial dose of dipyridamole. (Strauss, Tr. 695:6-16; TX 112 at 403, n.tt.)

78. Sollevi 1984 describes several advantagous features of adenosine. Specifically, Sollevi 1984 states that "[t]he rapidity of onset and termination, stability of action, maintenance of cardiac output, and decrease in oxygen demand differentiate adenosine from other antihypotensive agents. These excellent properties justify further clinical investigation." (TX 112 at 404.)

79. Sollevi 1984 did not report any instances of AV block. (Strauss, Tr. 696:2-697:11, 698:13-15.)

80. A person of skill in the art would have understood from Sollevi 1984 that continuous intravenous infusion of adenosine would result in a stable state of coronary vasodilatation. (Strauss, Tr. 699:4-17.)

81. A person of skill in the art would have understood from Sollevi 1984 that continuous intravenous infusion of adenosine is relatively safe, even at doses exceeding 200 mcg/kg/min. (Strauss, Tr. 699:4-17.)

iii. Owall

82. An article by Dr. Owall et al. ("Owall") published in March 1987 entitled, *Clinical Experience with Adenosine for Controlled Hypotension during Cerebral Aneurysm Surgery*, describes results from adenosine infusion in a series of 47 anesthetized patients without pretreatment with dipyridamole. (Strauss, Tr. 721:8-22; TX 1169.)

83. Owall describes infusion rates from 88-530 mcg/kg/minute, with a mean dose required to produce hypotension of about 210 mcg/kg/minute. (Strauss, Tr. 723:3-7, 724:20-725:5; TX 1169 at 230, 232.)

13

84.     Owall concludes that "adenosine induces a stable and easily controlled hypotension without negative effects on cardiac output or acid-base balance in patients undergoing cerebral aneurysm surgery during neurolept anesthesia." (TX 1169 at 233; *see also* Strauss, Tr. 724:20-725:11.)

85.     A person of skill in the art would have understood from Owall that one would need an infusion dose of adenosine of about 200 mcg/kg/minute or more to achieve hypotension and, once the desired result was achieved, one could maintain it for a prolonged period of time. (Strauss, Tr. 724:20-725:11; TX 1169.)

iv.     Biaggioni 1986

86.     A 1986 publication entitled, *Cardiovascular effects of adenosine infusion in man and their modulation by dipyridamole*, by Biaggioni et al. ("Biaggioni 1986"), describes continuous intravenous infusion of adenosine to seven conscious healthy volunteers at rates of 10, 20, 40, 60, 80, 100 and 140 mcg/kg/min. (Strauss, Tr. 711:1-14, 712:14-16; TX 48 at 2230.) Each infusion rate was maintained for 15 minutes. (Strauss, Tr. 711:9-14; TX 48 at 2230.)

87.     The duration of infusion of each dose is significant. Only a few minutes are needed for MPI, so even the 15 minute duration of one of the doses is longer than would be necessary to perform MPI. (Strauss, Tr. 711:20-712:13)

88.     Biaggioni 1986 described total adenosine infusions of either 1-1/2 or 1-3/4 hours. (Strauss, Tr. 711:22-712:13, 717:10-15; *see* TX 48 at 2230.)

89.     Of the seven patients described in Biaggioni 1986, five tolerated a dose of 140 mcg/kg/minute and all patients tolerated a dose of 100 mcg/kg/minute. (Strauss, Tr. 712:14-713:1; TX 48 at 2231.)

90.     According to Biaggioni 1986, the study shows "that adenosine administered by infusion over the range of 60 to 140 µg/kg/min to healthy conscious human subjects, lowers

14

diastolic blood pressure but raises heart rate, systolic blood pressure and levels of plasma norepinephrine." (TX 48 at 2234; *see* Strauss, Tr. 718:6-16.)

91. The increase in systolic blood pressure coupled with the decrease in diastolic blood pressure reported in Biaggioni 1986 indicates that the subjects had a "very significant vasodilation response to the adenosine infusion." (Strauss, Tr. 718:4-719:2.)

92. Biaggioni 1986 also describes the side effects experienced by the conscious subjects at the highest tolerated infusion rates. The side effects included headache, subjective flushing in the head and neck, nervousness and an urge to breathe deeply, and they "disappeared immediately after discontinuation of the infusion." (TX 48 at 2233; *see* Strauss, Tr. 715:4-8.)

93. A person of ordinary skill in the art would understand from Biaggioni 1986 that adenosine could be safely, continuously infused to conscious humans for extended periods of time at rates up to 140 mcg/kg/min and that the adenosine infusion would cause vasodilation. (Strauss, Tr. 719:3-18.)

v.    Conradson

94. Conradson, published in March 1987, describes stepwise infusion rates in conscious human subjects of 20 mcg/kg/min to a maximum of 100 mcg/kg/min in eight normal volunteers. Each dose was administered for six minutes. (Strauss, Tr. 726:23-727:15; TX 220 at 388.)

95. All eight subjects described in Conradson tolerated 70 mcg/kg/min; six of eight tolerated 90 mcg/kg/min; and three of the eight tolerated 100 mcg/kg/min. (Strauss, Tr. 726:19-727:5; TX 220 at 388.)

96. The duration of the adenosine infusions in Conradson exceeds the time necessary for MPI. (Strauss, Tr. 727:13-15.)

15

97.     Conradson reported side effects such as headache, backache, neck ache, pain in arms and legs, jaw ache, abdominal pain, chest cramp, blocked noce and dry mouth.  (TX 220 at 389.)  These side effects disappeared within 2 minutes after cessation of the adenosine infusion.  (Strauss, Tr. 728:22-5; TX 220 at 388-89.)

98.     A person of ordinary skill in the art would understand from Conradson that adenosine could be safely, continuously infused to conscious humans at rates up to 100 mcg/kg/min.  (Strauss, Tr. 728:19-729:3.)

### vi.     Fuller

99.     An article by Dr. Fuller, *et al.*, ("Fuller") published in September 1987 and entitled, *Circulatory and Respiratory Effects of Infused Adenosine in Conscious Man*, describes adenosine infusion beginning at 12 mcg/kg/min and increasing to 25, 50, and 100.  (Strauss, Tr. 729:13-730-9; TX 1208 at 310.)

100.     Each dose of adenosine was infused for 6 to 7 minutes.  (Strauss, Tr. 729:19-730-4; TX 1208 at 310.)

101.     Two of the six subjects described in Fuller tolerated 200 mcg/kg/min for 1 and 2 minutes, respectively.  (Strauss, Tr. 730:16-22; TX 1208 at 311.)

102.     A person of skill in the art would understand from Fuller that adenosine could be safely, continously infused to conscious humans at a rate of at least 100 mcg/kg/min and up to 200 mcg/kg/min.  (Strauss, Tr. 731:1-12.)

### vii.     Biaggioni 1987

103.     An article published in December1987 by Biaggioni et al. ("Biaggioni 1987") entitled, *Cardiovascular and Respiratory Effects of Adenosine in Conscious Man*, describes adenosine infusion at rates of 80-180 mcg/kg/minute to healthy male volunteers.  (Strauss, Tr. 732:6-733:6; TX 226.)

16

104.    Eight subjects are discussed in connection with the continuous intravenous infusion of adenosine described in Biaggioni 1987. Each of the eight subjects tolerated an infusion rate of 140 mcg/kg/minute. (Strauss, Tr. 732:17-22; TX 226 at 781-82, Fig.3, 784-86.)

105.    Biaggioni 1987 states that the adenosine infusions produced dose-dependent increases in heart rate and systolic blood pressure and decreases in diastolic blood pressure. (TX 226 at 781, Fig.3, *see also* Strauss, Tr. 736:8-13.)

106.    A person of ordinary skill in the art would understand from Biaggioni 1987 that adenosine can be safely, continuously infused for extended periods of time, that doses up to 140 mcg/kg/min are tolerable in conscious humans, and that adenosine has a predictable vasodilatory action. (Strauss, Tr. 735:4-19.)

viii.    The '296 Patent

107.    The '296 patent describes use of adenosine as a pharmacologic stress agent for MPI. (TX 275 at col. 21.)

108.    The '296 patent states that "a safer and more reliable test can be expected if adenosine is used" instead of dipyridamole. (TX 275 at col.21, ll.57-58.)

