# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KING PHARMACEUTICALS RESEARCH AND DEVELOPMENT, INC., ASTELLAS U.S. LLC, and ASTELLAS PHARMA US, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-0337-SLR |
| v. | ) ) | |
| SICOR INC. and SICOR PHARMACEUTICALS, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' POST-TRIAL BRIEF:
## U.S. PATENT NO. 5,077,877

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C. 20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research*
*and Development, Inc.*

# TABLE OF CONTENTS

*Page*

I.     INTRODUCTION:  A CAUTION AGAINST HINDSIGHT ............................................1

II.    THE INVENTION OF THE ASSERTED CLAIMS OF THE '877 PATENT
       WOULD NOT HAVE BEEN OBVIOUS ............................................................2

       A.     The Objective Contemporaneous Evidence Confirms the
              Nonobviousness of the Invention...............................................................2

              1.     Adenosine Was Not Perceived as a Viable Pharmacologic
                     Stress Agent for Human MPI.........................................................2

                     a.     The Art Taught Away From Administering Adenosine
                            to Patients With Coronary Artery Disease.......................2

                     b.     Adenosine Did Not Satisfy the Requirements For a
                            Pharmacologic Stress Agent ............................................4

                     c.     The Field Doubted the Safety of the Invention...............4

                     d.     Dipyridamole and Adenosine Were Not Viewed as
                            Interchangeable and Were Used Differently for
                            Different Purposes ..........................................................5

              2.     Sicor Wrongly Discounts What Those of Skill in the Art
                     Actually Did.................................................................................6

              3.     "Common Sense" Does Not Refute the Contemporaneous
                     Evidence.......................................................................................9

              4.     Sicor's *Ex Post* Arguments Do Not Negate the Clear Teaching
                     Away From Use of Adenosine In Human MPI ........................10

              5.     Adenosine Was Readily Available ...........................................12

              6.     The Prior Art Provided No Reasonable Expectation of Success ...............13

              7.     *Pfizer v. Apotex* Is Inapposite..................................................18

              8.     Plaintiff's Objective Evidence of Nonobviousness Disposes of
                     Sicor's Obviousness Challenge..................................................19

                     a.     Sicor Ignores or Disregards the Wealth of
                            Contemporaneous Evidence Documenting Surprise and
                            Skepticism of Persons Skilled in the Art .......................19

i

|   |   | b. | Sicor Erroneously Describes "Teaching Away" in the Prior Art as a Secondary Consideration | 22 |

|   |   | c. | Sicor's Critique of the Commercial Success of Adenoscan Rings Hollow In the Face of Its Efforts to Copy the Drug | 23 |

| | B. | | Adenosine Infused at 140 mcg/kg/min, as Required by Claim 23(18), Provides an Unexpected Balance of Safety and Efficacy for MPI | 27 |

|   |   | 1. | Sicor's Expert Testified that Reliable Pharmacologic MPI "Requires" a Steady State of Coronary Vasodilation Provided By the Dose in Claim 23(18) | 27 |

|   |   | 2. | The Identification of the Dose of 140 mcg/kg/min Was Not "Routine Optimization" | 30 |

| III. | | | EXAMPLE XIII OF THE '296 PATENT AND THE KAROLINSKA REQUEST DO NOT INVALIDATE THE ASSERTED CLAIMS | 32 |

| | A. | | Sicor Invites Legal Error By Asserting that Plaintiffs Must Show Conception of Every Feature of the Claimed Invention Before the Filing Date of Example XIII | 32 |

| | B. | | Even if Example XIII is Prior Art, the '296 Patent Does Not Anticipate or Render Obvious Claim 23(18) | 35 |

| | C. | | The Karolinska Request Is Not Prior Art and Teaches Away from Claim 23(18) | 37 |

| IV. | | | CONCLUSION | 38 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Page(s)*

*Atofina v. Great Lakes Chem. Corp.*,
   441 F.3d 991 (Fed. Cir. 2006).........................................................................................35, 36

*In re Bell*,
   991 F.2d 781 (Fed. Cir. 1993)................................................................................................22

*Biacore v. Thermo Bioanalysis Corp.*,
   79 F. Supp.2d 422 (D. Del. 1999).............................................................................................7

*In re Brouwer*,
   77 F.3d 422 (Fed. Cir. 1996)..................................................................................................11

*Burlington Indus., Inc. v. Quigg*,
   229 U.S.P.Q. 916 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987) ...............................20

*Diamond Rubber Co. v. Consol. Rubber Tire Co.*,
   220 U.S. 428 (1911)..........................................................................................................1, 23

*Dystar Textilfarben GMBH & Co. v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006)..............................................................................................22

*Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*,
   713 F.2d 693 (Fed. Cir. 1983)................................................................................................19

*F.T.C. v. Freeman Hospital*,
   911 F. Supp. 1213 (W.D. Mo. 1995) .....................................................................................23

*In re Facius*,
   408 F.2d 1396 (C.C.P.A. 1969) .............................................................................................21

*Forest Labs., Inc. v. Ivax Pharm., Inc.*,
   237 F.R.D 106 (D. Del. 2006) .................................................................................................7

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   365 F.3d 1054 (Fed. Cir. 2004)..............................................................................................22

*Graham v John Deere Co.*,
   383 U.S. 1 (1966)...................................................................................................... 2, 7, 10

*Hobbs v. Beach*,
   180 U.S. 383 (1901)..........................................................................................................8, 9

*Howerton v. Grace Hospital,*
    No. 4:90CV187, 1995 WL 787529 (W.D.N.C. July 7, 1995) ................................................23

*Interconnect Planning Corp. v. Feil,*
    774 F.2d 1132 (Fed. Cir. 1985).................................................................................2, 7, 10

*KSR International Co. v. Teleflex Inc.,*
    127 S.Ct. 1727 (2007).................................................................................................2, 9, 10

*In re Kratz,*
    592 F.2d 1169 (C.C.P.A. 1979) ..................................................................................13, 19

*Kridl v. McCormick,*
    105 F.3d 1446 (Fed. Cir. 1997)..........................................................................................33

*Loom Co. v. Higgins,*
    105 U.S. 580 (1881)...............................................................................................................1

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996)...........................................................................33, 34, 38

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995)................................................................................................7

*In re Mathews,*
    408 F.2d 1393 (C.C.P.A. 1969) .........................................................................................21

*In re Methionine Antitrust Litigation,*
    No. 00-1311, 2003 WL  22048232 (N.D. Cal. Aug. 26, 2003) .........................................23, 24

*Norian Corp. v. Stryker Corp.,*
    363 F.3d 1321 (Fed. Cir. 2004)..........................................................................................38

*Ormco Corp. v. Align Tech., Inc.,*
    463 F.3d 1299 (Fed. Cir. 2006).........................................................................25, 26, 36, 37

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)................................................................................18, 19

*Potts v. Creager,*
    155 US 597 (1895)..................................................................................................................8

*Richardson-Vicks Inc. v. Upjohn Co.,*
    122 F.3d 1476 (Fed. Cir. 1997)........................................................................................29

iv

*In re Rinehart*,
   531 F.2d 1048 (C.C.P.A. 1976) ................................................................13

*Ruiz v. A. B. Chance Co.*,
   234 F.3d 654 (Fed. Cir. 2000)................................................................19

*In re Shetty*,
   566 F.2d 81 (C.C.P.A. 1977) ................................................................13

*Sibia Neurosciences, Inc. v. Cadus Pharm. Corp.*,
   225 F.3d 1349 (Fed. Cir. 2000)................................................................7

*In re Spiller*,
   500 F.2d 1170 (C.C.P.A. 1974) ................................................................34

*In re Stempel*,
   241 F.2d 755 (C.C.P.A. 1957) ................................................................32, 34

*In re Stryker*,
   435 F.2d 1340 (C.C.P.A. 1971) ................................................................34

*Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*,
   204 F.3d 1360 (Fed. Cir. 2000)................................................................16

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
   837 F.2d 1044 (Fed. Cir. 1988)................................................................11

*United States v. Adams*,
   383 U.S. 39 (1966)................................................................19, 20

*In re Wesslau*,
   353 F.2d 238 (C.C.P.A. 1965) ................................................................17

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
   21 F. Supp. 2d 366 (S.D.N.Y. 1998), *aff'd*, 231 F.3d 1339 (Fed. Cir. 2000) ........................29

*In re Zenitz*,
   333 F.2d 924 (C.C.P.A. 1964) ................................................................29

## OTHER CASES

*Ex parte Levengood*,
   28 U.S.P.Q.2d 1300 (B.P.A.I. 1993)................................................................11

# FEDERAL STATUTES

35 U.S.C. § 102(a) ................................................................................................37, 38

35 U.S.C. § 103................................................................................................................19

## I.    INTRODUCTION:  A CAUTION AGAINST HINDSIGHT

In its post-trial submissions, Sicor simply fails to come to grips with the consistent body of documentary evidence reflecting the beliefs of people actually working in this field before and shortly after the invention of U.S. Patent 5,077,877 (the '877 patent) was made.  The contemporaneous literature revealed a widespread and long-standing belief before the invention of the '877 patent that adenosine should not be administered to patients with coronary artery disease because of its heart-blocking and systemic-vasodilating properties.  Equally clear from the contemporaneous literature was the initial belief after the invention of the '877 patent that adenosine could not be used safely in lieu of dipyridamole in human myocardial perfusion imaging (MPI).

Knowing now that subsequent experience with the invention of the '877 patent has persuaded cardiologists that adenosine is in fact safer for use in MPI than dipyridamole, Sicor repeatedly invokes "common sense" as establishing that it must always have been obvious that it would be.  Such arguments, however, have been rejected by the Supreme Court for more than a century as impermissibly based on hindsight:

> Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention.  But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not.

*Diamond Rubber Co. v. Consol. Rubber Tire Co.*, 220 U.S. 428, 435 (1911); *see also Loom Co. v. Higgins*, 105 U.S. 580, 591 (1881) ("Now that it has succeeded, it may seem very plain to any one that he could have done it as well.  This is often the case with inventions of the greatest merit.").

