## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KING PHARMACEUTICALS RESEARCH )
AND DEVELOPMENT, INC., ASTELLAS US )
LLC, and ASTELLAS PHARMA US, INC. )
                                             )
                       Plaintiffs, )
                                             )
              v. )     Civil Action No. 05-337 SLR
                                             )
SICOR INC. and SICOR )
PHARMACEUTICALS, INC. )
                                             )
                     Defendants. )

## PLAINTIFFS' COUNTERFINDINGS OF FACT
## AND COUNTERCONCLUSIONS OF LAW

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C. 20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research*
*and Development, Inc.*

## <u>TABLE OF CONTENTS</u>

Page

I.  PLAINTIFF'S PROPOSED COUNTERFINDINGS TO DEFENDANTS'
    PROPOSED FINDINGS OF FACT ..................................................................1

   A.  Counterfindings Regarding the '877 Patent.................................................2

   B.  Counterfindings Regarding Obviousness ...................................................3

       1.  Counterfindings Regarding Level of Ordinary Skill In the Art..................3

       2.  Counterfindings Regarding Scope and Content of the Prior Art ...............3

       3.  Counterfindings Regarding Use of Adenosine In Place of
           Dipyridamole ..........................................................................31

       4.  Counterfindings Regarding Expectations That Adenosine Would
           Work For MPI...........................................................................35

       5.  Counterfindings Regarding Differences Between the Asserted
           Claims and the Prior Art .............................................................41

       6.  Counterfindings Regarding Secondary Indicia.....................................43

   C.  Counterfindings Regarding the '296 Patent and the Karolinska Request.............66

       1.  Counterfindings Regarding Whether the '296 Patent and the
           Karolinska Request Are Prior Art...................................................66

       2.  Additional Counterfindings Regarding the '296 Patent...........................70

       3.  Additional Counterfindings Regarding the Karolinska Request ...............72

II. PLAINTIFFS' PROPOSED COUNTERCONCLUSIONS OF LAW ............................72

   A.  Counterconclusions Regarding Obviousness...........................................72

       1.  Counterconclusions Regarding the Law Of Obviousness ........................72

       2.  Counterconclusions Regarding the Scope of the Prior Art.......................82

       3.  Counterconclusions Regarding the Combination of Either Gould
           1978 Or Albro and Sollevi 1986....................................................83

       4.  Counterconclusions Regarding the Combination of Either Gould
           1978 Or Albro and Biaggioni 1986 ................................................87

       5.  Counterconclusions Regarding Either Gould 1978 Or Albro In
           Light of "Knowledge In Art"..................................................88

   B.  Counterconclusions Regarding Anticipation ...........................................91

       1.  Counterconclusions Regarding Legal Standard....................................91

       2.  Counterconclusions Regarding the '296 Patent...................................92

       3.  Counterconclusions Regarding the Karolinska Request...........................95

III. CONCLUSION.........................................................................97

## I.     PLAINTIFFS' PROPOSED COUNTERFINDINGS TO DEFENDANTS' PROPOSED FINDINGS OF FACT

As an aid to the Court, Plaintiffs have prepared responses and counterfindings with an emphasis on issues believed to be most pertinent to this case.  Each response and counterfinding is in bold text immediately following the finding to which it pertains.  While each response and counterfinding indicates specific reasons for Plaintiffs' disagreement with Sicor's proposed finding, such responses and counterfindings do not necessarily encompass all of the bases for Plaintiffs' disagreement.  Moreover, the absence of a response or counterfinding to any specific proposed finding or part thereof does not constitute an admission that Plaintiffs agree with or concede that the proposed finding or any part thereof is correct as stated.

As an aid to the Court, Plaintffs provide the following glossary of abbreviations used herein to refer to the various post-trial filings:

- ▪ "PB" refers to Plaintiffs' Opening Post Trial Brief, as filed on May 9, 2007, (D.I. 145);

- ▪ "DB" refers to Defendants Sicor's Post-Trial Brief, as filed on May 9, 2007, (D.I. 143);

- ▪ "POB" refers to Plaintiffs' Opposition to Defendants' Post Trial Brief, as filed on June 19, 2007;

- ▪ "PFF" refers to Plaintiffs' Proposed Findings of Fact, as filed on May 9, 2007, (D.I. 146);

- ▪ "DFF" refers to Defendants' Proposed Findings of Fact, as filed on May 16, 2007, (D.I. 148);

- ▪ "PCF" refers to Plaintiffs' Counterfindings of Fact corresponding to the DFF of the same number, as filed on June 19, 2007;

- ▪ "PCL" refers to Plaintiffs' Proposed Conclusions of Law, as filed on May 9, 2007, (D.I. 146);

- ▪ "DCL" refers to Defendants' Proposed Conclusions of Law, as filed on May 16, 2007, (D.I. 148); and

- ▪ "PCC" refers to Plaintiffs' Counterconclusions of Law corresponding to the DCL of the same number, as filed on June 19, 2007.

### A.    Counterfindings Regarding the '877 Patent

DFF16.        The '877 patent relates to use of the adenosine, and adenosine derivatives and analogues, as pharmacologic stress agents in connection with MPI.  (Strauss, Tr.642:17-643:2; TX 320.)

**PCF16.        The asserted claims of the '877 patent relate to methods for using adenosine in connection with diagnostic coronary imaging.  (TX-320.)**

DFF18.        The '877 patent includes 47 claims.  (TX 320.)  At trial, Plaintiffs asserted three claims:  claim 23 as read through claim 17 ("claim 23(17)"); claim 23 as read through claim 18 ("claim 23(18)"); and claim 43.  (Tr. 600:7-13.)

**PCF18.        The '877 patent includes 47 claims, some of which are multiply dependent claims.  (TX-320.)  At trial, Plaintiffs asserted three claims:  claim 23 as read through claim 17 ("claim 23(17)"); claim 23 as read through claim 18 ("claim 23(18)"); and claim 43.  (Tr. 600:7-13.)**

DFF25.        On its face, the priority date of the '877 patent is August 11, 1988.  The priority date of the '877 patent is no earlier than March 14, 1988.  (Wackers, Tr. 1010:12-23, 1012:2-5, 1013:1-12, 1015:23-1016:1.)

**RESPONSE:  Reference to the term "priority date" in the proposed finding is inaccurate.  The August 11, 1988 date is the effective filing date of the '877 patent under 35 U.S.C. § 120.  Plaintiffs contend that Example XIII of the '296 patent is removed as prior art, as demonstrated by a prior possession of as much of the claimed invention as Example XIII happens to show.  Plaintiffs have demonstrated prior possession as of a date no later than December 9, 1987, when the Creighton Protocols were filed with the FDA.  (*See* TX-57; PFF83-84, 136-146; PB at 37-39.).   Accordingly, the following counterfinding is proposed:**

**PCF25.        The effective filing date of the '877 patent under 35 U.S.C. § 120 is August 11, 1988.  (D.I. 133, Ex. 1, ¶ 8; TX-320.)  Plaintiffs also proved that the inventors of the '877 patent were in possession of as much of the claimed invention as was disclosed by**

Example XIII of the '296 patent by at least December 9, 1987, and proceeded diligently

thereafter to actually and constructively reduce that subject matter to practice.  (*See*

**PFF137-146; PCL54-55.**)

DFF26.        The named inventors had not conceived of using a dose of adenosine in
the range of 20-200 mcg/kg/minute prior until at least March 14, 1988.  (Wackers, Tr.
1010:12-15, 1013:1-12, 1015:23-1016:1; *see also* TX 57.)

**RESPONSE:  The requested finding is irrelevant because Example XIII of the '296**

**patent does not describe a specific adenosine dose for conducting myocardial perfusion**

**imaging in heart patients, describing only the case-by-case determination of such doses by**

**titration.  (*See* PCF25; PCL53-56; *see also* PCF230.)**

DFF27.        The named inventors had not conceived of using a dose of 140
mcg/kg/minute until at least March 14, 1988.  (Wackers, Tr. 1010:16-18, 1012:2-5, 1015:23-
1016:1; *see also* TX 57.)

**PCF27.        *See* Response to DFF26 and PCF25; *see also* PCF230.**

**B.        Counterfindings Regarding Obviousness**

**1.        Counterfindings Regarding Level of Ordinary Skill In the Art**

DFF29.        A person of ordinary skill in the art at the relevant time would have been a
practicing physician who either was trained in cardiology, with additional training in nuclear
cardiology, or was trained in nuclear medicine, with additional training in cardiology.  (Strauss,
Tr. 646:4-14; Wackers, Tr. 898:15-20.)

**PCF29.        Both parties' experts essentially agreed on the educational**

**qualifications of the person of ordinary skill in the art:  a physician trained in cardiology**

**with an additional 1-2 years training in nuclear cardiology, or a physician trained in**

**nuclear medicine with at least 1 year of additional training in nuclear cardiology.  (Strauss**

**646:4-14; Wackers 898:15-899:1, 899:7-11.)**

**2.        Counterfindings Regarding Scope and Content of the Prior Art**

DFF32.        Dr. Wackers did not dispute the relevance of any of the other references
on which Dr. Strauss relied in his obviousness analysis.  (Wackers, Tr. 900:21-24.)

**RESPONSE: The cited testimony of Dr. Wackers does not indicate that he considered each of the references considered by Dr. Strauss "relevant." The cited testimony merely indicates that Dr. Wackers considered each reference raised by Dr. Strauss and included it in his report. (Wackers 900:21-24.)**

DFF33.        Several of the references on which Dr. Strauss relied in his analysis, such as 1984 Sollevi reference, *Controlled Hypotension with Adenosine in Cerebral Aneurysm Surgery* ("Sollevi 1984," TX 112); the 1987 Owall reference, *Clinical Experience with Adenosine for Controlled Hypotension during Cerebral Aneurysm Surgery* ("Owall," TX 1169); and the 1987 Fuller reference, *Circulatory and respiratory effects of infused adenosine in conscious man* ("Fuller," TX 1208), were identified by the inventors in the references section of their own study Protocol. (TX 57 at 9-10.)

**RESPONSE: DFF33 is irrelevant given that there is no allegation of inequitable conduct in this case. If proffered on the issue of obviousness, the finding improperly suggests that the inventors' thought processes can be used to establish obviousness. Thus, the following counterfinding is proposed:**

**PCF33.        The inventor's subjective consideration of the prior art is irrelevant to an obviousness analysis, as "[p]atentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103(a).**

DFF34.        Named inventor Dr. Hilleman testified that his general practice was to cite articles that are relevant to the research being conducted, and he assumed that he followed his general practice in connection with the Protocol. (Hilleman, Tr. 2128:15-19, 2129:9-23.)

**PCF34.        *See* Response to DFF33 and PCF33.**

DFF35.        Several of the references cited by the inventors in the reference section of their Protocol (TX 57 at 9-10) were not cited during prosecution of the '877 patent (TX 320). These include Albro et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation*, ("Albro", TX 93); Gould et al., *Noninvasive Assessment of Coronary Stenoses by Myocardial Imaging During Pharmacologic Coronary Vasodilatation*, ("Gould 1978", TX 38); Sollevi 1984 (TX 112); Fuller (TX 1208); and Owall (TX 1169) (compare TX 57 at 9-10 with TX 320).

**RESPONSE:** *See* **Response to DFF33.  Regardless of whether or not all of the references cited in the Creighton Protocols (TX-57) were cited during the prosecution of the '877 patent, the references actually relied upon by Sicor were either submitted to the Patent and Trademark Office (PTO), cumulative with references submitted to the PTO, or generally addressed in the '877 patent application.  Thus, the following counterfinding is proposed:**

**PCF35.        The references actually relied upon by Sicor were either submitted to the PTO, cumulative with references submitted to the PTO, or generally addressed in the specification of the '877 patent.  For instance, *Biaggioni 1986* was cited to the PTO and is listed on the face of the '877 patent.  (*See* TX-320.)  Biaggioni 1986 is a normal volunteer study, like many of the references relied on here by Sicor, and was singled out by Sicor in its obviousness contentions.  Moreover, WO87/01593, a PCT publication authored by Dr. Sollevi, is also listed on the face of the '877 patent.  (*See* TX-320; TX-311.)  This PCT publication (1) discloses the use of adenosine for surgical hypotension; (2) discloses the information from Dr. Sollevi's hypotension studies upon which Sicor here relies; and (3) corresponds to the '296 patent without Example XIII.  (*See* TX-311; Strauss 837:7-16.)  Moreover, dipyridamole imaging, the subject of the *Gould 1978* (TX-38) and *Albro* (TX-93) references, was discussed in the specification of the '877 patent itself.  (*See* TX-320 at col. 1, ll. 34-40, cols. 4-5 (Example I), col. 7, ll. 19-32.)  The Examiner nonetheless found the claims allowable.  If a patent challenger alleges invalidity based on prior art the PTO considered during prosecution of the patent, that challenger has the "added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job."  *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.,* 204 F.3d 1360, 1367 (Fed. Cir. 2000).**

DFF41.        Gould 1978 describes the clinical feasability and methodology of performing MPI by continuous infusion of a pharmacological stress agent.  (Strauss, Tr. 663:10-664:4; TX 38 at 279.)

**PCF41.**        ***Gould 1978* does not describe the feasibility of human pharmacologic MPI using anything other than intravenous dipyridamole as a pharmacologic stress agent. *Gould 1978* stated that the use of more potent vasodilators could risk inducing ischemia or myocardial steal, depriving the heart of needed oxygen.  (TX-38 at 285; Wackers 905:6-19; PFF46, 47.)  In the preceding article in the same journal, Dr. Gould and his colleagues explained that an appropriate pharmacologic stress agent must be "selective for the coronary arteries," have "insignificant systemic effects," and have "an effect for at least 3 minutes until thallium-201 is removed from the systemic circulation." (TX-391 at 275.) Adenosine did not fit this profile, as it was associated with systemic hypotension, was known to cause AV block, was associated with ischemia, and had an extremely short duration of effect.  (*See, e.g*., TX-36 at 1254; TX-217 at 430; Strauss 790:3-791:3; Wackers 909:9-910:17.)**

DFF44.        Gould 1978 further describes injection of thallium-201 after completion of the dipyridamole infusion, and the use of a gamma camera to obtain scintigraphic images. (Strauss 662:17-22, 664:23-665:2; TX 38 at 280-81.)

**RESPONSE:  The proposed finding incorrectly suggests that the tracer in the technique of *Gould 1978* is infused immediately upon completion of the dipyridamole infusion.  In fact, the tracer in that protocol is introduced no earlier than 4 minutes *after* completion of the dipyridamole infusion.  (TX-38 at 280.)  Because the effect of adenosine would be gone 4 minutes after completion of the infusion due to adenosine's exceptionally short half-life, it would not be possible to substitute adenosine for dipyridamole in the pharmacologic MPI protocol described in *Gould 1978*.  (TX-45 at 418; Strauss 837:20-839:7.)  Accordingly, the following counterfinding is proposed:**

**PCF44.**        ***Gould 1978*** **(TX-38) described injection of a thallium-201 tracer no earlier than 4 minutes after completion of the dipyridamole infusion, and the use of a gamma camera to obtain scintigraphic images.  (Strauss 662:17-22, 664:23-665:2; TX-38 at 280-81.)  Because of adenosine's extremely short half-life, whereby its effects would no longer be present 4 or more minutes after infusion, adenosine could not be substituted for dipyridamole in the *Gould 1978* protocol.  (TX-45 at 418; Strauss 837:20-839:7.)**

DFF46.        Gould 1978 discusses an earlier study that reported changes in coronary blood flow from dipyridamole infusion in 28 patients.  According to Gould 1978, the average increase in coronary flow shown in the study was four times baseline control values.  However, there was a "wide standard deviation" because three of the 28 patients showed an increase of less than three times baseline blood flow.  (TX 38 at 284: *see also* Strauss, Tr. 663:10-20.)

**PCF46.**        ***Gould 1978*** **reported that dipyridamole had a "potent, selective" effect on the coronary arteries, increasing coronary flow four hundred percent (400%) over baseline levels.  (TX-38 at 279, 284; Wackers 924:3-6.)  The diagnostic reliability of MPI images obtained with a 400% increase in blood flow was reported to compare favorably with the results of exercise stress tests.  (*See* TX-38 at 279, 284.)  It is irrelevant that three of the 28 patients showed an increase of less than three times baseline blood flow, except to suggest that coronary blood flow measurements should not be based on very small sample sizes, such as the single patient measured in *Sollevi 1986*.  (*See* TX-1171 at 335; Wackers 923:20-23.)**

DFF47.        Gould 1978 describes the safe and effective continuous intravenous infusion of a pharmacologic stress agent to patients, in order to cause vasodilatation and the resultant increased blood flow, for purposes of using MPI as a diagnostic tool.  (Strauss, Tr. 663:10-20, 664:5-12, 665:21-666:7; TX 38 at 279.)

**PCF47.**        ***See*** **PCF41, 46.**

DFF50.        Albro demonstrated that pharmacologic coronary vasodilatation is as effective as treadmill exercise in creating myocardial perfusion abnormalities detectable with thallium-201 imaging in humans.  (Strauss, Tr. 667:15-22; TX 93 at 751.)  Albro states:

> However, sensitivity and specificity in identifying significant coronary stenoses were identical for dipyridamole and exercise images.

(TX 93 at 759.)

**PCF50.**    ***Albro* taught that diagnostically-reliable MPI images could be obtained after pharmacologic inducement of a 400% increase in coronary flow but does not describe the feasibility of human pharmacologic MPI using anything other than intravenous dipyridamole as a pharmacologic stress agent.  (TX-93.)  *Albro* nowhere taught, suggested, or even mentioned the possibility of direct administration of adenosine instead of dipyridamole.  (TX-93; Wackers 907:18-908:18.)**

DFF51.    Prior to 1987, the mechanism of dipyridamole was known in the art. (Wackers, Tr. 908:19-24.)

**PCF51.**    **As reflected in the quotations reproduced in DFF53 and DFF56, it had been reported in the literature that dipyridamole "may" induce coronary vasodilation by several different mechanisms.  One proposed mechanism was prevention of inactivation of endogenous adenosine.**

DFF52.    Albro describes the mechanism of dipyridamole as preventing the inactivation of adenosine by adenosine deaminase in the red blood cells and the lung and myocardial tissues, leading to an increase in endogenous adenosine.  (Strauss, Tr. 669:10-670:1; TX 93 at 758-59.)

**PCF52.**    ***See* PCF51.**

DFF53.    Specifically, Albro states that:

> Dipyridamole may induce coronary vasodilatation by several mechanisms. Adenosine, a product of adenine nucleotide utilization in myocardial tissue, has vasodilator activity and has been proposed as a coronary vasoregulator. Dipyridamole prevents inactivation of adenosine by adenosine deaminase in the red blood cells and lung and myocardial tissues, either by inhibiting adenosine deaminase or by preventing the uptake of adenosine into these tissues.

(TX 93 at 758.)

PCF53.    *See* PCF51.

DFF54.    A person of ordinary skill in the art at the time would understand from this portion of Albro that "if dipyridamole is selected as the vasodilator, that the effector drug, if you will, is adenosine . . . ." (Strauss, Tr. 670:12-18.)

**PCF54.    The "drug" used for human pharmacologic MPI in the prior art was exogenously-administered dipyridamole, not exogenously-administered adenosine.  No one considered adenosine as a realistic substitute for dipyridamole because adenosine was viewed as too dangerous.  (*See, e.g.*, TX-46; TX-47; Strauss 803:11-804:8, 805:23-806:8.) For example, Dr. Melvin Marcus, acknowledged by Sicor as an expert in the field, wrote in a well-regarded treatise in 1983 that intravenous administration of adenosine into animals caused "marked systemic hypotension and reflex tachycardia [abnormally rapid heart beat]."  (TX-217 at 430; Strauss 799:19-800:2; Wackers 909:9-910:25.)  Dr. Marcus stressed that "[b]ecause of the hypotensive effects of adenosine, it is not utilized clinically to produce maximal coronary dilation."  (TX-217 at 430; Wackers 909:19-910:7.)  Even Sicor's technical expert acknowledged that hypotension was "undesirable" during MPI. (Strauss 799:9-13.)  Indeed, the art as a whole taught away from the use of adenosine as a pharmacologic stress agent.  (PFF50-53.)**

DFF55.    The 1985 edition the textbook of pharmacology commonly used by students and physicians in 1985, Goodman and Gilman, states that dipyridamole acts, at least in part, through the metabolism and transport of adenosine and adenosine nucleotides.  In particular, dipyridamole inhibits the uptake of adenosine by erythrocytes and other cells.  (Strauss, Tr. 679:16-680:7; TX 39 at 822.)

PCF55.    *See* PCF51.

DFF56.    Goodman and Gilman states of dipyridamole:

> The actions of dipyridamole seem to be linked, at least in part, to the metabolism and transport of adenosine and adenine nucleotides; in particular, dipyridamole inhibits the uptake of adenosine by erythrocytes and other cells.  Adenosine, which is released from the hypoxic

> myocardium, is a coronary vasodilator and appears to be an important
> signal for the autoregulation of coronary blood flow.

(TX 39 at 822.)

**PCF56.** *See* **PCF51.**

DFF57.    Based on this portion of Goodman & Gilman, a person of skill in the art at the time would understand that when dipyridamole is infused, it is acting through adenosine to cause vasodilation.  (Strauss, Tr. 680:8-22.)

**PCF57.** *See* **PCF51, 54.**

DFF58.    A March 1987 article entitled, *Cardiovascular effects of infused adenosine in man: potentiation by dipyridamole*, by Conradson et al. ("Conradson"), describes how the cardiovascular effects of dipyridamole in man, at least in part, are mediated by the (sic) potentiation of the cardiovascular actions of the increased endogenous adenosine.  (Strauss, Tr. 682:17-24, 683:8-13; TX 220 at 387.)

**PCF58.** *See* **PCF51.**

DFF59.    Conradson states that:

> Dipyridamole inhibits the cellular update of adenosine which results in a
> potentiation of the cardiovascular actions of adenosine … [t]here is also
> evidence that the cardiovascular effects of dipyridamole in man, at least in
> part, are mediated by endogenous adenosine.

(TX 220 at 387 (internal citations omitted).)

**PCF59.** *See* **PCF51.**

DFF60.    A person of skill in the art would understand from Conradson that dipyridamole acts through adenosine.  (Strauss, Tr. 683:8-13.)

**PCF60.** *See* **PCF51, 54.**

DFF61.    United States Patent No. 5,731,296 (the "'296 patent") states that, "[m]ost data concerning the mechanism of action of dipyridamole's vasodilatory effect in fact support the view that it is solely due to adenosine vasodilation." (TX 275, co1.21, ll.49-51; *see* Strauss, Tr. 684:12-685:2.)

**PCF61.    The cited text of the '296 patent, which is based on material added on December 28, 1987, is not prior art to the '877 patent.  (*See*, *e.g.*, PFF131; *see also* PCF25, 51, 54.)**

10

DFF62.        The statement concerning dipyridamole's mechanism of action, as set forth in the '296 patent, reflects the state of knowledge in the art in 1987.  (Strauss, Tr. 684:12-685:6.)

**PCF62.        _See_ PCF51, 54, 61.**

DFF63.        A 1987 "Patient's Informed Consent" form to be used by Dr. Mario Verani and his group at Baylor College of Medicine in connection with use of adenosine of MPI states that "[a]lthough the drug dipyridamole is used to dilate the coronary vessels, the ultimate substance that effectively causes the vasodilation is called adenosine, which is made available in higher amounts by dipyridamole administration."  (TX 52 at AST0009469.)