109.    The '296 patent further states that "[t]he exact dose will normally have to be titrated individually but should lie in the range of 10 to 150 micrograms per kilogram per minute." (TX 275 at col. 21, ll. 59-61.)

110.    A person of ordinary skill in the art would understand from the '296 patent that doses within the range of 10-150 mcg/kg/min would likely be both safe and effective for MPI. (Strauss, Tr. 752:7-19.)

e.    The Use Of Adenosine For MPI Was Known In The Art

111.    The '296 patent describes, *inter alia*, the use of adenosine as a pharmacologic stress agent for MPI. (TX 275 at col. 21.)

17

112.    The '296 patent issued from U.S. Patent Application No. 08/031,666 (the "'666 application"), filed March 15, 1993.  (TX 275.)

113.    Example XIII was added in a continuation-in-part application filed on Dec. 28, 1987.  (TX 275; Joint Statement of Admitted Facts No. 17, D.I. 133.)

114.    Example XIII discloses "adenosine in the diagnosis of coronary heart disease by radionucleide (sic) scintigraphy."  (TX 275 at col.21, ll.25-61.)

115.    Example XIII describes the use of dipyridamole in connection with MPI using thallium 201.  (TX 275 at col.21, ll.25-61.)  Example XIII then explains the relationship of dipyridamole's action with adenosine's vasodilatory properties and teaches that adenosine can be used in place of dipyridamole as a pharmacologic stress agent for MPI.  (TX 275 at col.21, ll.25-61.)

116.    Example XIII of the '296 patent teaches a dose range of 10 to 150 mcg/kg/min of adenosine for MPI.  (TX 275 at col.21, ll.59-61; *see also* Strauss, Tr. 750:2-22.)

117.    The use of adenosine as a pharmacologic stress agent for MPI is also taught in a proposal that was submitted to the Karolinska Institute in Sweden in or around February of 1988 (the "Karolinska Request").  (TX 1193 at SIC010940.)

118.    The Karolinska Request discloses that adenosine could be used to replace dipyridamole as the pharmacologic stress agent for MPI.  (Strauss, Tr. 754:9-22; TX 1193 at SIC010943.)

119.    The dose described in the Karolinska Request is 60 mcg/kg/min.  (Strauss, Tr. 755:6-14; TX 1193 at SIC010944.)

DB01:2085107.1                                                                                                      058956.1016

      3.     *There Was Ample Reason To Use Adenosine In Place of Dipyridamole As A Pharmacologic Stress Agent For MPI*

120.    It was well known in the art by mid-1987 that dipyridamole acts through adenosine.

121.    A person of ordinary skill in the art in 1987 would have known that dipyridamole acts indirectly, and that adenosine is the direct acting agent. (*See, e.g.,* Strauss, Tr. 670:12-18; TX 93; TX 275.)

122.    Albro, Goodman and Gilman, Conradson and the '296 patent all demonstrate that it was well known in the art that dipyridamole works, at least in part, because of the increase in endogenous adenosine caused by dipyridamole's adenosine uptake inhibition. (Strauss, Tr. 670:12-671:12, 680:17-22, 683:8-13, 684:12-685-6; TX 93 at 758-59; TX 39 at 822; TX 220 at 387; TX 275, col.21, ll.49-51.)

123.    A person of ordinary skill in the art would have reason to substitute adenosine for dipyridamole in connection with MPI because that person would have known that the actual agent causing the vasodilation was adenosine. (Strauss, Tr. 670:12-671:12.)

124.    Common sense would provide ample reason to substitute the direct acting agent for the indirect agent in a known procedure.

125.    The prior art further provides various additional suggestions and/or reasons to use adenosine as a pharmacologic stress agent for MPI.

126.    Gould 1978 teaches that coronary vasodilators other than dipyridamole could be used for MPI. (Strauss, Tr. 664:13-18, 686:1-6.)

127.    Gould 1978 states that:

Any other coronary vasodilator that was more potent than dipyridamole would further increase the sensitivity of imaging techniques for identifying coronary disease.

         

(TX 38 at 285; *see* Strauss, Tr. 686:7-687:3.)

128.    Gould 1978 discusses imaging methods using a "coronary vasodilator" generally, further suggesting that coronary vasodilators other than dipyridamole could be used for MPI. (Strauss, Tr. 665:9-666:7; TX 38 at 285.)

129.    A person of skill in the art would have had reason to use adenosine for MPI based on the teachings of Gould 1978.  (Strauss, Tr. 686:7:687:18.)

130.    A person of ordinary skill in the art would have had further reason to substitute adenosine for dipyridamole for MPI because of knoweldge of the duration of action of the two agents.

131.    Dipyridamole was known to have a relatively long duration of action.  (Strauss, Tr. 673:17-674:11.)

132.    Because of the long duration of dipyridamole, it is not possible to turn off negative side effect by simply turning off the infusion.  (Strauss, Tr. 673:17-674:11, 674:18-675:12.)  Instead, use of a reversal agent may be necessary.  (Strauss, Tr. 673:17-674:11, 674:12-17; *see also* TX 38 at 283.)

133.    Adenosine has a very short duration of action.  (Strauss, Tr. 673:17-674:11.)  A person of ordinary skill in the art at the time would have known of adenosine's short duration, and would have expected the effects of adenosine to be far more easily controlled than dipyridamole.  (Strauss, Tr. 672:17-673:2; 673:17-674:11; 675:13-21; 742:2-18; *see also* TX 1171 at 345.)

134.    It was generally known prior by mid-1987 that a drug with a shorter duration of action would be preferable in terms of side effects.  (Hilleman, Tr. 2137:22-2139:7.)

135.    A person of ordinary skill in the art would have known that adenosine could be continuously infused to maintain a stable effect for the duration of time needed to perform the MPI, but that the effects could then be turned off almost immediately upon termination of the infusion.  (Strauss, Tr. 676:9-678:2; 692:12-694:7.)

136.    A person of ordinary skill in the art would have recognized at least two advantages of adenosine over dipyridamole:  (1) it would allow almost immediate termination of negative side effects, and (2) it would eliminate the extended effect of the drug past its usefulness for the procedure.  (Strauss, Tr. 673:17-674:11; 674:18-675:12; 676:9-677:8; 687:11-688:2.)

137.    Knowledge in the art regarding safety and vasodilation activity of adenosine when administered to humans via continuous intravenous infusion would provide yet another reason to use adenosine infusion in place of dipyridamole infusion for MPI.  (Strauss, Tr. 741:19-742:18; 749:7-9.)

4.    *A Person Of Ordinary Skill In The Art Would Have Had A Reasonable Expectation That Adenosine Would Work For MPI*

138.    A person of ordinary skill in the art in 1987 would have reasonably expected adenosine to work for MPI based on the strong suggestion in Gould 1978 that any other more potent coronary vasodilators could be used for MPI.  (Strauss, Tr. 664:15-18; TX 38 at 285.)

139.    A person of skill in the art in 1987 would have known that adenosine was already working as a pharmacologic stress agent for MPI, through the intermediary action of dipyridamole in the method described in Gould 1978 and Albro.  (Strauss Tr. 670:12-671:21; 687:11-688:2; TX 93 at 285.)  A person of ordinary skill in the art in 1987 would have reasonably expected adenosine to work directly for the same purpose for which it was already being used indirectly by the mechanism of action of dipyridamole.  (Strauss, Tr. 670:12-671:12.)

140.    It was known in the art that adenosine was a potent vasodilator.  (Strauss, Tr. 705:19-706:4; *see also* Mohiuddin, Tr. 1858:5-12; Hilleman, Tr. 2131:4-8.)  A person of ordinary skill in the art would have reasonably expected adenosine to work for the same purpose – as a vasodilator – for pharmacologic stress MPI.  (Strauss, Tr. 670:12-671:12.)

141.    The prior art disclosed a range of doses of adenosine that would cause vasodilation without causing hypotension or other severe side effects.  A person of ordinary skill in the art would have known from the teachings in the art that certain continuous infusion rates were both safe and sufficient to cause vasodilation.  (Strauss, Tr. 742:2-18, 748:2-13; 749:3-20, 750:2-22.)