It is for precisely this reason that objective evidence of the beliefs held at the relevant time has long been given greater weight than hindsight-driven opinion testimony based on *ex post* reasoning. *See Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966) (explaining that objective indicia of nonobviousness "serve to 'guard against slipping into use of hindsight'" and to "resist the temptation to read into the prior art the teachings of the invention in issue." (citation omitted)). *See also KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1742 (2007) (citing *Graham* to note that fact finders must avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning").

Herein lies the fundamental difference between the post-trial submissions of the parties. Plaintiffs rely primarily on objective, contemporaneous evidence, while Defendants rely almost exclusively on hindsight-driven *ex post* opinion. The former is the more reliable indicator of what would and would not have been obvious to an ordinary cardiologist back in 1985. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir. 1985) ("A retrospective view of the invention is best gleaned from those who were there at the time.").

## II.   THE INVENTION OF THE ASSERTED CLAIMS OF THE '877 PATENT WOULD NOT HAVE BEEN OBVIOUS

### A.   The Objective Contemporaneous Evidence Confirms the Nonobviousness of the Invention.

#### 1.   Adenosine Was Not Perceived as a Viable Pharmacologic Stress Agent for Human MPI

##### a.   The Art Taught Away From Administering Adenosine to Patients With Coronary Artery Disease

Prior to the work of the '877 patent inventors, practitioners avoided use of adenosine infusion in heart patients, viewing it as too toxic, too short-lived, and too systemically active.

(*See* PFF 28-38, 50, 52-54, 67-68.)[1]  In addition to its long-recognized negative effects on cardiac electrical conduction and heartbeat (so-called "AV block"), adenosine also had a well-documented risk of systemic effects, particularly its capacity to cause hypotension (a major decrease in blood pressure).  (TX-217 at 430; Wackers 909:19-910:17.)  These systemic effects were considered particularly risky for patients with coronary artery disease, as the dilation of relatively healthy arteries could "steal" blood away from partially blocked arteries, triggering myocardial ischemia.  (TX-240 at 439; Wackers 955:10-956:16.)  Indeed, the *Owall* publication explicitly cautioned against using adenosine in patients with a history of heart disease, stating that "[t]he use of adenosine hypotension should be carefully considered in patients with ischemic heart disease because in this clinical study, dysrhythmias occurred in the two subjects with earlier history of myocardial infarction."  (TX-1169 at 233; *see also* Wackers 929:18-930:2.)  Consequently, the hazards of AV block and the systemic effects associated with adenosine administration taught away from the use of adenosine as a pharmacologic stress agent for human MPI.

Sicor attempts to downplay these serious safety concerns, alleging that it was generally known that a drug with a shorter duration of action would be preferable in terms of side effects.  (DB 21.)  Even if this were true, however, it begs the question of why no one even proposed replacing dipyridamole with adenosine for human MPI for nearly a decade after the first publication describing use of dipyridamole in human MPI.  The answer lies in the undisputable fact that the prior art was replete with teachings not to infuse adenosine into patients with

---

[1]  As used herein, "DB" refers to Defendants' Post Trial Brief (D.I. 143), "PB" refers to Plaintiffs' Post Trial Brief (D.I. 145), and "PFF" refers to Plaintiffs' Proposed Findings of Fact (D.I. 146), all filed on May 9, 2007.

coronary artery disease.  (*See, e.g.*, TX-1169 at 233; TX-112 at 400; Wackers 909:9-910:25, 922:10-15.)

      **b.**      **Adenosine Did Not Satisfy the Requirements For a Pharmacologic Stress Agent**

Beyond the foregoing, the known pharmacologic profile of adenosine was fundamentally at odds with the documented requirements for a human pharmacologic stress agent described repeatedly in the prior art.  (*See, e.g.*, TX-229 at 432; Strauss 813:3-24.)  Adenosine was known as a systemic vasodilator (Wackers 910:18-25) that produced a wide array of systemic effects (*see, e.g.*, TX-48 at 2229), whereas pharmacologic MPI was believed to require "selective action on the *coronary* arteries" and an "insignificant systemic effect."  (TX-229 at 432 (emphasis added); Strauss 813:3-24.)  Moreover, adenosine had a known half-life of less than 10 seconds (TX-45 at 418), whereas a pharmacologic stress agent was believed to require "an effect that lasts for at least 3 minutes to permit thallium extraction from the systemic circulation."  (TX-229 at 432; Strauss 813:3-24.)

      **c.**      **The Field Doubted the Safety of the Invention**

Sicor's obviousness contentions also conflict with the outpouring of skepticism and concern that greeted the invention of the '877 patent.  Contemporaneous evidence documenting this concern includes a letter from the Director of Clinical Cardiology at the University of Minnesota doubting the suitability of adenosine for human MPI (TX-53), a letter to the editor published in 1990 in the journal *Radiology* questioning the safety of the procedure (TX-169), and a 1990 editorial published in *Circulation* stating that the safety of infusions of adenosine for myocardial imaging *still needed to be established* (TX-47 at 1856).  (*See* PB 16-18, 30-31.)

The superior safety of adenosine, now alleged by Sicor to have been an obvious motivation to use adenosine in MPI as far back as the 1970s, was not, in fact, apparent to

4

cardiologists of ordinary skill even after the invention of the '877 patent had been publicly

disclosed.  Cardiologists, including Sicor's expert, Dr. Strauss, were initially concerned about

using adenosine for human MPI for fear of inducing AV block.  (*See* Strauss 782:17-783:18;

Klose 1516:3-14; *see also* TX-314.)  That adenosine was actually safer than dipyridamole was a

lesson only slowly learned from actual use of this new method, leading ultimately to the

replacement of dipyridamole by adenosine as the market leader.  (*See* PB 18-20.)  The very

existence of all of this evidence is completely at odds with the benefits of adenosine for human

MPI having been obvious.[2]

> **d.  Dipyridamole and Adenosine Were Not Viewed as Interchangeable and Were Used Differently for Different Purposes**

Adenosine and dipyridamole were not viewed as interchangeable.  The drugs had

profoundly different pharmacologic profiles and were used differently for different purposes.

Dipyridamole was thought to produce a gentle increase of endogenous adenosine levels by

preventing adenosine breakdown.  (*See* Strauss 859:9-15; *see also* TX-39 at 822.)  In contrast to

the known properties of adenosine discussed above, dipyridamole was known as a long-acting,

"relatively selective coronary dilator" with only "modest effects on systemic pressure."  (TX-217

at 432; Wackers 911:8-14.)  Most importantly, unlike adenosine, dipyridamole had been proved

safe "based on experience with hundreds of patients with heart disease."  (*See* TX-217 at 432;

---

[2]  Sicor contends that the advantages of adenosine versus dipyridamole "provided more than adequate incentive to substitute adenosine for dipyridamole as a pharmacologic stress agent" (DB 21), while arguing in the same brief that the remarkable commercial success of Adenoscan® resulted not from the intrinsic differences between adenosine and dipyridamole, but rather from "promotion and other economic factors." (DB 33-34.)  The logical inconsistency between these two contentions is glaring and suggests that at least one is surely wrong.  In fact, both contentions are wrong because the advantages of using adenosine over dipyridamole in human MPI that led to its commercial success came to be generally recognized only *after* the invention of the '877 patent.  (Klose 1516:3-1517:25.)

*see also* TX-391 at 275; Wackers 913:3-12.)  It was this combination of properties not possessed

by adenosine that led to selection of dipyridamole for use in human MPI.  (*See* TX-217 at 432;

TX-391 at 275; Wackers 911:15-913:12.)

Underscoring the non-interchangeability of these drugs, the only accepted medical uses

for adenosine in the early 1980s relied on pharmacologic effects that were antithetical to its use

in heart patients with coronary artery disease.  The first known use of adenosine relied on its

ability to interfere with electrical impulses in the heart and involved administration of bolus

doses (*i.e.*, rapid injections) of adenosine to treat patients suffering from an abnormal heart

rhythm known as PSVT.  (*See* TX-45; Wackers 914:3-22.)  The other known use, pioneered by

Dr. Sollevi, relied on adenosine's ability to profoundly reduce systemic blood pressure and

involved infusion of adenosine to non-cardiac surgical patients.  (Wackers 922:3-15.)

Dipyridamole was not used for either purpose.  (*See* TX-45 at 423; TX-39 at 822.)

### 2.    Sicor Wrongly Discounts What Those of Skill in the Art Actually Did

Sicor contends that it is irrelevant that the actual physicians who served as experts in the

trial neither described nor suggested the use of adenosine for MPI prior to the '877 patent

inventors.  According to Sicor, it is irrelevant what the actual experts "described, or even thought

of." (DB 37.)  This argument mischaracterizes Plaintiffs' argument and misstates the law.[3]

---

[3]  Sicor also contends that Dr. Wackers did not engage in the appropriate inquiry, arguing that he incorrectly assumed that a hypothetical person of ordinary skill in the art would not have access to all the relevant art.  (DB 37-38.)  However, Dr. Wackers opined on every reference cited by Sicor, and testified that he considered all of the prior art references on which Dr. Strauss relied in formulating his opinions on anticipation and obviousness.  (Wackers 1034:24-1035:4; DTX-2017; DTX-2027.)  Notably, none of Dr. Wackers opinions relied on the distinctions cited by Sicor, such as whether or not an ordinary person would have been aware of second-rate journals or journals published outside the United States.  (*See* DB 38.)

6

It is not merely that experts such as Drs. Strauss and Wackers did not mention the use of adenosine as a pharmacologic stress agent.  They did not do so despite working as leaders in the field and authoring reviews and articles on MPI.  (*See*, *e.g.*, TX-170, TX-373; Strauss 774:2-18.)  The fact of the matter is that no one publicly disclosed even the possibility of using adenosine as a pharmacologic stress agent for MPI in human patients.  (PFF 77-82.)