**RESPONSE: DFF63 is misleading.  It does not acknowledge that Dr. Mario Verani was working in connection with Medco's IND, based on the work of Drs. Hilleman and Mohiuddin.  Thus, the following counterfinding is proposed:**

**PCF63.        Dr. Mario Verani and his group at Baylor College of Medicine developed a "Patient's Informed Consent" form in connection with Medco's IND after being told of the invention of Drs. Hilleman and Mohiuddin.  (TX-52; Wackers 1022:21-1024:11; Salzberg 1843:5-1844:3.)  Thus, Dr. Verani's protocol is based on the inventors' own work and has not been shown to be prior art.**

DFF64.        By mid-1987, safe doses of adenosine that could be administered by continuous infusion and that would result in vasodilation were known in the art.

**RESPONSE: The studies relied upon by Sicor produced conflicting results regarding tolerable dosing in healthy volunteers, and provided no information about the safety of adenosine infusions in patients with coronary artery disease.  Therefore, the following counterfinding is proposed:**

**PCF64.        While adenosine had been continuously infused previously, it was unknown if there was an effective dose that could be administered safely in MPI.  In fact, rather than addressing the use of adenosine in MPI, the prior art relied upon by Sicor relates to studies in which:  (1) heart patients, the relevant patient population for MPI,**

were systemically excluded; (2) the number of subjects studied was small;

(3) measurements of coronary blood flow (necessary for determining potency) are largely

lacking; (4) no mention was made of MPI; (5) dose-limiting negative side effects were

reported; and (6) the dose at which those side effects were reported to be intolerable to

healthy subjects was as low as 70 mcg/kg/min and varied widely.  (*See generally* DTX-2017;

Strauss 826:24-831:6; TX-48; TX-220; TX-226; TX-1208; TX-1211; PFF 69-76.)  These

studies produced conflicting results regarding tolerable dosing, and provided no

information about the safety of adenosine infusions in patients with coronary artery disease.

(Strauss 826:24-831:6; Wackers 934:21-935:5, 938:19-939:1.)  Further, none of these

studies characterized adenosine as a more potent coronary vasodilator than dipyridamole.

(*See* TX-48; TX-220; TX-226; TX-1208; TX-1211.)

DFF65.        In 1987, pharmaceutical grade adenosine for intravenous administration to humans had only recently become available.  TX52 at AST009465; Tr. 1023:22-1024:4.)  Medco, the original assignee of the '877 patent, was the only source of pharmaceutical grade adenosine at the time.  Tr. 1854:22-1855:16; *see also* Tr., 2119:13-2120:10.)

**RESPONSE:  Contrary to DFF65, adenosine availability was not an impediment to**

**its use or suggestion for use in other applications, as evidenced by the at least 6 separate**

**publications describing work administering adenosine to humans.  (*See* DTX-2016.)  Thus,**

**the following, more accurate, counterfinding is proposed:**

PCF65.        **Adenosine was readily available from several major U.S. and British**

**chemical manufacturers.  For example, DiMarco and coworkers at the University of**

**Virginia and Biaggioni and coworkers at Vanderbilt reported that they purchased their**

**adenosine from Sigma, a U.S. chemical manufacturer, while Fuller and coworkers and**

**Conradson and coworkers reported that they purchased their adenosine from Fluorochem,**

**a British manufacturer.  (*See* TX-36 at 1256; TX-48 at 2233; TX-1208 at 310; TX-1211 at**

526; Strauss 822:7-823:22.)  **Adenosine had been formulated by researchers into forms suitable for administration to humans as far back as 1933.  (TX-187; Strauss 822:2-6;** *see also* **PFF105-108.)**

DFF66.       The ability to obtain adenosine in pharmaceutical grade from Medco was sufficiently valuable that it was the only consideration either named inventor received for assigning all rights to the '877 patent to Medco.  (Tr. 1896:9-18; 1897:9-14; Hilleman, Tr. 2148:5-23.)

**RESPONSE: The proposed finding is unsupported by the evidence.  As Dr. Hillman, explained, no additional consideration was requested by the inventors, and the inventors assigned their rights to Medco following the advice of Creighton University's counsel.  (Hilleman 2148:24-2150:13.)  Thus, the following counterfinding is proposed:**

**PCF66.       The inventors assigned their rights to Medco following the advice of Creighton University's counsel, without requesting any additional consideration from Medco.  (Hilleman 2148:24-2150:13.)  They did so because neither they nor the University were in the business of developing pharmaceutical products.  (Hilleman 2149:18-2150:8.)**

DFF67.       Absent a source of pharmaceutical grade adenosine, anyone wishing to use intravenous adenosine in humans would have to purify chemical grade adenosine and qualify it as suitable for intravenous infusion to humans.  (*See* Strauss, Tr. 671:6-672:16.)

**PCF67.       Sicor's expert, Dr. Strauss, acknowledged that virtually any academic institution was equipped to take chemical grade adenosine and turn it into a pharmaceutical grade drug.  (*See* Strauss 823:23-824:14;** *see also* **PCF65.)  Research groups interested in doing so had done so since 1933.  (DTX-2016;** *see also* **PFF105-109.)**

DFF68.       A November1986 (sic) publication entitled, *Cardioavascular Effects of Adenosine in Man; Possible Clinical Implications*, by Dr. A. Sollevi ("Sollevi 1986") describes infusing adenosine at a rate of 80 mcg/kg/minute.  (TX 1171 at 335.) Sollevi 1986 further states that this infusion rate was associated with a "doubling of the myocardial blood flow."  (Strauss, Tr. 702:21-703:14, 704:3-9; TX 1171 at 335, Fig.11.) Sollevi 1986 also states that "[t]his study is additional evidence for adenosine being an extremely effective coronary vasodilator in man." (TX 1171 at 335).

13

**RESPONSE:  The assertions attributed to Dr. Strauss in DFF68 regarding a doubling in coronary blood flow were not in his expert reports and should, therefore, be excluded.  (Objection at 707:9-11; TX-70; TX-246.)  The contention is also without merit, and thus, the following counterfinding is proposed:**

**PCF68.        Data from *Sollevi 1986* cited by Dr. Strauss represented measurements taken from only a single patient.  (TX-1171 at 335; Wackers 923:20-23.) Moreover, the figure illustrating the data from this patient (Fig. 11), showed that the alleged "doubling" of coronary blood flow was in actuality an increase of only 70% and that this increase was associated with a reduction of blood pressure (hypotension) of about 20%.  (TX-1171 at 335; Wackers 923:24-924:2.)  In contrast, *Gould 1978* had previously reported that the dipyridamole dose used for diagnostically-reliable myocardial imaging produced a 400% increase in blood flow with little to no decrease in blood pressure. (TX-38 at 284, Fig. 8; Wackers 924:3-17.)  Systemic effects like the hypotension described in *Sollevi 1986* are antithetical to the requirements for MPI.  (TX-391 at 275; Wackers 910:8-17, 922:7-9; Strauss 805:23-809:14.)  Thus, the results from this single patient would have confirmed what had already been described by Dr. Sollevi, that adenosine was a potent vasodilator that caused significant systemic effects at doses below what would be required for diagnostically-reliable myocardial perfusion imaging.  (TX-1171 at 335; Wackers 923:24-924:17.)**

DFF69.        Sollevi 1986 states that a dose of 30-50 mcg/kg/minute caused a 100 percent increase in graft flow.  (Strauss, Tr. 704:22-705:5; TX 1171 at 335.)  Sollevi 1986 further states that the "data demonstrate that intravenously administered adenosine can produce preferential coronary vasodilation in man." (TX 1171 at 335; *see also* Strauss, Tr. 704:22-705:5.)

**RESPONSE:  The assertions of Dr. Strauss on which DFF69 is premised were not in his expert reports and should, therefore, be excluded.  (Objection at 707:9-11; TX-70;**

TX-246.)  In addition to being untimely, they are unmeritorious.  Therefore, the following counterfinding is proposed:

**PCF69.**        **The 30-50 mcg/kg/min adenosine infusion in *Sollevi 1986* described testing surgical grafts in anesthetized, open-chest heart patients prior to closure of the thorax.  This testing represented a form of surgical "quality control"—a context that is "totally different" from MPI.  (*See* TX-1171 at 335; Wackers 926:5-24.)  The degree of increased coronary blood flow attained in this experiment was well below the 400% increase reported in *Gould 1978* (TX-38 at 284) to yield diagnostically-reliable MPI images with dipyridamole.  (TX-1171 at 355; Wackers 925:7-926:4; PCF68.)  Thus, the statement plainly does not suggest the appropriateness of higher doses of adenosine for MPI where systemic effects, such as hypotension, would have been expected.**

DFF70.        Sollevi 1986 describes adenosine infusion doses greater than 200 mcg/kg/minute as inducing controlled hypotension in anesthetized patients.  (Strauss, Tr. 701:4-9; TX 1171 at 333.)

**PCF70.**        ***Sollevi 1986* states that adenosine induced an "extremely rapid" fall in blood pressure, mediated by "a profound decrease in the systemic vascular resistance." (TX-1171 at 332.)  Plaintiffs' and Defendants' experts agree that producing profound systemic hypotension was undesirable for MPI.  (Strauss 768:22-769:2; Wackers 910:8-17, 922:7-9.)  Systemic blood pressure reduction is said elsewhere in *Sollevi 1986* to result from doses as low as 150 mcg/kg/min and is explicitly reported at a dose of 80 mcg/kg/min.  (*See* PCF68, 69, 73.)**

DFF71.        Sollevi 1986 did not report any instances of AV block in connection to the doses required to produce controlled hypotension.  (Strauss, Tr. 702:2-6; TX 1171.)

**PCF71.**        ***Sollevi 1986* (TX 1171) is a review article based on references that not only lacked any systematic study of patients with coronary artery disease but generally**

**excluded or expressly cautioned against the administration of adenosine infusions to such**

**patients. (Wackers 921:5-931:6.) In fact, a later publication co-authored by Dr. Sollevi,**

*Owall 1987*, **reported that heart block began in such patients at adenosine doses as low as**

**140 mcg/kg/min. (TX-1169 at 231.) Moreover,** *Owall 1987* **reported that two patients with**

**a past history of myocardial infarction 9 and 13 years before the surgery both experienced**

**side effects from the adenosine infusion requiring medical intervention. (TX-1169 at 229;**

**Wackers 927:16-928:3.)**

DFF72.        The summary chart at the conclusion of Sollevi 1986 states that a property of the "low dose" of 20-50 mcg/kg/minute of adenosine is "preferential myocardial vasodilation." (TX 1171 at 345, Table 6.)

**PCF72.        The summary chart, entitled, "Some Tentative Therapeutic**

**Properties of Adenosine Administration" (TX-1171 at 345), is completely silent on the**

**magnitude of the alleged preferential myocardial vasodilation, and does not teach or**

**suggest that sufficient coronary vasodilation for diagnostically-reliable human MPI,**

**reported as being a 400% increase (TX-38 at 279, 284; Wackers 924:3-6), was obtained at**

**the 20-50 mcg/kg/min level. Indeed, it is reported elsewhere in** *Sollevi 1986* **that an even**

**higher dose of 80 mcg/kg/min produced only a 70% increase in coronary blood flow.**

**(TX-1171 at 335; s***ee* **PCF68.)**

DFF73.        The summary chart at the conclusion of Sollevi 1986 also describes a "mean dose" of 50-150 mcg/kg/minute and a "high dose" of 150-350 mcg/kg/min. (TX 1171 at 345, Table 6.)

**PCF73.        *Sollevi 1986*, Table 6, indicates that the high dose of 150-350**

**mcg/kg/min was used during the administration of anesthesia. Table 6 also indicates that**

**hypotension is associated with these doses. (TX-1171 at 345, Table 6.) However, systemic**

**hypotension should be avoided during MPI. (Strauss 768:22-769:2; Wackers 910:8-17,**

**922:7-9.) Further, the "mean doses" of 50-150 mcg/kg/min are described as useful for**

controlling excessively high blood pressure during surgery—the very type of systemic

blood pressure reduction cautioned against in the contemporaneous MPI literature.  (*See*

TX-1171 at 345; TX-229 at 432; Strauss 813:3-24.)

DFF74.    Sollevi 1986 states that "adenosine may be used in many clinical situations as a vasodilator, antiaggregatory compound as well as an antiarrythmic agent.  Its effect is easy to control due to the extremely short plasma half-life."  (TX 1171 at 345.)

**RESPONSE:  Notably missing from Sicor's proposed finding is any reference to**

**effects of adenosine cited in *Sollevi 1986* that teach away from the use of adenosine in**

**human MPI.  Thus, the following counterfinding is proposed:**

**PCF74.    *Sollevi 1986* described the dramatic decreases in blood pressure that**

**can result from intravenous infusions of adenosine, stating that adenosine induced an**

**"extremely rapid" fall in blood pressure, mediated by "a profound decrease in the systemic**

**vascular resistance."  (TX-1171 at 332.)  As agreed by both parties' experts, systemic**

**hypotension should be avoided during MPI.  (*See* Strauss 768:22-769:2; Wackers 910:8-17,**

**922:7-9.)  The "antiarrythmic" uses referred to involve disruption of electrical signals in**

**the heart and are contraindicated for patients with coronary artery disease.  (PFF52, 55,**

**56.)  Further, despite the recognition of the enormous scientific experience with adenosine**

**and the expressly stated purpose of the article to set forth "possible clinical implications" of**

**adenosine administration, adenosine is nowhere suggested as a candidate pharmacologic**

**stress agent for myocardial perfusion imaging.  (*See* TX-1171; Strauss 774:13-18.)**

DFF75.    A person of ordinary skill in the art would have understood from Sollevi 1986 that there was a range of doses of adenosine from about 20 mcg/kg/min at the low end to about 200 mcg/kg/min at the high end that would cause vasodilation and the related increased blood flow, but would not result in hypotension.  (Strauss, Tr. 708:10-709:12; 705:19-707:2; 747:10-748:13; 748:22-749:20.

**RESPONSE: DFF75 mischaracterizes *Sollevi 1986* ignoring the internally contradictory evidence teaching away from the use of adenosine infusions for MPI. Therefore, the following counterfinding is proposed:**

**PCF75.        Table 6 of *Sollevi 1986* expressly states that the "high dose" range, which includes the range of 150-200 mcg/kg/min, is associated with hypotension, thereby teaching away from the use of this range for myocardial perfusion imaging. (TX-1171 at 345, Table 6; *see also* PCF73.) Furthermore, and again contrary to Sicor's characterization, *Sollevi 1986* indicates that only doses of 30-50 mcg/kg/min would be both non-hypotensive and provide the "preferential" coronary vasodilation believed needed for human MPI. The increase in coronary blood flow attainable with such low doses was well below the 400% increase reported to result in diagnostically-reliable human MPI. (TX-1171 at 335-336; TX-38 at 279, 284; *see* PCF46.)**

DFF78.        Sollevi 1984 describes several advantageous features of adenosine. Specifically, Sollevi 1984 states that "[t]he rapidity of onset and termination, stability of action, maintenance of cardiac output, and decrease in oxygen demand differentiate adenosine from other antihypotensive agents. These excellent properties justify further clinical investigation." (TX 112 at 404.)

**PCF78.        The discussion in *Sollevi 1984b* (TX-112) of any advantageous features is in the context of producing profound hypotension in surgical patients. Hypotension would have been perceived as disadvantageous for a heart patient undergoing a pharmacologic stress test. (*See* TX-112 at 400; Strauss 797:7-21, 768:22-769:2.) Indeed, heart patients were excluded from the *Sollevi 1984b* study. (TX-112 at 400.) The reference does not explicitly or impliedly suggest the use of adenosine as a pharmacologic stress agent for human MPI, particularly at a dose of 140 mcg/kg/min, and does not include any data regarding a safe and efficacious dose for producing maximal coronary vasodilation in**

18

patients with suspected coronary artery disease.  (*See, e.g.*, TX-112; Wackers 921:5-931:6; *see* DTX-2027.)

DFF79.        Sollevi 1984 did not report any instances of AV block.  (Strauss, Tr. 696:2-697:11, 698:13-15.)

**PCF79.        Unlike patients in need of MPI (*see* PFF18, 19), the patients in *Sollevi 1984b* were described as having no known history of cardiopulmonary disease.  (TX-112 at 400; Wackers 922:10-15.)   The report of the results in patients not receiving dipyridamole pretreatment was in a five-line footnote that did not purport to be a complete report of all the study data.  (TX-112 at 403.)  The complete report of the study, *Owall 1987* (TX-1169), described adverse side effects in two patients with a history of heart problems and some AV block beginning at a dose of 140 mcg/kg/min.  (*Id.* at 229, 231.)**

DFF80.        A person of skill in the art would have understood from Sollevi 1984 that continuous intravenous infusion of adenosine would result in a stable state of coronary vasodilatation.  (Strauss, Tr. 699:4-17.)

**RESPONSE: The cited testimony of Dr. Strauss does not support Sicor's proposed finding.  Indeed, the testimony does not make any reference to a stable state (or any other state) of coronary vasodilation.  Further, although omitted in the citation in DFF80, the final sentence of Dr. Strauss's answer states that the patients being infused with adenosine "could not describe all the symptoms because they were anesthetized," thereby recognizing that the adenosine infusions used in *Sollevi 1984b* would not necessarily be tolerable in MPI patients.  (Strauss 699:4-20.)  Therefore, the following counterfinding is proposed:**

**PCF80.        A person of ordinary skill would understand that, according to *Sollevi 1984b*, continuous intravenous infusion of adenosine could be used to decrease blood pressure by forty percent (40%) in patients with no history of cardiopulmonary disease, a drop which Sicor's expert characterized as "quite significant," and which would have been**

highly undesirable in a patient undergoing a pharmacologic stress test.  (*See* TX-112 at

400; Strauss 797:7-21, 768:22-769:2.)

DFF81.    A person of skill in the art would have understood from Sollevi 1984 that
continuous intravenous infusion of adenosine is relatively safe, even at doses exceeding 200
mcg/kg/min.  (Strauss Tr. 699:4-17.)

**PCF81.    *See* PCF80.**

DFF82.    An article by Dr. Owall et al. ("Owall") published in March 1987 entitled,
*Clinical Experience with Adenosine for Controlled Hypotension during Cerebral Aneurysm
Surgery*, describes results from adenosine infusion in a series of 47 anesthetized patients without
pretreatment with dipyridamole.  (Strauss, Tr. 721:8-22; TX 1169.)

**PCF82.    *Owall 1987* described continuous intravenous infusions of adenosine**

**into patients to induce controlled hypotension (TX-1169), a result Plaintiffs' and**

**Defendants' experts agree is undersirable for MPI.  (Strauss 768:22-769:2; Wackers**

**910:8-17, 922:7-9.)**

DFF84.    Owall concludes that "adenosine induces a stable and easily controlled
hypotension without negative effects on cardiac output or acid-base balance in patients
undergoing cerebral aneurysm surgery during neurolept anesthesia." (TX 1169 at 233; *see also*
Strauss, Tr. 724:20-725:11.)

**RESPONSE:  Absent from Sicor's proposed findings regarding *Owall 1987* is any**

**mention that the only two subjects participating in the study who had a history of heart**

**disease experienced significant adverse events that required medical intervention.**

**(TX-1169 at 229, 231; Wackers 927:16-929:17.)  Also missing is any mention that *Owall***

**1987* reported heart block beginning at a dose of 140 mcg/kg/min.  (TX-1169 at 231.)**

**Therefore, the following counterfinding is proposed:**

**PCF84.    In *Owall 1987*, the only two subjects participating in the study who**

**had a history of heart disease experienced significant adverse events that required medical**

**intervention.  (TX-1169 at 229, 231; Wackers 927:16-929:17.)  Based on these results, the**

**authors explicitly cautioned against infusing adenosine into patients with a history of heart**

disease. **(TX-1169 at 233; Wackers 929:18-930:2.)  In addition, *Owall 1987* reported some heart block beginning at doses as low as 140 mcg/kg/min.  (TX-1169 at 231.)**

DFF85.        A person of skill in the art would have understood from Owall that one would need an infusion dose of adenosine of about 200 mcg/kg/minute or more to achieve hypotension and, once the desired result was achieved, one could maintain it for a prolonged period of time.  (Strauss, Tr. 724:20-725:11; TX 1169.)

**PCF85.        *See* Response to DFF84 and PCF84.**

DFF86.        A 1986 publication entitled, *Cardiovascular effects of adenosine infusion in man and their* modulation *by dipyridamole*, by Biaggioni et al.  ("Biaggioni 1986"), describes continuous intravenous infusion of adenosine to seven conscious healthy volunteers at rates of 10, 20, 40, 60, 80, 100 and 140 mcg/kg/min.  (Strauss, Tr. 711:1-14, 712:14-16; TX 48 at 2230.)  Each infusion rate was maintained for 15 minutes.  (Strauss, Tr. 711:9-14; TX 48 at 2230.)

**RESPONSE:  Several key distinctions between *Biaggioni 1986* (TX-48) and the use of adenosine for MPI are not reflected in DFF86.  (*See, e.g.,* DTX-2017.)  Thus, the following, more comprehensive counterfinding is proposed:**

**PCF86.        Two of the seven healthy subjects in *Biaggioni 1986* could not tolerate doses above about 100 mcg/kg/min.  (TX-48; Strauss 826:24-829:5, 831:7-11; DTX-2017.)  *Biaggioni 1986* also did not teach a safe dose for administration to patients with coronary artery disease, as the study specifically excluded such patients.  (Wackers 938:19-939:1.)  The patient population requiring pharmacologic stress imaging, however, was known to suffer from numerous adverse circulatory and coronary conditions.  (TX-168 at 1344; *see also* PFF18, 19.)  In fact, a subsequent publication reported that 50% of over 9,000 patients receiving pharmacologic stress testing had a history of coronary artery disease and nearly 25% of those patients had suffered a heart attack.  (TX-103 at 386; Strauss 835:1-836:1.)  As a result, one cannot determine from *Biaggioni 1986* how cardiac patients would respond to the doses studied.  (Wackers 934:9-20.)  Nor can it be determined from *Biaggioni 1986* whether sufficient coronary vasodilation had been achieved for diagnostically-reliable MPI.**

While Sicor's expert contends that the patients in *Biaggioni 1986* experienced a significant vasodilatory response, such systemic vasodilation would have been contraindicated in a human MPI procedure.  (*See* PCF90.)

DFF87.	The duration of infusion of each dose is significant.  Only a few minutes are needed for MPI, so even the 15 minute duration of one of the doses is longer than would be necessary to perform MPI.  (Strauss, Tr. 711:20-712: 13)

**RESPONSE: Sicor's proposed finding DFF87 is irrelevant to the ultimate issues of whether cardiac patients could tolerate adenosine infusions without experiencing severe side effects and whether diagnostically-reliable MPI images could be attained at the doses they could tolerate.  Indeed, there is no linkage in the prior art between *Biaggioni 1986* and human pharmacologic MPI.  (*See* TX-48.)  Thus, the following counterfinding is proposed:**

**PCF87.	The duration of adenosine infusions into young, healthy, normal volunteers is irrelevant to addressing the questions of whether cardiac patients could tolerate adenosine infusions without experiencing severe side effects and whether diagnostically-reliable MPI images could be attained at doses such patients could tolerate. (*See* PFF74, 75; Strauss 826:24-831:11; Wackers 934:21-935:5, 938:3-939:1.)  Patients that are in need of pharmacological stress imaging are typically more infirm.  (*See* PCF86.)  They are also older, with a mean age of 65.  (TX-103 at 386; Strauss 835:1-11.)  It is well known that age can influence the response to a given pharmaceutical.  (Wackers 934:9-20.)  The doses in *Biaggioni 1986*, for which there is no disclosed medical use (TX-48), are also irrelevant to an effective dose for use in MPI.  (*See* PCF86.)**

DFF88.	Biaggioni 1986 described total adenosine infusions of either 1-1/2 or 1-3/4 hours.  (Strauss, Tr. 711:21-712:13, 717:10-15; see TX 48 at 2230.)