142.    Based on Sollevi 1986, a person of skill in the art would have understood that a dose of about 20-30 mcg/kg/min would cause vasodilation.  (Strauss, Tr. 704:22-705:15; TX 1171 at 335, 345.)  Sollevi 1986 further taught that a dose of 30-50 mcg/kg/min caused a doubling of graft flow, and a dose of 80 mcg/kg/min caused a near doubling of myocardial blood flow.  (Strauss, Tr. 704:22-705:15; 702:21-703:14; TX 1171 at 335.)

143.    A person of skill in the art would have expected, based on Sollevi 1986 alone, that doses beginning as low as 30 mcg/kg/min would likely be effective to cause vasodilation.  (Strauss, Tr. 704:22-705:15, 739:2-15.)\

144.    A person of ordinary skill in the art would have also expected the upper range of useful doses for MPI to be around 200 mcg/kg/min because each of Sollevi 1984, Sollevi 1986 and Owall teach that continuous infusion of adenosine at levels greater than 200 mcg/kg/min result in hypotension.  (Strauss, Tr. 695:6-16; 700:19-701:9; 723:3-7; TX 112; 1169; 1171.)

145.    A person of ordinary skill in the art would have reasonably expected adenosine infusion rates between 20 and 200 mcg/kg/minute to be adequate for performing MPI.  (Strauss, Tr. 749:3-20, 750:2-23.)

146.    In light of the teachings of Biaggioni 1986, Conradson, Fuller and/or Biaggioni 1987, a person of skill in the art would have expected that most conscious patients would be able to tolerate doses somewhere between 90 and 140 mcg/kg/min.  (Strauss, Tr. 719:3-18; 728:15-729:3; 731:1-13: 735:4-12; TX 220; 226; 1169; 1208).

147.    A  person of ordinary skill in the art would have reasonably expected that doses in the range of 20-200 mcg/kg/min, and more likely doses above 50 mcg/kg/min but less than 200 mcg/kg/min, would be very likely to work for MPI.  (Strauss, Tr. 738:12-740:18.)

   5. *The Difference Between The Asserted Claims And The Prior Art*

148.    There is only one difference between the Gould 1978 reference and the asserted claims of the '877 patent – substituting the direct infusion of adenosine within the specified dosage ranges for the infusion of dipyridamole.

149.    There is only one difference between the Albro reference and the asserted claims of the '877 patent – substituting the direct infusion of adenosine within the specified dosage ranges for the infusion of dipyridamole.

150.    Everything in the asserted claims of the '877 patent, except the direct infusion of adenosine within the claimed dosage ranges, is disclosed in Gould 1978 and Albro.

151.    Gould 1978 and Albro each disclose a method for detecting and assessing coronary artery disease.  (Strauss, Tr. 663:10-20; 665:9-20; 667:15-22; TX 38, TX 93.)

152.    Both Gould 1978 and Albro disclose administering a pharmacologic stress agent by intravenous route, and administering enough of the stress agent to cause vasodilation. (Strauss, Tr. 663:10-20; 667:15-22; 668:18-669:1; TX 38; TX 93.)

23

153.    Both Gould 1978 and Albro disclose administering a radiopharmaceutical agent, specifically thallium-201, into the human.  (Strauss, Tr. 667:15-22; TX 38; TX 93.)

154.    Both Gould 1978 and Albro disclose performing MPI (scintigraphy) to detect and assess the severity of coronary artery disease.  (Strauss, Tr. 664:23-665:20; 667:15-22; TX 38; TX 93.)

155.    Gould 1978 suggests use of other more potent coronary vasodilators in place of dipyridamole.  (Strauss, Tr. 664:13-18; TX 38 at 285)

156.    Albro states that dipyridamole acts through adenosine.  (Strauss, Tr. 669:2-670:11; TX 93 at 758.)

157.    The sole difference between either of the prior art references Gould 1978 or Albro and the asserted claims is the direct infusion of adenosine within the claimed dosage ranges in place of reliance on dipyridamole infusion to increase endogenous adenosine for the same effect.

      6.    *No Secondary Indicia Weigh Against the Strong Showing of Obviousness*

      a.    No Unexpected Results

158.    Plaintiffs have not demonstrated any unexpected results for the methods in the asserted claims.

159.    A person of skill in the art at the relevant time would have expected adenosine to work as a vasodilator and to cause sufficient vasodilation for MPI in humans.  (Strauss, Tr. 735:4-12, 748:2-13; 749:10-21, 750:12-23.)

160.    A person of skill in the art would have expected adenosine infusion in the range of 20-200 mcg/kg/minute to be safe.  (*See, e.g.,* Strauss, Tr. 699:4-17, 747:18-748:1, 710:2-11.)

161.    A person of skill in the art would have expected any side effects from adenosine infusion to dissipate quickly upon termination of the infusion.  (Strauss, Tr. 674:4-12, 742:2-18; TX 112 at 404; TX 48 at 2233; TX 220 at 388-89; TX 226 at 780.)  A person of skill in the art

24

would have expected the advantages of safety and controllability that are associated with a short duration of action.  (Tr. 672:17-673:2; 673:17-674:11; 687:11-688:2.)

>    b.    No Long Felt Need

162.    Plaintiffs have not demonstrated any long felt need.  (Wackers, Tr. 997:4-14, 1001:16-1002:9.)

163.    Plaintiff's own expert Dr. Wackers explained that there was no particular need for a pharmacologic stress agent at the time of Gould 1978.  (Wackers, Tr. 905:20-906:14.)

164.    Dr. Wackers further explained that interest in pharmacologic stress agents did not become widespread until at least 1985.  (Wackers, Tr. 997:10-14.)

>    c.    No Skepticism or Teaching Away

165.    Plaintiffs have not shown skepticism or teaching away in the prior art.

166.    The prior art demonstrates interest in and willingness to use adenosine at the infusion doses claimed in the '877 patent, as well as at doses much higher than needed for MPI.  (Strauss, Tr. 717:2-15, 727:9-15, 730:5-9; TX 48, 220, 1208.)

167.    A person of ordinary skill in the art would not have been discouraged by earlier references discussing adenosine in other contexts.  (Strauss, Tr. 759:4-761:13).

>    d.    Any Commercial Success Of Adenoscan® Is Not Due To Any Alleged Superiority Of The Claimed Invention

168.    The sales levels achieved by Adenoscan® do not provide evidence of any superiority of this drug.  (Leffler; Tr. 1631:12-1632:22.)  Rather, the sales levels achieved by Adenoscan® are explained by the confluence and interaction of four economic factors:

>    (1)  There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

>    (2)  Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

25

(3)  Extensive marketing and promotion of Adenoscan® by Fujisawa; and

(4)  Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(Leffler, Tr. 1579:3-1582:13; DTX 3133.)

                    i.       There Was Only One Other FDA-Approved Competitor In The Pharmacological Stress-Testing Market At The Time Of Adenoscan® Entry

169.    Adenoscan® entered the market and began generating sales in August 1995. (Leffler, Tr. 1572:6-8.)  It was originally marketed by Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), now Astellas. (White, Tr. 1228:8-17.)

170.    In August 1995, when Adenoscan® entered the market, there was just one competing product, Persantine®, marketed by DuPont.  (Leffler, Tr. 1577:10-16, 1580:4-7; White, Tr. 1307:14-16; DTX 3133.)  Persantine® is the brand name for the drug dipyridamole. (Leffler, Tr. 1577:13-16.)

171.    The fact that there was only direct competitor to Adenoscan® made the pharmacological stressor market unique as compared to most pharmaceutical markets, which generally have many competitors engaged in promotional activity.  (Leffler, Tr. 1580:4-6.)

172.    In most pharmaceutical markets, the real difficulty is capturing the attention of the prescribers, who typically face numerous therapeutic alternatives and must filter through a lot of promotional "noise" in the marketplace.  (Leffler, Tr. 1602:11-21.)

173.    Unlike most pharmaceutical markets, the pharmacological stressor market was uncluttered.  (Leffler, Tr. 1602:22.)  It was "ripe for the picking" for a new player to enter and launch a competitive challenge against the available product.  (Leffler, Tr. 1602:22-25.)

174.    As a result, Adenoscan® was able to succeed in capturing the ears and the minds of doctors relatively quickly.  (Leffler, Tr. 1602:22-1603:2.)  There was just one other serious

competitor – Persantine® – with which Adenoscan® vied briefly for the attention of prescribers. (Leffler, Tr. 1602:2-4, 1603:12-14.)