While obviousness is determined by reference to a hypothetical person of ordinary skill, the actions of real people working in the field have long been viewed as shedding light on the issue.  In *Graham*, for example, the Supreme Court held that the failure of real people working in the field to come up with the invention at issue is instructive on the issue of obviousness.  383 U.S. at 17-18.  Many other "courts have described or compared real people" in evaluating what would have been obvious to a hypothetical person of ordinary skill.  *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 237 F.R.D 106, 116-17 (D. Del. 2006) (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 983 (Fed. Cir. 1995) and *Biacore v. Thermo Bioanalysis Corp.,* 79 F. Supp.2d 422, 441 n. 22 (D. Del. 1999)).  Indeed, reference to the actions and writings of real people during the relevant time period in determining what would have been obvious then to a person of ordinary skill is preferred over other types of evidence.  *Interconnect Planning Corp.*, 774 F.2d at 1143 ("A retrospective view of the invention is best gleaned from those who were there at the time.").

Sicor cites *Sibia Neurosciences, Inc. v. Cadus Pharm. Corp*., 225 F.3d 1349, 1358 (Fed. Cir. 2000), to support its contention that an expert's personal efforts are irrelevant to the hypothetical person of ordinary skill.  (DB 37.)  However, in *Sibia*, the testifying expert acknowledged that he was focused on a problem *different* than that addressed by the patent at issue.  *Id.*  In contrast, Dr. Strauss was very much involved in the development of pharmacologic

MPI.  He co-pioneered the use of coronary vasodilators for MPI in the 1970s and, in 1986, published a "State of the Art" review article on MPI that included a section entitled "Non-Exercise Stress Testing."  (TX-373; *see also* TX-232; Strauss 778:18-779:8.)  Dr. Strauss also published several articles that recommended the use of other vasodilators for MPI, such as ethyl-adenosine and dipyridamole.  (*See* TX-1184 at 406; TX-232 at 247-48.)  Nowhere was use of adenosine for human MPI proposed.  (*See*, *e.g.*, TX-1184, TX-373.)

Dr. Strauss was not the only expert who failed to recognize the benefits of adenosine for human MPI.  Plaintiffs' expert, Dr. Wackers, was also involved in the development of human MPI throughout the relevant time period but never suggested using adenosine for human MPI.  (*See* TX-170; Wackers 939:7-941:1, 942:12-943:19.)  He wrote review articles and a book chapter in 1987, specifically discussing pharmacologic stress but without mentioning adenosine.  (TX-170; TX-171; Wackers 939:7-941:1, 942:12-945:23.)  Indeed, in 1986 and 1987, Medco was working with about 20 cardiology groups to test use of adenosine for treatment of PSVT, yet no one suggested using adenosine for human MPI before the inventors of the '877 patent.  (Salzberg 1839:12-1840:11.)

The silence of experts such as Drs. Strauss and Wackers, coupled with the silence of the field as a whole, speaks volumes about the nonobviousness of the invention.  *See, e.g., Potts v. Creager*, 155 US 597, 608 (1895) ("The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before.")  Far from irrelevant, this fact is practically dispositive of the nonobviousness of the claimed invention in this case.  As observed by the Supreme Court more than a century ago in *Hobbs v. Beach*, 180 U.S. 383, 392 (1901):

8

> It appears from the testimony that several of these addressing
> machines, of which that of Dennis and York is a type, and which
> are now claimed to have inspired the Beach patent, had been upon
> the market for many years, and yet it never seems to have occurred
> to any one engaged in the manufacture of paper boxes that they
> could be made available for the purpose of attaching strips to the
> corners of such boxes. This very fact is evidence that the man who
> discovered the possibility of their adaptation to this new use was
> gifted with the prescience of an inventor.

Drs. Hilleman and Mohiuddin were the prescient inventors in this case, seeing something that others did not. Their courage to test their idea in actual human heart patients led to commercialization of a better, safer diagnostic method.

### 3.     "Common Sense" Does Not Refute the Contemporaneous Evidence

Sicor's Post Trial Brief does not effectively address the contemporaneous documents and testimony teaching away from the claimed invention. Sicor's rebuttal instead repeatedly invokes "common sense." (*See* DB 6-7, 19-20, 22, 24.) While the Supreme Court in *KSR* instructed courts not to overlook common sense in analyzing obviousness, it did not authorize the use of conjecture or hindsight.[4] *See KSR*, 127 S.Ct. at 1742. This court should be highly skeptical when, as Sicor does here, a defendant resorts to purported common sense that contradicts the clear teachings in the prior art and the contemporaneous evidence of reaction to the invention once it was made. There is a fundamental logical disconnect between Sicor's *ex post* opinions of obviousness and the contemporaneous warnings and concern regarding the perceived

---

[4]   The *KSR* Court's reliance on common sense must be viewed in the context in which it arose. The Court noted that resort to common sense may be more important in some fields, like the mechanical brake pedal there at issue, because there might be "little discussion of obvious techniques or combinations" where market demand rather than scientific literature drives design considerations. *KSR*, 127 S.Ct. at 1471. The human medical use of vasodilators, however, is surely not such a field. Indeed, Sicor's expert, Dr. Strauss, identified 20,000 publications looking into the physiological effects of adenosine since 1963. (Strauss 767:8-13.) This is not a field where development decisions are driven by unpublished "common sense."

unsuitability of adenosine as a pharmacologic stress agent for human MPI.  As noted above, the

Federal Circuit has held the latter to be more reliable evidence on the issue of obviousness.

*Interconnect Planning Corp.*, 774 F.2d at 1143 ("A retrospective view of the invention is best

gleaned from those who were there at the time.").

### 4.    Sicor's *Ex Post* Arguments Do Not Negate the Clear Teaching Away From Use of Adenosine In Human MPI

The Supreme Court reaffirmed in *KSR* that "[w]hen the prior art teaches away from

combining certain known elements, discovery of a successful means of combining them is more

likely to be nonobvious."  *KSR*, 127 S.Ct. at 1740 (citations omitted).  Furthermore, prior art

warnings about risks involved in the claimed invention and obtaining unexpected results also

support a conclusion of nonobviousness.  *Id.*  Fact finders must avoid "the distortion caused by

hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."  *Id*. at 1742

(citing *Graham*).  The handful of *ex post* contentions advanced by Sicor in its Post-Trial Brief

simply do not suggest substitution of adenosine for dipyridamole in any way that even remotely

negates the clear and contemporaneous teaching away from the claimed invention.

Sicor contends that *Gould 1978* teaches that "other vasodilators could be used instead of

dipyridamole."  (DB 20.)  In reality, *Gould 1978* speculates that "[a]ny other coronary

vasodilator that was *more potent* than dipyridamole would further increase the sensitivity of

imaging techniques for identifying coronary disease."  (TX-38 at 285 (emphasis added);

Wackers 905:6-19.)  Equally pertinent, however, is the warning in *Gould 1978* that a more potent

vasodilator would also increase the risk of causing ischemia.  (TX-38 at 285; Wackers

905:6-906:14.)  Notably, Sicor presented no evidence that adenosine was known to be a more

potent coronary vasodilator than dipyridamole, particularly when used at doses low enough to

avoid side effects.  Contrary to Sicor's suggestion, such evidence as existed in the prior art

suggested that adenosine was *less potent* than dipyridamole as a coronary vasodilator, while simultaneously causing greater undesirable systemic effects.  (Wackers 923:24-924:17; *compare* TX-1171 at 335 *with* TX-38 at 284; *see also* § II.A.6., *infra*.)

Sicor's argument that *Albro* "spells out" the relationship between dipyridamole and adenosine is similarly incorrect.  (DB 20.)  *Albro* nowhere taught, suggested, or even mentioned the possibility of direct administration of adenosine instead of dipyridamole.  (*See* Wackers 907:3-908:18; TX-93.)  Instead, *Albro* merely stated that dipyridamole may induce vasodilatation by several mechanisms, including by preventing the inactivation of adenosine.  (TX-93 at 758; Wackers 907:18-908:24.)[5]

Significantly, the distribution of adenosine throughout the various tissues in the body would be expected to be markedly different depending on whether local endogenous pools of adenosine are being protected from destruction by dipyridamole or exogenously administered adenosine is arriving at the tissue through the blood stream following administration at a remote site.  (Strauss 858:7-861:23.)  The former results in long-lasting, gradual elevation of adenosine concentrations in tissues that produce a lot of adenosine, like the heart, and lower concentrations elsewhere.  (*Id.*)  This is why dipyridamole acted as a selective coronary vasodilator with little systemic effect and was thought, therefore, to be useful for MPI.  (*Id.*; *see also* TX-38 at 279, 284.)  Intravenous administration of exogenous adenosine, however, strikes the heart with a tidal wave of adenosine that can wash on through the bloodstream causing vasodilation even in

_____

[5]  The Federal Circuit has "made clear that '[t]he mere fact that a device or process utilizes a known scientific principle does not alone make that device or process obvious.'"  *In re Brouwer*, 77 F.3d 422, 425 (Fed. Cir. 1996) (quoting *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1053 (Fed. Cir. 1988)); *see also Ex parte Levengood*, 28 U.S.P.Q.2d 1300, 1302 (B.P.A.I. 1993) ("That one can *reconstruct* and/or explain the theoretical mechanism of an invention by means of logic and sound scientific reasoning does not afford the basis for an obviousness conclusion . . . .").

peripheral tissues that did not normally produce a lot of adenosine. (Strauss 859:16-860:19; *see also* TX-1171.) This was the cause of adenosine's systemic effects, which resulted in the perception that it was inappropriate for use in patients with coronary artery disease. (TX-240 at 439-40.) Moreover, the effects of infused adenosine were so transient that it did not meet the perceived requirements for a pharmacologic stress agent. (TX-240 at 439-40; TX-45 at 418; TX-229 at 432; Strauss 813:3-24.) If anything, the failure of the prior art to use adenosine for human MPI instead of dipyridamole following publication of the supposed mechanism of dipyridamole's action strongly evidences the unobviousness of the invention.

### 5.    Adenosine Was Readily Available

Recognizing that the long passage of time between the use of dipyridamole and the use of adenosine undermines its principal contention that adenosine was an obvious substitute for dipyridamole, Sicor suggests that the reason adenosine was not used earlier was because of a lack of commercially-available pharmaceutical-grade adenosine. (*See* DB 40.) To the contrary, the evidence showed that numerous groups had obtained adenosine from commercial manufacturers, such as Sigma and Flurochem, and subsequently administered that adenosine to humans. (*See* TX-36 at 1256; TX-48 at 2233; TX-1208 at 310; TX-1211 at 526; Strauss 822:7-823:22; *see also* PFF 105-109.) Sicor tacitly acknowledges this ready availability of adenosine, asserting elsewhere in its brief that "a number of investigators had reported continuous infusion of adenosine to human subjects and/or patients at different rates for different purposes." (DB 13.) Adenosine was readily available had any prior art researcher recognized its value as a pharmacologic stress agent in humans. (*See* Strauss 821:13-823:22; DTX-2016.)