**PCF88.	*See* PCF86, 87.**

DFF89.        Of the seven patients described in Biaggioni 1986, five tolerated a dose of 140 mcg/kg/minute and all patients tolerated a dose of 100 mcg/kg/minute.  (Strauss, Tr. 712:14-713:1; TX 48 at 2231.)

**PCF89.        *See* PCF86, 87.**

DFF90.        According to Biaggioni 1986, the study shows "that adenosine administered by infusion over the range of 60 to 140 μg/kg/min to healthy conscious human subjects, lowers diastolic blood pressure but raises heart rate, systolic blood pressure and levels of plasma norepinephrine."  (TX 48 at 2234; *see* Strauss, Tr. 718:6-16.)

**PCF90.        Sicor's expert alleged that *Biaggioni 1986* indicates that the subjects had a "very significant vasodilation response to the adenosine infusion."  (Strauss 718:6-719:2.)  However, systemic vasodilation, as opposed to vasodilation limited to the coronary circulation, was considered undesirable in the context of diagnostic cardiac imaging and could potentially lead to ischemia and other ill effects. (Wackers 910:8-17, 922:7-9, *see also* PCF86, 87.)**

DFF91.        The increase in systolic blood pressure coupled with the decrease in diastolic blood pressure reported in Biaggioni 1986 indicates that the subjects had a "very significant vasodilation response to the adenosine infusion."  (Strauss, Tr. 718:4-719:2.)

**PCF91.        *See* PCF86, 87, 90.**

DFF93.        A person of ordinary skill in the art would understand from Biaggioni 1986 that adenosine could be safely, continuously infused to conscious humans for extended periods of time at rates up to 140 mcg/kg/min and that the adenosine infusion would cause vasodilation.  (Strauss, Tr. 719:3-18.)

**PCF93.        *See* PCF86, 87, 90.  There is no demonstration in *Biaggioni 1986* of a degree of attainment of a degree of coronary vasodilation sufficient for diagnostically-reliable MPI.**

DFF94.        Conradson, published in March 1987, describes stepwise infusion rates in conscious human subjects of 20 mcg/kg/min to a maximum of 100 mcg/kg/min in eight normal volunteers.  Each dose was administered for six minutes.  (Strauss, Tr. 726:23-727:15; TX 220 at 388.)

**RESPONSE:  Several key distinctions between *Conradson* (TX-220) and the use of adenosine for MPI are not reflected in DFF94.  (*See, e.g.*, DTX-2017.)  Therefore, the following counterfinding is proposed:**

**PCF94.          *Conradson* did not teach a safe adenosine dose for administration to patients with coronary artery disease.  The study was specifically limited to healthy subjects, thereby excluding such heart patients.  (TX-220 at 388; Wackers 938:19-939:1.) The patient population requiring pharmacologic stress imaging was known to be older and to suffer from numerous adverse circulatory and coronary conditions.  (TX-168 at 1344; *see also* PFF18, 19.)  In fact, a subsequent publication reported that 50% of over 9,000 patients receiving pharmacologic stress testing had a history of coronary artery disease and nearly 25% of those patients had suffered a heart attack.  (TX-103 at 386; Strauss 835:1-836:1.)  As a result, one cannot determine from *Conradson* how cardiac patients will respond to the doses studied.  (Wackers 934:9-20.)  It is also impossible to determine from *Conradson* whether sufficient coronary vasodilation had occurred to yield diagnostically-reliable MPI images.  (*See, e.g.*, Wackers 938:3-18; DTX-2017; TX-220.) *Conradson* did not include any measures of coronary blood flow or any mention of MPI, or any other medical use for adenosine.  (TX-220.)  Moreover, *Conradson* reported dose-limiting negative side effects associated with adenosine infusions, and two of the eight healthy subjects could not tolerate doses over 70 mcg/kg/min.  (TX-220; Strauss 829:6-831:11.)**

DFF95.          All eight subjects described Conradson tolerated 70 mcg/kg/min; six of eight tolerated 90 mcg/kg/min; and three of the eight tolerated 100 mcg/kg/min.  (Strauss, Tr. 726:19-727:5; TX 220 at 388.)

**PCF95.          *See* PCF94.**

DFF96.          The duration of the adenosine infusions in Conradson exceeds the time
necessary for MPI.  (Strauss, Tr. 727:13-15.)

**PCF96.          *See* PCF94.**

DFF98.          A person of ordinary skill in the art would understand from Conradson
that adenosine could be safely, continuously infused to conscious humans at rates up to 100
mcg/kg/min.  (Strauss, Tr. 728:19-729:3.)

**PCF98.          *See* PCF94.**

DFF99.          An article by Dr. Fuller, *et al.*, ("Fuller") published in September 1987 and
entitled, *Circulatory and Respiratory Effects of Infused Adenosine in Conscious Man*, describes
adenosine infusion beginning at 12 mcg/kg/min and increasing to 25, 50, and 100.  (Strauss, Tr.
729:13-730:9; TX 1208 at 310.)

**RESPONSE:  Several key distinctions between *Fuller* (TX-1208) and the use of**

**adenosine for MPI are not reflected in DFF99.  (*See, e.g.,* DTX-2017.)  Thus, the following,**

**more comprehensive counterfinding is proposed:**

**PCF99.          There are several key distinctions between *Fuller* and the use of**

**adenosine for MPI.  *Fuller* dealt with normal, healthy subjects ranging from 28 to 40 years**

**old, not elderly heart patients.  No measures of coronary blood flow were reported.  No**

**mention was made of MPI.  No medical use for adenosine in humans was proposed.  Dose-**

**limiting negative side effects were reported, with the maximum dose being 100 mcg/kg/min**

**or less depending upon the subject.  (TX-1208; Strauss 828:14-16, 830:15-831:11.)  *Fuller*,**

**therefore, did not teach a safe dose for administration to patients with coronary artery**

**disease.  (Wackers 938:19-939:1.)  The patient population requiring pharmacologic stress**

**imaging was known to suffer from numerous adverse circulatory and coronary conditions.**

**(TX-168 at 1344; *see also* PFF18, 19.)  In fact, a subsequent publication reported that 50%**

**of over 9,000 patients receiving pharmacologic stress testing had a history of coronary**

**artery disease and nearly 25% of those patients had suffered a heart attack.  (TX-103 at**

**386; Strauss 835:1-836:1.)  As a result, one cannot determine from *Fuller* whether cardiac**

**patients could tolerate adenosine infusions without experiencing severe side effects and whether diagnostically-reliable MPI images could be obtained at the doses such patients could tolerate.  (Strauss 826:24-831:6; Wackers 934:21-935:5, 938:3-939:1; DTX2017;** *see also* **PFF74, 75.)**

DFF100.        Each dose of adenosine was infused for 6 to 7 minutes.  (Strauss, Tr. 729:19-730:4; TX 1208 at 310.)

**PCF100.        *See* PCF99.**

DFF101.        Two of the six subjects described in Fuller tolerated 200 mcg/kg/min for 1 and 2 minutes, respectively.  (Strauss, Tr. 730:16-22; TX 1208 at 311.)

**PCF101.        *See* PCF99.**

DFF102.        A person of skill in the art would understand from Fuller that adenosine could be safely, continuously infused to conscious human at a rate of at least 100 mcg/kg/min and up to 200 mcg/kg/min.  (Strauss, Tr. 731:1-12.)

**PCF102.        *See* PCF86, 99.**

DFF103.        An article published in December 1987 by Biaggioni et al. ("Biaggioni 1987") entitled.  Cardiovascular *and Respiratory Effects of Adenosine in Conscious Man*, describes adenosine infusion at rates of 80-180 mcg/kg/minute to healthy male volunteers.  (Strauss, Tr. 732:6-733:6; TX 226.)

**PCF103.        The key distinctions between the use of adenosine for MPI and**

***Biaggioni 1987* (TX-226) are essentially the same as those for *Biaggioni 1986* (TX-48).**

**(*See* PCF86, 87, 90.)  Indeed, Sicor asserts *Biaggioni 1986* and *Biaggioni 1987* for the same**

**purpose.  (*See* DB15-17.)**

DFF104.        Eight subjects are discussed in connection with the continuous intravenous infusion of adenosine described in Biaggioni 1987.  Each of the eight subjects tolerated an infusion rate of 140 mcg/kg/minute.  (Strauss, Tr. 732:17-22; TX 226 at 781-82, Fig. 3, 784-86.)

**PCF104.        *See* PCF103.**

DFF105.        Biaggioni 1987 states that the adenosine infusions produced dose-dependent increases in heart rate and systolic blood pressure and decreases in diastolic blood pressure.  (TX 226 at 781, Fig. 3, *see also* Strauss, Tr. 736:8-13.)

PCF105.    *See* PCF103 and PCF90 regarding the undesirability of systemic vasodilation in human MPI.

DFF106.    A person of ordinary skill in the art would understand from Biaggioni 1987 that adenosine can be safely, continuously infused for extended periods of time, that doses up to 140 mcg/kg/min are tolerable in conscious humans, and that adenosine has a predictable vasodilatory action.  (Strauss, Tr. 735:4-19.)

PCF106.    *See* PCF103, 105.

DFF107.    The '296 patent describes use of adenosine as a pharmacologic stress agent for MPI.  (TX 275 at col. 21.)

**PCF107.    Example XIII of the '296 patent consists of a half-column prophetic suggestion on the use of adenosine in connection with MPI.  (TX-275 at cols. 21-22.) Example XIII did not identify adenosine doses that were both tolerable and effective for reliable MPI diagnosis.  (*Id.*)  Nor did it describe a dose of about 140 mcg/kg/min. (Wackers 959:14-22.)  It stated instead that "[t]he exact dose will normally have to be titrated individually" and went on to speculate that the dose "should lie in the range of 10 to 150 [mcg/kg/min]."  (TX-275 at col. 21, ll. 59-61.)  While titration was proposed, the endpoint of the titration was not defined.  (TX-275; Wackers 957:14-958:13.)  Additionally, the cited portion of the '296 patent is not prior art to the '877 patent, because the inventors conceived of as much of the invention as is disclosed in Example XIII prior to its effective date, and then diligently reduced that subject matter to practice.  (*Compare* TX-57 at 4 *with* TX-275 at cols. 21-22; Wackers 971:11-973:11; *see also* PFF138-146.)  Specifically, Example XIII was not added to the patent application for the '296 patent until December 28, 1987—after the December 9, 1987 submission to the FDA by Drs. Hilleman and Mohiuddin of protocols for their own experiments with adenosine for use in MPI.  (*See* TX-52 at AST0009417; TX-275; Wackers 973:24-974:14; DTX-2028; PFF139-142.)  While Example XIII of the '296 patent merely provided instructions to titrate and a speculative**

dose range, without defining any titration endpoints, the inventors had previously

conceived a titration protocol with defined starting and ending points.  (*See* **TX-57;**

**Wackers 971:11-973:11; PFF138-140.**)

DFF108.    The '296 patent states that "a safer and more reliable test can be expected if adenosine is used" instead of dipyridamole.  (TX 275 at col.21, ll.57-58.)

**PCF108.    *See* PCF107.**

DFF109.    The '296 patent further states that "[t]he exact dose will normally have to be titrated individually but should lie in the range of 10 to 150 micrograms per kilogram per minute."  (TX 275 at col. 21, ll. 59-61.)

**PCF109.    *See* PCF107.**

DFF110.    A person of ordinary skill in the art would understand from the '296 patent that doses within the range of 10-150 mcg/kg/min would likely be both safe and effective for MPI.  (Strauss, Tr. 752:7-19.)

**PCF110.        The '296 patent cannot be read as disclosing safe and effective doses**

**between 10 and 150 mcg/kg/min, and particularly cannot be read as disclosing a dose of**

**140 mcg/kg/min.  The '296 patent states that heart block can surely be avoided in conscious**

**patients only at doses below 100 mcg/kg/min.  (TX-275 at col. 3, lines 23-26; Strauss**

**864:23-865:12.)  Moreover, nothing in the '296 patent would lead one of ordinary skill to**

**the dose of 140 mcg/kg/min.  (Wackers 959:17-22.)  The point to which the titration in**

**Example XIII should be conducted is unstated.  (TX-275; Wackers 957:14-958:13.)  Dr.**

**Strauss acknowledged that: (1) the '296 patent taught that infusing adenosine above 100**

**mcg/kg/min caused risk of heart block in conscious patients (TX-275 at col. 3, lines 23-26;**

**Strauss 864:23-865:12) and (2) *Wilson 1990* reported that adenosine doses below 100**

**mcg/kg/min. can result in cyclical variations in coronary blood flow leading to the**

**possibility of falsely negative results (*see* TX-46 at 1600, 1603; Wackers 963:20-964:7).**

**(*See also* PCF109.)  Moreover, the testimony of Dr. Strauss established that the dose**

**titration set forth in Example XIII would *not* lead to a dose of 140 mcg/kg/min. (*See, e.g.,* PFF149-150.) Dr. Strauss admitted that titrating to a point where side effects were mild or just beginning could well result in a dose too low for useful myocardial imaging, and that, in his experience, while many people can tolerate 100 mcg/kg/min, some patients who receive 140 mcg/kg/min will sit up on the table and yell, STOP! (Strauss 849:21-851:5; *see also* PFF149-150.) Mere titration would *not* have led to the claimed 140 mcg/kg/min dose, but to a lower one with fewer side effects. (Strauss 850:11-851:5.) Consequently, a person of ordinary skill in the art would not understand from Example XIII that the dose of 140 mcg/kg/min would likely be considered both safe and effective.**

DFF111. The '296 patent describes, *inter alia*, the use of adenosine as a pharmacologic stress agent for MPI. (TX 275 at col. 21).

**PCF111. *See* PCF107, 110.**

DFF114. Example XIII discloses "adenosine in the diagnosis of coronary heart disease by radionucleide (sic) scintigraphy." (TX 275 at col.21, ll.25-61.)

**PCF114. *See* PCF107, 110.**

DFF115. Example XIII describes the use of dipyridamole in connection with MPI using thallium 201. (TX 275 at col.21, ll.25-61.) Example XIII then explains the relationship of dipyridamole's action with adenosine's vasodilatory properties and teaches that adenosine can be used in place of dipyridamole as a pharmacologic stress agent for MPI. (TX 275 at col.21, ll.25-61.)

**PCF115. *See* PCF107, 110.**

DFF116. Example XIII of the '296 patent teaches a dose range of 10 to 150 mcg/kg/min of adenosine for MPI. (TX 275 at col.21, ll.59-61; *see also* Strauss, Tr. 750:2-22.)

**PCF116. *See* PCF107, 110.**

DFF117. The use of adenosine as a pharmacologic stress agent for MPI is also taught in a proposal that was submitted to the Karolinska Institute in Sweden in or around February of 1988 (the "Karolinska Request"). (TX 1193 at SIC010940.)

**PCF117.    The Karolinska Request is not prior art.  It reflects activity outside the United States and is, therefore, neither prior knowledge nor prior use in this country under 35 U.S.C. § 102(a).  It is prior art only if it qualifies as a "printed publication" under U.S. law.  (*See* PCL57-61.)  The record is devoid of foundational testimony authenticating the document or indicating how, if it all, the Karolinska Request was disseminated or stored.  (*See* PFF159-160.)  The sole support cited by Sicor for DFF243, TX-1193 at SIC010940, is inadmissible hearsay, and consists of a letter written by a European patent attorney submitting a request to the European Patent Office.  This letter to the European Patent Office is also irrelevant to the question of whether the Karolinska Request is a printed publication under U.S. law.  (*See* PFF160; PB at 39-40.)  As set forth in the Stipulation of Mr. Mattsson, a partner in the international law firm of Awapatent AB, the statement in question referred not to any aspect of U.S. law, but to public availability under the European Patent Convention. (TX-Court11, ¶¶ 8-9.)  Under that Convention, a document would be considered publicly available even if the document was not indexed or catalogued in a way that a member of the public could look it up or that would raise a presumption that the public concerned with the art would know of it. (See TX-Court11, ¶¶ 10-12.)  Accordingly, Sicor has not proven that the Karolinska Request was sufficiently indexed to constitute a "printed publication" under U.S. law (35 U.S.C. § 102(a)) and has thus failed to carry its burden in proving that the Karolinska Request is prior art.  Further, its admissibility is objectionable on the grounds of hearsay and authenticity.  (*See, e.g.*, PCL64; PB at 39-40.)**

DFF118.    The Karolinska Request discloses that adenosine could be used to replace dipyridamole as the pharmacologic stress agent for MPI.  (Strauss, Tr. 754:9-22; TX 1193 at SIC010943.)

**PCF118.**          The Karolinska Request proposes replacing dipyridamole with adenosine as the pharmacologic stress agent for MPI.  The Karolinska Request describes a ten minute infusion of adenosine, followed by the injection of the radionuclide tracer, followed only one minute later by the termination of the adenosine infusion.  (*See* TX-1193 at 5.)  This protocol would likely not work for imaging, because the adenosine infusion is terminated too soon after the injection of the radionuclide tracer and constitutes "too short a continuation of adenosine."  (Wackers 960:16-25.)

DFF119.          The dose described in the Karolinska Request is 60 mcg/kg/min.  (Strauss, Tr. 755:6-14; TX 1193 at SIC010944.)

**PCF119.**          The Karolinska Request purports to represent Dr. Sollevi's actual proposal to the Ethics Committee at the Karolinska Institute in Stockholm, Sweden, for testing the use of adenosine in connection with MPI.  (*See* TX-1193.)  Tellingly, Dr. Sollevi, who had a wealth of experience administering adenosine, proposed a dose of 60 mcg/kg/min because he wanted to increase coronary blood flow "without producing other palpable effects."  (TX-1193 at SIC010942; Wackers 960:1-25.)  The distinction between the 140 mcg/kg/min dose and the lower dose of 60 mcg/kg/min proposed in the Karolinska Request is significant.  Indeed, Dr. Wilson reported that doses of 70-100 mcg/kg/min resulted in "cyclic" coronary flow that could lead to false negative results.  (*See* TX-46; Wackers 963:8-964:7.)

### 3.    Counterfindings Regarding Use of Adenosine In Place of Dipyridamole

DFF120.          It was well known in the art by mid-1987 that dipyridamole acts through adenosine.

**PCF120.**          *See* **PCF51.**

DFF121.    A person of ordinary skill in the art in 1987 would have known that dipyridamole acts indirectly, and that adenosine is the direct acting agent.  (*See, e.g.*, Strauss, Tr. 670:12-18; TX 93; TX 275.)

**PCF121.    *See* PCF51, 54.**

DFF122.    Albro, Goodman and Gilman, Conradson and the '296 patent all demonstrate that it was well known in the art that dipyridamole works, at least in part, because of the increase in endogenous adenosine caused by dipyridamole's adenosine uptake inhibition. (Strauss, Tr. 670:12-671:12, 680:17-22, 683:8-13, 684:12-685-6; TX 93 at 758-59; TX 39 at 822; TX 220 at 387; TX 275, col.21, ll.49-51.)

**PCF122.    *See* PCF51, 54.**

DFF123.    A person of ordinary skill in the art would have reason to substitute adenosine for dipyridamole in connection with MPI because that person would have known that the actual agent causing the vasodilation was adenosine.  (Strauss, Tr. 670:12-671:12.)

**PCF123.    *See* PCF54.  Further underscoring the non-interchangeability of adenosine and dipyridamole, the only accepted medical uses for adenosine in the early 1980s relied on pharmacologic effects that were antithetical to its use in heart patients.  The first known use of adenosine relied on its ability to interfere with electrical impulses in the heart and involved administration of bolus doses (*i.e.*, rapid injections) of adenosine to treat patients suffering from an abnormal heart rhythm known as PSVT.  (*See* TX-45; Wackers 914:3-22.)  The other known use, pioneered by Dr. Sollevi, relied on adenosine's ability to profoundly reduce systemic blood pressure and involved infusion of adenosine to non-cardiac surgical patients.  (Wackers 922:3-15.)  Dipyridamole was not used for either purpose.  (*See* TX-45 at 423.)**

DFF124.    Common sense would provide ample reason to substitute the direct acting agent for the indirect agent in a known procedure.

**PCF124.    *See* PCF51, 54, 123.**

DFF125.    The prior art further provides various additional suggestions and/or reasons to use adenosine as a pharmacologic stress agent for MPI.

**PCF125.    *See* PCF51, 54, 123.**

DFF126.    Gould 1978 teaches that coronary vasodilators other than dipyridamole could be used for MPI.  (Strauss, Tr. 664:13-18, 686:1-6.)

**PCF126.**    *See* **PCF41, 54.**

DFF127.    Gould 1978 states that:

> Any other coronary vasodilator that was more potent than dipyridamole would further increase the sensitivity of imaging techniques for identifying coronary disease.

(TX 38 at 285; *see* Strauss, Tr. 686:7-687:3.)

**PCF127.**    *See* **PCF41, 54, 68.**

DFF128.    Gould 1978 discusses imaging methods using a "coronary vasodilator" generally, further suggesting that coronary vasodilators other than dipyridamole could be used for MPI.  (Strauss, Tr. 665:9-666:7; TX 38 at 285.)

**PCF128.**    *See* **PCF41, 54, 68.**

DFF129.    A person of skill in the art would have had reason to use adenosine for MPI based on the teachings of Gould 1978.  (Strauss, Tr. 686:7:687:18.)

**PCF129.**    *See* **PCF41, 54, 68.**

DFF130.    A person of ordinary skill in the art would have had further reason to substitute adenosine for dipyridamole for MPI because of knowledge of the duration of action of the two agents.

**PCF130.**    **The prior art, including *Gould 1978* (TX-38), taught away from using adenosine for MPI.  (*See* PCF41, 54, 68.)  Rather than providing motivation, the short half life of adenosine taught directly away from its use as a pharmacologic stress agent for MPI, a perceived requirement for which was a long duration of effect.  (TX-391 at 275; Strauss 790:3-23; Wackers 955:1-9.)  Thus, the art was searching for compounds "which have greater duration of action *in vivo*" than adenosine.  (TX-214 at 415; *see, e.g.*, Strauss 770:5-20.)**

DFF133.    Adenosine has a very short duration of action.  (Strauss, Tr. 673:17-674:11.) A person of ordinary skill in the art at the time would have known of adenosine's short duration, and would have expected the effects of adenosine to be far more easily controlled than

dipyridamole.  (Strauss, Tr. 672:17-673:2; 673:17-674:13:675:13-21; 742:2-18; *see also* TX, 1171 at 345.)

**RESPONSE:  It is illogical to posit that physicians knew that adenosine would be better and safer than dipyridamole because of its short half-life, yet it was never used or even suggested for human pharmacologic MPI for a decade after the use of dipyridamole. Thus, the following counterfinding is proposed:**

**PCF133.        The short half life of adenosine taught directly away from adenosine's use as a pharmacologic stress agent for human MPI, a perceived requirement for which was a long duration of effect.  (TX-391 at 275; TX-229 at 432; Strauss 790:3-23, 813:3-24; Wackers 955:1-9.)  Indeed, Dr. Strauss was aware of numerous publications on modifications of adenosine that sought to limit its negative effects on the heart and blood pressure while *increasing* the duration of its beneficial effects.  (Strauss 769:18-770:20.) Further, the short-acting 2-10 second half life of adenosine complicates the question of how much adenosine should be administered.  (Wackers 954:24-955:9; TX-240 at 1038.)  As explained by Dr. Wackers, "if you consider that if you inject a drug in an arm vein, it takes at least 17, 20 seconds to arrive at the heart, which would mean if you inject a certain amount, when it gets to the heart, it's only half the dose."  (Wackers 955:1-955:9.) Moreover, while dipyridamole was considered safe, the perception that adenosine was too dangerous for administration by continuous infusion into heart patients was extensively documented in the prior art and continued into the early 1990s.  (*See* PCF54; *see also* PFF50-52.)**

DFF134.        It was generally known prior by mid-1987 that a drug with a shorter duration of action would be preferable in terms of side effects.  (Hilleman, Tr. 2137:22-2139:7.)