175.    For this reason, the pharmacological stressor market was an "ideal" market for a new entrant such as Fujisawa, seeking to achieve sales.  (Leffler, Tr. 1602:11-1603:4.)

ii.    Adenoscan® Became The Only Promoted Product In The Pharmacological Stress Testing Market Shortly After Its Entry

176.    The second economic factor explaining the sales levels of Adenoscan® is that it became the only promoted product in the pharmacological stress testing market shortly after its entry.  (Leffler, Tr. 1580:14-21; DTX 3133.)

177.    In anticipation of the 1997 expiration of the patent on Persantine®, DuPont launched an authorized generic product in November 1996 in an advance attempt to capture generic dipyridamole sales.  (Leffler, Tr. 1603:17-21.)

178.    DuPont ceased its promotion of Persantine® approximately 16 months after the entry of Adenoscan®.  (Leffler, Tr. 1580:16-1581:7, 1603:14-16; White, Tr. 1307:17-1308:5.)

179.    DuPont ceased its promotion of Persantine® when generic dipyridamole was launched because promotion was no longer in DuPont's economic interest. (Leffler, Tr. 1603:21-1604:2.)  First, the effects of such promotion would be most likely to benefit the competing generic dipyridamole products.  (Leffler, Tr. 1604:2-4.)   Second, the accompanying reduction in the price of the branded dipyridamole product in the face of generic competition made the promotion is no longer worth the expenditure.  (Leffler, Tr. 1604:4-6.)

180.    As a result, by late 1996, Adenoscan® found itself in the fortunate situation of being the only product advertising itself to the prescribers of pharmacological stress tests. (Leffler, Tr. 1604:7-11.)  This advantage has continued to the present day.  (Leffler, Tr. 1604:12-22; White, Tr. 1308:1-11.)

iii.    Extensive Marketing And Promotion of Adenoscan® By Fujisawa

181.    The third economic factor explaining the sales levels of Adenoscan® is Fujisawa's extensive and effective marketing and promotion of the product. (Leffler, Tr. 1581:11-15; DTX 3133.)

(1)    A Concentrated Market

182.    Typically, the pharmaceutical industry is very promotion-driven because companies compete to capture the attention of very busy prescribers, who act as agents for patients. (Leffler, Tr, 1605:2-9.) Many articles in the economic literature have demonstrated the significance and importance of marketing and promotion to the success of a pharmaceutical product. (Leffler, Tr. 1605:9-12, 1606:15-25.)

183.    One characteristic of the pharmacological stressor market in particular is that it is very concentrated, i.e., in that the majority of procedures using pharmacologic stress agents are performed in a relatively low number of institutions. (Leffler, Tr. 1608:10-1609:3; TX 1226 at AST0065741.) This market characteristic was recognized in Fujisawa's "Launch Plan for Adenoscan." (White, Tr. 1294:4-21; TX 1226 at AST0065741.)

184.    Since Adenoscan® is not prescribed by hundreds of thousands of office-based physicians – as is the case with consumer-oriented products – Fujisawa could focus its promotion in a direct way on the relatively small number of clinics and hospitals comprising the market for its product. (Leffler, Tr. 1607:1-25.)

185.    Fujisawa, a smaller company that did not have the resources for a vast marketing apparatus, recognized this market characteristic as advantageous. (Leffler, Tr. 1607:1-25, 1608:5-9; White, Tr. 1292:22-1294:21; TX 1226 at AST0065741.) The search for opportunities to manufacture products in specialty markets, i.e., niche areas such as cardiology, was at the

heart of Fujisawa's, and now Astellas's, business strategy. (White, Tr. 1227:5-1228:3; Leffler, Tr. 1607:1-25.)

186. Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture this narrow pharmacological stressor market. (Leffler, Tr. 1620:12-20; White, Tr. 1263:1-10, 1283:7-14.) Fujisawa's traditional marketing activities included, *e.g.*, detailing, or informational visits to doctors by pharmaceutical sales representatives; advertising; and sampling. (Leffler, Tr. 1605:13-1606:14, 1610:19-20; White, Tr. 1263:1-10.)

*(2)    Substantial Detailing Efforts*

187. The level of market concentration dictates how many human resources a company would need to get a marketing message out to the target audience; the higher the concentration of a market, the fewer the number of sales representatives that would be needed. (White, Tr. 1294:4-21.)

188. The concentration of the pharmacological stress test market notwithstanding, Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the Adenoscan® product. (Leffler, Tr. 1609:20-22.) The sales force employed by Fujisawa (86 sales representatives) was more than twice the size of the sales force DuPont had dedicated to the detailing of Persantine® to the same set of institutions and service providers (42 sales representatives). (Leffler, Tr. 1609:4-1610:3; White, Tr. 1294:22-25, 1303:22-1305:17; TX 1226 at AST0065741; TX 1242 at AST0185350.)

*(3)    Support Of The ASNC*

189. Fujisawa also engaged in non-traditional marketing activities that were not in the bailiwick of detailing, advertising, and sampling in its efforts to capture the pharmacological stressor market. (Leffler, Tr. 1610:15-20.; White, Tr. 1283:7-14, 1290:12-23.)

29

190.    The first of the promotional activities that was not within the traditional set of promotional activities was Fujisawa's sponsorship of the American Society of Nuclear Cardiology ("ASNC"), a medical society that advised doctors about which pharmacological stress agents to prescribe.  (Leffler, Tr. 1611:5-8, 1611:13-15, 1613:5-1614:13; TX 1045 at AST0083228; TX 1078 at AST0066744; TX 1128 at AST0043954; DTX 3148.)

191.    The ASNC was perceived to be a "major strategic partner" and engaged in several marketing programs sponsored by Fujisawa that were designed to increase awareness of and demand for pharmacological stress testing.  (Leffler, Tr. 1611:10-15; TX 1045 at AST0083228.) The goals of Fujisawa's partnership with the ASNC (and other medical societies) were to support market penetration of Adenoscan as well as achieve total market growth.  (Leffler, Tr. 1612:9-1613:4; White; Tr. 1252:17-25, 1339:4-15; TX 1078 at AST0066744.)

192.    One specific way in which Fujisawa supported the ASNC was by covering subscription costs to medical fellows, *i.e.*, young cardiologists in training.  (Leffler, Tr. 1614:14-1615:7; TX 1128 at AST0043954; DTX 3148.)  The covering of subscription costs was termed a "great strategic idea" that enabled Fujisawa and the ASNC to develop ground-floor relationships with the very individuals who would be prescribing pharmacological stress agents in the future. (Leffler, Tr. 1614:24-1615:7, 1630; TX 1128 at AST0043954; DTX 3148.)

### (4)    Physician Advocacy Program

193.    Another way Fujisawa engaged in non-traditional marketing and promotion was to develop a physician advocacy program in which the company forged relationships with influential doctors who would advocate for the use of Adenoscan® as a preferred pharmacological stressor.  (Leffler, Tr. 1615:9-17.)

194.    Physician advocates could be individuals at medical institutions who were called upon by Fujisawa to advocate for the institution's adoption of Fujisawa's product, or thought

30

leaders who publish frequently, garner respect, and speak at symposia sponsored by Fujisawa. (White, Tr. 1268:18-1270:5.)

195.    Physician advocates were paid in the form of fees and other benefits for their work. (Leffler, Tr. 1617:12-23; TX 1151 at AST0178186.)

*(5)    Financial Incentives: Trial Support And Pumps*

196.    Another example of Fujisawa's non-traditional marketing and promotional activities is its provision of financial incentives to physicians or institutions to try Adenoscan®. (Leffler, Tr. 1617:24-1618:18.)  Through its trial support program , Fujisawa would subsidize the cost of Adenoscan at clinics or hospitals that had not adopted Adenoscan. (Leffler, Tr. 1618:3-8; White, Tr. 1275:9-15; TX 1045 at AST0083229-230.)