More significantly, the alleged lack of commercial availability does not explain the absence of even a suggestion in the literature of the desirability of developing adenosine for use in human MPI. Like adenosine, ethyl-adenosine and intravenous dipyridamole were not initially

12

commercially available as pharmaceutical grade products. (*See* TX-1192 at Abstract and TX-129 at Abstract (commenting on lack of intravenous dipyridamole for imaging); Strauss 825:4-14, 825:19-826:12.) Given their similar unavailability, there is no rational explanation other than nonobviousness as to why ethyl-adenosine and intravenous dipyridamole were suggested in the literature for use as pharmacologic stress agents while adenosine was not.

### 6.    The Prior Art Provided No Reasonable Expectation of Success

Obviousness requires that the prior art provide a reasonable expectation of success. *In re Rinehart*, 531 F.2d 1048, 1054 (C.C.P.A. 1976). The less predictable the technological field, the more difficult it is to prove a reasonable expectation of success. *See, e.g., In re Shetty*, 566 F.2d 81, 86 (C.C.P.A. 1977); *In re Kratz*, 592 F.2d 1169, 1175 (C.C.P.A. 1979). Predictable success has not been proven here in the face of explicit concerns in the prior art over the safety of adenosine for use in patients with coronary artery disease.

Sicor strains to carry its burden by contending that a disparate collection of publications reporting continuous infusions of adenosine would have taught a person of ordinary skill in the art a range of adenosine doses that would be obviously useful for MPI. (DB 13.) As described in Plaintiff's Opening Brief (PB 12-15), however, these publications have important deficiencies that undermine Sicor's conclusion: (1) the studies systemically excluded heart patients, the relevant patient population for MPI; (2) the number of subjects studied was small; (3) measurements of coronary blood flow (necessary for determining usefulness for MPI) were largely lacking; (4) no mention was made of MPI; (5) dose-limiting negative side effects were reported; and (6) the dose at which those side effects were reported to be intolerable to healthy subjects was as low as 70 mcg/kg/min and varied widely. (*See generally* DTX-2017; Strauss 826:24-831:6; PFF 69-76.)

13

The prior art is particularly bereft of a reasonable basis for believing that a safe and tolerable adenosine dose would be efficacious for pharmacologic stress in human MPI. (*See generally* PFF 61-76.) In this regard, the degree of pharmacologically-induced coronary vasodilatation required for diagnostically-reliable human MPI had already been reported in the literature. *Gould 1978* reported that dipyridamole was a "potent, selective coronary vasodilator," increasing coronary flow four hundred percent (400%) over baseline levels. (TX-38 at 279, 284; Wackers 924:3-6.) A portion of the *Sollevi 1986* reference upon which Sicor specifically relies (albeit without support in the expert report of Dr. Strauss) showed that an adenosine dose of 80 mcg/kg/min, an amount already above the level reportedly found intolerable by some healthy volunteers (*see* DTX-2017), produced only a mild 70% increase in coronary blood flow and did so while simultaneously producing a host of unwanted systemic effects, including a 20% decrease in arterial blood pressure. (*See* TX-1171 at 335; Wackers 922:16-924:17.) Thus, *Sollevi 1986* would have demonstrated to one of ordinary skill that a dose of 80 mcg/kg/min would likely *not* cause a sufficient increase in coronary flow to obtain diagnostically-reliable images (a fact later confirmed by Wilson in 1990 (TX-46)) while suggesting that higher doses would likely have induced even greater unwanted systemic effects. (*See* Wackers 922:16, 924:17.)

Sicor focuses on a summary chart entitled "Some Tentative Therapeutic Properties of Adenosine Administration" from *Sollevi 1986*. (*See* DB 15.) This chart suggests that a "low dose" of 20-50 mcg/kg/min might be useful for "preferential myocardial vasodilation." (TX-1171 at 345.) That the increase in coronary blood flow attainable at these doses would have been perceived as inadequate for diagnostically-reliable human MPI is clear from the above-noted report in *Sollevi 1986* that an even higher dose of 80 mcg/kg/min produced only a

14

70% increase in coronary blood flow – only about 18% of the coronary blood flow increase

obtained with dipyridamole.  (*Compare* TX-1171 at 335 *with* TX-38 at 284.)

Sicor also argues that another study described in Section 7.2.1 of *Sollevi 1986* would

have taught a range of doses that would cause vasodilation without causing hypotension or other

severe side effects.  (*See* DB 15, 23.)  Specifically, Sicor cites a study describing a 30-50

mcg/kg/min adenosine infusion to test surgical grafts in anesthetized, open-chest heart patients

prior to closure of the thorax.  This testing represented a form of surgical "quality control"—a

context that is "totally different" from MPI.  (*See* TX-1171 at 335; Wackers 926:5-24.)  It suffers

from the same deficiencies as the other Sollevi disclosures of low-dose adenosine infusions

discussed above.  Moreover, reliance on this and the other studies in Section 7.2.1 of *Sollevi*

*1986* (Strauss 702:21-709:11) appeared nowhere in the expert reports of Dr. Strauss (*see* TX-

246) and should be stricken for that reason alone.  (Objection at 707:9-11; PB 40-41.)

Sicor contends that a person of ordinary skill would have understood from *Biaggioni*

*1986* that adenosine could be safely infused continuously to conscious humans for extended

periods of time at rates up to 140 mcg/kg/min and that the adenosine infusion would cause

vasodilation.  (DB 16-17.)  However, *Biaggioni 1986* studied the effects of infusions of

adenosine into seven normal volunteers, not heart patients, and nowhere discussed MPI,

coronary blood flow, or medical uses for continuous intravenous infusions of adenosine other

than induction of hypotension.  (TX-48; *see* Wackers 932:7-935:13; Strauss 851:6-10;

DTX-2017; DTX-2027.)[6]

---

[6]  Sicor contends that several of the references cited by the inventors in the reference
section of the Creighton Protocol (TX-57 at 9-10) were not cited during the prosecution of the
'877 patent.  (DB 8.)  The relevance of this contention is unclear given that no defense of
inequitable patent procurement was identified in the pretrial order.  *Biaggioni 1986*, however,
*was* cited to the Patent and Trademark Office (PTO) and is listed on the face of the '877 patent.

(continued…)

*Biaggioni 1986* states that although the researchers intended to titrate the adenosine dose

to 140 mcg/kg/min, two of the seven normal volunteers could tolerate only 100 mcg/kg/min.

(TX-48 at 2230.)  Moreover, the paper describes an array of dose-limiting side effects associated

with the adenosine infusion.  (TX-48 at 2233.)  While Sicor's expert now contends that the

subjects in *Biaggioni 1986* had a "very significant vasodilation response to the adenosine

infusion" (DB 16), systemic vasodilation, as opposed to vasodilation limited to the coronary

circulation, was considered undesirable in the context of diagnostic cardiac imaging and could

potentially lead to ischemia and other ill effects.  (*See* Wackers 910:8-17, 922:7-9.)  Indeed, the

literature identified as a requirement for use as a pharmacologic stress agent that the agent have

"an insignificant systemic effect."  (TX-229 at 432; Strauss 813:3-24.)  *Biaggioni 1986* thus

teaches away from the use of adenosine for human pharmacologic MPI and certainly does not

suggest a dose suitable for the generation of diagnostically-reliable MPI images in heart patients.

    Sicor's *ex post* analysis of the prior art largely disregards *Owall 1987* (TX-1169),

discussing it primarily in a footnote.  (*See* DB 14.)  However, *Owall 1987* represents the latest in

time of the prior art publications from Dr. Sollevi's group and is particularly instructive.

(TX-1169; *see also* Wackers 927:18-22; DTX-2017.)  *Owall 1987* described continuous

_____

(...continued)
(*See* TX-320)  Moreover, WO87/01593, a PCT publication authored by Dr. Sollevi, is also listed
on the face of the '877 patent.  (TX-320; TX-311.)  This PCT publication (1) discloses the use of
adenosine for surgical hypotension; (2) is largely cumulative with Dr. Sollevi's hypotension
studies; and (3) corresponds to the '296 patent without Example XIII.  (TX-311; *see* Strauss
837:7-16.)  Dipyridamole imaging was addressed in the specification of the '877 patent itself
(TX-320 at col. 1, ll. 34-40, cols. 4-5 (Example I), col. 7, ll. 19-32.)  The Examiner nonetheless
found the claims allowable.  If a patent challenger alleges invalidity based on prior art the PTO
considered during prosecution of the patent, that challenger has the "added burden of
overcoming the deference that is due to a qualified government agency presumed to have
properly done its job, which includes one or more examiners who are assumed to have some
expertise in interpreting the reference and to be familiar from their work with the level of skill in
the art and whose duty it is to issue only valid patents."  *Ultra-Tex Surfaces, Inc. v. Hill Bros.
Chem. Co.,* 204 F.3d 1360, 1367 (Fed. Cir. 2000).

intravenous infusions of adenosine into patients to induce controlled hypotension, and reported that some heart block was observed beginning at doses as low as 140 mcg/kg/min. (TX-1169 at 231; Wackers 927:18-22.)[7] Moreover, two of the patients included in the study had a history of myocardial infarction about a decade earlier. (TX-1169 at 229; Wackers 927:16-928:3.) Both of those patients experienced adverse effects with the adenosine infusion. (TX-1169 at 231; Wackers 928:4-929:17.) In view of these side effects, the authors of *Owall 1987* explicitly cautioned against using adenosine in patients with a history of heart disease. (TX-1169 at 233; Wackers 929:18-930:2.) This was a clear teaching away from use of adenosine in human pharmacologic MPI, where nearly half of the patients have known coronary artery disease, and one-quarter have already had a myocardial infarction. (TX-103 at 386; Strauss 834:3-836:1.)