**RESPONSE:  An underlying premise of DFF134 is that side effects can be separated from efficacy, such that one can be considered independent of the other.  Of course, this is**

**not so, as exemplified by the work with the ethyl-adenosine compound used by Dr. Strauss.**

**(PFF38-43.)  Indeed, there is no testimony or other evidence to support the illogical position**

**that a shorter acting drug lacking sufficient activity would be preferred over a longer**

**acting drug having sufficient activity.  (See Hilleman 2138:19-2139:7.)  Sicor's proposed**

**finding also ignores the clear teaching away in the prior art against vasodilators for MPI**

**having a duration of action shorter than that of dipyridamole.  (See PCF133.)**

DFF135.    A person of ordinary skill in the art would have known that adenosine could be continuously infused to maintain a stable effect for the duration of time needed to perform the MPI, but that the effects could then be turned off almost immediately upon termination of the infusion.  (Strauss, Tr. 676:9-678:2; 692:12-694:7.)

**RESPONSE:  The proposed finding signals the lapse into impermissible hindsight.**

**It attributes to the prior art knowledge of the benefits of using adenosine in human MPI**

**that came to be widely appreciated only after the invention was commercialized.  (See**

**PCF64, 133.)**

DFF136.    A person of ordinary skill in the art would have recognized at least two advantages of adenosine over dipyridamole:  (1) it would allow almost immediate termination of negative side effects, and (2) it would eliminate the extended effect of the drug past its usefulness for the procedure.  (Strauss, Tr. 673:17-674:11; 674:18-675:12; 676:9-677:8; 687:11-688:2.)

**PCF136.    See Response to DFF135 and PCF64, 133.**

DFF137.    Knowledge in the art regarding safety and vasodilation activity of adenosine when administered to humans via continuous intravenous infusion would provide yet another reason to use adenosine infusion in place of dipyridamole infusion for MPI.  (Strauss, Tr. 741:19-742:18; 749:7-9.)

**PCF137.    See Response to DFF135 and PCF64, 133.**

**4.    Counterfindings Regarding Expectations That Adenosine Would Work For MPI**

DFF138.    A person of ordinary skill in the art in 1987 would have reasonably expected adenosine to work for MPI based on the strong suggestion in Gould 1978 that any other more potent coronary vasodilators could be used for MPI.  (Strauss, Tr. 664:15-18; TX 38 at 285.)

PCF138.     One skilled in the art would not have reasonably expected adenosine to work for MPI.  Indeed, the art taught away from using adenosine for MPI (*see* PFF28-49) and considered adenosine too dangerous while dipyridamole was considered safe (PFF50-54).  *Gould 1978* (TX-38) does not describe the feasibility of human pharmacologic MPI using anything other than intravenous dipyridamole as a pharmacologic stress agent.  While *Gould 1978* mentioned use of more potent vasodilators, it stated that use of such materials would risk inducing ischemia or myocardial steal, depriving the heart of needed oxygen.  (TX-38 at 285; Wackers 905:6-19; PFF46, 47.)  In the preceding article in the same journal, Dr. Gould and his colleagues explained that an appropriate pharmacologic stress agent must be "selective for the coronary arteries," have "insignificant systemic effects," and have "an effect for at least 3 minutes until thallium-201 is removed from the systemic circulation." (TX-391 at 275.) Adenosine did not fit this profile, as it was associated with systemic hypotension, was known to cause AV block, was associated with ischemia, and had an extremely short duration of effect.  (*See, e.g.*, TX-36 at 1254; TX-217 at 430; TX-259 at 470; Strauss 790:3-23; Wackers 909:9-910:17.) Additionally, *Gould 1978* had previously reported that the dipyridamole dose used for diagnostically-reliable myocardial imaging produced a 400% increase in blood flow with little to no decrease in blood pressure.  (TX-38 at 284, Fig. 8; Wackers 924:3-17.)  The existing data showed that adenosine produced only a 70% increase of coronary blood flow with a reduction blood pressure (hypotension) of about 20%.  (TX-1171 at 335; Wackers 923:24-924:2.)

No one considered adenosine as a realistic substitute for dipyridamole because adenosine was viewed as too dangerous.  (*See, e.g.*, TX-46; TX-47; Strauss 803:11-804:8,

805:23-806:8.)  For example, Dr. Melvin Marcus, acknowledged by Sicor as an expert in the field, wrote in a well-regarded treatise in 1983 that intravenous administration of adenosine into animals caused "marked systemic hypotension and reflex tachycardia [abnormally rapid heart beat]."  (TX-217 at 430; Strauss 799:19-800:2; Wackers 909:9-910:25.)  Dr. Marcus stressed that "[b]ecause of the hypotensive effects of adenosine, it is not utilized clinically to produce maximal coronary dilation."  (TX-217 at 430; Wackers 909:19-910:7.)  Even Sicor's technical expert acknowledged that hypotension was "undesirable" during MPI.  (Strauss 799:9-13.)  Indeed, the art as a whole taught away from the use of adenosine as a pharmacologic stress agent.  (PFF50-53.)

While adenosine had been continuously infused previously, it was unknown if there was an effective dose that could be administered safely in MPI.  In fact, rather than addressing the use of adenosine in MPI, the prior art relied upon by Sicor relates to studies in which:  (1) heart patients, the relevant patient population for MPI, were systemically excluded; (2) the number of subjects studied was small; (3) measurements of coronary blood flow (necessary for determining potency) are largely lacking; (4) no mention was made of MPI; (5) dose-limiting negative side effects were reported; and (6) included studies in which the dose at which those side effects were reported to be intolerable to healthy subjects was as low as 70 mcg/kg/min and varied widely.  (*See generally* DTX-2017; Strauss 826:24-831:6; TX-48; TX-220; TX-226; TX-1208; TX-1211; PFF 69-76.)  These studies produced conflicting results regarding tolerable dosing, and provided no information about the safety of adenosine infusions in patients with coronary artery disease.  (Strauss 826:24-831:6; Wackers 934:21-935:5, 938:19-939:1.)  Further, none of these studies characterized adenosine as a more potent coronary vasodilator than dipyridamole.  (*See*

**TX-48; TX-220; TX-226; TX-1208; TX-1211.)  Thus, rather than expecting adenosine to work for MPI in humans, one skilled in the art would have understood that "concern over adenosine-induced hypotension and heart block would have hampered its use in humans." (TX-46 at 1596; Strauss 803:11-804:8, 852:1-10; PFF41-54.)**

DFF139.     A person of skill in the art in 1987 would have known that adenosine was already working as a pharmacologic stress agent for MPI, through the intermediary action of dipyridamole in the method described in Gould 1978 and Albro.  (Strauss Tr. 670:12-671:21; 687:11-688:2; TX 93 at 285.)  A person of ordinary skill in the art in 1987 would have reasonably expected adenosine to work directly for the same purpose for which it was already being used indirectly by the mechanism of action of dipyridamole.  (Strauss, Tr. 670:12-671:12.)

**PCF139.     *See* PCF138.**

DFF140.     It was known in the art that adenosine was a potent vasodilator.  (Strauss, Tr. 705:19-706:4; *see also* Mohiuddin, Tr. 1858:5-12; Hilleman, Tr. 2131:4-8.)  A person of ordinary skill in the art would have reasonably expected adenosine to work for the same purpose – as a vasodilator – for pharmacologic stress MPI.  (Strauss, Tr. 670:12-671:12.)

**PCF140.     *See* PCF138.**

DFF141.     The prior art disclosed a range of doses of adenosine that would cause vasodilation without causing hypotension or other severe side effects.  A person of ordinary skill in the art would have known from the teachings in the art that certain continuous infusion rates were both safe and sufficient to cause vasodilation.  (Strauss, Tr. 742:2-18, 748:2-13; 749:3-20, 750:2-22.)

**PCF141.     *See* PCF138.**

DFF142.     Based on Sollevi 1986, a person of skill in the art would have understood that a dose of about 20-30 mcg/kg/min would cause vasodilation.  (Strauss, Tr. 704:22-705:15; TX 1171 at 335, 345.)  Sollevi 1986 further taught that a dose of 30-50 mcg/kg/min caused a doubling of graft flow, and a dose of 80 mcg/kg/min caused a near doubling of myocardial blood flow.  (Strauss, Tr. 704:22-705:15, 702:21-703:14; TX 1171 at 335.)

**RESPONSE:  The assertions attributed to Dr. Strauss in DFF142 were not in his expert reports, and should, therefore, be excluded.  (Objection at 707:9-11; TX-70; TX-246.)  The contention is also without merit.  Therefore, the following counterfinding is proposed:**

**PCF142.     *See* PCF68, 69.**

DFF143.     A person of skill in the art would have expected, based on Sollevi 1986 alone, that doses beginning as low as 30 mcg/kg/min would likely be effective to cause vasodilation.  (Strauss, Tr. 704:22-705:15, 739:2-15.)

**PCF143.     *See* Response to DFF142 and PCF68, 69.**

DFF144.     A person of ordinary skill in the art would have also expected the upper range of useful doses for MPI to be around 200 mcg/kg/min because each of Sollevi 1984, Sollevi 1986 and Owall teach that continuous infusion of adenosine at levels greater than 200 mcg/kg/min result in hypotension.  (Strauss, Tr. 695:6-16; 700:19-701:9; 723:3-7; TX 112; 1169; 1171.)

**RESPONSE:  The cited references are specifically directed to producing profound hypotension in a surgical environment.  Further, the references lacked any systematic study of patients with coronary artery disease, generally excluding or expressly cautioning against the administration of adenosine infusions to such patients.  (PFF67.)  Thus, the following counterfinding is proposed:**

**PCF144.     A person of ordinary skill in the art would have expected that an adenosine dose of around 200 mcg/kg/min would cause profound systemic hypotension and that it would not be expected to be useful in MPI, where systemic hypotension was dangerous and undesirable.  (Strauss 768:22-769:2; Wackers 910:8-17, 922:7 9.)  For example, Table 6 of *Sollevi 1986* expressly states that the "high dose" range, which includes the range of 150-200 mcg/kg/min, is associated with hypotension, and a dose of 80 mcg/kg/min is explicitly reported to cause systemic blood pressure reduction.  (TX-1171 at 345, Table 6; *see also* PCF73.)**

**Particularly significant among these publications was *Owall 1987*, in which two of the patients receiving adenosine to induce hypotension during brain surgery had a history of myocardial infarction 9 and 13 years before surgery.  (TX-1169 at 229; Wackers 927:16-928:3.)  Both of those patients experienced adverse side effects from the adenosine infusion**

**requiring medical intervention. (TX-1169 at 231; Wackers 928:4-929:17.) As a result,**

***Owall 1987* specifically cautioned against use of adenosine in heart patients.**

DFF145.    A person of ordinary skill in the art would have reasonably expected adenosine infusion rates between 20 and 200 mcg/kg/minute to be adequate for performing MPI. (Strauss, Tr. 749:3-20, 750:2-23.)

**PCF145.    *See* PCF138, 141.**

DFF146.    In light of the teachings of Biaggioni 1986, Conradson, Fuller and/or Biaggioni 1987, a person of skill in the art would have expected that most conscious patients would be able to tolerate doses somewhere between 90 and 140 mcg/kg/min. (Strauss, Tr. 719:3-18; 728:15-729:3; 731:1-13: 735:4-12; TX 220; 226; 1169; 1208).

**PCF146.    There are several key distinctions between *Biaggioni 1986*, *Conradson*, *Fuller*, and *Biaggioni 1987* and the use of adenosine for MPI. *Biaggioni 1986*, *Conradson*, *Fuller*, and *Biaggioni 1987* dealt with normal, healthy subjects, not older, more infirm heart patients or candidates for pharmacological stress MPI. (*See*, *e.g.*, Wackers 934:6-935:5.) No measures of coronary blood flow were reported. No mention was made of MPI. No medical use for adenosine infusion in humans was proposed. Dose-limiting negative side effects were reported. (*See generally* DTX-2017; Strauss 826:24-831:6; PFF69-76; *see also* TX-48; TX-220; TX-226; TX-1208; TX-1211.) In fact, the normal volunteer studies suggested that even many healthy subjects could not tolerate a continuous intravenous infusion of 140 mcg/kg/min. (*See* Wackers 934:21-935:5, 938:19-939:1; DTX-2017.) Of the 35 healthy volunteers collectively examined in TX-48, TX-1211, TX-220, TX-1208, and TX-226, less than half tolerated doses of 140 mcg/kg/min, and many failed to tolerate even 100 mcg/kg/min. (*See* DTX-2017.) Other normal volunteers experienced dose limiting side effects at doses as low as 70 mcg/kg/min. (*See* TX-220; Strauss 829:6-831:11.)**

DFF147.    A person of ordinary skill in the art would have reasonably expected that doses in the range of 20-200 mcg/kg/min, and more likely doses above 50 mcg/kg/min but less than 200 mcg/kg/min, would be very likely to work for MPI. (Strauss, Tr. 738:12-740:18.)

**RESPONSE:  DFF147 is premised upon opinions that were offered for the first time at trial (Objection at 740:19-21) and should be stricken for that reason.  Moreover, the proposed finding fails to recognize that one of ordinary skill would not have expected that the recited doses would be safe and effective for MPI in human patients.  Thus, the following counterfinding is proposed:**

**PCF147.**     *See* **PCF138, 141, 146.**

**5.     Counterfindings Regarding Differences Between the Asserted Claims and the Prior Art**

DFF148.     There is only one difference between the Gould 1978 reference and the asserted claims of the '877 patent – substituting the direct infusion of adenosine within the specified dosage ranges for the infusion of dipyridamole.

**PCF148.     There are at least two separate inventive steps between both *Gould 1978* (TX-38) and *Albro* (TX-93) and the claimed invention: (1) bucking the conventional wisdom and considering use of adenosine as the pharmacologic stress agent in human MPI; and (2) determining whether there existed adenosine doses that could be tolerated by human heart patients while simultaneously providing sufficient coronary vasodilation to yield diagnostically-reliable MPI images.  In addition, the protocol used in *Gould 1978* or *Albro* would be entirely unsuited with adenosine.  Both described injection of a thallium-201 tracer 4 or more minutes after completion of the dipyridamole infusion, and the use of a gamma camera to obtain scintigraphic images.  (Strauss 662:17-22, 664:23-665:2; TX-38 at 280-81; TX-93 at 752.)  Because of adenosine's extremely short half-life, whereby its effects would no longer be present 3 minutes after infusion, adenosine could not be substituted for dipyridamole in the *Gould 1978* or *Albro* protocols (TX-45 at 418; Strauss 838:10-839:7)**

41

DFF149.     There is only one difference between the Albro reference and the asserted claims of the '877 patent – substituting the direct infusion of adenosine within the specified dosage ranges for the infusion of dipyridamole.

**PCF149.     *See* PCF148.**

DFF150.     Everything in the asserted claims of the '877 patent, except the direct infusion of adenosine within the claimed dosage ranges, is disclosed in Gould 1978 and Albro.

**PCF150.     *See* PCF148.**

DFF152.     Both Gould 1978 and Albro disclose administering a pharmacologic stress agent by intravenous route, and administering enough of the stress agent to cause vasodilation. (Strauss, Tr. 663:10-20; 667:15-22; 668:18-669:1; TX 38, TX 93.)

**PCF152.     Neither *Gould 1978* (TX-38) nor *Albro* (TX-93) describe the feasibility of human pharmacologic MPI using anything other than intravenous dipyridamole as a pharmacologic stress agent.  Moreover, the methods disclosed in *Gould 1978* and *Albro* rely upon dipyridamole to induce pharmacological stress, do not entail administering adenosine at any dose, and would be entirely incompatible and non-functional with the use of adenosine.  (*See* PCF148.)**

DFF155.     Gould 1978 suggests use of other more potent coronary vasodilators in place of dipyridamole.  (Strauss, Tr. 664:13-18; TX 38 at 285)

**PCF155.     *See* PCF138.**

DFF156.     Albro states that dipyridamole acts through adenosine.  (Strauss, Tr. 669:2-670:11; TX 93 at 758.)

**PCF156.     *See* PCF51, 54.**

DFF157.     The sole difference between either of the prior art references Gould 1978 or Albro and the asserted claims is the direct infusion of adenosine within the claimed dosage ranges in place of reliance on dipyridamole infusion to increase endogenous adenosine for the same effect.

**PCF157.     *See* PCF138, 148, 152.**

### 6.    Counterfindings Regarding Secondary Indicia

DFF158.        Plaintiffs have not demonstrated any unexpected results for the methods in the asserted claims.

**PCF158.        The safety and efficacy of adenosine for MPI are both unexpected results, wholly contrary to conventional wisdom.  (PFF83-92.)  Not only did adenosine's side effects, short half-life, hypotensive effects, and ability to interrupt cardiac electrical conduction limit adenosine's use in patients, there was specific concern expressed about using adenosine infusions in heart patients and reports that adenosine at 140 mcg/kg/min could induce some heart block.  (*See, e.g.*, Strauss 782:17-783:18, 805:23-809:14; TX-47 at 1855; PFF45, 50-54.)  The perception that adenosine would not be safe in human pharmacologic MPI persisted into the 1990s.  (Klose 1516:3-14.)  The fact that adenosine is actually safer than dipyridamole for human MPI was wholly unexpected.**

DFF159.        A person of skill in the art at the relevant time would have expected adenosine to work as a vasodilator and to cause sufficient vasodilation for MPI in humans. (Strauss, Tr. 735:4-12, 748:2-13; 749:10-21, 750:12-23.)

**PCF159.        *See* PCF138.**

DFF160.        A person of skill in the art would have expected adenosine infusion in the range of 20-200 mcg/kg/minute to be safe.  (*See, e.g.*, Strauss, Tr. 699:4-17, 747:18-748:1, 710:2-11.)

**PCF160.        *See* PCF138.**

DFF161.        A person of skill in the art would have expected any side effects from adenosine infusion to dissipate quickly upon termination of the infusion.  (Strauss, Tr. 674:4-12, 742:2-18; TX 112 at 404; TX 48 at 2233; TX 220 at 388-89; TX 226 at 780.)  A person of skill in the art would have expected the advantages of safety and controllability that are associated with a short duration of action.  (Tr. 672:17-673:2; 673:17-674:11; 687:11-688:2.)

**PCF161.        No one recognized that the short half life of adenosine made it advantageous for MPI relative to dipyridamole.  Indeed, those working in the field at the**

time were looking for compounds having a *longer* duration of action.  The medical

literature of the time reflects those efforts:

> The use of adenosine in cardiovascular therapy has been precluded
> both by the transitory nature of its vasodilator effects and by its toxic
> actions on the heart. It would seem feasible however that certain
> analogs of adenosine may be found which have the coronary
> vasodilatory activity of adenosine, but which have greater duration of
> action in vivo and which lack the cardiac depressant action of the
> parent compound.

(TX-214 at 415; *see, e.g.*, Strauss 770:5-20.)  Similarly, a February 1988 review article

reiterated perceived requirements for a pharmacologic stress agent, including a *lasting*

effect, that adenosine simply did not meet:

> It appears that the specific type of coronary vasodilator does not
> appear to be of critical importance as long as the agent has a selective
> action on the coronary arteries, has an insignificant systemic effect,
> and has an effect that lasts for at least 3 minutes to permit thallium
> extraction from the systemic circulation.

(TX-229 at 432; Strauss 813:3-24.)  Dr. Wackers stated that as of 1987 he had not thought

of using adenosine as a pharmacologic stress agent and had never heard anyone discuss

using adenosine for MPI in human patients. (Wackers 943:11-19.)  Even after the invention

was made cardiologists resisted using adenosine in MPI for fear of inducing heart block.

(Klose 1516:3-14.)  Dr. Strauss stated that even he was concerned that adenosine at 140

mcg/kg/min would induce heart block, and initially administered the drug at a much lower

dose.  (*See* TX-314, Abstract No. 517; Strauss 779:9-13, 779:21-780:19, 782:17-783:18.)

Additionally, *Owall 1987* reported that both patients with a past history of

myocardial infarction in his study experienced side effects from the adenosine infusion

requiring active medical intervention.  (TX-1169 at 229; Wackers 927:16-928:3; *see*

PCF82.)  These contemporaneous teachings from the prior art would have taught away

from the use of adenosine for pharmacologic MPI.   Indeed, it is illogical to posit that

physicians knew that adenosine would be better and safer than dipyridamole because of its short half-life, yet never used or even suggested its use for human MPI.

DFF162.    Plaintiffs have not demonstrated any long felt need.  (Wackers, Tr. 997:4-14, 1001:16-1002:9.)

**PCF162.    Dr. Strauss testified that there were clear negatives associated with use of dipyridamole, including the speed of the procedure and the danger of its adverse effects outlasting the effects of the antidote.  (Strauss 784:12-786:2.)  Dipyridamole was first used as a pharmacologic stress agent in humans in 1978.  Notably, however, despite the alleged drawbacks identified by Sicor's own expert, not a single publication discussed or even proposed using adenosine for MPI in human patients prior to the work of the inventors.  (*See, e.g.*, Strauss 774:2-18.)  This is particularly significant as Dr. Strauss identified 20,000 publications relating to the physiological effects of adenosine dating from 1963.  (Strauss 767:1-13.)  Whether cast as long felt need, or the failure to recognize the benefits of adenosine as a pharmacologic stress agent for nearly a decade after the use of dipyridamole, this is strong objective evidence of the nonobviousness of the invention.**

DFF163.    Plaintiff's [sic] own expert Dr. Wackers explained that there was no particular need for a pharmacologic stress agent at the time of Gould 1978.  (Wackers, Tr. 905:20-906:14.)

**RESPONSE:  The testimony of Dr. Wackers cited by Sicor in DFF163 does not state that there was no** "**particular" need for a pharmacologic stress agent at the time of *Gould 1978*.  Indeed, the cited testimony states that pharmacologic stress MPI was a "very novel approach" that "[p]eople were very interested in."  (Wackers 905:20-906:14.)**

DFF164.    Dr. Wackers further explained that interest in pharmacologic stress agents did not become widespread until at least 1985.  (Wackers, Tr. 997:10-14.)

**RESPONSE:  In the testimony cited by Sicor in DFF164, Dr. Wackers stated that interest in pharmacologic stress became "more widespread" after Dr. Boucher's article of**

1985.  (Wackers 997:10-14.)  By omitting the adjective "more," Sicor's proposed finding mischaracterizes Dr. Wackers testimony by implying that interest in pharmacologic stress agents was not previously widespread.  Indeed, the use of dipyridamole as a pharmacologic stress agent for MPI in humans was published in three adjacent related papers in a major medical journal as early as 1978, evidencing the widespread interest in pharmacologic stress MPI.  (*See* TX-38; TX-93; TX-391; *see also* PCF 163.)

DFF165.    Plaintiffs have not shown skepticism or teaching away in the prior art.

**PCF165.    The prior art taught away from the use of adenosine with coronary artery disease patients (*e.g.*, PFF28-40) and the use of adenosine for pharmacological stress tests (*e.g.*, PFF41-54).  Infusions of adenosine were not perceived as safe, particularly for administration into patients with heart disease.  (TX-1169 at 233; Wackers 929:18-930:2.)  Adenosine was also not perceived as having sufficient duration of action for use in MPI.  (TX-391 at 275; TX-214 at 415 (compounds "which have greater duration of action *in vivo*" than adenosine were needed); Wackers 955:1-9; Strauss 770:5-20.)  Indeed, profound skepticism regarding the use of adenosine continued well after the time of the invention.  (PFF85-92.)  Even defendant's expert Dr. Strauss was concerned about using adenosine for MPI due to its potential side effects.  (PFF90, 91.)  Indeed, he had previously used ethyl-adenosine, not adenosine, because it caused coronary vasodilatation "with a relatively small change in systemic arterial pressure." (TX-1184 at 406; Strauss 772:19-773:5; *see* PCF138.)**

DFF166.    The prior art demonstrates interest in and willingness to use adenosine at the infusion doses claimed in the '877 patent, as well as at doses much higher than needed for MPI.  (Strauss, Tr. 717:2-15, 727:9-15, 730:5-9; TX 48, 220, 1208.)