197.    Fujisawa also implemented a program in which it distributed, free-of-charge, the specialized volumetric pumps required for Adenoscan® administration to institutions that did not have them and might otherwise have been disincented to use Adenoscan® as a pharmacological stressor. (Leffler, Tr. 1618:19-1619:3; Klose, Tr. 1539:14-1540:12, 1540:18-1541:2.)  The cost of a volumetric infusion pump was approximately $2,000, a significant up-front expense and hurdle to account conversion. (Leffler, Tr. 1618:19-1619:8; White, Tr. 1289:11-14.)  No customer request for a pump was rejected, and Fujisawa's sales representatives perceived that the pump program was "vital to the success of Adenoscan." (Klose, Tr. 1540:4-12; Leffler, Tr. 1619:9-1620:3; TX 1077 at AST0043166-167; DTX 3151.)

*(6)    Educational Initiatives: The Chest Pain Initiative*
*And The Her Heart Initiative*

198.    Fujisawa also engaged in non-traditional marketing and promotion by sponsoring and implementing educational initiatives that not only had the objective of educating prescribing doctors and the public, but were also designed to increase the market for pharmacological stress

31

testing, the sales of Adenoscan®, the revenues of Fujisawa, and the ultimate return on investment to the shareholders of Fujisawa.  (White, Tr. 1290:12-1291:6, 1311:11-18.)

199.    One of these initiatives was the "Chest Pain Initiative."  (Leffler, Tr. 1620:4-18.) The Chest Pain Initiative was designed to introduce nuclear imaging into emergency room diagnostics for the purpose of identifying whether or not a patient complaining of chest pain is experiencing a heart attack.  (Klose, Tr. 1529:23-1530:12.)  Although the initiative was not successful, it represented an attempt by Fujisawa to expand the market for Adenoscan® at a time (2000-early 2001) when the product was beginning to reach market penetration and experience resultant slowed sales growth, as discussed *infra*.  (Klose, Tr. 1530:9-1531:6.)

200.    Another of Fujisawa's educational initiatives was the "Her Heart Initiative," which was designed not only to educate doctors and the public about the cardiovascular risks faced by women, but also to increase the use of stress testing for the diagnosis of cardiovascular problems in women, and therefore boost sales of Adenoscan®. (Leffler, Tr. 1620:19-1621:7, 1623:4-13; DTX 3143.)  The Her Heart Initiative did in fact result in an increase in the sales of Adenoscan®. (Klose, Tr. 1532:9-16.)

201.    A Regional Manager of Fujisawa's Hospital Sales Force in mid-2002 observed that "[d]octors really saw [the Her Heart Initiative] as a business expansion opportunity that can increase their number of scans."  (Leffler, Tr. 1621:8-1623:13; DTX 3143.)

202.    The Her Heart Initiative represented another effort by Fujisawa to expand the use of Adenoscan® in order to achieve sales growth from the product.  (White, Tr. 1290:12-23.)

*(7)    Combining Adenosine With Exercise*

203.    Another way in which Fujisawa engaged in non-traditional marketing and promotion was by supporting the publication, distribution, and presentation of educational materials that described the application of  Adenoscan® in ways that would increase its use.

32

(Leffler, Tr. 1624:17-1625:1.)  An example of such a publication, entitled "The Use of Myocardial Perfusion Imaging," was created by Rush Medical Center and funded by an unrestricted educational grant from Fujisawa.  (White, Tr. 1258:1-15.)  The document is a text for a Continuing Medical Education program contains a description of the potential advantages of combining limited exercise with adenosine.  (Leffler, Tr. 1623:14-1624:7; TX 224 at AST0094043.)

204.    "The Use of Myocardial Perfusion Imaging" indicates that adenosine can be used for stress testing in ways that it was not typically used, *i.e.*, in conjunction with exercise as opposed to as a complete substitute for exercise, and represents another effort on the part of Fujisawa to expand the market of potential users of Adenoscan®.  (Leffler, Tr. 1624:12-1625:1; TX 224 at AST0094043.)

(8)    *Fujisawa's Marketing And Promotion Was Extensive*

205.    As described *supra* in paragraphs 184-219, Fujisawa's marketing and promotion was extensive and effective at expanding the market for pharmacological stress testing at a time when, absent a promoting competitor, Fujisawa could capture the bulk of the expanded market. (Leffler, Tr. 1581:11-15, 1620:8-10, 1625:2-25, 1629:11-22.)

206.    The fact that Fujisawa's sales force was over two times the detail force used by DuPont to promote its competing product Persantine® indicates that Fujisawa's promotion of Adenoscan® was extensive.  (Leffler, Tr. 1625:2-11.)

207.    Fujisawa's promotional expenditure data also demonstrates that Fujisawa's promotion of Adenoscan® was extensive.  (Leffler, Tr. 1625:12-13.)  For the years 1998 through 2000, Fujisawa's promotional expenditures were over $28 million, or approximately seven percent of sales.  (Leffler, Tr. 1625:12-15.)  This ratio of promotion-to-sales is in the upper range

for hospital-based products, and is particularly high in the pharmacological stress testing market where, as discussed *supra* in paragraphs 195 and 198, the market is concentrated in fewer institutions and there is no other promoted competing product.  (Leffler, Tr. 1625:12-25.)

208.    There was nothing improper about Fujisawa's promotion of Adenoscan®. (Leffler, Tr. 1626:1-4.)  It was a well-managed promotional campaign that succeeded in raising awareness and adoption of the use of pharmacological stress testing – using Adenoscan® in particular – irrespective of any claimed superiority of the drug.  (Leffler, Tr. 1626:5-11, 1629:11-22, 1631:12-1632:22.)

> iv.    Growth In Demand For Pharmacological Stress Testing Unrelated To The Asserted Inventions

209.    The fourth economic factor explaining the sales levels of Adenoscan® is the growth in demand for pharmacological stress testing unrelated to the asserted inventions. (Leffler, Tr. 1581:19-20; DTX 3133.)

210.    Between 1996 and 2004, the pharmacological stress test market experienced an over 300-percent growth in the use of pharmacological stressors for myocardial perfusion imaging.  (Leffler, Tr. 1627:15-1628:17; TX 21; DTX 3134.)

211.    Trends in the sales of Adenoscan reflected this general market growth.  (Leffler, Tr. 1628:18-25; DTX 3130.)



212.    After its entry into the marketplace in August 1995, Adenoscan® experienced relatively moderate sales from August 1995 through about mid-1999.  (Leffler, Tr. 1575:23-1576:8, 1630:12-1631:4; DTX 3130.)

213.    Adenoscan®'s growth then leveled out during the period from about mid-1999 through about mid-2001.  (Leffler, Tr. 1576:15-18.)  This flattened growth is typical of the life cycle of products in pharmaceutical markets.  (Leffler, Tr. 1576:8-10; DTX 3130.)

214.    Beginning in about 2001 to 2002, the sales of Adenoscan® accelerated at a relatively substantial rate through mid-2005.  (Leffler, Tr. 1576:23-1577:4, 1628:18-1629:10; DTX 3130.)  Such a phenomenon is unusual in pharmaceutical markets; it is rare to see a product

35

in its sixth year on the market suddenly show substantially increasing sales. (Leffler, Tr. 1629:1-10; DTX 3130.)

215.    In the meantime, in the late 1990s and early 2000s, demographic phenomena such as the increased aging of the American population and the rise in American obesity stimulated a growing concern about cardiovascular disease and sparked changes in diagnostic and treatment guidelines with respect to cardiovascular disease. (Leffler, Tr. 1581:21-1582:4, 1626:12-1627:14; White, Tr. 1309:22-1310:18.) As the American population aged and became less fit, the result was an increased inability to perform exercise-based stress tests for the diagnosis of possible cardiovascular problems. (Leffler, Tr. 1626:15-1627:11.)

216.    These demographic phenomena and guideline changes resulted in a growth in demand for pharmacological stress agents at a time that was very fortuitous for Fujisawa, because there was a general, substantial growth in demand for the product the company was marketing in a market in which Adenoscan® was the only promoted product. (Leffler, Tr. 1582:5-8, 1627:12-14; White, Tr. 1311:3-9.)

217.    These demographic phenomena, combined with Fujisawa's role in generating growth through its educational initiatives and other forms of promotion, are reflected in the increasing sales growth experienced by Adenoscan® in recent years. (Leffler, Tr. 1629:11-22; DTX 3130.)

218.    It is notable that this general growth in the demand for pharmacological stressors also benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, namely, dipyridamole. (Leffler, Tr. 1628:23-1629:1.)