In sum, Sicor's assertions of obviousness are simply not supported by the record and do not provide the reasonable expectation of success required for proof of obviousness. It is elementary patent law that a defendant may not "pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art." *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965). Sicor mischaracterizes or fails to acknowledge clear evidence from the very publications on which it relies that would have discouraged or even explicitly warned against administering an adenosine infusion to patients suffering from coronary artery disease. This is particularly true for the dose of 140 mcg/kg/min in claim 23(18), which was well above the tolerable level for many normal volunteers, much less patients with coronary artery disease. (*See* PFF 71-72.)

---

[7] The induction of even low-grade heart block was potentially of concern because it could signal a progression to a more serious disturbance. (Strauss 768:14-21.)

7.    *Pfizer v. Apotex* **Is Inapposite**

To support its suggestion that a person of ordinary skill would have known from *Gould 1978* that other vasodilators could have been used, Sicor cites to *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1365 (Fed. Cir. 2007).  (DB 22.)  Sicor's reliance on *Pfizer* is misplaced.

The issue in *Pfizer* involved substituting salt forms of the same active drug.  *See Pfizer*, 480 F.3d at 1365.  In contrast, this case involves *changing the active drug itself*.  Moreover, the prior art in *Pfizer* suggested that "any and all pharmaceutically-acceptable anions would form non-toxic acid addition salts and would work for their intended purpose. . . " and "placed no limitations on the acid addition salt whatsoever." *Id.*  Here, however, the prior art placed a series of limitations on the active drug.  *Gould 1978* referred at most only to the use of other coronary vasodilators that were "more potent" than dipyridamole, warned against the increased risk of subendocardial ischemia, suggested the need for an antidote, and warned against "coronary or myocardial steal."  (TX-38 at 285.)  The companion paper to *Gould 1978*, published in the same journal and immediately preceding *Gould 1978*, placed additional requirements on the vasodilator, stating that an appropriate pharmacologic stress agent must be "selective for the coronary arteries," have "insignificant systemic effects," and have "an effect for at least 3 minutes until thallium-201 is removed from the systemic circulation."  (TX-391 at 275; Strauss 790:3-17, 813:3-24.)  Adenosine did not fit this profile, as it was associated with systemic hypotension, was known to cause AV block, was associated with ischemia, and had an extremely short duration of effect.  (*See, e.g.*, TX-36 at 1254; TX-217 at 430; TX-259 at 470; Strauss 790:3-23; Wackers 909:9-910:17.)

In a continued attempt to shoehorn the demonstrably different facts of this case into the holding of *Pfizer*, Sicor suggests that others would have expected the invention to work because the inventors themselves expected the invention to work.  (*See* DB 22.)  However, *Pfizer* can be

18

read for no more than the proposition that the inventor's testimony can *reflect* the reasonable expectation of persons of skill in the art, not that it should serve as the basis for establishing a reasonable expectation of success. *See Pfizer,* 480 F.3d at 1364 (stating that a "reasonable expectation of success is further amply reflected in [the inventor's] further testimony. . . .")

This dictum in *Pfizer* notwithstanding, the patent statute states in no uncertain terms that the inventor's thought processes cannot negate patentability. As observed in *In re Kratz,* 592 F.2d at 1175, "making weight of the method appellant used in finding the invention is beside the point. The last sentence of *35 U.S.C. s 103*, with great clarity, excludes such methodology in stating that '(p)atentability shall not be negatived by the manner in which the invention was made.'" Sicor's reliance on the inventors' statements regarding expectation of success is not only in contravention of the statutory mandate but also suggests the wholly irrational result that the only nonobvious inventions are those where the inventors themselves expected their inventions to fail.

> **8.    Plaintiffs' Objective Evidence of Nonobviousness Disposes of Sicor's Obviousness Challenge**
>
> **a.    Sicor Ignores or Disregards the Wealth of Contemporaneous Evidence Documenting Surprise and Skepticism of Persons Skilled in the Art**

Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *United States v. Adams,* 383 U.S. 39, 52 (1966); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.,* 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Ruiz v. A. B. Chance Co.,* 234 F.3d 654, 668 (Fed. Cir. 2000) ("[P]roceeding contrary to the accepted wisdom. . . is strong evidence of unobviousness.") (internal citations omitted). This is particularly true where "the skepticism is expressed at the time of the

invention, in a nonadversarial setting." *Burlington Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919

(D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987).

Sicor contends that the "scant evidence" that Plaintiffs provided is not sufficient to

overcome Defendant's alleged *prima facie* case of obviousness.  (DB 29.)  Yet, Sicor turns a

blind eye toward the wealth of contemporaneous information summarized in §II.A.1. and 2.,

*supra*. (*See* PB 30-31 and PFF 85-92, discussing TX-53, TX-169, TX-47, TX-314; *see also*

TX-240.)

Sicor also implies that articles that are not prior art cannot document skepticism and

concern.  (DB 31.)  However, evidence of surprise and concern involve *reactions* by persons of

skill in the art upon learning of the invention and, therefore, must logically come *after* exposure

to the claimed invention.  *See Adams,* 383 U.S. at 51-52 (claimed invention not obvious because

the successful operating characteristics it achieved were "unexpected" and experts expressed

disbelief *upon learning of the invention*).

In addition to Sicor's generalized unsupported dismissal of this evidence, Sicor singles

out Dr. Verani's "*ex post facto*" 1995 book chapter as not persuasive.  (*See* DB 31.)  Dr. Verani

was conceded to have been a reliable authority in the field of human MPI as well as one of the

most insightful people working in the field.  (*See* Strauss 806:9-11, 820:6-13.)  In this regard, he

was clearly of much greater than ordinary skill in the art.  Nobody was in a better position than

he to observe the development of the field and thereafter chronicle and explain it.  Dr. Verani's

1995 chapter retrospectively summarized the concerns that kept adenosine out of the clinic,

stating that the long interval between animal experiments and clinical investigations using

adenosine may have resulted from concern with the ultrashort half-life of exogenous adenosine

(2-10 seconds), concerns regarding the safety of large intravenous doses of a drug that could

trigger severe myocardial ischemia in patients with coronary artery disease, and the potential for slowing atrioventricular conduction (*i.e.*, AV block). (*See* TX-240 at 439-40; Strauss 806:15-809:14.) That explanation is totally consistent with all of the contemporaneous evidence and is, therefore, probative on the issue of obviousness. It is certainly more likely to be accurate than the contrary opinion advanced by Sicor developed solely for purposes of this litigation and never expressed by Dr. Strauss at the time.

Sicor suggests that Dr. Verani's involvement in Medco's clinical trials, and in particular his authorship in 1987 of a patient protocol expressing his own interest in pursing adenosine for MPI, somehow undermine Dr. Verani's 1995 explanation for the long delay between the animal experiments and clinical investigations. (*See* DB 31.) As noted above, however, Dr. Verani was acknowledged by Sicor's expert, Dr. Strauss, as a leader in the field of pharmacologic stress imaging, and was, therefore, not a person of simply ordinary skill in the art. (Strauss 806:9-11.) More importantly, Sicor's suggestion ignores the fact that Dr. Verani's December 1987 protocol was written on behalf of Medco, the predecessor in interest to Plaintiff King, *after* Dr. Verani learned of the inventors' idea of using adenosine for human MPI. (*See* Wackers 973:24-974:23; Salzberg 1843:5-23.) Consequently, Dr. Verani's 1987 protocol, derived as it was from the inventors' own work, is not prior art and cannot be relied upon to defeat the invention. *See In re Mathews*, 408 F.2d 1393, 1396 (C.C.P.A. 1969); *see also In re Facius*, 408 F.2d 1396, 1406 (C.C.P.A. 1969) ("But certainly one's own invention, whatever the form of disclosure to the public, may not be prior art against oneself, absent a statutory bar.")

Despite articles, such as Dr. Verani's, expressly describing adenosine's short half-life as an impediment to the use of adenosine for MPI, Sicor nonetheless suggests that the improved safety of adenosine as a pharmacologic stress agent relative to dipyridamole would have been

21

known by a person of skill in the art in 1987 because the short half-life was known.[8]  (DB 30.)

As documented in § II.A.1., *supra*, this is a blatant use of hindsight.  Rather than providing

motivation, the short half-life of adenosine taught directly away from its use as a pharmacologic

stress agent for MPI, a perceived requirement for which was a long duration of effect.  (TX-391

at 275; Strauss 790:3-23; Wackers 955:1-9.)  Thus, the art was searching for compounds "which

have greater duration of action *in vivo*" than adenosine.  (TX-214 at 415; *see, e.g*., Strauss 770:5-

20.)

### b.    Sicor Erroneously Describes "Teaching Away" in the Prior Art as a Secondary Consideration

Instead of addressing the fears and misconceptions that prevented the art from adopting

adenosine for use in human MPI, Sicor erroneously suggests that the "teaching away" described

in the prior art should be considered as merely a secondary factor.  (*See* DB 30-31, referring to

TX-48, TX-112, TX-220, TX-226, TX-1171, and TX-1208.)  However, the question of whether

a reference teaches away rather than toward a claimed invention is part of determining the scope

and content of the prior art.  *Dystar Textilfarben GMBH & Co. v. C.H. Patrick Co.,* 464 F.3d

1356, 1360 (Fed. Cir. 2006); *see also In re Bell*, 991 F.2d 781, 784 (Fed. Cir. 1993) ("What a

reference teaches and whether it teaches toward or away from the claimed invention are

questions of fact.").  Sicor bears the burden of proving the factual elements of its case, including

all matters related to the scope and content of the prior art, by clear and convincing evidence.

*Golden Blount, Inc. v. Robert H. Peterson Co*., 365 F.3d 1054, 1056, 1061-62 (Fed. Cir. 2004).

---

[8]  Sicor again improperly cites to the testimony of the inventor Dr. Hilleman to support its position regarding the person of ordinary skill in the art.  (DB 30.)  Dr. Hilleman merely stated that in general, it is better to use a drug having a shorter duration of side effects.  (DB 30; Hilleman 2138:19-2139:7.)  However, for use as a pharmacologic agent for MPI, the drug needed to be effective as well as safe, and efficacy was perceived to require a selective coronary effect with a duration of effect of at least three minutes, which adenosine did not have.  (*See* TX-391 at 279; TX-229 at 432; Strauss 790:3-17, 813:3-24.)