**RESPONSE:  To the extent offered to suggest a willingness to use adenosine in human pharmacologic MPI, the proposed finding is in conflict with the vast bulk of the pre-suit scientific literature.**

**PCF166.**    *See* **PCF138, 161, 165.**

DFF167.    A person of ordinary skill in the art would not have been discouraged by earlier references discussing adenosine in other contexts.  (Strauss, Tr. 759:4-761:13).

**PCF167.**    *See* **PCF138, 161, 165.**

DFF168.    The sales level achieved by Adenoscan® do not provide evidence of any superiority of this drug.  (Leffler; Tr. 1631:12-1632:22.)  Rather, the sales levels achieved by Adenoscan® are explained by the confluence and interaction of four economic factors:

> (1) There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;
>
> (2) Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;
>
> (3) Extensive marketing and promotion of Adenoscan® by Fujisawa; and
>
> (4) Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(Leffler, Tr. 1579:3-1582:13; DTX 3133.)

**RESPONSE:  Dr. Leffler, who provided the only testimony cited in support of DFF168, admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product.  (Leffler 1631:5-11.)  He never consulted any physicians about the reasons why they purchase adenosine versus dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents.  (Leffler 1683:6-11.)  Dr. Leffler also did not provide any information about what percentage of sales were due to Adenoscan's merits and what percentage were due to promotion and advantageous market circumstances. (Leffler 1683:6-1684:12.)  Following a trend recognized by other courts (PFF129, 130), Dr. Leffler's opinion was also based on substantial mistakes, inaccurate calculations, and incomplete data (PFF126-128).  Dr. Leffler's opinions as to whether doctors purchased Adenoscan**

based on its merits are not, therefore, trustworthy or reliable.  Thus, the following

counterfinding is proposed:

**PCF168.**   **Sales of Adenoscan were driven by the characteristics of the invention**

**claimed in the '877 patent, not promotion.  (Hay 1712:17-1713:20, 1738:22-1740:1,**

**1754:10-1757:19, 1796:22-1798:1.)  Adenoscan's sales grew because clinicians recognized**

**significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; *see also***

**Hay 1754:10-1757:15.)  Sicor's arguments are inconsistent with the strong evidence that**

**doctors recognized significant therapeutic advantages in Adenoscan and used it because of**

**those advantages.  (Hay 1796:22-1798:1, 1754:10-1757:15; Strauss 784:6-786:6; Wackers**

**892:2-13.)  Sicor overstates the impact of promotion and fails to acknowledge that**

**pharmacologic stress agents are sold to expert consumers, cardiologists and nuclear**

**medicine specialists, who are not swayed by pure promotion because their patients' health**

**depends on their medical diagnosis and treatment decisions.  (White 1231:22-1232:7; Hay**

**1712:6-1713:25, 1754:14-1757:15, 1797:2-1798:1.)**

DFF170.     In August 1995, when Adenoscan[®] entered the market, there was just one
competing product, Persantine[®], marketed by DuPont.  (Leffler, Tr. 1577:10-16, 1580:4-7; White,
Tr. 1307:14-16; DTX 3133.) Persantine[®] is the brand name for the drug dipyridamole.  (Leffler,
Tr. 1577:13-16.)

**PCF170.**   **Persantine[®] (dipyridamole) and dobutamine were the competing**

**products in the market when Adenoscan was launched.  (TX-21.)  Thus, Adenoscan had**

**two competitors in the market, not one, at the time of its launch. (TX 21; White**

**1343:11-22.)**

DFF171.     The fact that there was only direct competitor to Adenoscan[®] made the
pharmacological stressor market unique as compared to most pharmaceutical markets, which
generally have many competitors engaged in promotional activity.  (Leffler, Tr. 1580:4-6.)

**PCF171.**     While dipyridamole was the only primary competitor in the field of pharmacological stress agents, its absolute dominance was a substantial challenge to the entry of Adenoscan in 1995.  (TX-21; White 1232:13-24; Hay 1732:9-25.)  Not only was the Adenoscan product new at that time, Astellas itself was new to the pharmacologic stress market, having never sold a product in that market before.  (White 1232:13-24.)  Despite its newcomer status, Adenoscan's sales, both unit sales and sales revenue, experienced substantial and sustained growth after its launch. (TX-19; TX-21; Hay 1733:11-1734:22, 1714:13-1716:9; DTX-2032; DTX-2014.)  Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005.  (TX-19; Hay 1714:13-1716:9; DTX-2014.)

DFF172.     In most pharmaceutical markets, the real difficulty is capturing the attention of the prescribers, who typically face numerous therapeutic alternatives and must filter through a lot of promotional "noise" in the marketplace.  (Leffler, Tr. 1602:11-21.)

**PCF172.**     Sicor overstates the impact of promotion in pharmaceutical markets and fails to take into account that the attributes of the claimed invention drove the sales of Adenoscan, not marketing and promotion.  (Hay 1738:22-1740:1; *see* Strauss 784:6-786:6.) Sicor's sole support for this proposition about pharmaceutical markets is the opinion of their expert Dr. Leffler.  (Leffler 1602:11-21.)  Moreover, pharmacologic stress agents are purchased by expert consumers who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (Hay 1712:17-1713:25, 1797:2-8.)

DFF173.     Unlike most pharmaceutical markets, the pharmacological stressor market was uncluttered. (Leffler, Tr. 1602:22.)  It was "ripe for the picking" for a new player to enter and launch a competitive challenge against the available product.  (Leffler, Tr. 1602:22-25.)

**RESPONSE:  The success of Adenoscan is not attributable to the market conditions independent of the merits of the claimed invention.  The recitation of market conditions are**

**also incomplete, and therefore misleading, in that they omit any reference to competitive**

**disadvantages faced by Adenoscan.  For example, Defendants' recited market conditions**

**fail to mention the substantial cost differential that favors dipyridamole, now sold by Sicor**

**(Lea 2035:22-2036:9), which is seven to ten times cheaper.  (Hay 1738:22-1740:1,**

**1754:10-1757:19.)  Importantly, the purported conclusion is not based on any consideration**

**of the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on**

**its superiority.  (PFF100, 119.)**

> **PCF173.     The clinical attributes of pharmacological stressors drove the sales of**

**pharmacological stressors in the market, not the circumstances of the market itself.  (Hay**

**1796:22-1798:1.)**

DFF174.     As a result, Adenoscan® was able to succeed in capturing the ears and the minds of doctors relatively quickly.  (Leffler, Tr. 1602:22-1603:2.)  There was just one other serious competitor – Persantine® – with which Adenoscan® vied briefly for the attention of prescribers.  (Leffler, Tr. 1602:2-4, 1603:12-14.)

**RESPONSE:**  *See* **Response to DFF173.**

> **PCF174.     Adenoscan caught the interest of doctors because of its attributes and**

**the benefits doctors believed these attributes provided.  (Klose 1516:17-1517:25.)  The**

**record reflects that once clinicians learned about the benefits of Adenoscan and gained**

**experience with the drug, the sales of Adenoscan boomed.  (Klose 1516:17-1517:25,**

**1528:18-1529:14.)**

DFF175.     For this reason, the pharmacological stressor market was an "ideal" market for a new entrant such as Fujisawa, seeking to achieve sales.  (Leffler, Tr. 1602:11-1603:4.)

> **PCF175.     Adenoscan had to compete with a significantly cheaper generic**

**dipyridamole in an extremely cost conscious health care environment.  (Hay**

**1738:22-1740:1.)  Astellas's Vice President of Marketing and Sales for the Critical Care**

Unit identified this as the biggest sales challenge facing Adenoscan.  (White 1246:1-11.)

This challenge made the pharmacologic stressor market far from an "ideal" market for

Astellas.

DFF176.    The second economic factor explaining the sales levels of Adenoscan® is that it became the only promoted product in the pharmacological stress testing market shortly after its entry.  (Leffler, Tr. 1580:14-21; DTX 3133.)

RESPONSE.  The assertion that promotion relative to the incumbent generic

product explains the Adenoscan sales levels presupposes that doctors are gullible

consumers, yet the evidence is that Adenoscan has significant advantages and is used by

expert consumers, including Defendants' expert Dr. Strauss, due to these advantages.

(PFF94, 100, 119.)

DFF180.    As a result, by late 1996, Adenoscan® found itself in the fortunate situation of being the only product advertising itself to the prescribers of pharmacological stress tests.  (Leffler, Tr. 1604:7-11.)  This advantage has continued to the present day.  (Leffler, Tr. 1604:12-22; White, Tr. 1308:1-11.)

PCF180.    By late 1996, Adenoscan had the disadvantage of being seven to ten

times more expensive than the generic dipyridamole competition. (White 1246:1-17; Hay

1738:22-1740:1, 1754:10-1757:19; *see also* PCF172.)

DFF181.    The third economic factor explaining the sales levels of Adenoscan® is Fujisawa's extensive and effective marketing and promotion of the product.  (Leffler, Tr. 1581:11-15; DTX 3133.)

PCF181:    The level of promotion of Adenoscan was typical in the industry, and

does not explain the product's remarkable success.  (PFF120-124.)  The success is due to

the merits of the product, as judged by a market of expert consumers.  (PFF94, 100, 119.)

Defendants have not established a link between the success of Adenoscan and the level of its

promotion, or offered any evidence to negate the fact that doctors, including Defendants'

expert Dr. Strauss, use Adenoscan based on its superiority.  (PFF100, 119.)

DFF182.        Typically, the pharmaceutical industry is very promotion-driven because companies compete to capture the attention of very busy prescribers, who act as agents for patients.  (Leffler, Tr, 1605:2-9.)  Many articles in the economic literature have demonstrated the significance and importance of marketing and promotion to the success of a pharmaceutical product.  (Leffler, Tr. 1605:9-12, 1606:15-25.)

**PCF182.        *See* PCF172.  The merits of a pharmaceutical product are often far more determinative of a pharmaceutical's success than promotion.  Articles in the economic literature recognize that promotion is less important for products that are sold in a hospital and clinic environment, such as pharmaceutical stress agents, as opposed to those sold in a pharmacy setting. (TX-24 at 53-54.)  Furthermore, doctors fully observe the effects of pharmaceutical stress agents in their patients and are not likely to be swayed by marketing, since they are responsible for their patients' health.  (White 1231:22-1232:7; Hay 1712:17-1713:25, 1797:2-1798:1.)**

DFF186.        Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture this narrow pharmacological stressor market.  (Leffler, Tr. 1620:12-20; White, Tr. 1263:1-10, 1283:7-14.) Fujisawa's traditional marketing activities included, *e.g.*, detailing, or informational visits to doctors by pharmaceutical sales representatives; advertising; and sampling. (Leffler, Tr. 1605:13-1606:14, 1610:19-20; White, Tr. 1263:1-10.)

**PCF186.        Astellas promoted Adenoscan using a marketing program that was typical of the industry at the time.  (TX-19; TX-24; TX-1165; Hay 1742:3-24, 1745:3-1749:10.)**

DFF188.        The concentration of the pharmacological stress test market notwithstanding, Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the Adenoscan® product.  (Leffler, Tr. 1609:20-22.)  The sales force employed by Fujisawa (86 sales representatives) was more than twice the size of the sales force DuPont had dedicated to the detailing of Persantine® to the same set of institutions and service providers (42 sales representatives).  (Leffler, Tr. 1609:4-1610:3; White, Tr. 1294:22-25, 1303:22-1305:17; TX 1226 at AST0065741; TX 1242 a AST0185350.)

**PCF188.        Although the raw number of sales representatives employed by Astellas may have been higher, since Astellas's representatives spent only about half their time promoting Adenoscan, Astellas and DuPont had an equivalent number of full time**

sales representatives.  (Hay 1749:23-1750:20.)  Moreover, Defendants have not established

a link between the success of Adenoscan and the number of sales representatives, or offered

any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use

Adenoscan based on its superiority.  (PFF100, 119.)

DFF189.    Fujisawa also engaged in non-traditional marketing activities that were not in the bailiwick of detailing, advertising, and sampling in its efforts to capture the pharmacological stressor market.  (Leffler, Tr. 1610:15-20.; White, Tr, 1283:7-14, 1290:12-23.)

PCF189.    All of Astellas's marketing and promotion activities for Adenoscan

were typical of the industry.  (Hay 1745:3-1749:10.)

DFF190.    The first of the promotional activities that was not within the traditional set of promotional activities was Fujisawa's sponsorship of the American Society of Nuclear Cardiology ("ASNC"), a medical society that advised doctors about which pharmacological stress agents to prescribe.  (Leffler, Tr. 1611:5-8, 1611:13-15, 1613:5-1614:13; TX 1045 at AST0083228; TX 1078 at AST0066744; TX 1128 at AST0043954; DTX 3148.)

PCF190.    The American Society of Nuclear Cardiology ("ASNC") is a society of

nuclear cardiology specialists that is involved primarily in educational endeavors to further

the diagnosis and prognosis of cardiovascular disease.  (White 1339:4-9.)  Astellas's

support of ASNC was educational, and included funding of journal subscriptions for

cardiology fellows (physicians-in-training) and tutorials teaching about products other

than Adenoscan.  (White 1253:6-1255:2.)  ASNC educated doctors about pharmacologic

stress agents in general but did not advise doctors about which pharmacological stress

agents to prescribe.  (TX-92; TX-224; White 1252:17-1259:19.)  Defendants have not

established a link between the success of Adenoscan and Astellas's support of ASNC or

other education groups, or offered any evidence to negate the fact that doctors, including

Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  (PFF100, 119.)

DFF191.    The ASNC was perceived to be a "major strategic partner" and engaged in several marketing programs sponsored by Fujisawa that were designed to increase awareness of and demand for pharmacological stress testing.  (Leffler, Tr. 1611:10-15; TX 1045 at

AST0083228.) The goals of Fujisawa's partnership with the ASNC (and other medical societies) were to support market penetration of Adenoscan as well as achieve total market growth. (Leffler, Tr. 1612:9-1613:4; White; Tr. 1252:17-25, 1339:4-15; TX 1078 at AST0066744.)

**PCF191.       Astellas supported ASNC as part of its educational program, viewing these efforts as supporting the pharmacologic stress market overall.  Astellas did not look to position Adenoscan or promote Adenoscan with this support.  (TX-92; TX-224; TX-365; White 1252:17-1260:10, 1257:2-16; Hay 1751:13-1752:19.)  These education efforts were directed to supporting the market overall and were not focused on any particular product.  (White 1257:2-16.)  Competitors stood to also benefit from these efforts yet Adenoscan's growth outpaced that of much cheaper dipyridamole in this growing market.  (Hay 1751:13-1752:2, 1731:11-1733:3.)  (*See also* PCF 190, 193.)**

DFF192.       One specific way in which Fujisawa supported the ASNC was by covering subscription costs to medical fellows, *i.e.*, young cardiologists in training.  (Leffler, Tr. 1614:14-1615:7; TX 1128 at AST0043954; DTX 3148.) The covering of subscription costs was termed a "great strategic idea" that enabled Fujisawa and the ASNC to develop ground-floor relationships with the very individuals who would be prescribing pharmacological stress agents in the future.  (Leffler, Tr. 1614:24-1615:7, 1630; TX 1128 at AST0043954: DTX 3148.)

**PCF192.       Astellas supported ASNC by covering subscription costs to medical fellows as a way to provide educational support to physicians-in-training.  (TX-92; White 1253:1-1255:2.)  These efforts were directed to supporting the market overall and were not focused on any particular product.  (White 1257:2-16.)**

DFF193.       Another way Fujisawa engaged in non-traditional marketing and promotion was to develop a physician advocacy program in which the company forged relationships with influential doctors who would advocate for the use of Adenoscan® as a preferred pharmacological stressor.  (Leffler, Tr. 1615:9-17.)

**RESPONSE:  Advocates have supported the use of Adenoscan, but physician consultants are not advocates for Adenoscan because they are paid.  (White 1268:18-21.)**

**PCF193.       Adenoscan's advocates were clinicians that believed in the value of Adenoscan and its utility for their patients, and they would espouse these feelings to their**

54

peers.  (White 1268:12-17.)  Many companies had such physician advocacy programs since

they were a common promotional practice in the industry.  (Hay 1752:3-19.)

DFF194.    Physician advocates could be individuals at medical institutions who were called upon by Fujisawa to advocate for the institution's adoption of Fujisawa's product, or thought leaders who publish frequently, garner respect, and speak at symposia sponsored by Fujisawa.  (White, Tr. 1268:18-1270:5.)

PCF194.    Advocates have supported the use of Adenoscan, but physician

consultants were not advocates for Adenoscan because they were paid (White 1268:18-21);

rather they were advocates because they believed in the attributes of Adenoscan (White

1290:3-6).

DFF195.    Physician advocates were paid in the form of fees and other benefits for their work.  (Leffler, Tr. 1617:12-23; TX 1151 at AST0178186.)

PCF195.    Not all physician advocates for Adenoscan were paid, and those that

were retained as consultants were not advocates for Adenoscan because they were paid

(White 1268:18-21); rather they were advocates because they believed in the attributes of

Adenoscan (White 1290:3-6).

DFF196.    Another example of Fujisawa's non-traditional marketing and promotional activities is its provision of financial incentives to physicians or institutions to try Adenoscan®.  (Leffler, Tr. 1617:24-1618:18.)  Through its trial support program, Fujisawa would subsidize the cost of Adenoscan at clinics or hospitals that had not adopted Adenoscan.  (Leffler, Tr. 1618:3-8; White, Tr. 1275:9-15; TX 1045 at AST0083229-230.)

PCF196.    Astellas's trial support program is the provision of a limited amount

of sample Adenoscan to give physicians the opportunity to try Adenoscan and to train their

staff with it.  (White 1274:21-1275:23.)  The trial support program typically provided only

enough Adenoscan to do 20 or 30 scans and participants were only allowed to do the

program once, so the trial support program was not a financial incentive to use Adenoscan.

(White 1274:21-1275:23; Klose 1518:1-1519:12.)  Furthermore, the provision of samples is

one of the most common promotional practices in the industry.  (Leffler 1605:13-1606:14; White 1263:1-10.)

DFF197.       Fujisawa also implemented a program in which it distributed, free-of-charge, the specialized volumetric pumps required for Adenoscan® administration to institutions that did not have them and might otherwise have been disincented to use Adenoscan® as a pharmacological stressor.  (Leffler, Tr. 1618:19-1619:3; klose, Tr. 1539:14-1540:12, 1540:18-1541:2.)  The cost of a volumetric infusion pump was approximately $2,000, a significant up-front expense and hurdle to account conversion.  (Leffler, Tr. 1618:19-1619:8; White, Tr. 1289:11-14.)  No customer request for a pump was rejected, and Fujisawa's sales representatives perceived that the pump program was "vital to the success of Adenoscan."  (Klose, Tr. 1540:4-12; Leffler, Tr. 1619:9-1620:3; TX 1077 at AST0043166-167; DTX 3151.)

PCF197.       Astellas was focused on safety as well as on education.  Since an infusion pump is necessary for the safe and effective administration of Adenoscan, Astellas instituted a pump program to make infusion pumps available at no charge to those using Adenoscan.  (White 1264:24-1265:9, 1266:8-17.)  This was not unusual in the industry because it enabled the safe and proper use of the product.  (Hay 1752:21-1754:1.) Defendants have not established a link between the success of Adenoscan and Astellas's pump program, or offered any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  (PFF100, 119.)

DFF198.       Fujisawa also engaged in non-traditional marketing and promotion by sponsoring and implementing educational initiatives that not only had the objective of educating prescribing doctors and the public, but were also designed to increase the market for pharmacological stress testing, the sales of Adenoscan®, the revenues of Fujisawa, and the ultimate return on investment to the shareholders of Fujisawa.  (White, Tr. 1290:12-1291:6, 1311:11-18.)

PCF198.       As many pharmaceutical companies did at the time, Astellas had an educational program that was focused on the pharmacological stress market in general as opposed to a particular product.  (TX 92; White 1253:1-1255:2.)  These education efforts were directed to supporting the market overall and were not focused on any particular product.  (White 1257:2-16.)  Competitors stood to also benefit from these efforts, yet

**Adenoscan's growth outpaced that of much cheaper dipyridamole in this growing market. (Hay 1751:13-1752:2, 1731:11-1733:3.)**

DFF199.    One of these initiatives was the "Chest Pain Initiative."  (Leffler, Tr. 1620:4-18.) The Chest Pain Initiative was designed to introduce nuclear imaging into emergency room diagnostics for the purpose of identifying whether or not a patient complaining of chest pain is experiencing a heart attack.  (Klose, Tr. 1529:23-1530:12.) Although the initiative was not successful, it represented an attempt by Fujisawa to expand the market for Adenoscan® at a time (2000-early 2001) when the product was beginning to reach market penetration and experience resultant slowed sales growth, as discussed *infra*.  (Klose, Tr. 1530:9-1531:6.)

**PCF199.    *See* PCF197.  Adenoscan did not experience slowed sales growth.  In reality, sales continued to grow substantially and steadily in the years 1998-2001.  (Hay 1725:8-1728:8; DTX-2043.)  Moreover, Ms. Klose admitted that the "Chest Pain Initiative" was not successful (Klose 1529:23-1531:6) and, therefore, could not explain the commercial success of Adenoscan.**

DFF200.    Another of Fujisawa's educational initiatives was the "Her Heart Initiative," which was designed not only to educate doctors and the public about the cardiovascular risks faced by women, but also to increase the use of stress testing for the diagnosis of cardiovascular problems in women, and therefore boost sales of Adenoscan®. (Leffler, Tr. 1620:19-1621:7, 1623:4-13; DTX 3143.)  The Her Heart Initiative did in fact result in an increase in the sales of Adenoscan®.  (Klose, Tr. 1532:9-16.)

**PCF200.    Astellas participates, along with the American Heart Association and many other companies, in the Her Heart campaign, which is an effort to increase the awareness of women's cardiovascular health issues.  (TX-222; TX-359; White 1259:20-1261:19; Klose 1531:8-1532:8.)  Astellas's competitors stood to also benefit from this participation since it was directed to the pharmaceutical stress market as a whole. (Hay 1751:13-1752:2, 1731:11-1733:3.)  Yet, Adenoscan's growth outpaced that of the much cheaper dipyridamole in this growing market.  (Hay 1731:11-1733:3.)  Defendants have not established a link between the success of Adenoscan and Astellas's support of the Her Heart campaign nor do they offer any evidence to negate the fact that doctors,**

including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  (**See also**

**PFF100, 119.**)

DFF201.    A Regional Manager of Fujisawa's Hospital Sales Force in mid-2002 observed that "[d]octors really saw [the Her Heart initiative] as a business expansion opportunity that can increase their numbers of scans."  (Leffler, Tr. 1621:8-1623:13; DTX 3143.)

**PCF201.    See PCF200.**

DFF202.    The Her Heart initiative represented another effort by Fujisawa to expand the use of Adenoscan® in order to achieve sales growth from the product.  (White, Tr. 1290:12-23.)