36



219.    Looking at the number of pharmacological stress tests performed using dipyridamole, from 1995 through 2005, it is clear that the use of dipyridamole was relatively constant with slight growth through about mid-2000, when an acceleration in the use of dipyridamole is observed.  (Leffler, Tr. 1599:12-1600:5; TX 21; DTX 3132.)  Then usage of dipyridamole experiences a rapid acceleration for about five quarters and then a general continued growth in use.  (Leffler, Tr. 1600:1-5; TX 21; DTX 3132.)

220.    The pattern in the usage of dipyridamole demonstrates that it clearly retained significant usage throughout the period during which Adenoscan has been on the market, such that the pharmacological stressor market does not display a dynamic in which a competitor enters

the market and takes significant usage away from another product.  (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132.)

221.    While the general growth in the demand for pharmacological stressors benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, Adenoscan® differentially benefited from the growth in the marketplace because it was the only product being promoted.  (Leffler, Tr. 1629:23-1630:11.)

> v.    The Four Economic Factors Explain The Sales Levels Achieved By Adenoscan®, Irrespective Of Any Claimed Superiority Of The Product

222.    There is no nexus between the claimed superiority of Adenoscan® and the sales achieved by the product.  (Leffler, Tr. 1631:5-11.)

223.    The sales of Adenoscan® are explained by the facts recited *supra* in paragraphs 183-237.  (Leffler, Tr. 1631:12-21.)

224.    If Adenoscan® truly had significant advantages over the existing competitors in the pharmacological stressor market, it would have been expected to capture most of those competitors' sales and quickly dominate the marketplace, particularly in a situation where it was the only product being promoted.  (Leffler, Tr. 1631:22-1632:12, *see* Lipitor example at 1632:8-11.)  However, dipyridamole continued to generate significant growth in usage and sales alongside Adenoscan®.  (Leffler, Tr. 1632:5-7.)

225.    Therefore, the sales pattern exhibited by Adenoscan® is well-explained by the circumstances that existed in the marketplace and Fujisawa's recognition of and ability to capitalize on those circumstances – irrespective of any claimed superiority of the product.  (Leffler, Tr. 1631:12-1632:22.)

D.    **The '296 Patent And/Or The Karolinska Request Disclose The Elements Of The Asserted Claims**

1.    *The '296 Patent And The Karolinska Request Are Prior Art*

a.    Priority Date Of The '877 Patent Claims

226.    The named inventors of the '877 patent submitted a research proposal to the Institutional Review Board of Creighton University ("the Protocol"). (TX 57 at 4.)

227.    In the first study described in the protocol, the named inventors proposed to study the effect of adenosine in normal volunteers aged 19 to 39 years old by titrating an infusion dose of .01 mg/kg/minute to one of three endpoints: 1) a maximum dosage of .32 mg/kg/minute, 2) the patient develops symptoms of headache, nervousness, flushing in the face and/or neck, shortness of breath, chest pain, or other disabling symptoms, or 3) a reduction in mean arterial blood pressure of 40-50 mmHg. (TX 57 at 4.)

228.    The Protocol's second proposed study is a comparison of intravenous adenosine and intravenous dipyridamole for MPI in 20 patients with documented coronary artery disease. (TX 57 at 6.)

229.    There is no dosing information listed in the description of the second study. (Wackers, Tr. 1015:4-7; TX 57 at 6.)

230.    At the time of the protocol, the named inventors had not conceived of a dose range of 20-200 mcg/kg/minute. (Wackers, Tr. 1010:12-15.)

231.    At the time of the protocol, the named inventors had not conceived of a dose of about 140 mcg/kg/minute. (Wackers, Tr. 1010:16-18.)

232.    Medco submitted an IND, which included the Protocol, to the FDA on or about December 9, 1987. (TX 52.)

39

233.    The named inventors tested their first volunteer according to their research proposal on March 14, 1988.  (TX 295 at AST0004333.)  The first patients with coronary artery disease were tested under the research protocol on May 3, 1988.  (TX 296 at AST0004357.)

234.    The inventors obtained successful test results using doses of adenosine ranging from 60 to 140 mcg/kg/minute.  (Wackers, Tr. 1018:2-17; TX 296 at AST0004363.)

235.    The 140 mcg/kg/minute dose was administered to just two of fifteen patients during the inventors' first studies using continuous intravenous adenosine infusion in patients for MPI.  (Wackers, Tr. 1018:13-17; TX 296 at AST0004363.)

236.    The priority date of the asserted claims of the '877 patent is no earlier than March 14, 1988.

b.      The Priority Date Of Example XIII Of The '296 Patent

237.    The '296 patent issued from U.S. Patent Application No. 08/031,666 (the "'666 application"), filed March 15, 1993.  (TX 275.)

238.    Example XIII was added in a continuation-in-part application filed on Dec. 28, 1987.  (TX 275; Joint Statement of Admitted Facts No. 17, D.I. 133.)

239.    The priority date of Example XIII is December 28, 1987.  (TX 275.)

240.    Example XIII of the '296 patent is prior art to the '877 patent.

c.      The Priority Date Of The Karolinska Request

241.    The Karolinska request is dated December 28, 1987.  (TX 1193 at SIC010937.)

242.    The Karolinska request was received by the Ethics Committee at the Karolinska Insitute on or about February 3, 1988.  (TX 1193 at SIC010940.)

243.    Requests such as the Karolinska Request are generally available to the public in Sweden.  (TX 1193 at SIC010937.)

244.    The Karolinska Request is prior art to the '877 patent.

40

2.    *Every Element Of The Asserted Claims Is Disclosed In The '296 Patent*

245.    Example XIII of the '296 patent discloses a method of detecting the presence of and assessing the severity of coronary artery disease in a human.  Specifically, Example XIII describes the use of MPI to diagnose coronary heart disease.  (TX 275 at col.21, ll.29-61.)

246.    Example XIII of the '296 patent discloses intravenously administering adenosine at a dose range of 10-150 mcg/kg/minute to cause vasodilation.  (Strauss, Tr. 752:2-23; TX 275 at Example XIII; *see* DTX3117.)

247.    Example XIII of the '296 patent describes the advantages of using adenosine in place of dipyridamole for MPI and acknowledges that dipyridamole's vasodilation effect is due to adenosine.  (TX 275, col.21, ll.49-51.)

248.    Example XIII of the '296 patent states that:

> [A]denosine can be used instead of dipyridamole in the diagnostic test described.  It would in fact be an advantage to use adenosine insofar as it can be dosed exactly and dose-titrated to a precise effect, whereas with dipyridamole, the adenosine levels are unpredictable.  Thus, a safer and more reliable test can be expected if adenosine is used.

(TX 275, col. 21, ll. 52-58).

249.    Example XIII of the '296 patent describes administration of radio-isotopes such as thallium-201 to record images of the heart.  (TX 275, col.21, ll.29-34.)

250.    Example XIII of the '296 patent describes the use radionuclide scintigraphy, and specifically the use of thallium-201 imaging, for the diagnosis of coronary heart disease.  (TX 275 at col. 21, ll. 25-34.)

251.    Example XIII of the '296 patent discloses every element of asserted claims 23(17), 23(18) and 43.

     3.    *Every Element Of Claims 23(17) and 43 Is Disclosed In The Karolinska Request*

252.    The Karolinska Request discloses the continuous infusion of adenosine at a dose of 60 mcg/kg/minute in conjunction with injection of thallium-201 for myocardial scintigraphy in humans with heart disease. (Strauss, Tr. 755:10-14; TX 1193 at SIC010944.)

253.    The Karolinska request discloses every element of asserted claims 23(17) and 43. (Strauss, Tr. 754:14-22; TX 1193.)

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Claims 23(17), 23(18) and 43 of the '877 Patent Are Invalid As Obvious

    1.    *The Law Of Obviousness*

254.    A claimed invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103(a); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006).

255.    Obviousness is a legal conclusion, based on underlying factual findings. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

256.    The factual inquiries underlying the legal determination of obviousness include the following four factors: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) other secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

257.    The obviousness inquiry should address question of whether there was "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements

in the way the claimed new invention dose." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. -- (2007), slip op at 15.

258.    The Supreme Court has clarified the appropriate standard for determining whether the prior art shows a reason to combine. The test for whether the art shows a reason to combine must not be rigid and inflexible. The appropriate, flexible test for considering whether a combination of elements is obvious "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, slip op at 14. This analysis "cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 15.