> c.    **Sicor's Critique of the Commercial Success of Adenoscan Rings Hollow In the Face of Its Efforts to Copy the Drug**

Predictably, Sicor fights vigorously in this litigation for the right to make generic adenosine for infusion according to the claimed invention but criticizes Adenoscan®[9], the product embodying that use, contending that the "sales levels are explained, not by any perceived superiority of the claimed invention, but by the interplay of four economic factors" involving promotion, marketing, and a general growth in demand for pharmacologic stress testing unrelated to the asserted inventions.  (DB 32.)  Defendants have made such arguments for a hundred years or more, and courts have always been duly skeptical.  As explained by the Supreme Court in a case involving a tire design patented by Grant, "[the defendant] gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, as others have done."  *Diamond Rubber*, 220 U.S. at 441.  Indeed, Sicor never explains why it is intent on selling a generic form of Adenoscan if Adenoscan's commercial value is solely due to the marketing efforts of Astellas, which would not be expected to continue after generic entry.

As discussed in Plaintiffs' Proposed Findings of Fact (PFF 125-130), Sicor's economic theories are grounded on the testimony of its economic expert, Dr. Leffler, an "expert" who has been specifically criticized in written opinions for having offered unsupported or unreliable opinions.  *See, e.g., F.T.C. v. Freeman Hospital*, 911 F. Supp. 1213, 1219 (W.D. Mo. 1995) (finding that Dr. Leffler's use of "erroneous data casts doubt on the reliability of his calculations."); *Howerton v. Grace Hospital*, No. 4:90CV187, 1995 WL 787529 at *15 (W.D.N.C. July 7, 1995) (criticizing Dr. Leffler's opinion for using "selective factual allegations, often not supported in the record…."); *In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL

---

[9]  Adenoscan® (Adenoscan) is the registered trademark for adenosine for use in MPI marketed by Astellas.

22048232 at *4 (N.D. Cal. Aug. 26, 2003) (finding that Dr. Leffler did "none of the proposed analysis upon which the Court relied in granting [plaintiff's] motion for class certification" and that Dr. Leffler's regression analysis failed to account for factors that had served as "the whole premise behind his original methodology").  Dr. Leffler's opinions here suffered from similar errors and inaccuracies.

    In actual fact, the record shows that sales of Adenoscan were driven by the characteristics of the claimed invention, not promotion.  (Hay 1712:17-1713:20, 1738:22-1740:1, 1754:10-1757:19, 1796:22-1798:1.)  Adenoscan's sales grew because clinicians recognized significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; *see also* Hay 1754:10-1757:15; Klose 1516:17-1517:25.)  Sicor's arguments are inconsistent with the strong evidence that doctors recognized significant therapeutic advantages in Adenoscan and used it because of those advantages.  (Hay 1796:22-1798:1, 1754:10-1757:15; Strauss 784:6-786:6; White 1353:19-1354:16.)  Sicor overstates the impact of promotion and fails to acknowledge that pharmacologic stress agents are sold to expert consumers, cardiologists, and nuclear medicine specialists, who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (White 1231:22-1232:7; Hay 1712:6-1713:25, 1754:14-1757:15, 1797:2-1798:1; Klose 1532:17-1533:6.)

    Although Sicor contends that the pharmacologic stress market was an ideal market for a new entrant (DB 32-33), in fact, shortly after its launch, Adenoscan had to compete with a significantly cheaper generic dipyridamole in an extremely cost conscious health care environment.  (Hay 1738:22-1740:1.)  Astellas's Vice President of Marketing and Sales for the Critical Care Unit identified this as the biggest sales challenge facing Adenoscan.  (White 1246:1-11.)  This challenge made the pharmacologic stress agent market far from an "ideal"

24

market for Adenoscan. Furthermore, while Sicor suggests that Fujisawa devoted an unusual amount of resources to the marketing of Adenoscan (DB 33), the actual promotion was typical in the industry at the time. (TX-19; TX-24 at 54; TX-1165; Hay 1742:3-1749:10, 1757:20-25; DTX-2041.)

Sicor also suggests that the increase in Adenoscan sales can be attributed to a general growth in demand for pharmacologic stress testing. (DB 33.) But the trend in Adenoscan's sales growth exceeds the general market growth. Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005. (TX-19; Hay 1714:13-1716:9; DTX-2014.) More importantly, its market share grew too. In December of 1995, Adenoscan held just 16.5% of the market share of scans and dipyridamole held 76%. (TX-21; Hay 1731:11-22; DTX-2029.) By June of 2005, Adenoscan's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%. (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2030; DTX-2031.) Indeed, despite being seven to ten times cheaper than Adenoscan, dipyridamole's sales growth significantly lagged that of both Adenoscan and the pharmacologic stress agent market. (Hay 1733:4-1734:11; DTX-2032.)

To counter this evidence of remarkable commercial success, Sicor alleges that Plaintiffs have failed to demonstrate the required nexus between the claimed invention and the alleged commercial success of their product. (DB 31) (citing *Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006)). In *Ormco*, the Federal Circuit found the requisite nexus lacking between the claimed invention and the plaintiff's commercial product, which was a set of numerically ordered dental appliances ("invisible braces"). *Ormco*, 463 F.3d at 1313. According to the court in *Ormco*, commercial success was due to unclaimed or non-novel features of the tooth repositioning devices at issue, such as the aesthetic appeal and improved

comfort of transparent devices, neither of which were claimed, but which were attributes found in third party prior art devices. *Id*. at 1306, 1312. Because the attributes deemed essential for commercial success were divisible from the invention as claimed and found in the prior art, the court in *Ormco* held that there was no nexus between the claimed invention and the commercial success of the product. *Id*. at 1311-12.

In contrast, the attributes leading to commercial success here are not divisible from the invention and were not known in the prior art. Adenoscan is preferred to the competitor product because it constitutes an administration of adenosine for pharmacologic MPI. (TX-75; TX-138 at 300; Wackers 892:2-13, 893:1-894:3.) Adenosine is safer than the competitor product, which is why experts like Drs. Strauss and Wackers use it in their practices. (Strauss 786:3-6; Wackers 892:2-13.) The safety and efficacy of the invention is one and the same with what is claimed, not some feature divisible from what is claimed, as in *Ormco*. In further distinction from *Ormco*, the benefits of adenosine as a stress agent in human MPI were *not* generally appreciated before the invention. (PB 15-16.) Indeed, the evidence shows that it took some time for the safety and efficacy to be fully appreciated by the medical community even after the invention. (Klose 1516:3-14.)

Notwithstanding the contentions of Sicor and Dr. Leffler, the evidence overwhelmingly supports the view that Adenoscan was a remarkable commercial success whose sales were driven by significant product advantages that made it more attractive to physicians.

      **B.**     **Adenosine Infused at 140 mcg/kg/min, as Required by Claim 23(18),
Provides an Unexpected Balance of Safety and Efficacy for MPI**

          **1.**     **Sicor's Expert Testified that Reliable Pharmacologic MPI
"Requires" a Steady State of Coronary Vasodilation Provided
By the Dose in Claim 23(18)**

The benefits of using adenosine as a pharmacologic stress agent in human patients were unexpected in view of the teachings in the prior art. In particular, the dose of 140 mcg/kg/min would have been viewed as well above what would be safe and tolerable for a patient who may have coronary artery disease. In fact, *Sollevi 1986*, so heavily relied upon by Sicor elsewhere, states that preferential coronary vasodilation of the sort perceived as a requirement for pharmacologic MPI occurred only at adenosine doses of 20-50 mcg/kg/min. (TX-1171 at 345; *see also* TX-229 at 432.)

Sicor argues that the Plaintiffs are trying to avoid obviousness by importing additional elements into the claims. (DB 38.) In particular, Sicor argues that whether any particular dose is "optimal" or provides "maximal vasodilation" is irrelevant to the obviousness analysis. (DB 38.) Sicor's argument is without merit and in contradiction with the testimony of its own expert.

Claim 23(18) requires infusing adenosine "sufficient to provide coronary artery dilation" for "detecting the presence and assessing the severity of coronary artery disease in a human." (*See* TX-320, col. 8, l. 53-col. 9, l. 35.) According to the direct testimony of Sicor's expert, Dr. Strauss, the reliable detection of coronary artery disease by pharmacologic MPI *requires* a steady state of coronary vasodilation—hopefully maximal coronary vasodilation:

        Well, I think it is very important that one achieve a stable state of
coronary vasodilation to perform myocardial perfusion imaging.
The test requires that the patient be in a steady state, hopefully of
maximum coronary vasodilation to optimize the sensitivity of
myocardial perfusion imaging. So knowing that when one is
perfusing adenosine, that one is achieving a stable circumstance for
several minutes is important to know that the tracer is then

reflecting the distribution of blood flow at the time of maximum vasodilation.

(Strauss 693:15-694:7.) The evidence shows that an adenosine infusion of about 140 mcg/kg/min provides a steady, non-oscillating state of maximal coronary flow. (*See* TX-46 at 1600, 1603; Strauss 854:13-22; Wackers 963:12-964:7; 965:17-25.) Without such steady, maximal flow, less severe obstructions in the coronary arteries may go undetected. (Strauss 660:18-661:13; Wackers 901:2-22; DTX-2018.)

Work by Wilson and colleagues demonstrated that "submaximal" adenosine infusions at rates of 70-100 mcg/kg/min produced an oscillating blood flow, in which blood flow velocity rises and falls in a cyclical pattern. (*See* TX-46 at 1600; Wackers 963:12-964:7.) Wilson warned that, with such submaximal doses, "injection of thallium at the low ebb of coronary hyperemia [increased blood flow] may result in falsely normal findings." (TX-46 at 1603; Strauss 854:1-12; *see also* Wackers 963:12-964:7.) Thus, while a positive result with a lesser adenosine dose could provide an accurate diagnosis, a negative result would have little diagnostic value.[10] Because of the risk of false negatives, Wilson and co-workers recommended using an infusion rate of 140 mcg/kg/min to attain maximal coronary vasodilation in most patients (TX-46 at 1603-04), the same rate of infusion identified by Drs. Hilleman and Mohiuddin and required by asserted claim 23(18) of the '877 patent. (*See* TX-46 at 1595; TX-320, col. 8, l. 53-col. 9, l. 35; Wackers 963:12-964:7.) Thus, "maximal" or "optimal" coronary vasodilation are not imported claim elements in the claim requiring the 140 mcg/kg/min dose.