**PCF202.    See PCF200.**

DFF203.    Another way in which Fujisawa engaged in non-traditional marketing and promotion was by supporting the publication, distribution, and presentation of educational materials that described the application of Adenoscan® in ways that would increase its use. (Leffler, Tr. 1624:17-1625:1.)  An example of such a publication, entitled "The Use of Myocardial Perfusion Imaging," was created by Rush Medical Center and funded by an unrestricted educational grant from Fujisawa.  (White, Tr. 1258:1-15.) The document is a text for a Continuing Medical Education program contains a description of the potential advantages of combining limited exercise with adenosine.  (Leffler, Tr. 1623:14-1624:7; TX 224 at AST0094043.)

**PCF203.    TX-224 is a brochure that was put together by Rush Medical Center**

**in Chicago, not by Astellas.  Astellas simply supported Rush Medical Center with an**

**unrestricted educational grant.  (White 1258:1-11.)  Defendants have not established a link**

**between the success of Adenoscan and any education grant from Astellas, nor did they**

**offer any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss,**

**use Adenoscan based on its superiority.  (See also PFF100, 119.)**

DFF204.    "The Use of Myocardial Perfusion Imaging" indicates that adenosine can be used for stress testing in ways that it was not typically used, *i.e.*, in conjunction with exercise as opposed to as a complete substitute for exercise, and represents another effort on the part of Fujisawa to expand the market of potential users of Adenoscan®.  (Leffler, Tr. 1624:12-1625:1; TX 224 at AST0094043.)

**PCF204.    "The Use of Myocardial Perfusion Imaging" indicates that**

**pharmacologic stress agents, including but not limited to adenosine, could be used in stress**

testing in conjunction with exercise.  (TX-224 at AST0094084.)  To the extent this is an

expansion of the market for Adenoscan, Astellas's competitors stood to benefit from any

expansion of the market as much as Astellas did, yet Adenoscan's growth outpaced that of

the much cheaper dipyridamole.  (Hay 1751:13-1752:2, 1731:11-1733:3; *see also* **PCF203.**)

DFF205.    As described *supra* in paragraphs 184-219, Fujisawa's marketing and promotion was extensive and effective at expanding the market for pharmacological stress testing at a time when, absent a promoting competitor, Fujisawa could capture the bulk of the expanded market.  (Leffler, Tr. 1.581:11-15, 1620:8-10, 1625:2-25, 1629:11-22.)

**PCF205.    *See* PCF181.  Astellas's marketing and promotion efforts were typical**

**in the industry, and the success of Adenoscan is attributed to its superior properties.**

**Moreover, Astellas's competitors stood to benefit from any expansion of the market as**

**much as Astellas did, yet Adenoscan's growth outpaced that of the much cheaper**

**dipyridamole  (Hay 1751:13-1752:2, 1731:11-1733:3.)**

DFF206.    The fact that Fujisawa's sales force was over two times the detail force used by DuPont to promote its competing product of Persantine[®] indicates that Fujisawa's promotion of Adenoscan[®] was extensive.  (Leffler, Tr. 1625:2-11.)

**PCF206.    *See* PCF181, 188.  When considering that only about 50% of their**

**time was spent on Adenoscan, the Astellas sales force was not bigger in terms of "FTEs"**

**than the incumbent DuPont sales force marketing Persantine, indicating that Astellas's**

**marketing was typical for the industry.**

DFF207.    Fujisawa's promotional expenditure data also demonstrates that Fujisawa's promotion of Adenoscan[®] was extensive.  (Leffler, Tr. 1625:12-13.)  For the years 1998 through 2000, Fujisawa's promotional expenditures were over $28 million, or approximately seven percent of sales.  (Leffler, Tr. 1625:12-15.)  This ratio of promotion-to-sales is in the upper range for hospital-based products, and is particularly high in the pharmacological stress testing market where, as discussed *supra* in paragraphs 195 and 198, the market is concentrated in fewer institutions and there is no other promoted competing product. (Leffler, Tr. 1625:12-25.)

**PCF207.    The Astellas accounting figures designated as "marketing" include**

**extensive educational efforts directed to support the field as a whole, yet these expenditures**

**are not separately accounted for in Dr. Leffler's analysis of the ratio of promotion to sales.**
**(*See, e.g.*, White 1257:2-20, 1260:19-22, 1262:16-21; Hay 1750:21-1751:6, 1751:13-1752:2.)**
**Moreover, this finding focuses, for no justified reason, on promotional expenses during the**
**limited period from 1998 to 2000 while the ratio of promotion to expenses over 10 years**
**averaged only 4.7 percent. (Hay 1743:7-19.) Indeed, Astellas's efforts are "very typical,**
**very customary in the pharmaceutical industry and certainly in terms of total effort… it's,**
**if anything, somewhat on the low side for pharmaceuticals." (Hay 1751:7-12.)**

DFF208.        There was nothing improper about Fujisawa's promotion of Adenoscan®.
(Leffler, Tr. 1626:1-4.) It was a well-managed promotional campaign that succeeded in raising
awareness and adoption of the use of pharmacological stress testing – using Adenoscan® in
particular – irrespective of any claimed superiority of the drug. (Leffler, Tr. 1626:5-11,
1629:11-22, 1631:12-1632:22.)

**PCF208.        Defendants have not established a link between the success of**
**Adenoscan and Astellas's education and promotional efforts, nor have they offered any**
**evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use**
**Adenoscan based on its superiority. (*See* PFF100, 119.)**

DFF209.        The fourth economic factor explaining the sales levels of Adenoscan® is
the growth in demand for pharmacological stress testing unrelated to the asserted inventions.
(Leffler, Tr. 1581:19-20; DTX 3133.)

**PCF209.        Even though the total number of annual procedures steadily increased,**
**the sales of Adenoscan increased disproportionally faster than dipyridamole, whose market**
**share dropped over a 10 year period from 76 percent down to 32 percent. (Hay 1732:12-15,**
**1733:14-1734:5.) The evidence shows that the growth in market share for Adenoscan over**
**dipyridamole was due to the superiority of adenosine for MPI. (*See* PFF100, 119.)**

DFF211.        Trends in the sales of Adenoscan reflected this general market growth.
(Leffler, Tr. 1628:18-25; DTX 3130.)

**PCF211.     The trend in Adenoscan's sales growth exceeded the general market growth. Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005. (TX-19; Hay 1714:13-1716:9; DTX-2014.) Adenoscan's dramatic sales growth is seen in its market share. In December of 1995, Adenoscan held 16.5% of the market share of scans, and dipyridamole held 76%. (TX-21; Hay 1731:11-22; DTX-2029.) By June of 2005 Adenoscan's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%. (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2030; DTX-2031.)**

DFF212.     After its entry into the marketplace in August 1995, Adenoscan[®] experienced relatively moderate sales from August 1995 through about mid-1999. (Leffler, Tr. 1575:23-1576:8, 1630:12-1631:4; DTX 3130.)

**PCF212.     Adenoscan's sales revenue increased from approximately $36 million in 1996 to approximately $105 million by 1999. (TX-19; Hay 1714:13-1716:9; DTX-2014.)**

DFF213.     Adenoscan[®]'s growth then leveled out during the period from about mid-1999 through about mid-2001. (Leffler, Tr. 1576:15-18.) This flattened growth is typical of the life cycle of products in pharmaceutical markets. (Leffler, Tr. 1576:8-10; DTX 3130.)

**PCF213.     Adenoscan's sales growth did not level out between 1999 and 2001. In reality, sales continued to grow substantially and steadily in the years between 1999 and 2001 (Hay 1725:8-1728:8; DTX-2043), with the Japanese parent company reporting double digit growth in sales for the period in which Sicor alleges they were slowing. Moreover, on cross examination, Dr. Leffler disavowed the existence of any "plateau" in the sales and admitted that his calculated growth rate, now recharacterized as a "slowing," is an artifact of his calculation method. (PFF127.)**

DFF214.     Beginning in about 2001 to 2002, the sales of Adenoscan[®] accelerated at a relatively substantial rate through mid-2005. (Leffler, Tr. 1576:23-1577:4, 1628:18-1629:10; DTX 3130.) Such a phenomenon is unusual in pharmaceutical markets; it is rare to see a product in its sixth year on the market suddenly show substantially increasing sales. (Leffler, Tr. 1629:1-10; DTX 3130.)

61

**PCF214.        As they had been in previous years, sales of Adenoscan continued to grow substantially and steadily in the years between 2001 and 2005.  (Leffler 1662:11-1666:9; Hay 1725:8-1728:8; DTX-2043.)**

DFF216.        These demographic phenomena and guideline changes resulted in a growth in demand for pharmacological stress agents at a time that was very fortuitous for Fujisawa, because there was a general, substantial growth in demand for the product the company was marketing in a market in which Adenoscan[®] was the only promoted product. (Leffler, Tr. 1582:5-8, 1627:12-14; White, Tr. 1311:3-9.)

**PCF216.        Adenoscan's sales grew because clinicians recognized significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; Strauss 784:6-786:6; *see also* Hay 1754:10-1757:15.)  Moreover, Astellas's competitors stood to benefit from any expansion of the market as much as Astellas did, yet Adenoscan's growth outpaced that of the much cheaper dipyridamole.  (Hay 1751:13-1752:2, 1731:11-1733:3; *see also* PCF217.)**

DFF217.        These demographic phenomena, combined with Fujisawa's role in generating growth through its educational initiatives and other forms of promotion, are reflected in the increasing sales growth experienced by Adenoscan[®] in recent years.  Leffler, Tr. 1629:11-22; DTX 3130.)

**PCF217.        The increase in the market for pharmaceutical stress agents and Astellas's educational efforts supporting the market as a whole would have benefited all pharmaceutical stressors alike if the pharmaceutical stressors were perceived to have equally advantageous attributes.  (*See* Hay 1739:8-1740:1.)  Adenoscan's market share is nearly twice that of dipyridamole, its significantly cheaper competitor, because physicians prefer the attributes of Adenoscan.  (*See* White 1353:19-1354:16.)**

DFF218.        It is notable that this general growth in the demand for pharmacological stressors also benefited Adenoscan[®]'s competing, non-promoting pharmacological stressor competitors, namely, dipyridamole.  (Leffler, Tr. 1628:23-1629:1.)

**PCF218.        Despite being seven to ten times cheaper than Adenoscan, dipyridamole's sales growth significantly lagged behind both Adenoscan sales and the**

**pharmaceutical stress agent market in general.  (Hay 1733:4-1734:11; DTX-2032.)**

**Dipyridamole's market share dropped from 76% in December of 1995 to 32% by June of**

**2005.  (TX-21; Hay 1731:11-1733:3; DTX-2031.)**

DFF219.        Looking at the number of pharmacological stress tests performed using dipyridamole, from 1995 through 2005, it is clear that the use of dipyridamole was relatively constant with slight growth through about mid-2000, when an acceleration in the use of dipyridamole is observed.  (Leffler,  Tr. 1599:12-1600:5; TX 21; DTX 3132.)  Then usage of dipyridamole experiences a rapid acceleration for about five quarters and then a general continued growth in use.  (Leffler, Tr. 1600:1-5; TX 21; DTX 3132.)

    **PCF219.        *See* PCF209, 217, and 218.**

DFF220.        The pattern in the usage of dipyridamole demonstrates that it clearly retained significant usage throughout the period during which Adenoscan has been on the market, such that the pharmacological stressor market does not display a dynamic in which a competitor enters the market and takes significant usage away from another product.  (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132.)

    **PCF220.        Adenoscan in fact did enter the market and take significant market**

**share away from dipyridamole.  Indeed, Adenoscan's increases in market share came at**

**dipyridamole's expense and Adenoscan displaced dipyridamole as market leader.  (TX-21;**

**Hay 1731:11-1733:3; DTX-2029; DTX-2030; DTX-2031.)  Adenoscan gained market share**

**because doctors switched from dipyridamole and also by taking an increasingly larger**

**share of the growing market as doctors chose Adenoscan over dipyridamole. (Hay**

**1733:4-1734:11, 1739:20-1740:1; Klose 1528:18-1529:22; DTX-2032.)**

DFF221.        While the general growth in the demand for pharmacological stressors benefited Adenoscan[®]'s competing, non-promoting pharmacological stressor competitors, Adenoscan[®] differentially benefited from the growth in the marketplace because it was the only product being promoted.  (Leffler, Tr. 1629:23-1630:11.)

    **PCF221.        There is no evidence that Adenoscan's growth in market share was**

**due to its promotion as opposed to its superiority, which is merely an "expect[ation]" of Dr.**

**Leffler.  (Leffler 1630:9-11.)  To the contrary, the growth in market share for Adenoscan**

over dipyridamole was due to the superiority of adenosine for MPI as evidenced by Dr. Strauss's testimony.  (PFF100, 119.)

DFF222.        There is no nexus between the claimed superiority of Adenoscan® and the sales achieved by the product.  (Leffler, Tr. 1631:5-11.)

PCF222.        Dr. Leffler, whose testimony provides the only support for DFF239, did not conduct a sufficient analysis and is not qualified to opine based on this analysis that there is no nexus between the commercial success of Adenoscan and the merits of the claimed invention.  Indeed, Dr. Leffler admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1631:5-11.)   He never consulted any physicians about the reasons why they purchase adenosine instead of dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents. (Leffler 1683:6-11.) Dr. Leffler also did not provide any information about what percentage of sales were due to Adenoscan's merits and what percentage were due to promotion and advantageous market circumstances.  (Leffler 1683:6-1684:12.)  Following a trend recognized by other courts (PFF129,130), Dr. Leffler's opinion was also based on substantial mistakes, inaccurate calculations, and incomplete data (PFF126-128).

DFF223.        The sales of Adenoscan® are explained by the facts recited *supra* in paragraphs 183-237.  (Leffler, Tr. 1631:12-21.)

DCF223.  *See* 167-221, *supra*.

DFF224.        If Adenoscan® truly had significant advantages over the existing competitors in the pharmacological stressor market, it would have been expected to capture most of those competitors' sales and quickly dominate the marketplace, particularly in a situation where it was the only product being promoted.  (Leffler, Tr. 1631:22-1632:12, *see* Lipitor example at 1632:8-11.)  However, dipyridamole continued to generate significant growth in usage and sales alongside Adenoscan®.  (Leffler, Tr. 1632:5-7.)

**RESPONSE: Dr. Leffler admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1631:5-11.)   The opinions he did offer were based on substantial mistakes, inaccurate calculations, and incomplete data.  (PFF126-128.)  Thus, having disavowed any opinion on the issue, Dr. Leffler's testimony—the only citations provided in DFF224—cannot support the assertions that Adenoscan lacked significant advantages.  To the contrary, qualified physicians, including defendant's expert Dr. Strauss, use Adenoscan based on its superiority.  (PFF100, 119.)**

**PCF224.    Adenoscan had truly significant advantages over its competitors, and it captured most of those competitor's sales.  (TX-21; Hay 1731:11-1733:3; DTX-2029; DTX-2030; DTX-2031.)  Sicor's expectation for the behavior of a commercially successful product is its own construct, and tellingly, Sicor offers nothing more than the bare opinion of Dr. Leffler for its support.  (*See* Leffler 1631:22-1632:12.)**

DFF225.    Therefore, the sales pattern exhibited by Adenoscan® is well-explained by the circumstances that existed in the marketplace and Fujisawa's recognition of and ability to capitalize on those circumstances – irrespective of any claimed superiority of the product. (Leffler, Tr. 1631:12-1632:22.)

**PCF225.    Adenoscan's sales performance demonstrates that doctors must recognize advantages in Adenoscan to choose it over generic dipyridamole - a seven to ten times cheaper product.  (Hay 1738:22-1740:1, 1754:10-1757:19.)  Astellas's promotion of Adenoscan and the circumstances that existed in the marketplace fail to explain Adenoscan's sales performance.**

C.    Counterfindings Regarding the '296 Patent and the Karolinska Request

1.    Counterfindings Regarding Whether the '296 Patent and the
Karolinska Request Are Prior Art

DFF229.    There is no dosing information listed in the description of the second study. (Wackers, Tr. 1015:4-7; TX 57 at 6.)

**RESPONSE:  DFF229 improperly suggests that the second, comparative study in TX-57 did not teach or suggest the same dosing method described for the first, normal volunteer study in TX-57.  Thus, the following counterfinding is proposed:**

**PCF229.    The Creighton Protocols, TX-57, provided for a titration method and relevant endpoints for determining an adenosine dose for imaging.  The titration method consisted of infusing adenosine at a dose of 10 mcg/kg/min and increasing the dose until one of three endpoints was observed:  1) a maximum dosage of 320 mcg/kg/min, 2) the patient develops symptoms of headache, nervousness, flushing in the face and/or neck, shortness of breath, chest pain, or other disabling symptoms, or 3) a reduction in mean arterial blood pressure of 40-50 mmHg.  (TX-57 at 4.)  The second study developed by Drs. Hilleman and Mohiuddin was designed to compare the safety and efficacy of adenosine versus dipyridamole in patients with documented coronary artery disease.  (*See* TX-57; Mohiuddin 1870:21-1871:3.)  The inventors intended that the comparative study use the same adenosine dose regimen as the normal volunteer study.  (Mohiuddin 1872:19-1873:3.) This intent was implicit in that the protocol for the comparative study was adjacent to and repeatedly referenced the normal volunteer study.  (*See* TX-57 at 6; Hilleman 2171:17-2172:8.)  Indeed, neither the Creighton IRB nor the FDA objected to the patient protocol as lacking a dosing scheme.  (*See* TX-54; TX-60; Wackers 976:4-10; Hilleman 2171:17-2172:8.)**

DFF230.        At the time of the protocol, the named inventors had not conceived of a dose range of 20-200 mcg mcg/kg/minute.  (Wackers, Tr. 1010:12-15.)

**RESPONSE:  DFF230 is irrelevant.  Plaintiffs proved that Example XIII of the '296 patent is removed as prior art by demonstration of prior possession of as much of the claimed invention as Example XIII of the '296 patent happens to show.  (*See* PCL52-56.) Plaintiffs have done so, as of a date no later than December 9, 1987, when the Creighton Protocols were filed with the FDA.  (PFF136-146.)  Furthermore, Sicor has omitted highly relevant testimony immediately preceding its citation, in which Dr. Wackers testified that this section of TX-57 includes a description of an adenosine infusion dosage from 10-320 mcg/kg/min along with the idea to titrate.  (Wackers 1009:21-1010:11.)  Accordingly, the following counterfinding is proposed:**

**PCF230.        Plaintiffs proved that the inventors of the '877 patent were in possession of as much of the claimed invention as was disclosed in Example XIII of the '296 patent by at least December 9, 1987, and proceeded diligently thereafter to actually and constructively reduce that subject matter to practice.  (*See* PFF136-142; PCL52-56.) Moroever, as documented in the Creighton Protocols (TX-57), the inventors of the '877 patent had invented a dose titration in the range of 10-320 mcg/μg/min by at least December 9, 1987.  (*See* PFF136-142.)**

DFF231.        At the time of the protocol, the named inventors had not conceived of a dose of about 140 mcg/kg/minute.  (Wackers, Tr. 1010:16-18.)

**RESPONSE:  *See* Response to DFF230 and PCF230.**

**PCF231.        *See* PCF230.**

DFF234.        The inventors obtained successful test results using doses of adenosine ranging from 60 to 140 mcg/kg/minute.  (Wackers, Tr. 1018:2-17; TX 296 at AST0004363.)

**RESPONSE:  The proposed finding does not fully reflect Dr. Wackers' testimony.**
**Dr. Wackers actually testified that adenosine doses of 60-140 mcg/kg/min worked for "each**
**of those patients," referring to the patients in the inventors' "C1B" clinical trial, each of**
**whom were known to have angiographically-documented coronary artery disease.  (*See***
**TX-57 at 6; TX-296 at AST 0004357-63; Wackers 1017:14-1018:17.)  Therefore, the**
**following, more accurate counterfinding is proposed:**

**PCF234.        The inventors successfully confirmed angiographically-documented**
**coronary artery disease in a series of patients using adenosine doses ranging from 60 to 140**
**mcg/kg/min in conjunction with MPI.  (*See* TX-57 at 6; TX-296 at AST 0004357-63;**
**Wackers 1017:14-1018:17.)  Dr. Wackers further testified that higher doses such as 140**
**mcg/kg/min are needed to insure a consistent and adequate increase of coronary blood flow**
**(Wackers 965:17-25), which is required to ensure that a patient in whom no coronary**
**obstruction is detected is in fact healthy.  (Strauss 693:20-694:7.)**

DFF236.        The priority date of the asserted claims of the '877 patent is no earlier than
March 14, 1988.

**PCF236.        *See* Response to DFF25 and PCF25.**

DFF239.        The priority date of Example XIII is December 28, 1987.  (TX 275.)

**RESPONSE:  Sicor's imprecise use of the phrase "priority date" with respect to**
**Example XIII may result in unnecessary confusion regarding the separate issue of priority**
**of invention.  Although the application leading to the issuance of the '296 patent was not**
**filed until March 15, 1993, the parties agree that Example XIII is entitled to the benefit of**
**the December 28, 1987 filing date of U.S. Application No. 07/138,306.  (*See* TX-275; D.I.**
**133, Ex. 1, ¶ 17.)  Therefore, the following counterfinding is proposed:**

**PCF239.          Example XIII is entitled to the benefit of the December 28, 1987 filing date of U.S. Application No. 07/138,306.  (*See* TX-275; D.I. 133, Ex. 1, ¶ 17.)**

DFF240.          Example XIII of the '296 patent is prior art to the '877 patent.

**PCF240.          Example XIII of the '296 patent is not prior art to the '877 patent, as the inventors of the '877 patent were in prior possession of as much of the claimed invention as Example XIII of the '296 patent happens to show by at least December 9, 1987, and proceeded diligently thereafter to actually and constructively reduce that subject matter to practice.  (*See* PFF136-142, PCL52-56.)**

DFF243.          Requests such as the Karolinska Request are generally available to the public in Sweden.  (TX 1193 at SIC010937.)

**PCF243.          The sole support relied on by Sicor in suggesting that the Karolinska Request was generally available to the public in Sweden is TX-1193 at SIC010937, a letter written by a European patent attorney submitting a request to the European Patent Office. This letter has not been properly authenticated, constitutes inadmissible hearsay, and is also irrelevant to the question of whether the Karolinska Request is a "printed publication" under 35 U.S.C. § 102(a) and, therefore, prior art.  (Objections at 1364:14-18, 1813:23-24.) Moreover, as set forth in the Stipulation of Mr. Mattsson, a partner in the international law firm of Awapatent AB, the statement in question referred not to any aspect of U.S. law, but to public availability under the European Patent Convention. (TX-Court11, ¶¶ 8-9.)  Under that Convention, a document would be considered publicly available even if the document was not indexed or catalogued in a way that a member of the public could look it up or that would raise a presumption that the public concerned with the art would know of it. (*See* TX-Court11, ¶¶ 10-12.)**

DFF244.          The Karolinska Request is prior art to the '877 patent.

**PCF244:**        Sicor offers no evidentiary support whatsoever for DFF244, despite bearing the burden of proving that the *Karolinska Request* (TX-1193) is prior art by clear and convincing evidence.  *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004); *see also Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("By challenging the validity of [the patent], [the challenger] bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the Cook catalog as prior art.")  The *Karolinska Request* (TX-1193) is not prior art under 35 U.S.C. § 102(a) because it is unauthenticated, inadmissible hearsay, and reflects activity outside the United States, and is not a "printed publication."  (*See* PB § IV.C.3;  *see also* POB § III.C.)  A "printed publication" under U.S. law must have been "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it . . . ." *Bruckelmyer v. Ground Heaters, Inc.*, 453 F.3d 1352, 1354 (Fed. Cir. 2006) (*citations omitted*).  The ability to locate a printed publication is critical and, in the case of single-copy documents like doctoral theses and the Karolinska Request, requires some form of indexing.  *Id.* at 1379; *see also In re Cronyn*, 890 F.2d 1158, 1160-61 (Fed. Cir. 1989).  Sicor presented no evidence that the Karolinska Request was a printed publication; accordingly, Sicor has failed to prove by clear and convincing evidence that the Karolinska Request is prior art to the '877 patent.  (*See also* PCF117.)