259.    Even before *KSR*, the Federal Circuit was clear that the test for whether the prior art provides a suggestion "is not a rigid categorical rule. The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Dystar,* 464 F.3d at 1361; *see also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006) ("We do not have a rigid test that requires an actual teaching to combine before concluding that one of ordinary skill in the art would know to combine the references.")

260.    The "suggestion, teaching or motivation to combine the relevant prior art teachings *does not have to be found explicitly in the prior art . . . .*" *Alza*, 464 F.3d at 1290 (emphasis in original). The motivation or suggestion can be found implicitly in the prior art as a whole and/or in the knowledge of a person of skill in the art. *Id.* at 1290, 1294.

261.    The suggestion test "not only permits, but *requires*, consideration of common knowledge and common sense." *Dystar*, 464 F.3d at 1367 (emphasis in original).

262.    A person of ordinary skill in the art at the time must also have had a reasonable expectation that the combination of references would succeed for its intended purpose. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). The appropriate standard is whether a person of skill would have a "reasonable expectation" of success, not "absolute predictability." *In re O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988).

263.    The "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

264.    Relevant secondary considerations must also be considered if they are present.

265.    For secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention. *See Ormco*, 463 F.3d at 1311-12.

266.    To properly consider whether a particular result was "unexpected," the Court must first evaluate what was expected based on the art. *See Pfizer*, 480 F.3d at 1371.

267.    Secondary considerations do not control the obviousness determination. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks Inc. v. UpJohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997)**;** *see also Newell Cos., Inc. v. Kenney Manuf. Co.*, 864 F.2d 757, 769 (Fed. Cir. 1989) ("[A]lthough the record shows a highly successful product, the record also establishes such a strong case of obviousness . . . that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion.")

268.    The obviousness analysis must focus on the scope of the claimed invention.  *See In re Huang*, 100 F.3d 135, 138 (Fed. Cir. 1996) ("[o]ur obviousness analysis focuses on the invention *as claimed*.") (emphasis in original); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1360 (Fed. Cir. 2001).

269.    Obviousness is determined from the point of view of a hypothetical person of ordinary skill in the art to which the patent pertains, who is presumed to have access to all prior art references in the field of the invention.  *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

270.    The "fundamental issue [is] whether a hypothetical person of ordinary skill in the art, when confronted with the problem . . . would have been motivated" to make the connection. *Sibia Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000).

271.    A person of ordinary skill in the art is presumed to have common sense and the ordinary creativity of a person in the relevant field(s).  *KSR,* slip op at 17.

272.    A reference need not be enabling to qualify as prior art for obviousness purposes. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003); *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991).

273.    To establish obviousness, Sicor has the burden of proving any disputed underlying facts by clear and convincing evidence.  *See Brown & Williamson*, 229 F.3d at 1124 (Fed. Cir. 2000).

274.    The Court must make the ultimate legal conclusion as to obviousness based on the evidence presented.  *Id.; see also Pfizer*, 480 F.3d at 1359.

2.    *Scope Of The Prior Art*

275.    Relevant references may be drawn from any of these relevant fields of art or from other fields so long as the reference in another field is related to the problem that the inventor

45

was trying to solve.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) ("Two separate tests

define the scope of analogous prior art: (1) whether the art is from the same field of endeavor,

regardless of the problem addressed and, (2) if the reference is not within the field of the

inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem

with which the inventor is involved.")

276.    In determining what is relevant prior art, it is improper to assume that "a person of

ordinary skill attempting to solve a problem will be led only to those elements of prior art

designed to solve the same problem."  *KSR*, slip op. at 16.

277.    Each of the references on which Dr. Strauss relied in his obviousness analysis was

within the relevant field of art and/or "reasonably pertinent to the particular problem" that the

named inventors of the '877 patent addressed.  *See Bigio*, 381 F.3d at 1325.

3.    *The Combination Of Either Gould 1978 Or Albro And Sollevi 1986
Renders The Asserted Claims Obvious*

278.    Gould 1978 describes the use of a pharmacologic stress agent for MPI.

279.    Gould 1978 describes every element of the asserted claims except for the direct

infusion of adenosine at the claimed doses.  Gould further states that other, more potent coronary

vasodilators could be used.

280.    Albro describes the use of a pharmacologic stress agent for MPI.

281.    Albro describes every element of the asserted claims except for the direct infusion

of adenosine at the claimed dosages ranges.  Albro describes the relationship between

dipyridamole infusion and vasodilation caused by increased endogenous adenosine.

282.    A person of skill in the art in 1987 would have had reason to use adenosine for

MPI.

46

283.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work through the mechanism of action of dipyridamole infusion.

284.    Sollevi 1986 discloses a range of rates of continuous intravenous infusion of adenosine that are sufficient to cause vasodilation and are safe for use in humans.

285.    In light of the teachings of Sollevi 1986, a person of ordinary skill in the art would have expected continuous infusion of adenosine within the range of doses disclosed in Sollevi 1986 as sufficient to cause coronary vasodilation, but not sufficient to cause hypotension, to be "very likely to work for myocardial perfusion imaging as a vasodilator."  (Strauss, Tr. 708:10-709:20.)  Specifically, in light of Sollevi 1986, a person of skill in the art would have expected a dose in the range of 20 to 200 mcg/kg/min to work for MPI.  (*See id.*; *see also* TX 1171.)  Moreover, in light of the teachings of Sollevi 1986, the specific dose of 140 mcg/kg/min as claimed in dependent claim 18 is one of the doses that would have been "very likely to work." (Strauss, Tr. 748:2-13.)

286.    Therefore, a person of skill in the art would have had a reasonable expectation of success based on combination of either Gould 1978 or Albro with Sollevi 1986**.**

287.    Adenosine was known to be the active agent causing vasodilation during dipyridamole infusion.  In addition, a range of doses of direct infusion of adenosine sufficient to cause coronary vasodilation – a range that overlaps and includes the range claimed in the '877 patent – was shown in Sollevi 1986.  The asserted claims are therefore obvious.  *See, e.g., Ormco*, 463 F.3d at 1311 ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *Medichem*, 437 F.3d at 1167 (selecting a narrow

range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range).

288.    Even if the claimed range of adenosine doses sufficient to cause vasodilation without causing hypotension were not disclosed in Sollevi 1986, the process of arriving at a useful value of a single variable – the rate of continuous infusion of adenosine – is nothing more than routine and the claims are obvious on that basis as well.  *See KSR*, slip op. at 17; *Pfizer*, 480 F.3d at 1368.

289.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient to overcome the strong showing of obviousness.

290.    Claims 23(17), 23(18) and 43 of the '877 patent are obvious over a combination of either Gould 1978 and Sollevi 1986 or Albro and Sollevi 1986.

4.    *The Combination Of Either Gould 1978 Or Albro And Biaggioni 1986 Renders The Asserted Claims Obvious*

291.    As discussed above, each of Gould 1978 and Albro disclose every element of the asserted claims except the direct, continuous infusion of adenosine within the claimed range of doses.

292.    A person of skill in the art in 1987 would have had reason to use adenosine for MPI.

293.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work because of knowledge of the mechanism of action of dipyridamole.

294.    Biaggioni 1986 states "that adenosine administered by infusion over a range of 60 to 140 µg/kg/min to healthy conscious human subjects, lowers diastolic blood pressure but raises

heart rate, [and] systolic blood pressure . . . ."  (TX 48 at 2234.)  These results are indicative of significant vasodilation.  (Strauss, Tr. 718:4-719:2.)

296.    Because Biaggioni 1986 teaches that doses ranging from 60 to 140 mcg/kg/min would cause significant vasodilation and could be safely tolerated by conscious humans, a person of skill in the art would have reason to use those doses of adenosine infusion as the pharmacologic stress agent for MPI.  (Strauss, Tr. 719:6-18.)

296.    A person of skill in the art would have had a reasonable expectation of success based on either combination of these references.

297.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient to overcome the strong showing of obviousness.

298.    Claims 23(17), 23(18) and 43 of the '877 patent are obvious over a combination of either Gould 1978 and Biaggioni 1986 or Albro and Biaggioni 1986.  *See KSR*, slip op. at 13-15; *Pfizer*, 480 F.3d at 1364-68.