---

[10] Sicor argues that Dr. Wackers conceded that the named inventors own studies showed that adenosine doses of 60-120 mcg/kg/min also worked for pharmacologic MPI. (DB 39.) However, Dr. Wackers actually stated that these lower doses worked for "each of those patients," each of whom was known to have angiographically documented coronary artery disease. (*See* TX-57 at 6.) The higher doses are needed to insure that a patient in whom no disease is detected is in fact healthy. (Wackers 962:2-965:25.)

Without citation to any legal authority, Sicor suggests that reliance on the work of Wilson (TX-46) is misplaced, because Wilson is not an inventor of the '877 patent and because the named inventors "neither identified a dose that produced maximized flow (Tr. 1901:15-22) nor claimed any such dose." (DB 39.) Sicor's allegations are clearly erroneous. Based on their empirical experience with a number of patients with known coronary artery disease, the inventors of the '877 patent identified 140 mcg/kg/min as a useful adenosine dose for diagnostically-reliable pharmacologic MPI. (*See* TX-296; Mohiuddin 1887:6-13; *see also* PFF 146-148.) This dose is also plainly recited in claim 23(18). (*See* TX-320.)

The later work of Wilson confirmed the importance of the 140 mcg/kg/min dose by direct measurement of coronary blood flow. It is not relevant that the inventors themselves had not proven directly that the dose of 140 mcg/kg/min produced a sustained maximal coronary flow rate:

> [T]he mere failure of a patentee to realize all the benefits and possibilities of his invention is not fatal. The after-discovery of unsuspected usefulness in a disclosed apparatus, far from detracting from its value, may serve to enhance it. It is the benefits which test, use, and time unfold that really determine merit."

*In re Zenitz*, 333 F.2d 924, 927 (C.C.P.A. 1964); *see also Richardson-Vicks Inc. v. Upjohn Co*., 122 F.3d 1476, 1482 (Fed. Cir. 1997) (finding error in district court proceeding where "evidence of unexpected results . . . was considered 'irrelevant' by the trial court because . . . [they were] unknown at the time of [the inventors'] invention"); *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.,* 21 F. Supp. 2d 366, 370 (S.D.N.Y. 1998), *aff'd*, 231 F.3d 1339 (Fed. Cir. 2000) ("[E]ven if famotidine were structurally obvious, its patentability was clearly supported by fatomidine's *after-discovered superior properties*." (emphasis added)).

       2.       **The Identification of the Dose of 140 mcg/kg/min Was Not "Routine Optimization"**

Sicor contends that even if an adenosine dose of 140 mcg/kg/min is optimal for pharmacologic MPI, mere optimization of a dose within an obvious range is not inventive, but rather common practice. (DB 39.) In so contending, Sicor mischaracterizes the problem confronted by the inventors and the evidence of what the result of allegedly "routine" experimentation would be.

For starters, there was no known range of adenosine doses for human MPI in which to seek an "optimal" dose. Prior to the work of the inventors, no one had administered adenosine to a human to diagnose coronary artery disease using MPI, and no prior art document even suggested doing so. (*See* PB 15-16.) Thus, when Sicor asserts (DB 24) that the "single difference" between *Gould 1978* or *Albro* and the claimed invention is "substituting adenosine within the specified dosage ranges for dipyridamole," Sicor combines at least two separate inventive steps: (1) proceeding against conventional wisdom by contemplating use of adenosine for pharmacologic human MPI; and (2) determining whether an adenosine dose existed that could be tolerated by patients with coronary artery disease while still inducing sufficient coronary vasodilation to yield diagnostically-reliable MPI images.

Moreover, the prior art suggested that doses as high as 140 mcg/kg/min would be affirmatively contraindicated for human MPI. The normal volunteer studies suggested that even many healthy subjects could not tolerate a continuous intravenous infusion of 140 mcg/kg/min. (*See* Wackers 934:21-935:5; DTX-2017.) Of the 35 healthy volunteers collectively examined in TX-48, TX-1211, TX-220, TX-1208, and TX-226, less than half tolerated doses of 140 mcg/kg/min, and many failed to tolerate even 100 mcg/kg/min. (*See* DTX-2017.) Some AV block was reported at the 140 mcg/kg/min dose in *Owall*. (TX-1169 at 231.) Indeed,

Dr. Sollevi's published international patent application suggested that AV block could surely be avoided in conscious patients only at adenosine doses below 100 mcg/kg/min. (TX-311 at 4, ll. 25-27.)

Sicor suggests that the Sollevi and Biaggioni publications would have taught the dose of 140 mcg/kg/min. (DB 26-27.) As discussed above in § II.A.6., however, those publications suggested that the significant degree of coronary vasodilation required for diagnostically-reliable MPI could not be attained at adenosine doses that did not produce significant systemic effects contraindicated for that purpose. Indeed, when Dr. Sollevi himself pursued the use of adenosine for pharmacologic MPI, he selected a dose of only 60 mcg/kg/min because he sought a dose with *no palpable side effects*. (TX-1193 at SIC010942 (emphasis added).) Dr. Sollevi's selection of this lower dose demonstrates that even a practitioner of extraordinary skill, when confronted with the evidence in the prior art, concluded that a much lower adenosine dose should be used for pharmacologic MPI.

Finally, the contemporaneous proposal of Dr. Sollevi and the opinion testimony offered by Sicor's expert, Dr. Strauss, confirm that any experimentation even arguably characterizable as "routine" would not lead to identification of the 140 mcg/kg/min dose. Both scientists suggested that one should seek an adenosine dose where side effects were non-existent or just beginning. (*See* TX-1193 at SIC010942; Strauss 850:11-851:5.) Dr. Strauss admitted that titrating the adenosine dose to a point where side effects were mild or just beginning could well result in a dose well below 140 mcg/kg/min and too low for reliable myocardial imaging. (Strauss 850:11-23.) In his experience, while many people can tolerate 100 mcg/kg/min, some patients who receive 140 mcg/kg/min will sit up on the table and yell, STOP! (Strauss 850:11-851:5.)

Taken collectively or considered alone, the prior art publications relied on by Sicor simply did not render obvious the claimed dose of 140 mcg/kg/min.

III.    **EXAMPLE XIII OF THE '296 PATENT AND THE KAROLINSKA REQUEST DO NOT INVALIDATE THE ASSERTED CLAIMS**

    A.    **Sicor Invites Legal Error By Asserting that Plaintiffs Must Show Conception of Every Feature of the Claimed Invention Before the Filing Date of Example XIII**

Example XIII of U.S. Patent No. 5,731,296 (the '296 patent (TX-275)) was added to the specification of that patent on December 28, 1987 and is not prior art to the asserted claims in the '877 patent because the inventors had already conceived of as much of their invention as was disclosed in Example XIII prior to that date. Sicor contends that Plaintiffs cannot antedate Example XIII because the inventors' Creighton Protocol (TX-57) does not show conception of a specific dose of adenosine for use with MPI. (DB 18-19.) Critically, Sicor overlooks the fact that Example XIII likewise does not disclose a specific dose of adenosine for use in MPI, disclosing instead case-by-case determination of the dose by titration. (*See* Wackers 957:14-958:13, 959:14-22.)

When a prior art reference does not disclose every element of the claimed invention, the applicant need not show prior possession of the complete invention to prevail on priority grounds. "[A]ll the applicant can be required to show is priority with respect to so much of the claimed invention as the reference happens to show. When he has done that he has disposed of the reference." *In re Stempel*, 241 F.2d 755, 759 (C.C.P.A. 1957). Thus, it is sufficient here that the inventors can establish prior invention of the use of adenosine for MPI at a dose to be determined by titration. These aspects of the claimed invention are set forth in the Creighton

Protocol (TX-57), which was part of the Investigational New Drug application Medco submitted

to the FDA on December 9, 1987 (TX-52).  (*See* Wackers 973:24-974:23; Salzberg 1843:5-23).[11]

Sicor cites *Kridl v. McCormick*, 105 F.3d 1446 (Fed. Cir. 1997) and *Mahurkar v. C.R.*

*Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996), in support of its contention that conception requires a

formation in the mind of the inventor of every element of the *complete* invention.  (*See* DB 18.)

While perhaps true in general, Sicor's definition of conception is irrelevant to the question of

what an inventor needs to show to antedate a prior art reference that does not itself teach every

element of the claimed invention.  The cases relied upon by Sicor are completely inapposite.

*Kridl* concerns conception in the context of an interference proceeding in the PTO (where

conception of every element of the claim adopted as the interference count must be proven) and

does not address antedating a prior art reference.  *See Kridl*, 105 F.3d at 1448.  In *Mahurkar*, the

patentee disposed of an otherwise *anticipatory* reference by offering evidence at trial to show

that he had invented the subject matter of the patent before the asserted reference.  *See*

*Mahurkar*, 79 F.3d at 1577.  In other words, *Mahurkar* simply stands for the unremarkable

principle that where a prior art reference discloses every element of a claimed invention, the

inventor must demonstrate prior possession of all that is disclosed in the reference (*i.e.*, every

element of the claimed invention) to antedate that reference.