## 2.    Additional Counterfindings Regarding the '296 Patent

DFF245.        Example XIII of the '296 patent discloses a method of detecting the presence of and assessing the severity of coronary artery disease in a human.  Specifically, Example XIII describes the use of MPI to diagnose coronary heart disease.  (TX 275 at col.21, ll.29-61.)

**PCF245.        Example XIII of the '296 patent consists of a half column prophetic suggestion on the use of adenosine in connection with myocardial imaging.  (*See* TX-275 at col. 21, ll. 22-61.)  Example XIII proposes the use of adenosine in MPI to diagnose coronary heart disease at a dose to be determined on a case-by-case basis by titration.  (*Id.*; *see also* PCF 107, 110.)**

DFF246.        Example XIII of the '296 patent discloses intravenously administering adenosine at a dose range of 10-150 mcg/kg/minute to cause vasodilation.  (Strauss, Tr. 752:2-23; TX 275 at Example XIII; *see* DTX3117.)

**RESPONSE:  While Sicor suggests that Example XIII discloses administering a dose range of 10-150 mcg/kg/min, the patent actually teaches individual titrations on a case-by-case basis, as acknowledged by Dr. Strauss in the cited testimony.  (TX-275 at col. 21, ll. 59-61; Strauss 752:2-23.)  Therefore, the following, more accurate counterfinding is proposed.**

**PCF246.        Example XIII of the '296 patent proposes individual titrations on a case-by-case basis, stating that the "exact dose will normally have to be titrated individually but should lie in the range of 10 to 150 [mcg/kg/min.]"  (TX-275 at col. 21, ll. 59-61; Wackers 957:14-958:13; *see also* PCF 107, 110.)**

DFF248.        Example XIII of the '296 patent states that:

> [A]denosine can be used instead of dipyridamole in the diagnostic test described.  It would in fact be an advantage to use adenosine insofar as it can be dosed exactly and dose-titrated to a precise effect, whereas with dipyridamole, the adenosine levels are unpredictable.  Thus, a safer and more reliable test can be expected if adenosine is used.

(TX 275, col. 21, ll. 52-58).

**PCF248.        *See* PCF 107.**

DFF251.        Example XIII of the '296 patent discloses every element of asserted claims 23(17), 23(18) and 43.

PCF251.        *See* **PCF 107, 110, 245, 246.**

### 3.    Additional Counterfindings Regarding the Karolinska Request

DFF253.        The Karolinska request discloses every element of asserted claims 23(17) and 43.  (Strauss, Tr. 754:14-22; TX 1193.)

PCF253.        **The Karolinska Request has not been proven to be prior art to the '877 patent.  (*See* PCF243-244.)**

## II.    PLAINTIFFS' PROPOSED COUNTERCONCLUSIONS OF LAW

As an aid to the court, Plaintiffs have prepared responses and counterconclusions with an emphasis on issues believed to be most pertinent to this case.  Each response and counterconclusion is in bold text immediately following the proposed conclusion to which it pertains.  While each response and counterconclusion indicates specific reasons for Plaintiffs' disagreement with Sicor's proposed conclusion, such responses and counterconclusions do not necessarily encompass all of the bases for Plaintiffs' disagreement.  Moreover, the absence of a response or counterconclusion to any specific proposed conclusion or part thereof does not constitute an admission that Plaintiffs agree with or concede that the proposed conclusion or any part thereof is correct as stated.

Many of Sicor's proposed conclusions of law are actually or predominantly findings of fact.  To the extent this occurs, Plaintiffs have cross-referenced the relevant counterfindings of fact.  To the extent Sicor's proposed conclusions of law are not supported by the underlying evidence, Plaintiffs have also cross-referenced the relevant counterfindings of fact.

### A.    Counterconclusions Regarding Obviousness

### 1.    Counterconclusions Regarding the Law Of Obviousness

DCL256.        The factual inquiries underlying, the legal determination of obviousness include the following four factors:  (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4)

other secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

**RESPONSE:  For completeness, the following counterconclusion is proposed:**

**PCC256.     The factual inquiries underlying, the legal determination of obviousness include the following four factors:  (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) other secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).  Additional factual inquiries include determining what the prior art teaches and whether it "teaches away" from the claimed invention.  *In re Bell*, 991 F.2d 781, 784 (Fed. Cir. 1993).  Furthermore, these inquiries must be conducted viewing the invention in the context of the state of the art that existed at the time the invention was made.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).  Moreover, it is improper to use hindsight to reconstruct the claimed invention from the prior art.  *ACS Hosp. Sys.*, 732 F.2d at 1577; *Uniroyal*, 837 F.2d at 1050-51.**

DCL257.     The obviousness inquiry should address question of whether there was "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention dose."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. -- (2007), slip op at 15.

**RESPONSE:  For completeness, the following counterconclusion is proposed:**

**PCC257.     Under *KSR International Co. v. Teleflex Inc.*, fact finders must still avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."  127 S. Ct. 1727, 1742 (2007) (citing *Graham*, 383 U.S. at 36).  While prior art combinations resulting in  "predictable solutions" leading to "anticipated success" are clear indicators of obviousness, where those combinations "work [] together in an unexpected and fruitful manner" they are not obvious.  *See id.* at 1740, 1742.**

**Furthermore, the Supreme Court in *KSR* acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id*. at 1741. Moreover, the Court noted, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id*. at 1740. Furthermore, prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness. *See id.***

DCL258.    The Supreme Court has clarified the appropriate standard for determining whether the prior art shows a reason to combine. The test for whether the art shows a reason to combine must not be rigid and inflexible. The appropriate, flexible test for considering whether a combination of elements is obvious "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, slip op at 14. This analysis "cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id*. at 15.

**PCC258.    Although the Court stated "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," the Supreme Court in *KSR*, did not do away with the "teaching-suggestion-motivation" ("TSM") test employed by the Federal Circuit, stating that "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis." 127 S. Ct. at 1741. Furthermore, the Court acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* Moreover, the Court found, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be**

nonobvious." *Id.* at 1740.  **Additionally, the Court concluded that prior art warnings about**

**risks involved in the claimed invention and obtaining unexpected results also support a**

**conclusion of nonobviousness.** *Id.*

DCL260.    The "suggestion, teaching or motivation to combine the relevant prior art teachings *does not have to be found explicitly in the prior art . . . .*" *Alza*, 464 F.3d at 1290 (emphasis in original).  The motivation or suggestion can be found implicitly in the prior art as a whole and/or in the knowledge of a person of skill in the art.  *Id.* at 1290, 1294.

**RESPONSE:  Sicor misquotes the cited case law in DCL 260.  Thus, the following**

**counterconclusion is proposed:**

**PCC260.    "A suggestion, teaching, or motivation to combine the relevant prior**

**art teachings *does not have to be found explicitly in the prior art*, as 'the teaching, motivation,**

**or suggestion may be implicit from the prior art as a whole, rather than expressly stated in**

**the references.'"** *Alza Corp. v. Mylan Labs., Inc*. 464 F.3d 1286, 1290 (Fed. Cir. 2006)

**(emphasis in original) (citations omitted).  The motivation or suggestion can also be found**

**implicitly in the knowledge "generally available" to a person of skill in the art.** *Id.* **at 1291.**

**Of course, the claimed invention must be viewed in the state of the art that existed at the**

**time of invention, and it is improper to use hindsight to reconstruct the claimed invention**

**from the prior art.** *Uniroyal, Inc. v. Rudkin-Wiley Corp*., 837 F.2d at 1050-51.

DCL261.    The suggestion test "not only permits, but *requires*, consideration of common knowledge and common sense." *Dystar*, 464 F.3d at 1367 (emphasis in original).

**PCC261.    While the Federal Circuit in** *Dystar Textilfarben GmbH & Co. v. C.H.*

*Patrick Co*. **stated that the suggestion test "not only permits, but requires, consideration of**

**common knowledge and common sense," 464 F.3d at 1367,  the Supreme Court has**

**recognized for decades that after-the-fact assertions that a patented invention was the**

**result of mere common sense should be viewed skeptically, particularly where those**

**assertions are supported by little more than bare expert opinion:**

> Many things, and the patent law abounds in illustrations, seem
> obvious after they have been done, and "in the light of the
> accomplished result," it is often a matter of wonder how they so long
> "eluded the search of the discoverer . . . ."Knowledge after the event is
> always easy, and problems once solved present no difficulties, indeed,
> may be represented as never having had any, and expert witnesses
> may be brought forward to show that the new thing which seemed to
> have eluded the search of the world was always ready at hand and
> easy to be seen by a merely skillful attention.  But the law has other
> tests of the invention than subtle conjectures of what might have been
> seen and yet was not.

*Diamond Rubber Co. v. Consol. Rubber Tire Co.,* **220 U.S. 428, 434-35 (1911) (citation**

**omitted);** *see also  Potts v. Creager***, 155 U.S. 597, 608 (1895) ("The apparent simplicity of a**

**new device often leads an inexperienced person to think that it would have occurred to any**

**one familiar with the subject; but the decisive answer is that, with dozens and perhaps**

**hundreds of others laboring in the same field, it had never occurred to any one before.");**

*Loom Co. v. Higgins***, 105 U.S. 580, 591 (1881) ("Now that it has succeeded, it may seem very**

**plain to any one that he could have done it as well.  This is often the case with inventions of**

**the greatest merit.").  Thus, a court should be highly skeptical when a defendant resorts to**

**purported "common sense" that contradicts the clear teachings of the prior art.**

DCL262.      A person of ordinary skill in the art at the time must also have had a
reasonable expectation that the combination of references would succeed for its intended purpose.
*See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1125 (Fed. Cir.
2000).  The appropriate standard is whether a person of skill would have a "reasonable
expectation" of success, not "absolute predictability."  *In re O'Farrell*, 853 F.2d 894, 903-904
(Fed. Cir. 1988).

**PCC262.      A second and equally necessary question in an obviousness inquiry is**

**whether a person of ordinary skill would have had a reasonable expectation of success.**

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.***, 320 F.3d 1339, 1354 (Fed.**

**Cir. 2003) ("A showing of obviousness requires a motivation or suggestion to combine or**

**modify prior art references, coupled with a reasonable expectation of success . . . .").**

**Furthermore, while absolute certainty is not necessary to establish a reasonable expectation of success,** *In re O'Farrell,* **853 F.2d 894, 903-04 (Fed. Cir. 1988), "there can be little better evidence negating an expectation of success than actual reports of failure."** *Boehringer,* **320 F.3d at 1354.  Moreover, merely asserting that a teaching in a reference would "pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result, or that the claimed result would be obtained if certain directions were pursued" is not sufficient to establish obviousness.** *See, e.g., Gillette Co. v. S.C. Johnson & Son, Inc.***, 919 F.2d 720, 725 (Fed. Cir. 1990).**

DCL263.    The "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

**PCC263.    It has long been the law that in unpredictable arts, proof of obviousness requires proof of a reasonable expectation of success.** *See In re Rinehart***, 531 F.2d 1048, 1054 (C.C.P.A. 1976).  The** *KSR* **decision did not change this aspect of the law of obviousness.  While the Supreme Court found error in the Federal Circuit's conclusion that the patent claim in** *KSR* **could not be proved obvious merely by showing that the combination of elements was "obvious to try," that finding was in the context of a mechanical invention where there was "a design need or market pressure to solve a problem" and "a finite number of identified,** *predictable* **solutions," not an** *unpredictable* **pharmaceutical invention.** *See* **127 S. Ct. at 1743, (emphasis added).  Numerous aspects of the patent law are applied differently in predictable mechanical technologies than they are in unpredictable technologies, like human medicine.** *See, e.g., Capon v. Eshar***, 418 F.3d 1349, 1358-59 (Fed. Cir. 2005)** *In re Bowen,* **492 F.2d 859, 861-62 (C.C.P.A. 1974)***; In re Cook,* **439 F.2d 730, 734 (C.C.P.A. 1971).  The requirement for a reasonable expectation of**

success is such a patent law principle that is less easily satisfied where predictability is lacking, as it is here. *See, e.g., In re Kratz*, 592 F.2d 1169, 1175 (C.C.P.A. 1979) *In re Shetty*, 566 F.2d 81, 86 (C.C.P.A. 1977).

DCL264.    Relevant secondary considerations must also be considered if they are present.

**RESPONSE:  Sicor's proposed DCL264 fails to cite any legal authority and downplays the importance in evaluating objective evidence of nonobviousness.  Thus, the following counterconclusion is proposed:**

**PCC264.    The Federal Circuit, following the mandate of *Graham,* has emphasized the need for evaluating objective evidence of nonobviousness.  *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness").  This evaluation must be made during a court's consideration of whether the claimed invention is obvious, not after such a determination is complete.  *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co*., 730 F.2d 1452, 1461 (Fed. Cir. 1984).**

**Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others.  *Graham*, 383 U.S. at 17-18; *U.S. v. Adams*, 383 U.S. 39, 51-52 (1966); *Forest Labs., Inc. v. Ivax Pharm., Inc*. 438 F. Supp. 2d 479, 496 (D. Del. 2006).  Objective evidence is often the best and clearest evidence bearing on the issue of obviousness.  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).**

**The defendants have the burden of proof with respect to *all* of the *Graham* factors, including objective evidence of nonobviousness.  *See Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 8 (Fed. Cir. 1984) (holding that burden is not on the patentee to**

78

prove new and surprising results, but is on the patent challenger to establish the lack of

new and surprising results).

DCL267.    Secondary considerations do not control the obviousness determination.
*Pfizer*, 480 F.3d at 1372; *Richardson-Vicks Inc. v. UpJohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir.
1997); *see also Newell Cos., Inc. v. Kenney Manuf. Co.*, 864 F.2d 757, 769 (Fed. Cir. 1989)
("[A]lthough the record shows a highly successful product, the record also establishes such a
strong case of obviousness . . . that the objective evidence of nonobviousness does not persuade
us to reach a contrary conclusion.")

PCC267.    **While secondary considerations do not necessarily control the**

**obviousness determination, they must be considered,** *Ruiz,* **234 F.3d at 667, and "are often**

**[the] most probative and determinative of the ultimate conclusion of obviousness or**

**nonobviousness."** *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, **75 F.3d 1568, 1573**

**(Fed. Cir. 1996).**

DCL269.    Obviousness is determined from the point of view of a hypothetical person
of ordinary skill in the art to which the patent pertains, who is presumed to have access to all
prior art references in the field of the invention.  *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir.
1998).

PCC269.    **The determination of the level of skill in the art is an integral part of**

**the obviousness analysis.** *Ruiz*, **234 F.3d at 666-667. Obviousness is determined from the**

**point of view of a hypothetical person of ordinary skill in the art to which the patent**

**pertains, who is presumed to have access to all prior art references in the field of the**

**invention.** *See In re Rouffet*, **149 F.3d 1350, 1357 (Fed. Cir. 1998).   Both parties' experts**

**essentially agree on the educational qualifications of the person of ordinary skill in the art:**

**a physician trained in cardiology with an additional 1-2 years training in nuclear**

**cardiology, or a physician trained in nuclear medicine with at least 1 year of additional**

**training in nuclear cardiology.  (Strauss 646:4-14; Wackers 898:15-899:1, 899:7-11.)**

**Consistent with the requirement that a person of ordinary skill be considered "presumed to**

**think along conventional lines," such a physician would have been actually aware of the**

adverse cardiac side effects that had been associated with adenosine for decades and unlikely to discount them without significant reassurance. *See Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000)  The "fundamental issue [is] whether a hypothetical person of ordinary skill in the art, when confronted with the problem . . . would have been motivated" to make the connection. *Sibia Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000).

DCL271.      A person of ordinary skill in the art is presumed to have common sense and the ordinary creativity of a person in the relevant field(s). *KSR*, slip op at 17.

RESPONSE: This Court should be highly skeptical when a defendant resorts to purported common sense that contradicts the clear teaching in the prior art and the contemporaneous evidence of reaction to the invention once it was made.  There is a fundamental logical disconnect between Sicor's *ex post* opinions of blatant obviousness and the testimony and writings of those who were actually present at the relevant time, reflecting the perceived unsuitability of adenosine as a pharmacologic stress agent for human MPI.  Of the two, the Federal Circuit has held the latter to be more reliable. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir. 1985) ("A retrospective view of the invention is best gleaned from those who were there at the time.").

In addition, the *KSR* Court noted only that in some fields, like the mechanical brake pedal there at issue, there might be "little discussion of obvious techniques or combinations" because market demand rather than scientific literature drives design considerations. *See* 127 S. Ct. at 1741.  The human medical use of vasodilators, however, is surely not such a field.  Indeed, Sicor's expert, Dr. Strauss, identified 20,000 publications looking into the physiological effects of adenosine since 1963.  (Strauss 767:8-13.)  This is

not a field where development decisions are driven by unpublished common sense. Thus, the following counterconclusion is proposed:

**PCC271.**        While the Supreme Court in *KSR* indicated that in an obviousness analysis "a person of ordinary skill is also a person of ordinary creativity", and that *factfinders* should not be denied recourse to common sense, 127 S. Ct. at 1742-43, the Supreme Court has recognized for decades that after-the-fact assertions that a patented invention was the result of mere common sense should be viewed skeptically, particularly where those assertions are supported by little more than bare expert opinion and are in conflict with the clear teachings of the prior art. (*See* PCC261.)

DCL272.        A reference need not be enabling to qualify as prior art for obviousness purposes. *Amgen Inc, v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003); *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991).

**PCC272.**        While a reference need not be enabling to qualify as prior art for obviousness purposes, *Amgen Inc, v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003); *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991), obviousness requires that the prior art as a whole place the claimed invention in the posssession of the public. *In re Hoeksema*, 399 F.2d 269, 273-74 (C.C.P.A. 1968.)

DCL273.        To establish obviousness, Sicor has the burden of proving any disputed underlying facts by clear and convincing evidence. *See Brown & Williamson*, 229 F.3d at 1124 (Fed. Cir. 2000).

**PCC273.**        Patents are presumed valid, and each claim within a patent is independently presumed valid, even if other claims within patent are held invalid. 35 U.S.C. § 282. In order to overcome the presumption of validity, the challenger bears the burden of proving invalidity by clear and convincing evidence. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000). That burden is "constant and remains throughout the suit on the challenger" and "does not shift at any

time to the patent owner." *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984). Thus, to establish obviousness, Sicor has the burden of proving any disputed facts by clear and convincing evidence. The challenger's "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)). In other words, the challenger has the "added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

### 2.    Counterconclusions Regarding the Scope of the Prior Art

DCL275.    Relevant references may be drawn from any of these relevant fields of art or from other fields so long as the reference in another field is related to the problem that the inventor was trying to solve. *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) ("Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.")

PCC275.    While the scope of the prior art does include references from the same field of endeavor and references reasonably pertinent to the particular problem with which the inventor was involved, *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004), the scope and content of the art must be considered as a whole. *E.g., In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) ("It is impermissible . . . to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."). Moreover, consideration must be given to what the prior art fails to disclose as well as what the prior art discloses as undesirable. *In re Kamm*, 452 F.2d 1052, 1057 (C.C.P.A. 1972);

*see also Adams*, 383 U.S. at 52.  **Known disadvantages which would "naturally discourage the search for new inventions may be taken into account in determining obviousness.")**

DCL276.    In determining what is relevant prior art, it is improper to assume that "a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *KSR*, slip op. at 16.

**PCC276.    In considering the art, however, it is important to identify "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."  KSR, 127 S. Ct. at 1741.  Inventions usually "rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *Id*.  Indeed, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).**

### 3.    Counterconclusions Regarding the Combination of Either Gould 1978 Or Albro and Sollevi 1986

DCL278.    Gould 1978 describes the use of a pharmacologic stress agent for MPI.

**PCC278.    *See* PCF41.**

DCL279.    Gould 1978 describes every element of the asserted claims except for the direct infusion of adenosine at the claimed doses.  Gould further states that other, more potent coronary vasodilators could be used.

**PCC279.    *See* PCF41, 44, 54, 148.**

DCL280.    Albro describes the use of a pharmacologic stress agent for MPI.

**PCC280.    *See* PCF50.**

DCL281.    Albro describes every element of the asserted claims except for the direct infusion of adenosine at the claimed dosages ranges.  Albro describes the relationship between dipyridamole infusion and vasodilation caused by increased endogenous adenosine.

**PCC281.    *See* PCF50, 51, 148, 152.**

DCL282.    A person of skill in the art in 1987 would have had reason to use adenosine for MPI.

**PCC282.    *See* PCF51, 54, 64, 123, 130, 133.**

DCL283.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work through the mechanism of action of dipyridamole infusion.

**PCC283.    *See* PCF51, 54.**

DCL284.    Sollevi 1986 discloses a range of rates of continuous intravenous infusion of adenosine that are sufficient to cause vasodilation and are safe for use in humans.

**RESPONSE:  Both considered alone and in the context of the prior art, *Sollevi 1986* taught away from the use of adenosine as a pharmacologic stress agent for MPI in humans. *See* POB §§ II.A.1. and 6.  Additionally, Sicor improperly elicited from Dr. Strauss detailed testimony about two surgical experiments described in the *Sollevi 1986* article, (TX-1171) to which Plaintiffs objected.  (Strauss 702:21-709:12; Objection at 707:9-11.)  Review of Dr. Strauss's expert reports (TX-70, TX-246), shows that those new opinions are not there, and should thus be stricken.  (*See* PB § V.)  Plaintiffs, therefore, propose the following counterconclusion:**

**PCC284.    *See* PCF68-75;  *see also* PCF138.**

DCL285.    In light of the teachings of Sollevi 1986, a person of ordinary skill in the art would have expected continuous infusion of adenosine within the range of doses disclosed in Sollevi 1986 as sufficient to cause coronary vasodilation, but not sufficient to cause hypotension, to be "very likely to work for myocardial perfusion imaging as a vasodilator."  (Strauss, Tr. 708:10-709:20.)  Specifically, in light of Sollevi 1986, a person of skill in the art would have expected a dose in the range of 20 to 200 mcg/kg/min to work for MPI.  (*See id.*; *see also* TX 1171.)  Moreover, in light of the teachings of Sollevi 1986, the specific dose of 140 mcg/kg/min as claimed in dependent claim 18 is one of the doses that would have been "very likely to work." (Strauss, Tr. 748:2-13.)

**PCC285.    *See* PCF68-75; *see also* PCF138.**

DCL286.    Therefore, a person of skill in the art would have had a reasonable expectation of success based on combination of either Gould 1978 or Albro with Sollevi 1986.

**PCC286.**        *See* **PCF 68, 69, 138 and the Response to DFF142.**

DCL287.        Adenosine was known to be the active agent causing vasodilation during dipyridamole infusion.  In addition, a range of doses of direct infusion of adenosine sufficient to cause coronary vasodilation – a range that overlaps and includes the range claimed in the '877 patent – was shown in Sollevi 1986.  The asserted claims are therefore obvious.  *See, e.g.*, *Ormco*, 463 F.3d at 1311 ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *Medichem*, 437 F.3d at 1167 (selecting a narrow range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range).