5.    *Either Gould 1978 Or Albro In Light Of Knowledge In Art Concerning Adenosine Infusion Renders The Asserted Claims Obvious*

299.    Each of Gould 1978 and Albro disclose every element of the asserted claims except the direct, continuous infusion of adenosine within the claimed range of doses.

300.    A person of skill in the art in 1987 would have had reason to use adenosine for MPI.

301.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work because of knowledge of the mechanism of action of dipyridamole.

302.    Conradson described infusion rates in conscious patients up to 100 mcg/kg/minute.  (TX 220 at 388.)  Fuller described the infusion of adenosine at a rate of 100

mcg/kg/minute in conscious humans and showed that two subjects out of six tolerated an

infusion rate of 200 mcg/kg/minute.  (TX 1208 at 311.)  Sollevi 1986 stated that preferential

myocardial vasodilation can be induced at low doses of 20-50 mcg/kg/min.  (Strauss, Tr. 704:22-

705:15; TX 1171 at 345.)  Sollevi 1984, Sollevi 1986 and Owall taught that controlled

hypotension can be induced at doses of 200 mcg/kg/min and above.  (Strauss, Tr. 695:6-16;

700:19-701:9; 723:3-7; TX 112; TX 1169; TX 1171.)   Biaggioni 1987 showed that intravenous

administration of adenosine without pretreatment of dipyridamole at a rate of 140 mcg/kg/minute

was effective and safe.  (TX 226 at 781, 784.)  The '296 patent stated that the appropriate dose of

adenosine for MPI "should lie in the range of 10 to 150 micrograms per kilogram per minute."

(TX 275, col.21, ll.60-61.)

303.    A person of skill in the art would have had a reasonable expectation of success

based on either Gould 1978 or Albro in light of the knowledge in the art concerning the safety

and tolerability of adenosine infusion for MPI.

304.    A person of skill in the art, would have had "good reason" to pursue the options

presented by the disclosed dose ranges in the art, which would have been well "within his or her

technical grasp" and which, when tried, lead to the anticipated success.  *See KSR* slip op. at 17.

305.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient

to overcome the strong showing of obviousness.

306.    Therefore, the asserted claims of the '877 patent are obvious over a combination

of either Gould 1978 and the knowledge in the art or Albro and the knowledge in the art.

6.    *Plaintiffs Present No Persuasive Secondary Indicia*

307.    For secondary considerations to be relevant there must be a nexus between the

secondary consideration and the claimed invention.  *See Ormco*, 463 F.3d at 1311-12.

308.    Even if relevant, secondary considerations do not control the obviousness

determination. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks*, 122 F.3d at 1483; *see also Newell*,

864 F.2d at 769 ("[A]lthough the record shows a highly successful product, the record also

establishes such a strong case of obviousness . . . that the objective evidence of nonobviousness

does not persuade us to reach a contrary conclusion.")  Indeed, it is well-established that such

evidence will not save a patent when the prior art provides "strong evidence of obviousness."

*Brown & Williamson*, 229 F.3d at 1131.

309.    Whether evidence of these "secondary considerations" of nonobviousness suffices

to rebut the *prima facie* case of obviousness is a question of law.  *Tec Air, Inc. v. Denso Mfg.*

*Michigan Inc.,* 192 F.3d 1353, 1360 (Fed. Cir. 1999).

310.    Plaintiffs' scant evidence of any secondary factors is insufficient to overcome the

strong showing of obviousness in this case.

## B.    Claims 23(17), 23(18) and 43 of the '877 Patent Are Invalid As Anticipated

### 1.    *Legal Standard*

311.    A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every

limitation of the claim was contained, either expressly or inherently, in a single prior art

reference.  *See* 35 U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246

F.3d 1368, 1374 (Fed. Cir. 2001).

312.    To anticipate, a prior art reference "must also be enabling, such that one of

ordinary skill in the art could practice the invention without undue experimentation."  *Novo*

*Nordisk Pharm, Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).

313.    Disclosures in a prior art patent, such as the '296 patent, are presumed to be

enabled.  *Amgen*, 314 F.3d at 1355 (Fed. Cir. 2003) ("[A] presumption arises that both the

claimed and unclaimed disclosures in a prior art patent are enabled.")  A patentee bears the burden of proving non-enablement of an asserted prior art patent.  *Id.*

> 2.      *The '296 Patent Anticipates And/Or Renders Obvious The Asserted Claims*

314.     The '296 patent is prior art to the '877 patent under 35 U.S.C. § 102(e).

315.     The '296 patent discloses every element of the asserted claims of the '877 patent.

316.     Example XIII of the '296 patent describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease.  TX 275, col. 21, ll. 29-61; Tr. 751:11-753:11.

317.     Example XII of the '296 patent further discloses that, while the dose of adenosine should be titrated individually, it should lie in the range of 10 to 150 mcg/kg/min.  TX 275, col. 21, ll. 59-61.

318.     The range of 10 to 150 mcg/kg/min substantially overlaps with, and is narrower than, the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43.  The "species" of 10 to 150 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min.  *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) ("[A]n earlier species reference anticipates a later genus claim.")

319.     In addition, "a very small genus can be a disclosure of each species within the genus."  *Id.* (citation omitted).  The disclosures of the range 10 to 150 mcg/kg/min, particularly coupled with the specific instruction that doses "should be titrated individually" and "should lie within the range of 10 to 150 mcg/kg/min," discloses the dose of "about 140" of claim 23(18).

320.     The '296 anticipates the asserted claims of the '296 patent.

321.     At a minimum, the '296 patent renders the asserted claims of the '877 patent obvious.

322.    The '296 patent discloses every element of the asserted claims of the '877 patent, including a dosage range that substantially overlaps the range of 20 to 200 mcg/kg/min of claims 23(17) and 43 and encompasses the dose of about 140 mcg/kg/min of claim 23(18).

323.    The asserted claims are therefore obvious in light of Example XIII alone. *See Ormco,* 463 F.3d at 1311 ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *see also Medichem,* 437 F.3d at 1168 (selecting a narrow range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range).

### 3.    *The Karolinska Request*

324.    The Karolinska Request is prior art to the '877 patent under 35 U.S.C. § 102(a).

325.    The Karolinska Request describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease. TX 1193 at SIC10942. The Karolinska Request further discloses a dose of 60 mcg/kg/min of adenosine, continuously infused. TX 1193 at 10944; Tr. at 755:6-20.

326.    The dose of 60 mcg/kg/min is narrower than and within the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43. The "species" of 60 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min. *See Atofina,* 441 F.3d at 999.

327.    At a minimum, the Karolinska Request renders claims 23(17) and 43 of the '877 patent obvious. *See Ormco,* 463 F.3d at 1311; *Medichem*, 437 F.3d at 1168.

## III.    CONCLUSION

Defendants respectfully ask the Court to adopt the foregoing findings of fact and conclusions of law, and enter judgment that the asserted claims of the '877 are invalid as obvious or anticipated, or both.

Respectfully submitted,


*/s/ Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
    STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for SICOR INC. and
SICOR PHARMACEUTICALS, INC.


Dated:  May 9, 2007

058956.1016

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on May 16, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

| | |
|---|---|
| Paul Crawford, Esquire | Richard K. Herrmann, Esquire |
| Connolly Bove Lodge & Hutz | Morris James Hitchens & Williams |
| The Nemours Building | 222 Delaware Avenue, 10th Floor |
| 1007 North Orange Street | P.O. Box 2306 |
| P.O. Box 2207 | Wilmington, DE 19899-2306 |
| Wilmington, DE 19899-2207 | |

I further certify that on May 16, 2007, I caused copies of the foregoing document to be served by e-mail on the above-listed counsel and on the following in the manner indicated:

**BY E-MAIL**

| | |
|---|---|
| Charles E. Lipsey, Esquire | Susan H. Griffen, Esquire |
| Finnegan, Henderson, Farabow, | Finnegan, Henderson, Farabow, |
| Garrett & Dunner, LLP | Garrett & Dunner, LLP |
| Two Freedom Square | 901 New York Avenue, N.W. |
| 11955 Freedom Drive | Washington, DC 20001-4413 |
| Reston, VA 20190-5675 | |

Brian M. Poissant, Esquire
Jones Day
222 East 41st Street
New York, NY 10017

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*