By contrast, here the prior art reference relied on by Sicor did not disclose every element

of the claimed invention and the inventors need not demonstrate prior possession of every

---

[11]  Both the '877 patent inventors (*see* TX-57) and Example XIII (TX-275) disclosed a titration method to determine the adenosine dose.  Example XIII speculates that the resulting dose "should lie" in the range of 10-150 mcg/kg/min, but this is not a disclosure of actual doses. If disclosure of a range encompassing some useable doses were sufficient to render the invention obvious, dose titration in the range of 10-320 mcg/kg/min was disclosed in the Creighton Protocol, which would suffice to remove the range disclosure of Example XIII from the prior art. (TX-57 at 4; Wackers 1009:21-1010:11.)

element to remove the reference. *Stempel*, 241 F.2d at 759. Indeed, cases following *Stempel* have made clear that when the inventor's proof of prior invention shows possession of less than the final claimed invention, the only requirement is that the reference itself and the corresponding evidence of prior invention be sufficient to render the final claimed invention obvious. *In re Stryker*, 435 F.2d 1340, 1341 (C.C.P.A. 1971) ("In the case before us the differences between the claimed invention and the reference disclosure are so small as to render the claims obvious over the reference."); *In re Spiller*, 500 F.2d 1170, 1176 (C.C.P.A. 1974).

Thus, under the proper legal standard, Sicor's contention that Example XIII of the '296 patent constitutes prior art to the asserted claims of the '877 patent must fail. If, as Sicor contends, the disclosure of Example XIII is sufficient to render the asserted claims obvious, then the inventor's prior possession of as much as is taught in Example XIII is sufficient to antedate the reference. Conversely, if the disclosure of Example XIII does not render the claims obvious, the corresponding evidence of prior invention might fail, but so too must Sicor's assertion of invalidity.

It is Sicor that bears the burden of proving, by clear and convincing evidence, that Drs. Hilleman and Mohiuddin *did not* already possess as much of the invention as was disclosed in Example XIII prior to its filing date. *See Mahurkar*, 79 F.3d at 1578 ("With all of the evidence from both sides before the jury, [Defendant] must persuade the jury by clear and convincing evidence that its version of the facts is true. In other words, [Defendant] must persuade the jury that [the Patentee] did not invent prior to the publication of the [prior art] catalog."). In an attempt to meet that burden, Sicor contends, contrary to the weight of the evidence, that the Creighton Protocol did not describe a dose range for patients, as opposed to normal volunteers. (DB 3.) However, the protocol itself makes clear that the inventors intended that the

34

comparative study on patients use the same adenosine dose titration regimen as the normal

volunteer study.  (Mohiuddin 1872:19-1873:3.)  This intent was implicit in that the protocol for

the comparative study was adjacent to and repeatedly referenced the normal volunteer study.

(*See* TX-57 at AST0001048; Hilleman 2171:17-2172:8.)  Further demonstrating that one of

ordinary skill would have understood that the dosing of normal volunteers would ultimately be

applied to patients, neither the Creighton Institutional Review Board nor the FDA objected to the

patient protocol as lacking a dosing scheme.  (Hilleman 2171:17-2172:8; TX-54; TX-60; *see also*

Wackers 976:4-10.)  Neither institution responsible for ensuring patient safety would have

allowed a clinical trial to proceed with no dosing guidelines.[12]

### B.    Even if Example XIII is Prior Art, the '296 Patent Does Not Anticipate or Render Obvious Claim 23(18)

Even if Example XIII of the '296 patent were considered to be prior art, the '296 patent

would not anticipate or render obvious the subject matter of claim 23(18) of the '877 patent

because that claim is limited to a dose of about 140 micrograms per kilogram per minute, which

is not disclosed in the Example.  Sicor contends that claim 23(18) is anticipated because

Example XIII discloses titrating each dose individually, and that such a titration "effectively

disclos[es] each dose within the range of 10 to 150 mcg/kg/min."  (DB 35.)  Specifically, Sicor

relies on the idea that a "very small" genus can be a disclosure of every species within the genus,

to suggest that the 140 dose is disclosed in Example XIII of the '296 patent.  (DB 35) (citing

*Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006)).

---

[12]  Sicor does not challenge Plaintiffs' evidence of diligence in reducing the claimed invention to practice.  Indeed, Defendants' chose not to offer any rebuttal testimony to Dr. Wackers' opinion that the inventors showed "remarkable" diligence in carrying out their trial of the claimed methods.  (*See* Wackers 983:9-20.)

The flaw in Sicor's reasoning lies in its characterization of the disclosure of Example XIII as a "very small" genus. A numerical range, by definition, discloses an essentially infinite number of numerical possibilities. In *Atofina*, for example, the Federal Circuit held that "[a] temperature range of over 100 degrees is not a small genus" and determined that neither a temperature range of 100 to 500 $^o$C nor a narrower preferred range of 330 to 450 $^o$C constituted a disclosure that would anticipate every temperature within the range. *Atofina*, 441 F.3d at 999. Sicor fails to explain how the disclosure in Example XIII of individual, case-by-case dose titrations paired with a statement that the dose "should lie" within a broad dose range of 10 to 150 mcg/kg/min differs from the disclosure in *Atofina* so as to justify a different result. Tests in the prior art showed that many normal volunteers (who were plainly healthier than patients who were undergoing myocardial imaging with pharmacological stress), could not tolerate doses in excess of 100 mcg/kg/min. (*See, e.g.*, TX-220; DTX-2017.) There is no evidence in the record that a dose as low as 10 mg/kg/min would work at all. Thus, far from being a "very small" genus of similar doses, the disclosure in Example XIII constituted a wide variety of choices encompassing significant functional differences.

Moreover, as set forth in § II.B.2., *supra*, the testimony of Sicor's expert, Dr. Strauss, established that the dose titration set forth in Example XIII carried out to the point where side effects were mild or just beginning would *not* lead to a dose of 140 mcg/kg/min. Consequently, there is no basis for concluding that the teaching in Example XIII would constitute an anticipating disclosure of a dose of 140 mcg/kg/min.

Sicor further contends that Example XIII renders claim 23(18) obvious, contending that there is a "presumption" of obviousness where a claimed range overlaps with a range disclosed in the prior art. (DB 36) (citing *Ormco Corp.* v. *Align Tech.*, 463 F.3d 1299 (Fed. Cir. 2006)).

36

The law is clear, however, that even if such a presumption existed, the "presumption can be rebutted if it can be shown that the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results. *Ormco*, 463 F.3d at 1311. Here, any such presumption is clearly overcome by Dr. Strauss's unequivocal testimony, which shows that mere titration would *not* have led to the claimed 140 mcg/kg/min dose, but to a lower one with fewer side effects. (Strauss 850:11-23, 850:24-851:5.) Moreover, as discussed *supra* at § II.B.1., later data plainly showed what could not have been predicted from the prior art – that despite expectations that lower doses would be necessary, in fact, the higher 140 mcg/kg/min dose was needed to assure reliable myocardial imaging with sustained maximal coronary vasodilation.

### C.    The Karolinska Request Is Not Prior Art and Teaches Away from Claim 23(18)

The Karolinska Request, submitted to the Ethics Board of the Karolinska Institute in Stockholm, Sweden, purports to represent Dr. Sollevi's actual proposal for testing the use of adenosine in conjunction with MPI. (TX-1193; Strauss 755:6-14; Wackers 961:13-24.) Sicor suggests that the Karolinska Request anticipated and/or would have rendered obvious claims 23(17) and 43 but apparently concedes that Dr. Sollevi's proposed adenosine dose of 60 mcg/kg/min would neither anticipate nor render obvious the 140 mcg/kg/min dose in claim 23(18). (*See* DB 36.) Indeed, the suggestion to use a 60 mcg/kg/min dose in order to avoid any palpable side effects squarely teaches away from the much higher dose in claim 23(18). (TX-1193 at SIC010942, SIC010944.)

As explained in Plaintiffs' Opening Post-Trial Brief, Sicor failed at trial to offer *any* foundational testimony concerning the Karolinska Request, much less prove by clear and convincing evidence that the request is a "printed publication" under 35 U.S.C. § 102(a) and,

therefore, prior art.  (PB 39-40.)[13]  Not surprisingly, Sicor also failed to address the issue in any

of its Post Trial Brief, Findings of Fact, or Conclusions of Law.  Accordingly, Sicor has not

proven that the Karolinska Request was sufficiently indexed to constitute a "printed publication"

under U.S. law and has thus failed to carry its burden in proving that the Karolinska Request is

prior art.  *See Norian Corp. v. Stryker Corp.,* 363 F.3d 1321, 1330 (Fed. Cir. 2004); *see also*

*Mahurkar* 79 F.3d at 1576 ("By challenging the validity of [the patent], [the challenger] bore the

burden of persuasion by clear and convincing evidence on all issues relating to the status of the

Cook catalog as prior art.") (citations omitted).  Indeed, Sicor failed to offer sufficient

foundational evidence regarding the Karolinska Request to overcome objections to its

admissibility on authenticity and hearsay grounds.  (Objections at 1364:14-18.)

## IV.    CONCLUSION

For the foregoing reasons, Sicor has failed to prove by clear and convincing evidence that

the asserted claims of the '877 patent are invalid.  Plaintiffs respectfully request, therefore, that

judgment in their favor be entered.

---

[13]  Mere "knowledge," even "public knowledge," outside the United States is not prior art under 35 U.S.C. § 102(a).  For the Karolinska Request to be cognizable as prior art under the U.S. patent law, it would have to qualify as a "printed publication."

Dated:  June 19, 2007


    /s/ Mary B. Matterer                                    /s/ Paul E. Crawford
Richard K. Herrmann #405                    Paul E. Crawford #493
Mary B. Matterer #2696                        Patricia Smink Rogowski #2632
MORRIS JAMES LLP                            CONNOLLY BOVE LODGE & HUTZ LLP
500 Delaware Avenue, Suite 1500          1007 North Orange Street
Wilmington, DE  19801                          Wilmington, DE  19801
(302) 888-6800                                      (302) 658-9141
mmatterer@morrisjames.com                progowski@cblh.com


Charles E. Lipsey                                  F. Dominic Cerrito
FINNEGAN, HENDERSON, FARABOW,       Brian Poissant
   GARRETT & DUNNER, LLP                 JONES DAY
Two Freedom Square                            222 E. 41st Street
11955 Freedom Drive                           New York, NY  10017
Reston, VA 20190-5675                         (212) 326-3939
(571) 203-2700
                                                           *Attorneys for Plaintiff*
Susan H. Griffen                                  *King Pharmaceuticals Research and*
David P. Frazier                                   *Development, Inc.*
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*