**PCC287.        Contrary to the suggestion of DCL287, the prior art suggested that adenosine produced only about 18% of the coronary blood flow increase obtained with dipyridamole, while simultaneously producing a host of unwanted systemic effects, including a 20% decrease in arterial blood pressure.  (*Compare* TX-1171 at 335 with TX-38 at 284; *see* Wackers 922:16-924:17.)  Thus, the prior art would have demonstrated to one of ordinary skill that adenosine would likely *not* cause a sufficient increase in coronary flow to obtain diagnostically-reliable images while simultaneously causing unwanted systemic effects.  Moreover, prior to the invention described and claimed in the '877 patent, a person of skill in the art would not have viewed adenosine as an acceptable candidate for pharmacologic MPI.  (*See* POB §§ II.A.1.-6., 8.)  Additionally, DCL287 is immaterial to claim 23(18) because it discusses only dose ranges and does not address claim 23(18), which recites an adenosine dose of about 140 mcg/kg/min.  (*See* TX-320.)**

DCL288.        Even if the claimed range of adenosine doses sufficient to cause vasodilation without causing hypotension were not disclosed in Sollevi 1986, the process of arriving at a useful value of a single variable – the rate of continuous infusion of adenosine – is nothing more than routine and the claims are obvious on that basis as well.  *See KSR*, slip op. at 17; *Pfizer*, 480 F.3d at 1368.

**PCC288:        Even had a person of ordinary skill undertaken a dose titration to arrive at a dose of adenosine useful for pharmacologic MPI, as recommended by Dr. Strauss, he or she would not have identified the adenosine dose of 140 mcg/kg/min**

recited in claim 23(18).  (TX-246 at 18; Strauss 850:11-23)  Indeed, Dr. Strauss admitted

that titrating to a point where side effects were mild or just beginning could well result in a

dose well below 140 mcg/kg/min and too low for reliable myocardial imaging.  (Strauss

850:11-23.)  In his experience, while many people can tolerate 100 mcg/kg/min, some

patients who receive 140 mcg/kg/min will sit up on the table and yell, STOP!  (Strauss

850:24-851:5.)  (*See also* POB §§ II.B. and III.B.)

DCL289.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient to overcome the strong showing of obviousness.

PCC289:    Sicor turns a blind eye to the wealth of objective evidence (also called

secondary indicia) that support the non-obviousness of the invention.  Plaintiffs' objective

evidence of nonobviousness includes, at a minimum, commercial success, surprise or

unexpected results, concern or skepticism expressed in reaction to the invention, copying,

failure of others, and the lack of any mention or suggestion in the prior art.  (*See* POB

§§ II.A.1., 2., 8.; *see also* PB §§ III.F.-I., IV.B.6; PCF158-225.)

DCL290.    Claims 23(17), 23(18) and 43 of the '877 patent are obvious over a combination of either Gould 1978 and Sollevi 1986 or Albro and Sollevi 1986.

PCC290:    The invention would not have been obvious to a person of ordinary

skill in the art over a combination of either *Gould 1978* and *Sollevi 1986* or *Albro* and

*Sollevi 1986*.  Sicor has failed to carry its burden of proving, by clear and convincing

evidence, that claims 23(17), 23(18), and 43 of the '877 patent are obvious over any of the

prior art references it asserts, including either *Gould 1978* and *Sollevi 1986* or *Albro* and

*Sollevi 1986*.  (*See* POB §§ II.A.-B.)

### 4. Counterconclusions Regarding the Combination of Either Gould 1978 Or Albro and Biaggioni 1986

DCL291.    As discussed above, each of Gould 1978 and Albro disclose every element of the asserted claims except the direct, continuous infusion of adenosine within the claimed range of doses.

**PCC291.    *See* PCF 41, 44, 50, 54, 148.**

DCL292.    A person of skill in the art in 1987 would have had reason to use adenosine for MPI.

**PCC292.    *See* PCF41, 54, 64, 123, 130, 133.**

DCL293.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work because of knowledge of the mechanism of action of dipyridamole.

**PCC293.    *See* PCF51, 54.**

DCL294.    Biaggioni 1986 states "that adenosine administered by infusion over a range of 60 to 140 µg/kg/min to healthy conscious human subjects, lowers diastolic blood pressure but raises heart rate, [and] systolic blood pressure . . . ." (TX 48 at 2234.) These results are indicative of significant vasodilation. (Strauss, Tr. 718:4-719:2.)

**PCC294.    *See* PCF90; *see also* PCF86, 87.**

DCL295.    Because Biaggioni 1986 teaches that doses ranging from 60 to 140 mcg/kg/min would cause significant vasodilation and could be safely tolerated by conscious humans, a person of skill in the art would have reason to use those doses of adenosine infusion as the pharmacologic stress agent for MPI. (Strauss, Tr. 719:6-18.)

**PCC295.    *See* PCF86, 87, 90.**

DCL296.    A person of skill in the art would have had a reasonable expectation of success based on either combination of these references.

**RESPONSE: DCL296 does not explain which references are alleged to provide a reasonable expectation of success.**

**PCC296.    A person of ordinary skill in the art would not have expected that adenosine could be used as a diagnostically-reliable pharmacologic stress agent based on**

*Sollevi 1986*, *Biaggioni 1986*, **or any of the other references relied on by Sicor, whether**

**considered alone or in combination.**  (*See* **POB §§ II.A.1., 6., II.B.2.**)

DCL297.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient to overcome the strong showing of obviousness.

**PCC297.    *See* PCC289.**

DCL298.    Claims 23(17), 23(18) and 43 of the '877 patent are obvious over a combination of either Gould 1978 and Biaggioni 1986 or Albro and Biaggioni 1986.  *See KSR*, slip op. at 13-15; *Pfizer*, 480 F.3d at 1364-68.

**PCC298.    The invention would not have been obvious to a person of ordinary**

**skill in the art over a combination of either *Gould 1978* and *Biaggioni 1986* or *Albro* and**

***Biaggioni 1986* .  Sicor has failed to carry its burden of proving, by clear and convincing**

**evidence, that claims 23(17), 23(18), and 43 of the '877 patent are obvious over any of the**

**prior art references it asserts, including either *Gould 1978* and *Biaggioni 1986* or *Albro* and**

***Biaggioni 1986*.  (*See* POB §§ II.A.-B.)**

> **5.    Counterconclusions Regarding Either Gould 1978 Or Albro In Light
> of *"Knowledge In Art"***

DCL299.    Each of Gould 1978 and Albro disclose every element of the asserted claims except the direct, continuous infusion of adenosine within the claimed range of doses.

**PCC299.    *See* PCF41, 44, 50, 51, 54, 148**

DCL300.    A person of skill in the art in 1987 would have had reason to use adenosine for MPI.

**PCC300.    *See* PCF41, 54, 64, 123, 130, 133.**

DCL301.    A person of skill in the art would have expected adenosine to work directly as a pharmacologic stress agent for MPI because it was already known to work because of knowledge of the mechanism of action of dipyridamole.

**PCC301.    *See* PCF51, 54.**

DCL302.    Conradson described infusion rates in conscious patients up to 100 mcg/kg/minute.  (TX 220 at 388.)  Fuller described the infusion of adenosine at a rate of 100 mcg/kg/minute in conscious humans and showed that two subjects out of six tolerated an

infusion rate of 200 mcg/kg/minute. (TX 1208 at 311.) Sollevi 1986 stated that preferential myocardial vasodilation can be induced at low doses of 20-50 mcg/kg/min. (Strauss, Tr. 704:22-705:15; TX 1171 at 345.) Sollevi 1984, Sollevi 1986 and Owall taught that controlled hypotension can be induced at doses of 200 mcg/kg/min and above. (Strauss, Tr. 695:6-16; 700:19-701:9; 723:3-7; TX 112; TX 1169; TX 1171.) Biaggioni 1987 showed that intravenous administration of adenosine without pretreatment of dipyridamole at a rate of 140 mcg/kg/minute was effective and safe. (TX 226 at 781, 784.) The '296 patent stated that the appropriate dose of adenosine for MPI "should lie in the range of 10 to 150 micrograms per kilogram per minute." (TX 275, col.21, ll.60-61.)

**RESPONSE: The prior art references relied on by Sicor and cited in DCL302 taught away from the use of adenosine as a pharmacologic stress agent for MPI in humans, and taught away from infusing adenosine at a rate of 140 mcg/kg/min for pharmacologic MPI in humans. (*See* POB §§ II.A.6., B.2.) In addition, DCL302 cites to Example XIII of the '296 patent, which does not anticipate or render obvious claim 23(18) and is not available as prior art. (*See* POB §§ III.A., B.) Therefore, the following counterfinding is proposed:**

**PCC302.        *See* PCF64, 107, 110, 138, 144, 146, 240.**

DCL303.        A person of skill in the art would have had a reasonable expectation of success based on either Gould 1978 or Albro in light of the knowledge in the art concerning the safety and tolerability of adenosine infusion for MPI.

**PCC303:        DCL303 erroneously suggests that there was knowledge in the art concerning the safety and tolerability of adenosine infusion for human MPI. Prior to the work of the inventors, and despite an abundance of adenosine studies, no one had disclosed even the possibility of using adenosine as a pharmacologic stress agent for MPI in humans. (*See* POB § II.A.3.) Moreover, the prior art provided no reasonable expectation of success. Indeed, a person of ordinary skill in the art would not have expected that adenosine could be used as a diagnostically reliable pharmacologic stress agent based on *Gould 1978* or *Albro* in light of knowledge in the art concerning continuous intravenous infusions of adenosine. (*See* POB §§ II.A.6., II.B.2. *See also* PCF51, 138.)**

DCL304.    A person of skill in the art, would have had "good reason" to pursue the options presented by the disclosed dose ranges in the art, which would have been well "within his or her technical grasp" and which, when tried, lead to the anticipated success.  *See KSR* slip op. at 17.

**RESPONSE: DCL304 is ambiguous.  Moreover, the prior art references relied on by Sicor and cited in DCL302 taught away from the use of adenosine as a pharmacologic stress agent for MPI in humans, and taught away from infusing adenosine at a rate of 140 mcg/kg/min for pharmacologic MPI in humans.  (*See* POB §§ II.A.1., 4., 6., B.2.)  Therefore, the following counterfinding is proposed:**

**PCC304.    *See* PCF64, 107, 110, 138, 144, 146.**

DCL305.    Plaintiffs present no evidence of secondary indicia of non-obviousness sufficient to overcome the strong showing of obviousness.

**PCC305.    *See* PCC289.**

DCL306.    Therefore, the asserted claims of the '877 patent are obvious over a combination of either Gould 1978 and the knowledge in the art or Albro and the knowledge in the art.

**PCC306:    The invention would not have been obvious to a person of ordinary skill in the art over a combination of either *Gould 1978* and the knowledge in the art or *Albro* and the knowledge in the art.  Sicor has failed to carry its burden of proving, by clear and convincing evidence, that claims 23(17), 23(18), and 43 of the '877 patent are obvious over any of the prior art references it asserts, including either *Gould 1978* and the knowledge in the art or *Albro* and the knowledge in the art.  (*See* POB §§ II.A.-B.)**

DCL307.    For secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention.  *See Ormco*, 463 F.3d at 1311-12.

**PCC307.    While a nexus is required for commercial success, "the presumption that commercial success is due to the patented invention applies 'if the marketed product embodies the claimed features, and is coextensive with them.'"  *Ormco*, 463 F.3d at 1312**

(*quoting Brown & Williamson Tobacco Corp. v. Philip Morris Inc*., 229 F.3d 1120, 1130 (Fed.

Cir. 2000)).

DCL308.     Even if relevant, secondary considerations do not control the obviousness determination. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks*, 122 F.3d at 1483; *see also Newell*, 864 F.2d at 769 ("[A]lthough the record shows a highly successful product, the record also establishes such a strong case of obviousness . . . that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion.")  Indeed, it is well-established that such evidence will not save a patent when the prior art provides "strong evidence of obviousness." *Brown & Williamson*, 229 F.3d at 1131.

**PCC308:**          *See* **PCC264.**

DCL310.     Plaintiffs' scant evidence of any secondary factors is insufficient to overcome the strong showing of obviousness in this case.

**PCC310.**          *See* **PCL289.**

**B.**          **Counterconclusions Regarding Anticipation**

**1.**          **Counterconclusions Regarding Legal Standard**

DCL311.     A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every limitation of the claim was contained, either expressly or inherently, in a single prior art reference.  *See* 35 U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc*., 246 F.3d 1368, 1374 (Fed. Cir. 2001).

**PCC311.          In order to constitute an invalidating prior-art reference, a patent or**

**printed publication "must sufficiently describe the claimed invention to have placed the**

**public in possession of it."  *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).  References**

**that are ambiguous as to the presence or description of a particular claim element cannot,**

**as a matter of law, anticipate a claim.  *In re Hughes*, 345 F.2d 184, 188  (C.C.P.A. 1965).**

**Further, a patent's statutory presumption of validity under 35 U.S.C. § 282 "can only be**

**overcome by clear and convincing evidence to the contrary."  *Bristol-Myers Squibb Co. v.***

***Ben Venue Labs., Inc*., 246 F.3d 1368, 1374 (Fed. Cir. 2001).**

DCL313.     Disclosures in a prior art patent, such as the '296 patent, are presumed to be enabled. *Amgen*, 314 F.3d at 1355 (Fed. Cir. 2003) ("[A] presumption arises that both the

claimed and unclaimed disclosures in a prior art patent are enabled.") A patentee bears the burden of proving non-enablement of an asserted prior art patent.  *Id.*

**PCC313.**      **The presumption that a prior art patent is enabled is not absolute. Rather, "[i]f a patentee presents evidence of nonenablement that a trial court finds persuasive, the trial court must then exclude that particular prior art patent in any anticipation inquiry, for then the presumption has been overcome."** *Amgen Inc. v. Hoechst Marion Roussel, Inc***., 314 F.3d 1313, 1355 (Fed. Cir. 2003).**

### 2.      Counterconclusions Regarding the ʻ296 Patent

DCL314.      The ʻ296 patent is prior art to the ʻ877 patent under 35 U.S.C. § 102(e).

**RESPONSE:  Example XIII of the ʻ296 patent, upon which Sicor relies, is not prior art to the ʻ877 patent, and therefore cannot anticipate or render obvious the claims of the ʻ877 patent.  (***See*** POB § III.A.;** *see also* **PB § IV.C.3.a.)  Therefore, the following counterconclusion is proposed:**

**PCC314.**      **Example XIII of the ʻ296 patent is not prior art to the ʻ877 patent, as the inventors of the ʻ877 patent were in prior possession of as much of the claimed invention as Example XIII of the ʻ296 patent happens to show by at least December 9, 1987, and proceeded diligently thereafter to actually and constructively reduce that subject matter to practice.  (***See*** PFF136-146; PCL52-56.)  When a prior art reference does not disclose every element of the claimed invention, the applicant need not show prior possession of the complete invention to prevail on priority grounds.  "[A]ll the applicant can be required to show is priority with respect to so much of the claimed invention as the reference happens to show.  When he has done that he has disposed of the reference."** *In re Stempel***, 241 F.2d at 759.  Thus, it is sufficient here that the inventors can establish prior invention of the use of adenosine for MPI at a dose to be determined by titration.  These**

aspects of the claimed invention are set forth in the Creighton Protocol (TX-57), which was part of the Investigational New Drug Application (TX-52) Medco submitted to the FDA on December 9, 1987.  (*See* Wackers 974:6-23; *see also* PCF107.)

DCL315.     The '296 patent discloses every element of the asserted claims of the '877 patent.

**PCC315:     Sicor's proposed conclusion is irrelevant because Example XIII of the '296 patent, on which Sicor relies, is not prior art to the '877 patent.  (*See* PCC314.) Moreover, the '296 patent does not disclose administering by intravenous infusion an adenosine dose of 140 mcg/kg/min for pharmacologic MPI, as is required by claim 23(18). (*See* POB § III.B.; PB § IV.C.1; PCF107, 110.)**

DCL316.     Example XIII of the '296 patent describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease.  TX 275, col. 21, ll. 29-61; Tr. 751:11-753:11.

**PCC316.     *See* PCF107, 110.**

DCL317.     Example XIII of the '296 patent further discloses that, while the dose of adenosine should be titrated individually, it should lie in the range of 10 to 150 mcg/kg/min.  TX 275, col. 21, ll. 59-61.

**PCC317:     Example XIII teaches individual titrations on a case-by-case basis, suggesting that the exact dose "should lie in the range of 10 to 150 [mcg/kg/min]."  (*See* POB § III.B.; *see also* PB § IV.C.1.)**

DCL318.     The range of 10 to 150 mcg/kg/min substantially overlaps with, and is narrower than, the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43.  The "species" of 10 to 150 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min. *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) ("[A]n earlier species reference anticipates a later genus claim.")

**PCC318:     Sicor's proposed conclusion DCL318 is irrelevant and inaccurate.  As explained above, Example XIII of the '296 patent is not prior art to the '877 patent, and cannot therefore be used to invalidate the '877 patent.  (PCC314, 315; *see also* POB**

§ III.A.; PB § IV.C.3.a.)  **Furthermore, DCL318 mischaracterizes the disclosure of Example XIII, which actually teaches individual titrations on a case-by-case basis, suggesting that the exact dose "should lie in the range of 10 to 150 [mcg/kg/min]."  Finally, the cite to *Atofina* is inapposite.  The excerpt from *Atofina* refers to an "earlier species."  *Atofina v. Great Lakes Chem. Corp*., 441 F.3d 991, 999 (Fed. Cir. 2006)  However, the range of 10-150 mcg/kg/min is a genus, not a species.**

DCL319.        In addition, "a very small genus can be a disclosure of each species within the genus."  *Id*. (citation omitted).  The disclosures of the range 10 to 150 mcg/kg/min, particularly coupled with the specific instruction that doses "should be titrated individually'" and "should lie within the range of 10 to 150 mcg/kg/min," discloses the dose of "about 140" of claim 23(18).

**PCC319.        Example XIII of the '296 patent teaches individual titrations on a case-by-case basis, suggesting that the exact dose "should lie in the range of 10 to 150 [mcg/kg/min]."  (TX-275, col. 21, ll. 59-61.)  Sicor's opinion on the anticipation of claim 23(18) is based on the fact that 140 mcg/kg/min was encompassed within this hypothetical range.  (Strauss 842:14-19.)  But the disclosure of a broad numerical range in a prior art reference is not sufficient to anticipate a claim reciting a point within that range.  *Atofina*, 441 F.3d at 1000 ("The disclosure is only that of a range, not a specific temperature in that range, and the disclosure of a range is no more a disclosure of the end points of the range than it is of each of the intermediate points.").  (*See* POB § III.B.; *see also* PB § IV.C.1.)**

DCL320.        The '296 anticipates the asserted claims of the '296 patent.

**RESPONSE:  Sicor's proposed conclusion, which regards the validity of the' 296 patent, is not relevant to this case.**

**PCC320.        The '296 patent does not anticipate the asserted claims of the '877 patent.  *See* PCC314, 315; POB § III.A.; *see also* PB §§ IV. C. l., 3.)**

DCL321.    At a minimum, the '296 patent renders the asserted claims of the '877 patent obvious.

**PCC321:    Example XIII of the '296 patent, upon which Sicor relies, is not prior art to the '877 patent, and therefore cannot render obvious the claims of the '877 patent. (PCC314, 315; *see also* POB § III.A.; PB § IV.C.3.)  Moreover, the '296 patent teaches away from administering by intravenous infusion an adenosine dose of 140 mcg/kg/min for pharmacologic MPI, as is required by claim 23(18).  (PCF110; *see also* POB § III.B.; PB § IV.C.2.)**

DCL322.    The '296 patent discloses every element of the asserted claims of the '877 patent, including a dosage range that substantially overlaps the range of 20 to 200 mcg/kg/min of claims 23(17) and 43 and encompasses the dose of about 140 mcg/kg/min of claim 23(18).

**PCC322.    *See* PCF107, 110; PCC321.**

DCL323.    The asserted claims are therefore obvious in light of Example XIII alone. *See Ormco*, 463 F.3d at 1311 ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *see also Medichem*, 437 F.3d at 1168 (selecting a narrow range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range).

**PCC323:    Example XIII of the '296 patent, upon which Sicor relies, is not prior art to the '877 patent, and therefore cannot render obvious the claims of the '877 patent. (PCC314, 315;  *see also* POB § III.A.; PB § IV.C.3.a.)  Moreover, the '296 patent teaches away from administering by intravenous infusion an adenosine dose of 140 mcg/kg/min for pharmacologic MPI, as is required by claim 23(18), and dose titration would not have led to the claimed 140 mcg/kg/min dose, but to a lower one with fewer side effects.  (PCF107, 110; *see also* POB § III.B.; PB § IV.C.)**

### 3.    Counterconclusions Regarding the Karolinska Request

DCL324.    The Karolinska Request is prior art to the '877 patent under 35 U.S.C. § 102(a).

**PCC324.      *See* PCF117;  *see also* PB § IV.C.3.  Moreover, information that has not been publicly known or used in the United States, or patented, must qualify as a "printed publication" to be "prior art."  35 U.S.C. § 102(a).**

DCL325.      The Karolinska Request describes substituting adenosine for dipyridamole in connection with a diagnostic technique such as thallium-201 scintigraphy of the myocardium to diagnose coronary heart disease.  TX 1193 at SIC 10942.  The Karolinska Request further discloses a dose of 60 mcg/kg/min of adenosine, continuously infused.  TX 1193 at 10944; Tr. at 755:6-20.

**PCC325.      *See* PCF118.**

DCL326.      The dose of 60 mcg/kg/min is narrower than and within the range of 20 to 200 mcg/kg/min that is claimed in claims 23(17) and 43.  The "species" of 60 mcg/kg/min anticipates the broader "genus" of 20 to 200 mcg/kg/min.  *See Atofina*, 441 F.3d at 999.

**PCC326.      In addition to not being prior art (PCF117; PCC324), the Karolinska Request does not anticipate either claim 23(17) or claim (43) because it does not enable one of skill in the art to practice the invention.  The Karolinska Request describes a ten minute infusion of adenosine, followed by the injection of the radionuclide tracer, followed only one minute later by the termination of the adenosine infusion.  (*See* TX-1193 at 5.)  This protocol would likely not work for imaging, because the adenosine infusion is terminated too soon after the injection of the radionuclide tracer and constitutes "too short a continuation of adenosine."  (Wackers 960:16-25.)  "If a patentee presents evidence of nonenablement that a trial court finds persuasive, the trial court must then exclude that particular prior art patent in any anticipation inquiry, for then the presumption has been overcome."  *Amgen,* 314 F.3d at 1355.**

DCL327.      At a minimum, the Karolinska Request renders claims 23(17) and 43 of the '877 patent obvious.  *See Ormco*, 463 F.3d at 1311; *Medichem*, 437 F.3d at 1168.

**PCC327.      Sicor makes no specific contention as to the modification to the Karolinska Request that would have been necessary to render obvious the invention of**

claims 23(17) and 43 of the '877 patent.  Moreover, Dr. Wackers gave unrebutted testimony stating that the adenosine infusion protocol disclosed in the Karolinska Request would likely not work for diagnosing coronary artery disease using MPI, because the adenosine infusion terminated too soon after injection of the radionuclide tracer. (PCC326.)  In view of these deficiencies, the Karolinska Request does not render claim 23(17) and 43 of the '877 patent obvious, as the prior art as a whole must place the claimed invention in the possession of the public.  *See In re Hoeksema*, 399 F.2d at 273-74.  (*See also* PCF117-119;  PB § IV.C.)

## III.   CONCLUSION

Plaintiffs respectfully ask the Court to adopt the foregoing counterfindings of fact and counterconclusions of law, and enter judgment that the asserted claims of the '877 patent are not invalid.

97

Dated:  June 19, 2007


_____/s/ Mary B. Matterer_____
Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

_____/s/ Paul E. Crawford_____
Paul E. Crawford #493
Patricia Smink Rogowski #2632
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141
progowski@cblh.com

F. Dominic Cerrito
Brian Poissant
JONES DAY
222 E. 41st Street
New York, NY  10017
(212) 326-3939

*Attorneys for Plaintiff*
*King Pharmaceuticals Research and*
*Development, Inc.*