IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KING PHARMACEUTICALS RESEARCH )
AND DEVELOPMENT, INC., ASTELLAS US )
LLC, and ASTELLAS PHARMA US, INC. )
                                                 )
           Plaintiffs, )
                                                   )
           v. )        Civil Action No. 05-337 SLR
                                                   )
SICOR INC. and SICOR )
PHARMACEUTICALS, INC. )
                                                   )
          Defendants. )
                                                   )
                                                   )

**DEFENDANTS SICOR INC. AND SICOR PHARMACEUTICALS INC.'S
RESPONSIVE POST TRIAL BRIEF**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
  STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for Defendants SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated: June 19, 2007

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................... 1
II.   RESPONSIVE ARGUMENT .................................................................................. 3
      A.    THE ASSERTED CLAIMS WERE OBVIOUS IN LIGHT OF THE PRIOR
            ART.............................................................................................................. 3
            1.    The Law Of Obviousness................................................................ 3
            2.    Sicor Has Shown Obviousness By Clear And Convincing Evidence ........ 4
                  a.    The Underlying Facts Supporting Sicor's Prima Facie Case Of
                        Obviousness Are Largely Undisputed.................................... 4
                  b.    There Is No Persuasive Evidence Of Teaching Away ............................ 4
                  c.    The Field Of Pharmacologic Stress Agent Development For MPI
                        Was Dormant For Several Years.......................................... 13
                  d.    The Prior Art Demonstrated The Speed And Safety Advantages
                        Of Adenosine Over Dipyridamole ........................................ 15
                  e.    There Is Nothing Special About The Dose Of "About 140"
                        Micrograms Per Kilogram Per Minute .................................. 15
            3.    The Secondary Considerations Argued By Plaintiff Do Not Rebut
                  The Prima Facie Case ...................................................................... 19
                  a.    No Credible Evidence Of Skepticism Or Surprise................................ 19
                  b.    Copying Is Irrelevant In The ANDA Context....................................... 22
                  c.    Any Commercial Success Enjoyed By Adenoscan® Does Not
                        Rebut Obviousness Here ...................................................... 23
                        i.    The Sales Levels of Adenoscan® Are Explained By
                              the Interplay of Economic Factors.................................... 23
                              (1)   Adenoscan® Entered the Pharmacological
                                    Stressor Market at a Fortuitous Time ............................ 24
                              (2)   Fujisawa's Extensive Marketing and Promotion
                                    Drove The Adenoscan® Market Share Growth.......... 25
                              (3)   Adenoscan®'s Increasing Sales Were Also Due
                                    to the General Growth of the Pharmacological
                                    Stress Market ...................................................... 26
                        ii.   Dr. Hay's Analysis Is Unsound and His Testimony
                              Is Unreliable ....................................................... 28
                  d.    Lack Of Specific Suggestion Is Irrelevant............................................. 29
                  e.    Simultaneous Invention Suggests Obviousness .................................... 30
      B.    THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED................................ 30
            1.    The '296 Patent Is Prior Art ............................................................ 30
            2.    The Karolinska Request Is Prior Art................................................ 34
            3.    Claims 23(17) and 43 Are Anticipated By The '296 Patent And
                  The Karolinska Request .................................................................. 34
            4.    Claim 23(18) Is Anticipated By The '296 Patent ............................ 35
III.  EVIDENTIARY ISSUES ...................................................................................... 35
      A.    RESPONSE TO PLAINTIFFS' EVIDENTIARY OBJECTIONS ................................ 35
      B.    OBJECTIONS TO EVIDENCE ON WHICH PLAINTIFFS HAVE RELIED............... 38
IV.   CONCLUSION...................................................................................................... 39

## TABLE OF AUTHORITIES

**CASES**                                                                  Page

*Adams v. U.S.*,
    330 F.2d 622 (Ct. Cl. 1964).................................................................13, 20

*Alpex Computer Corp. v. Nintendo Co.*,
    No. 86-1749, 1994 WL 681752 (S.D.N.Y. Dec. 5, 1994)................................. 21

*Aventis Pharma Deutschland GmbH v. Lupin Ltd.*,
    2006 WL 1008962 (E.D. Va. July 17, 2006)............................................. 22-23

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ............................................................ 35

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994) .............................................................. 33

*Cable Elec. Prods. v. Genmark, Inc.*,
    770 F.2d 1015 (Fed. Cir. 1985) ............................................................ 22

*Comfort Silkie, Co. v. Seifert*,
    1998 U.S. Dist. LEXIS 22285 (C.D. Cal. May 26, 1998)........................... 21-22

*Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*,
    693 F. Supp. 114 (D. Del. 1988)........................................................ 26-27

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004) .......................................................... 5, 16

*In re GPAC Inc.*,
    57 F.3d 1573 (Fed. Cir. 1995) .............................................................. 22

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).............................................................................. 29

*Hobbs v. Beach*,
    180 U.S. 383 (1901).......................................................................... 29

*ISCO Int'l, Inc. v. Conductus, Inc.*,
    279 F. Supp. 2d 489 (D.Del. 2003) ....................................................... 33

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ........................................................... 23

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ............................................................... 5

*In re Koller*,
    613 F.2d 819 (C.C.P.A. 1980) .............................................................. 11

*Kridl v. McCormick*,
   105 F.3d 1446 (Fed. Cir. 1997) ............................................................................... 31

*KSR Int'l Co. v. Teleflex Inc.*,
   127 S.Ct. 1727 (2007) ................................................................................... 5, 29

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
   485 F.3d 1157 (Fed. Cir. 2007) ................................................................................... 3

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
   730 F.2d 1452 (Fed. Cir. 1984) ............................................................................... 30

*Mahurkar v. C.R. Bard Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996) ............................................................................... 31

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
   337 F.3d 1362 (Fed Cir. 2003) ............................................................................... 26

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ........................................................................... 5, 12

*Merck & Co., Inc. v. Biocraft Labs., Inc.*,
   874 F.2d 804 (Fed. Cir. 1989) ............................................................................... 16

*Merck & Co., Inc. v. Teva Pharms USA, Inc.*,
   405 F.3d 1338 (Fed Cir. 2005) ............................................................................... 27

*Optivus Tech., Inc. v. Ion Beam Apps. S.A.*,
   469 F.3d 978 (Fed. Cir. 2006) ................................................................................... 5

*Pacifica Technica Corp. v. U.S.*,
   2 Cl. Ct. 170 (1983) ............................................................................... 24

*In re Petering*,
   301 F.2d 676 (C.C.P.A. 1962) ............................................................................... 35

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ............................................................... Passim

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
   461 F. Supp. 2d 271 (D.N.J. 2006) ............................................................................... 23

*Revlon, Inc. v. Carson Prods. Co.*,
   602 F. Supp. 1071 (S.D.N.Y. 1985) ............................................................................... 26

*Richardson-Vicks, Inc. v. Upjohn Co.*,
   122 F.3d 1476 (Fed. Cir. 1997) ................................................................................... 3

*In re Rouffet*,
   149 F.3d 1350 (Fed. Cir. 1998) ............................................................................... 19

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995) ........................................................................ 17

*Speller v. U.S.*,
    14 Cl. Ct. 170 (1988) ................................................................................ 24

*In re Stempel*,
    241 F.2d 755 (C.C.P.A. 1957) ............................................................... 31-33

*Syntex LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) ................................................................... 5

*In re Tanczyn*,
    347 F.2d 830 (C.C.P.A. 1965) ............................................................... 32-33

*Tec Air, Inc. v. Denso Manuf. Mich., Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ................................................................... 3

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F.Supp.2d 487 (D. Del. 2005) ............................................................. 36

*U.S. v. Adams*,
    383 U.S. 39 (1966) ................................................................................ 19-20

*Vandenberg v. Dairy Equip. Co.*,
    740 F.2d 1560 (Fed. Cir. 1984) ................................................................. 27

## STATUTES

35 U.S.C. § 103 ................................................................................... 14, 33

35 U.S.C. § 282 ...................................................................................... 36

## OTHER AUTHORITIES

Fed. R. Evid. 402 .................................................................................... 38

Fed. R. Evid. 703 .................................................................................... 37

Fed. R. Evid. 802 .................................................................................... 38

I.      **INTRODUCTION**

To be entitled to patent protection, an invention must be both novel and non-obvious.  For all the reasons set forth in detail in Sicor's Opening Brief, and those discussed below, the asserted claims of United States Patent 5,070,877 (the "'877 patent") are invalid as anticipated and obvious.

The core of the obviousness analysis is the comparison of the prior art and the asserted claims.  Here, Plaintiffs do not seriously dispute that the differences between the prior art and the actual language of the asserted claims are not substantial.  Instead, Plaintiffs contest obviousness by creating new claim elements out of whole cloth and then arguing that the additional elements are missing from or not taught by the prior art.  But these purported claim elements are nowhere to be found in the asserted claims.  For example, Plaintiffs contend that a person of ordinary skill in the art at the time would not have known from the prior art what adenosine dose would cause "maximal" increase in coronary blood flow.  D.I. 145 at 28-30.  But causing a "maximal" increase in blood flow is not an element of any asserted claim.  Instead, the asserted claims only require an adenosine infusion "sufficient to provide coronary artery dilation."  *See, e.g.,* TX 320, col. 8, lines 58-59.  At trial Plaintiffs never seriously disputed that at the critical date the person of ordinary skill in the art would have reasonably expected that adenosine administered within the claimed range of doses was likely to cause coronary artery dilation.  At trial Sicor proved that persons of skill in the art would have known that adenosine could provide sufficient arterial dilation for MPI based on knowledge in the art that MPI was already being performed with dipyridamole, which acted by increasing blood levels of endogenous adenosine.

In like fashion, Plaintiffs focus on the "about 140 mcg/kg/min" limitation of claim 23 as read through claim 18 of the '877 patent.  Plaintiffs argue that "about 140 mcg/kg/min" is a particularly good dose that provides unexpected results and would not have been obvious to the person of ordinary skill.  Once again, Plaintiffs are wrong.  There is no "optimal" or "best" dose claim limitation.  The '877 patent does not disclose that the results from administering "about 140" are so substantially different from other doses within the claimed range such that 140 is an optimal or best dose.  Nor does the '877 patent indicate that the dose of "about 140" causes a particular level of patient discomfort that is necessary to ensure

1

sufficient vasodilation, as Plaintiffs now argue.  Notably, Plaintiffs do not cite ***anything*** from the trial record in support of their newly minted claim element.  *See* D.I. 145 at 29-30.  Further, the results of administering adenosine – vasodilation and side effects which were intolerable to some subjects – were known in the art and thus were not unexpected.  Finally, even assuming *arguendo* that "about 140" were an optimized dose, optimization of a single variable such as dose is nothing more than routine experimentation and does not save claim 23(18) from obviousness.

Plaintiffs also contend that the prior art taught away from the use of adenosine in patients as too dangerous.  While older prior art using bolus injections of adenosine at higher doses in species other than humans might have discouraged medical use of adenosine in humans for a period of time, that era had ended by the mid-1980s.  Before the '877 patent application was filed in 1988, adenosine was being safely administered to humans by continuous intravenous infusion at substantially lower doses.  When the person of ordinary skill in the art is credited with common sense and average creativity in understanding and applying the prior art, as he or she must be, Plaintiffs' arguments fail.

Finally, no secondary considerations raised by Plaintiffs overcome the obviousness of the asserted claims.  For example, the alleged expressions of skepticism cited by Plaintiffs fall far short of expressions of disbelief that the claimed invention could or did work.  In fact, the context of the statements reveals quite the opposite – the belief that the claimed invention would or did work.

None of Plaintiffs' arguments demonstrate anything novel or non-obvious in 1987 about using the known coronary vasodilator, adenosine, as a pharmacologic stress agent.  It is undisputed that the MPI procedures set forth in the asserted claims were already in use with the pharmacologic stress agent, dipyridamole, which was known to cause vasodilation through the action of adenosine.  The evidence is clear and convincing that skilled artisans, taking into account all the relevant prior art and applying their ordinary creativity and common sense, would have reasonably expected that adenosine in the claimed ranges would work as a pharmacologic stress agent for MPI.

## II.    RESPONSIVE ARGUMENT

### A.    THE ASSERTED CLAIMS WERE OBVIOUS IN LIGHT OF THE PRIOR ART

#### 1.    *The Law Of Obviousness*

The legal standards for determining obviousness are set forth in detail in Sicor's Opening Brief and will not be repeated here in full.  The law on the role of secondary factors, however, bears some repeating in view of Plaintiffs' discussion of secondary factors in their Opening Post-trial Brief.

The relevant authority is clear that secondary considerations must be considered when they are present, but their existence alone does not control the obviousness determination.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007).  Where the case for obviousness is strong, even substantial evidence of secondary factors cannot render the claims not obvious.  *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (finding that patentees' "substantial evidence of commercial success, praise and long-felt need" was insufficient to overcome the strong prima facie case of obviousness); *Richardson-Vicks, Inc. v. Upjohn Co.,* 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious.").

Most important, while Plaintiffs are correct that the burden of persuasion remains on Sicor, Plaintiffs' discussion incorrectly suggests that Sicor has an affirmative duty to disprove the existence of certain secondary factors.  D.I. 145 at 22-23.  That is not the case.  Rather, if Plaintiffs want the Court to consider any secondary factors, Plaintiffs should come forward with evidence of such factors.  *See Pfizer*, 480 F.3d at 1360 (citations omitted) ("[O]nce a challenger has presented a prima facie case of invalidity, the patentee has the burden of going forward with rebuttal evidence.").  The Court then must determine whether Sicor "has met its burden by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee." *Id.*; *see also Tec Air, Inc. v. Denso Manuf. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) ("'Whether the evidence presented [by

patentee] suffices to rebut the *prima facie* case is part of the ultimate conclusion of obviousness, and is therefore a question of law.'" (quoting *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998))).

### 2. *Sicor Has Shown Obviousness By Clear And Convincing Evidence*

#### a. *The Underlying Facts Supporting Sicor's Prima Facie Case Of Obviousness Are Largely Undisputed*

The parties agree on several relevant factors. For example, there is no dispute that the person of ordinary skill in the art is a highly skilled medical doctor with a specialty in either cardiology or nuclear medicine and training in the other area. D.I. 145 at 23; D.I. 143 at 7. In addition, there is no dispute that the only difference between the prior art pharmacologic stress MPI procedures and the asserted claims of the '877 patent was the use of adenosine instead of dipyridamole. *See* D.I. 145 at 23; D.I. 143 at 24-25.

Nor is there any dispute as to the scope and content of much of the prior art. For example, it is undisputed that (a) the mechanism of action of dipyridamole – specifically, that it acted by blocking adenosine uptake, thereby increasing levels of endogenous adenosine – was known in the prior art (*see* D.I. 145 at 15; D.I. 143 at 11-13); (b) adenosine was known in the prior art to be a potent vasodilator (*see* D.I. 145 at 1; D.I. 143 at 23)**;** and (c) by mid-1987, adenosine had been administered to humans, both in the form of bolus injections and in the form of continuous intravenous infusions (*see* D.I. 145 at 12-15; D.I. 143 at 13-18).

The critical dispute between the parties is whether, by mid to late 1987, the art as a whole taught toward or away from using the known, potent vasodilator adenosine as a pharmacologic stress agent for MPI. When the prior art is considered as a whole, as it must be, there can be no question that a person of ordinary skill in the art at the time would have been motivated to use adenosine for MPI, and that the asserted claims of the '877 patent were obvious.

#### b. *There Is No Persuasive Evidence Of Teaching Away*

Plaintiffs' primary argument against Sicor's *prima facie* case of obviousness is that the prior art taught away from the use of adenosine in patients, particularly heart patients. In so arguing, however, Plaintiffs incorrectly fail to credit the person of ordinary skill in the art, a medical doctor with training in

cardiology and nuclear medicine, with even average common sense or creativity in understanding the significance of relevant art.  *See KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1742 (2007).  Moreover, Plaintiffs' arguments run counter to the evidence of a surge in interest in adenosine that took place in the field during the early to mid 1980s.  That increased interest taught toward adenosine use, including adenosine use for MPI, not away from it.

A reference may teach away "'when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'"  *Optivus Tech., Inc. v. Ion Beam Apps. S.A.*, 469 F.3d 978, 989 (Fed. Cir. 2006) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).  Whether a reference "teaches away" should be considered based on the teachings of the prior art as a whole, and should not be based on isolated statements taken out of context.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166 (Fed. Cir. 2006) ("The prior art must be considered *as a whole* for what it teaches.") (emphasis in original).

Whether the prior art teaches away from, or motivates toward, a combination is a question of fact. *In re Fulton*, 391 F.3d 1195, 1199-1200 (Fed. Cir. 2004).  Although all teachings must be considered in context, the Federal Circuit has provided some guidance as to the types of things that do not "teach away."  For example, disclosure in the prior art of a variety of alternatives, without specific dissuasion from a particular choice, does not constitute teaching away from any one of the alternatives.  *Id.* at 1201. In addition, a reference "that does not specifically refer to one element of a combination does not, per se, teach away."  *Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).

Plaintiffs rely on a number of references, including some of the same references on which Sicor relies in establishing obviousness, for the proposition that the prior art would have taught away from using adenosine for MPI.  Plaintiffs' analysis of this prior art is selective, and wrong, because it ignores the significance of the means of administration of adenosine and the doses used in the prior art references. *See* D.I. 145 at 6-14.  When each reference is considered in its entirety, and in the context of the other

prior art, it becomes clear that nothing in any single reference, and nothing in the prior art as a whole, would have discouraged or led away from using adenosine for MPI as of the middle of 1987.

One of the references on which Plaintiffs' rely is a 1983 article entitled "Adenosine, electrophysiologic effects and therapeutic use for terminating paroxysmal supraventricular tachycardia" ("DiMarco 1983," TX 36). *See* D.I. 145 at 6. DiMarco 1983 describes the use of adenosine to treat heart arrhythmias by inducing AV block. TX 36. In DiMarco 1983 the adenosine was given by rapid bolus injection, not continuous intravenous infusion. Tr. 760:13-20; TX 36. DiMarco 1983 also described advantages associated with adenosine's rapid clearance from the system, including the lack of persistent drug effect and the fact that rapid clearance would allow a physician to titrate the adenosine dose individually, "gradually increasing the dose until the arrhythmia is stopped." TX 36 at 1261. A person of skill in the art in 1987 would have understood the distinction between rapid bolus injection, which is an all-at-once method of application appropriate for rapidly halting an in-process cardiac arrhythmia, and continuous intravenous infusion, which can be safely titrated up to a level that has a stable effect for the duration of the infusion. *See* Tr. 677:9-678:2. Further, DiMarco 1983 would have taught the skilled artisan that the rapid clearance of adenosine would facilitate a quick end to any undesired side effects. DiMarco 1983 would not have discouraged that person of ordinary skill in the art from using adenosine for MPI in 1987. Tr. 760:13-20.

Plaintiffs also rely on a chapter from a 1983 book entitled "The Coronary Circulation In Health And Disease," by Dr. Melvin L. Marcus ("Marcus," TX 217) in an attempt to support their argument that a person of skill in the art would have been discouraged from using adenosine because of fear of hypotension. Notably, Marcus describes the use of adenosine in animals at very high doses. TX 217 at 430-31; Tr. 800:19-801:9. By the middle of 1987, several references in the art including Sollevi 1984, Sollevi 1986 and Owall disclosed the dose of adenosine necessary to achieve controlled hypotension in anesthetized humans. *See* TX 112, TX 1171; TX 1169. Each of those references describes doses of 200 mcg/kg/min of adenosine, or more, for controlled hypotension in ***humans***. *Id.* A person of skill in the art in 1987 would not have been discouraged from using adenosine for MPI in humans at doses that were less

than those that produced hypotension in humans – doses which were far below those described in the 1983 Marcus reference. *See* Tr. 759:14-22.[1]

Still other references in the prior art made clear that adenosine could be safely, continuously infused to cause vasodilation at a dose less than the dose necessary for hypotension. For example, Biaggioni 1986 described continuous intravenous infusion of adenosine to conscious subjects at doses up to 140 mcg/kg/min *without* inducing hypotension, but with evidence of vasodilation. Tr. 718:4-719:2; TX 48 at 2234. In fact, none of the prior art references on which Sicor relies that describe continuous intravenous infusion to conscious humans identified hypotension. *See* TX 48; TX 220; TX 226; TX 1208. Accepting Plaintiffs' argument requires that this Court wrongly assume that the person of ordinary skill in the art in 1987 would have been discouraged by a 1983 caution about hypotension based on administration of high doses of adenosine to dogs, even though subsequent references provided clear guidance that lower doses of adenosine would not produce hypotension in humans.

Plaintiffs attempt to use Biaggioni 1986 as support for the proposition that adenosine was thought to be too dangerous and short-lived to be a useful coronary vasodilator. D.I. 145 at 6 (*citing* TX 48). Plaintiffs, however, ignore a fact that would not be lost on persons of ordinary skill in the art. Biaggioni 1986 cites art from 1930 and 1933 concerning the effect of "large boluses of the drug." Compare D.I. 145 at 6 with TX 48 at 2229. Although this early work may have "discouraged further research" for some period of time in the past, by the publication of Biaggioni 1986 that era had ended. Biaggioni 1986 describes two areas in which adenosine was already being used clinically in 1986 – in the treatment of PSVT and for controlled hypotension during anesthesia. TX 48 at 2229. Biaggioni 1986 itself describes the results of research concerning the cardiovascular effects of adenosine in conscious subjects. *See generally*, TX 48. The disclosures of the Biaggioni 1986 reference would have taught a person of

---

[1]    Likewise, a person of ordinary skill in the art in 1987 would not have been discouraged from using adenosine for MPI because of statements in a 1970 article discussing potential therapeutic, as opposed to diagnostic, use of adenosine. *See* D.I. 145 at 8 (citing TX 214). Tellingly, Plaintiffs did not question Dr. Wackers about this reference and have presented no evidence that this 1970 reference would have taught away from adenosine use as a diagnostic 17 years later.

ordinary skill in the art that continuous intravenous infusion of adenosine at a dose of 140 mcg/kg/min would likely be tolerated by a majority of subjects (5 of the 7 subjects in the study), would result in vasodilation, but would not cause hypotension.  Tr. 717:22-719:18; TX 48.  In view of such disclosures, it is simply not credible to conclude that Biaggioni 1986 taught away from the use of adenosine as described in the asserted claims.

Plaintiffs also ignore the clear statement in Biaggioni 1986 that intravenous infusion of adenosine had already been shown to be useful in inducing a "sustained" hypotensive effect.  TX 48 at 2229.  A person of ordinary skill in the art in 1987 would have known that continuous infusion, as opposed to rapid bolus injection, of adenosine would result in a sustained effect.  Tr. 677:9-678:2.  Other references in the art, such as Sollevi 1984, further demonstrate that it was known in the art before 1984 that continuous infusion of adenosine would result in a stable effect during the infusion.  Tr. 692:12-694:7; TX 112.

Biaggioni 1986 simply does not support Plaintiffs' teaching away argument.  When the entire article is considered in context, Biaggioni 1986 teaches directly toward using adenosine infusion at a dose up to about 140 mcg/kg/min for MPI.

Yet another of Plaintiffs' scattershot "teaching away" arguments is that a person of ordinary skill in the art would have been discouraged from using adenosine for MPI because of the possibility of ischemia.  D.I. 145 at 7, 25.  Once again, this argument does not stand up when viewed in the context of the actual teachings in the art.  As discussed in Sicor's Opening Brief, the prior art pharmacologic stress MPI procedure used continuous intravenous infusion of dipyridamole.  D.I. 143 at 9-11.  Dipyridamole's vasodilating effect was known to be caused by endogenous adenosine.  D.I. 143 at 11-13.  A known possible side effect of dipyridamole stress MPI was ischemia.  Tr. 673:15-674:11; Tr. 688:3-89:23; Tr. 1006:7-11; TX 93 at 758; TX 38 at 285-86.  Indeed, a known effect of exercise stress was ischemia.  Tr. 688:22-689:23; TX 38 at 285-86.  As Dr. Strauss explained at trial:

> Now to put this in perspective, it's important to recognize that when patients are studied with exercise, that the patients always become ischemic, because that is the intent of stressing the person in that fashion.

Tr. 689:10-14.  Yet, exercise stress remains the preferred method of stress testing, even today.  Tr. 996:25-997:3.  The prior art taught that ischemia was less likely with pharmacologic stress MPI with dipyridamole (which was acting through adenosine) than it was with exercise.  TX 38 at 285-86.  The known characteristics of adenosine, in particular its short half-life which enabled negative side effects to be terminated almost immediately upon termination of administration, would have encouraged a person of skill in the art to use adenosine instead of dipyridamole for MPI because ischemia, if it occurred, could be reversed more rapidly after adenosine infusion.  Tr. 673:17-674:11; 688:22-690:9.

Plaintiffs' reliance on Owall in their attempt to support their ischemia argument highlights Plaintiffs' failure to credit persons of skill in the art with any common sense.  Owall describes doses of adenosine sufficient to cause controlled hypotension in anesthetized patients undergoing cerebral aneurysm surgery.  Owall states that doses ranging from 88 up to 530 mcg/kg/min of adenosine were administered, and that a mean dose of 210 mcg/kg/min was required to induce controlled hypotension.  TX 1169 at 230, 232.  Owall describes two patients who had an earlier history with myocardial infarction who experienced disturbances of heart rhythm during the study.  *Id.* at 231, 233.  One of the two patients experienced the adverse event approximately five minutes after the induction of hypotension.  *Id.* at 231.  The second patient experienced an adverse event that was terminated *during* hypotension.  *Id.*  In other words, these adverse cardiac events occurred at doses sufficient to induce controlled hypotension – doses higher than what a person of ordinary skill in the art would reasonably expect to work for MPI.  Tr. 725:12-726:6.  Owall expressly states that "the use of adenosine *hypotension* should be carefully considered in patients with ischemic heart disease."   TX 1169 at 233 (emphasis added).  Owall would not have discouraged a person of skill in the art in 1987 from using adenosine for MPI because such a person would have avoided doses sufficient to induce hypotension.  *See* Tr. 725:12-726:6; Tr. 910:8-17.

Plaintiffs further argue that a person of skill in the art would have been discouraged from using adenosine for MPI because of concerns about "achieving sufficient efficacy."  D.I. 145 at 25.[2]  Simple

---

[2]    Plaintiffs refer to TX 38 in support of their argument that Gould observed that a 400% increase in coronary
blood flow was sufficient for reliable imaging.  D.I. 145 at 25.  Notably, Plaintiffs do not argue that a 400%

common sense dictates that a person of skill in the art would have understood from the prior art, including Gould 1978 and Albro, that there was necessarily an amount of adenosine that would be both safe and efficacious for MPI because dipyridamole, which caused vasodilation by increasing endogenous adenosine, was efficacious for MPI. The only question would have been what dose. Tr. 691:1-8. The prior art provided more than ample guidance as to the range of doses that would likely be successful. Tr. 708:10-709:20; Tr. 719:3-18; 738:16-740:18. Any optimization of this single variable – the dose of intravenously infused adenosine that would cause sufficient vasodilation for MPI – is precisely the type of routine work that is typically obvious. *See Pfizer*, 480 F.3d at 1368.

The studies describing continuous, intravenous adenosine infusion to conscious, healthy volunteers provide information not only as to what doses would be safe and effective, but also as to the range of doses likely to be tolerated by conscious patients. With respect to these studies, the dose alone does not tell the complete story. Instead, additional factors such as the duration of the infusion must also be considered. As Dr. Strauss pointed out during his testimony, these studies described infusion of adenosine for much longer than the few minutes necessary to conduct an MPI test. *See, e.g.,* Tr. 711:20-712:13. In these prior art studies, adenosine was infused to a total of 29 healthy volunteers at doses that were increased stepwise during the infusion, resulting in total infusion times ranging from 37 minutes to 105 minutes. *See* TX 48; TX 220; TX 226; TX 1208. Even with these prolonged exposures to adenosine infusion, the maximum doses tolerated by the healthy volunteers ranged from 70 to 200 mcg/kg/min. *See* TX 48; TX 220; TX 226; TX 1208.[3] The volunteers all tolerated doses of 70 mcg/kg/min or above, and the majority tolerated doses from 100 to 140 mcg/kg/min. *Id.* The references, alone and in combination

---

increase is **necessary** for reliable imaging, only that it is sufficient. *See id.* Figure 8 of Gould 1978 shows an average of a 400% increase in coronary blood flow, with a range from slightly less than a 300% increase to more than a 500% increase. TX 38 at 284. Gould 1978 does not state that a 400% increase is necessary for reliable imaging. TX 38. In the Protocol document, the named inventors of the '877 patent noted the results of various tests concerning increased blood flow after dipyridamole infusion, including an increase "up to 3.4 to 4.1 times baseline values" when studied by inert gas tracers. TX 52 at AST0009472.

[3]    There were other reported studies of adenosine in the prior art on which Sicor has not relied in its arguments. For example, a second article by Conradson, reports continuous adenosine infusion to an additional 6 healthy volunteers aged 23-40. *See* TX 1211.

with each other, would have encouraged, not discouraged, a person of ordinary skill in the art to use adenosine at doses within these ranges for MPI.  *See* D.I. 147 at ¶¶ 68-106; 120-137.

Plaintiffs' contention that this information from healthy volunteers would not be sufficiently instructive, or would even teach away, is contradicted by Plaintiffs' own research proposal.  In their Protocol seeking permission from their internal review board, a Protocol that was ultimately submitted to the FDA in support of the investigational new drug application seeking to use adenosine for MPI in humans, the named inventors of the '877 patent proposed infusing adenosine to 20 healthy volunteers aged 19-39 before proceeding in patients.  TX 52 at AST0009474; TX 57 at 000145.  The fact that the named inventors were willing to proceed with infusion of adenosine to heart patients after conducting MPI with adenosine in 20 healthy volunteers aged 19-39 further supports Sicor's argument that the published results summarized above, showing safe infusion of adenosine to 29 healthy volunteers whose ages (when indicated) ranged from 23-40 would have been more than adequate to provide a reasonable expectation of at least the safety of these doses.[4]  It is also worth noting that the second protocol submitted as part of the IND seeking FDA approval to use adenosine in humans for MPI did not propose *any* additional studies in healthy volunteers, but instead proposed the use of adenosine in "[f]ifty patients with suspected coronary artery disease."  TX 52 at AST0009465.

Plaintiffs also rely on three publications that are not prior art in arguing that the prior art discouraged or taught away from the use of adenosine for MPI.  *See* D.I. 145 at 7-8.  Plaintiffs have not asserted that any of these references fit within any of the limited circumstances in which later publications may be used to show the state of the art at the relevant time.  *See, e.g., In re Koller*, 613 F.2d 819, 824 (C.C.P.A. 1980).  Nor have Plaintiffs established that any of these later references reflect the state of the art at the relevant time, and the references themselves do not purport to reflect the state of the art as of any particular date, let alone as of the relevant date.  *See* TX 46, TX 47, TX 240.  Accordingly, none of the later published references should be considered in assessing the obviousness of the asserted claims, which

---

[4]   Obviousness requires only a reasonable expectation of success, not absolute predictability or proof as Plaintiffs seem to demand.  *See Pfizer*, 480 F.3d at 1364.

must be determined based upon what would have been obvious to a person of skill in the art at the time of invention. *See Medichem,* 437 F.3d at 1164. However, even if the three reference were considered, they do not show teaching away, discouragement or skepticism as of the relevant date.

The first of these later publications is a 1995 chapter by Dr. Mario Verani in which Dr. Verani stated "it is interesting to speculate" as to why adenosine usage for MPI evolved as it did. TX 240 at 439; Tr. 953:17-24; 954:13-17. Dr. Verani's passing speculation in 1995 is hardly a persuasive assessment of the state of the art in 1987. More important, contemporaneous evidence from 1987 shows that Dr. Verani himself thought that, by 1987, adenosine had been shown to be safe enough for use with MPI. Dr. Verani stated in a research protocol that given "present knowledge" of adenosine by December 1987, the benefits from investigating adenosine for MPI "clearly outweigh the unlikely possibilities of side effects or complications." TX 52 at AST0009468; Tr. 1023:6-7; 1024:24-1025:11.

The second of the three after-the-fact references cited by Plaintiffs is a 1990 article entitled "Effects of Adenosine on Human Coronary Arterial Circulation" by Robert F. Wilson and others ("Wilson," TX 46). D.I. 145 at 7. Although Wilson refers to concerns that he states "hampered" use of adenosine in humans, his comment is at best ambiguous as to when any such use was "hampered." TX 46 at 1596. The comment in Wilson does not establish that a person of skill in the art would have been discouraged from using adenosine in 1987. Neither does the comment show any continued skepticism about the use of adenosine when it is considered in the context of the full article, which describes continuous adenosine infusion to heart patients. TX 46.

The third of the three later publications on which Plaintiffs rely is equally unpersuasive. That third publication is an Editorial Comment entitled "Adenosine, Renewed Interest in an Old Drug" (the "Editorial," TX 47). D.I. 145 at 7-8. Plaintiffs selectively cite the portion of the Editorial that states that adenosine "never achieved clinical usefulness . . ." D.I. 145 at 7. From context, "never" in the Editorial appears to mean the time from 1929 until some unspecified time before the date of the Editorial in 1990. TX 47 at 1854. The next sentence of the Editorial states "[h]owever, adenosine is now becoming a clinically relevant compound. There is increasing interest in 1) its application in the diagnosis and

treatment of supraventricular arrhythmias, 2) its potential importance in the evolution and treatment of myocardial ischemia, and 3) its use as an ultrashort-acting coronary vasodilator." TX 47 at 1854. Based on the other known uses of adenosine in the art prior to 1987, it is clear that "never" as used in the Editorial must have ended by 1983 when DiMarco 1983 was published, and the statements in the Editorial are not credible evidence that the art in 1987 taught away from using adenosine for MPI in humans.

Plaintiffs' teaching away theory is also contradicted by their own arguments. On the one hand, Plaintiffs assert vigorously that anyone of skill in the art at the relevant time would have been afraid to use adenosine. On the other hand, Plaintiffs assert that Sicor's obviousness challenge is suspect because of the "sheer volume" of references. *See* D.I. 145 at 20. Unlike *Adams v. U.S.*, 330 F.2d 622 (Ct. Cl. 1964), on which Plaintiffs' rely, this is not a situation where the obviousness challenge is based on multiple combinations of over 50 years worth of references. *See id.* at 624. Rather, the "volume" of the art here shows an increased interest in and use of adenosine from the early 1980s through the date of invention. Many of the references individually, and certainly the group of references taken together, show that the tide had turned by 1987, and that a person of ordinary skill in the art reasonably would have considered adenosine to be safe for use in human patients. These references also provide guidance as to doses of adenosine that likely would, and would not, work for MPI.

> c.    *The Field Of Pharmacologic Stress Agent Development For MPI Was*
> *Dormant For Several Years*

Plaintiffs argue that adenosine was "passed over" as a potential pharmacologic stress agent and that the approach in the art was "anything but adenosine" for almost a decade. D.I. 145 at 11, 24. This argument suggests that adenosine was actively rejected, but there is no evidence in the record to support that interpretation. The evidence is that the MPI field was young and there was no particular interest in developing pharmacologic stress testing during much of that period, not that researchers in the field were actively searching for additional agents and had rejected or ignored adenosine.

Plaintiffs refer to Dr. Strauss's 1977 experiments with ethyl-adenosine as a pharmacologic stress agent in dogs. D.I. 145 at 9. This fact is inapposite. Dr. Strauss testified that he used ethyl-adenosine because it was made available to him by Abbott, not because anything in the prior art taught away from using adenosine. Tr. 654:3-10. Further, Dr. Strauss testified that Abbott chose to stop work with ethyl-adenosine and withdrew the supply. Tr. 654:11-16. Dr. Wackers confirmed that there was no particular push for a pharmacologic stress for MPI in the late 1970s. Tr. 997:4-14; Tr. 1002:7-9. In Dr. Wackers' words "the whole field was so new that you were still exploring" and only a "handful of laboratories" were involved with that exploration. Tr. 997:15-998:5.

Shortly after Dr. Strauss's work with ethyl-adenosine, Gould 1978 described the first use of pharmacologic stress MPI in humans. TX 38. However, there was no widespread interest in pharmacologic stress testing for MPI until at least seven years later, after publication of an article by Dr. Boucher in 1985. Tr. 997:10-14.[5] Notably, Plaintiffs do not point to any failed studies seeking other pharmacologic stress agents for MPI during this period. *See generally,* D.I. 145. Nor do Plaintiffs cite any evidence that adenosine had been considered and rejected. *Id.* This lack of mention is entirely consistent with the early stage of development of MPI and is not evidence that adenosine had been passed over as a pharmacologic stress agent option.

More importantly, obviousness must be considered as of the time of the invention. 35 U.S.C. § 103(a) (subject matter not patentable if "subject matter as a whole would have been obvious ***at the time the invention was made*** to a person having ordinary skill in the art") (emphasis added). By 1987, a number of uses of adenosine in humans had been described in the art, and the use of adenosine for MPI was obvious.

---

[5]  In their background facts, Plaintiffs rely on information about the prevalence and need for pharmacologic stress MPI that was not available in the prior art and does not reflect the state of the art in 1987. D.I. 145 at 4-5, *citing* TX 138 (a chapter from the Fourth Edition of Diagnostic Nuclear Medicine, published in 2003); TX 103 (article dated February 1994); Tr. 986:21-23.

> d.     *The Prior Art Demonstrated The Speed And Safety Advantages Of*
> *Adenosine Over Dipyridamole*

A person of ordinary skill in the art in 1987 would have known that dipyridamole had a longer duration of action than adenosine. Tr. 673:17-674:11. That person would have also understood that a longer duration of action means, among other things, a longer duration of negative side effects when they occur. Tr. 673:17-675:21.

The prior art references describing continuous infusion of adenosine to humans established a number of facts about adenosine. Among those are (1) adenosine's action can be sustained for the duration of an infusion; and (2) adenosine's action can be terminated almost immediately upon termination of the infusion. For example, Sollevi 1984 describes a controlled, stable effect. Tr. 693:15-694:7; TX 112. A person of ordinary skill in the art would have understood that continuous adenosine infusion, as opposed to rapid bolus, could be used to create a stable effect. Tr. 677:9-678:2. The art also taught that side effects, when they occurred, were fleeting. *See, e.g.,* TX 220 at 389 (symptoms "completely vanished within 2 min after stopping the adenosine infusion"); TX 48 at 2233 (side effects "disappeared immediately after discontinuation of the infusion"); TX 1171 at 319 (adenosine's "effect is easy to control due to the extremely short plasma half-life"). A person of skill in the art in 1987 would have recognized the advantages of using a pharmacologic stress agent with an effect that did not last any longer than necessary for the procedure. Tr. 673:17-675:11. Adenosine was just such an agent. Indeed, Dr. Verani recognized this advantage prior to December of 1987 and noted it in his proposal that was submitted with Medco's IND. *See* TX 52 at AST0009465 ("The main advantage of using adenosine to provoke coronary vasodilation is the short duration of effect (10 to 20 seconds in humans.").

> e.     *There Is Nothing Special About The Dose Of "About 140" Micrograms*
> *Per Kilogram Per Minute*

Plaintiffs argue that routine experimentation, particularly experimentation titrating to a tolerable dose, would not have resulted in the dose of about 140 mcg/kg/min. The evidence shows the opposite to be true. For example, in Biaggioni 1986, 5 out of 7 healthy volunteers tolerated a dose of 140 mcg/kg/min. TX 48 at 2231. In Biaggioni 1987, all 8 volunteers tolerated a dose of 140 mcg/kg/min.

TX 226 at 781-82.  In Conradson, 3 of 8 volunteers tolerated a dose of 100 mcg/kg/min, the maximum

dose administered in that study.  TX 200 at 388.  In Fuller, 6 volunteers tolerated a dose of 100

mcg/kg/min,[6] and two tolerated a dose of 200 mcg/kg/min for 1 and 2 minutes respectively.  TX 1208 at

311.  Fuller provided no additional information as to whether doses between 100 and 200 mcg/kg/min

would be tolerated, as none were reported.  TX 1208.  Based on this data alone, a person of skill in the art

would have expected that a substantial percentage of conscious humans would be able to tolerate an

adenosine dose of 140 mcg/kg/min.  In fact, the person of skill in the art would understand that volunteers

often do not tolerate side effects as readily as patients do, because unlike volunteers who have no real

incentive to tolerate even mild discomfort, patients have a vested interest in completing medical

procedures.  Tr. 714:7-715:3.

The law does not require that "about 140" had to be the only obvious dose in order for the claim

to have been obvious.  The fact that a range of doses, including 140, was likely to work does not render

"about 140" any less obvious.  *See Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 806-807 (Fed.

Cir. 1989) ("A multitude of effective combinations does not render any particular formulation less

obvious."); *see also In re Fulton*, 391 F.3d 1195, 1200 ("[A] finding that the prior art as a whole suggests

the desirability of a particular combination need not be supported by a finding that the prior art suggests

that the combination claimed by the patent applicant is the preferred, or most desirable, combination.").

Plaintiffs' argument that a person of skill in the art would have tried to find a dose that resulted in

no noticeable side effects (D.I. 145 at 27-28) is also belied by the prior art.  Gould 1978 describes various

side effects experienced by 43 patients given dipyridamole for MPI.  TX 38 at 283.  Those side effects

included mild transient headache, mild transient facial flushing, mild transient nausea, and mild fleeting

angina pectoris.  *Id.*  Similar types of side effects, including headache, flushing, nervousness and an urge

to breathe deeply, were reported in prior art references, such as Biaggioni 1986 and Conradson, that

described the results of adenosine infusion.  Tr. 720:11-14; Tr. 728:10-14; TX 48 at 2233; TX 220 at 389.

---

[6]    One of the six volunteers in Fuller tolerated 100 mcg/kg/min for only 1 min.  TX 1208 at 311.

These are precisely the types of side effects that a person of skill in the art in 1987 with even a modicum of common sense would have expected to see with adenosine in view of the known mechanism of action of dipyridamole. The prior art references that reported these as the side effects of adenosine infusion in conscious humans confirmed the expected result.

It is also worth noting that the only reference on which Plaintiffs rely in support of their argument that a person of skill in the art in 1987 would have sought to accomplish pharmacologic stress without any side effects is the Karolinska Request, a document which Plaintiffs contend was not public and should not even be considered as prior art. *See* D.I. 145 at 39-40. Yet, another prior art publication by the same researcher, the '296 patent, expressly discloses that the effective dose of adenosine for MPI is likely to be in the range of 10 to 150. TX 275 at col. 21, ll. 59-61.

In their attempt to salvage the most narrow claim of the '877 patent, Plaintiffs assert that the results of the dose of 140 mcg/kg/min of adenosine were "unpredictable." D.I. 145 at 27-30. Sicor assumes that Plaintiffs' intended argument is that the results of using the dose of 140 mcg/kg/min were unexpected. Plaintiffs were required to come forward with evidence of such unexpected results at trial. *See Pfizer*, 480 F.3d at 1371. Plaintiffs failed to do so. The evidence in the record does not show any surprising superior property or advantage to the dose of "about 140 mcg/kg/min." *See In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995) (showing of unexpected results is "that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the art would have found surprising or unexpected"). Plaintiffs also never demonstrated what results were "expected," a failure that prevents this Court from properly considering what properties might be unexpected. *See Pfizer,* 480 F.3d at 1371 (finding that patentee's evidence of unexpected results "must fail because the record is devoid of *any* evidence of what the skilled artisan would have expected").

There is no evidence that the dose of "about 140 mcg/kg/min" as specified in claim 23(18) is actually better than other doses within the range that is disclosed in the prior art. Wilson, on which Plaintiffs rely, describes increases in coronary blood flow reserve at various doses of adenosine. TX 46. However, the Wilson study shows only a minor difference in coronary blood flow reserve between the

dose of 100 mcg/kg/min and 140 mcg/kg/min.  TX 46 at 1601 (Table 4 and Figure 4).  The insignificance

of the difference is further highlighted in the textbook <u>Clinical Nuclear Cardiology</u>, in which the coronary

flow reserve at 100 and 140 mcg/kg/min of adenosine is shown as equal -- based on the Wilson study.

TX 5011 at 235, figure 14.1; Tr. 1030:4-12.  The data in Wilson does not include results for intravenous

doses of either 120 or 160 mcg/kg/min of adenosine.  *See generally* TX 46.  Nor does Wilson compare,

describe or discuss the quality of myocardial perfusion images at any of these doses.  *Id.*  The most that

Wilson shows is that coronary blood flow velocity rose and fell in a cyclic pattern at doses from 70 to 100

mcg/kg/min.  TX 46 at 1600; Tr. 1031:17-1032:7.  The Wilson study, and the depiction of the Wilson

results in later publications, establish that the differences between the doses of 100 and 140 mcg/kg/min

were insignificant at best.  Wilson provides no evidence on whether doses of 120 or 160 mcg/kg/min are

the same as or better than 100 and 140.  Nothing in the record demonstrates anything special or

unexpected about a dose of  "about 140" mcg/kg/min of adenosine for MPI.

      There is also no evidence in the record that "about 140" mcg/kg/min results in better images or

greater accuracy than any other dose between 60 and 120 mcg/kg/min.  Referring to the results on which

Plaintiffs rely as evidence of reduction to practice, Plaintiffs' expert, Dr. Wackers, testified that when the

adenosine MPI results match up with the angiography results, the adenosine test was successful in that

patient.  Tr. 1016:9-17; 1017:14-21; TX 296 at AST0004357.  Those study results show infusion of

adenosine to 15 different patients at doses from 60 to 140 mcg/kg/min.  TX 296 at AST0004357; Tr.

1018:2-17.  The dose of 140 mcg/kg/min was used in only two of the 15 patients described in the study.

Tr. 1018:13-17.  The study results show that doses of 60, 100 and 120 mcg/kg/min resulted in successful

identification of myocardial dysfunction in those patients, just as the 140 mcg/kg/min dose did.  Tr.

1017:14-1018:12; TX 296 at 4357, 4364.  In other words, the only evidence in the record concerning what

doses of adenosine will work for MPI demonstrates that doses of any of 60, 100 or 120 mcg/kg/min will

work.  Thus, the evidence is that each of 60, 100, 120 and 140 work, not that  "about 140" is

unpredictably better.

Finally, Plaintiffs' "no pain no gain" argument is nothing more than a litigation construct without evidentiary support.  *See* D.I. 145 at 29-30.  Nothing in the asserted claims or the description of the invention in the '877 patent suggests that some amount of patient discomfort will be necessary in order to achieve sufficient vasodilation for MPI using the claimed invention.  *See, e.g.,* TX 320.  More importantly, however, a person of ordinary skill in the art at the time would have expected some degree of patient discomfort during pharmacologic stress MPI procedures.  *See* TX 38 at 283 (describing side effects during dipyridamole stress testing).  The side effects of both dipyridamole and adenosine were known, and the manifestation of those side effects during MPI stress procedures was neither unpredictable or unexpected.  TX 38 at 283; TX 48 at 2233; TX 220 at 389; TX 1171 at 319.

### 3. *The Secondary Considerations Argued By Plaintiff Do Not Rebut The Prima Facie Case*

Secondary considerations of nonobviousness may include any of (1) copying; (2) long-felt but unresolved need; (3) failure of others; (4) commercial success; (5) unexpected results; (6) unexpected properties of the claimed invention: (7) licensing showing industry respect for the invention; and (8) skepticism of skilled artisans before the invention.  *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998).  Plaintiffs argue that three of these secondary indicia – skepticism, commercial success, and copying – support non-obviousness in this case.  D.I. 145 at 30-34.  As set forth in more detail below, there is no persuasive evidence of skepticism; no nexus between any commercial success and any particular value of the claimed invention; and no relevance to an assertion of copying in the context of this ANDA case.

#### a. *No Credible Evidence Of Skepticism Or Surprise*

As discussed above and in Sicor's Opening Brief, the prior art taught toward, not away from, the use of adenosine for MPI.  The evidence presented by Plaintiffs also does not establish any skepticism in the art at or after the time of the invention.

In *U.S. v. Adams*, 383 U.S. 39 (1966), on which Plaintiffs rely, the evidence showed skepticism by persons of skill in the art about the feasibility of the invention as well as continued disbelief that the

invention worked, even after the inventor had disclosed his discovery.  *See id.* at 44.  Specifically, the inventors in *Adams* gave demonstrations and provided graphical data showing characteristics of the invention to the government.  *Id.*  Even with this information, a government expert thought that the inventor was making "unusually large claims" about the characteristics and the expert found the evidence "far from convincing."  *Id.*  That is, the government expert did not think the invention actually worked as the inventor claimed it did.  Here, the statements relied upon by Plaintiffs are a far cry from doubt as to feasibility or disbelief that adenosine worked for MPI.

Plaintiffs rely on a smattering of out-of-context statements in their effort to show skepticism.  First, Plaintiffs point to a statement in a December 31, 1987 letter – a letter that predates Plaintiffs' first use of adenosine for MPI – in which the author states, "I am not certain how effective and safe adenosine would be as a coronary vasodilator for this purpose but would be interested in discussing this with you further."  TX 53.  At most, this statement reflects a lack certainty as to the degree to which adenosine would be safe and effective for the purpose.  It does not reflect doubt as to whether adenosine would work.  Notably, the author here was sufficiently interested, and sufficiently convinced that adenosine was **likely** to be safe and effective, that he went on to state:

> We would definitely be interested in studying adenosine with our Doppler catheter to measure coronary flow reserves.  I am certain that a protocol could be easily worked out comparing papaverine to adenosine.  There are also other uses of intracoronary adenosine which we can envision that might also be of considerable interest to you.

*Id.*  This offer to work out a protocol and devote research time as of December 1987 contradicts Plaintiffs' contention that the author was skeptical about whether adenosine would work.

Plaintiffs also rely on a letter to the editor published in a June 1990 journal.  TX 169.  The letter notes the report of two instances of heart block in connection with a study concerning the use of adenosine for MPI that was published in December of 1989.  *Id.*  The letter further asks for more detail about the two instances, then expresses the need for more study and for caution during that study.  *Id.*  This letter raises questions, but does not express disbelief that adenosine worked as described.  Moreover, Plaintiffs' expert witness, Dr. Wackers, did not know the author of the letter and thus could not say

whether the author was a person of skill in the art at the relevant time. Tr. 1026:5-14. For this reason

alone, the letter should be given little weight. *See Alpex Computer Corp. v. Nintendo Co.*, No. 86-1749,

1994 WL 681752, at *30 (S.D.N.Y. Dec. 5, 1994) ("[I]n the absence of a showing that the skeptics were

people of ordinary skill in the art, evidence of their skepticism should be accorded little weight in the

obviousness determination."), *aff'd in rel. part*, *rev'd in part*, 102 F.3d 1214 (Fed. Cir. 1996).

Plaintiffs further suggest that the Wilson article, the Editorial, and the 1995 Verani chapter

support skepticism. For the reasons discussed above, neither the two 1990 publications nor Dr. Verani's

speculation in 1995 demonstrates any skepticism about the use of adenosine for MPI, either in 1990 or

before. In fact, the Editorial concludes that "adenosine holds promise as a safe and effective coronary

vasodilator that could be useful in studying the normal and abnormal coronary circulation in humans."

TX 47 at 1856.

Finally, Plaintiffs rely on hearsay testimony from one sales representative that some customers

were concerned about the use of Adenoscan® when it was launched as a commercial product in 1995. *See*

D.I. 145 at 17-18. Plaintiffs did not call any of these customers as witnesses, so Sicor could ask the

customers whether they had any particular concern about adenosine or if instead they were content with

dipyridamole and saw no particular reason to change. Plaintiffs relied on a sales representative to testify

as to her uncorroborated memory of events within her small sales area more than ten years ago. *See* D.I.

145 at 17-18; Tr. 1535:11-1536:20. The probative value of that memory, if any, is further undermined by

that same sales representative's testimony that she was still trying convince doctors within her sales area

to switch from dipyridamole to adenosine as late as 2003. *See* Tr. 1542:10-21. Plaintiffs have not

contended that the purported skepticism endured until 2003 – to do so would contradict their argument as

to the commercial success of Adenoscan®. Finally, this testimony should be given little, if any, weight

because Plaintiffs did not identify these customers or offer any evidence to establish whether these

specific customers were persons of ordinary skill in the art in 1987. *See Alpex* 1994 WL 681752, at *30

(S.D.N.Y. Dec. 5, 1994); *see also Comfort Silkie, Co. v. Seifert*, 1998 U.S. Dist. LEXIS 22285, at *26

(C.D. Cal. May 26, 1998) (finding "evidence of the skepticism of a handful of unnamed retailers as to the

commercial viability" of the invention insufficient to render the invention non-obvious), *aff'd*, 215 F.3d 1344 (Fed. Cir. 1999).

Plaintiffs' contention that the purported "skepticism" about the use of adenosine for MPI existed even in 1995 is contradicted by its own expert's testimony. Plaintiffs' expert, Dr. Wackers, testified that the audience attending the cardiology meeting in 1989 responded to a presentation concerning the use of adenosine for MPI with "great interest" and that "[p]eople were very interested in this alternative way of doing stress testing." Tr. 946:16-947:3.[7] Dr. Wackers also testified that there was "a general excitement and interest" in the adenosine protocol at that 1989 meeting. Tr. 1027:21-1028:3. "Great interest" and "excitement" from cardiologists at a cardiology meeting in March of 1989 is a far cry from "skepticism" in the art at the time.

b.       *Copying Is Irrelevant In The ANDA Context*

Plaintiffs argue that copying should be considered as a secondary factor in support of the nonobviousness of the asserted claims. However, as the Federal Circuit has stated, "'more then the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue.'" *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (*quoting Cable Elec. Prods. v. Genmark, Inc.*, 770 F.2d 1015 (Fed. Cir. 1985)). Indeed, many reasons for copying are unrelated to any purported nonobviousness of the invention. *See Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).

The Eastern District of Virginia has explained why evidence of copying is particularly weak in the context of an ANDA litigation such as this one. *See Aventis Pharma Deutschland GmbH v. Lupin*

---

[7]     In their Proposed Findings of Fact, Plaintiffs also purport to quote a statement from Dr. Marcus at the 1989 meeting. *See* D.I. 146 at ¶ 86. The statement, which is based on Dr. Wackers' testimony as to what he believes Dr. Marcus said at a conference almost twenty years ago, is hearsay and should be excluded by this Court. If the Court does consider Dr. Wackers' memory of something said by Dr. Marcus in 1989, it should do so in context. First, even assuming Dr. Marcus made the statement, it was in the context of a meeting where the general response was "great interest" in and "general excitement" about using adenosine for MPI. Tr. 946:24-947:11; 1027:21-25. Second, Dr. Wackers did not recall Dr. Marcus's exact words. Tr. 1026:23-

*Ltd.*, 2006 WL 1008962, at *45 (E.D. Va. July 17, 2006).  Like the defendant in *Aventis*, Sicor has filed

an ANDA seeking to market a generic version of Plaintiffs' branded pharmaceutical product.  As the

court noted in *Aventis*, "the ANDA process allows a generic drug company to challenge a drug patent by

alleging the patent is invalid."  *Id.* at *45.  The *Aventis* court therefore found that, even though there was

no question that the defendant attempted to copy the branded pharmaceutical product, "given that there is

a statute in place that encourages generic drug companies to challenge patents, [Plaintiffs'] copying

argument is weak."  *Id.*  This case originates out of that same statute, and Plaintiffs' copying argument is

equally weak here and should be afforded no weight.

c.    *Any Commercial Success Enjoyed By Adenoscan<sup>®</sup> Does Not Rebut Obviousness Here*

As Sicor demonstrated in its opening post-trial brief, there is no nexus between the claimed

invention of the '877 patent and the alleged commercial success of the Adenoscan® product.  (D.I. 143 at

32-34.)  Specifically, Sicor has demonstrated the sales levels achieved by Adenoscan® are the product of

various economic factors and do not demonstrate any particular value of the claimed invention that would

suggest that the '877 patent was not obvious at the relevant time.  *Pfizer Inc. v. Teva Pharms. USA, Inc.,*

461 F. Supp. 2d 271, 274 (D.N.J. 2006) (commercial success alone does not demonstrate non-

obviousness and must be the result of the product's features rather than other factors such as advertising).

i.    The Sales Levels of Adenoscan<sup>®</sup> Are Explained By the Interplay of Economic Factors

The sales levels achieved by Adenoscan® are explained by economic and demographic factors,

not by any unexpected or unknown feature of adenosine infusion.  To be probative of non-obviousness,

the commercial success must have some nexus with the asserted innovation, not merely with features that

were known in the prior art.  *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed.

Cir. 1997).

---

1027:12.  Finally, whatever Dr. Marcus may have said was, at most, a caution, it was not a statement that Dr. Marcus did not think the drug would work.  *Id.*; *see also* Tr. 1027:13-20.

In assessing commercial success, a court should

> "not be blinded to other factors which may contribute to the commercial success
> of an invention, such as extensive advertising campaigns, price discounts for the
> patented item, or promotional schemes which enhance the commercialization of
> the invention without in any way evidencing a long-felt need for the device."

*Speller v. U.S.*, 14 Cl. Ct. 170, 174 n.5 (1988) (quoting *Pacifica Technica Corp. v. U.S.*, 2 Cl. Ct. 170,

173 (1983)).  As described at length in Sicor's opening brief and proposed findings of fact, the sales

levels achieved by Adenoscan® were driven by the interplay of four economic factors:

(1)     There was only one other FDA-approved competitor in the
pharmacological stress-testing market at the time of Adenoscan entry;

(2)     Adenoscan® became the only promoted product in the pharmacological
stress testing market shortly after its entry;

(3)     Extensive marketing and promotion of Adenoscan® by Fujisawa; and

(4)     Growth in demand for pharmacological stress testing unrelated to the
asserted inventions.

(Tr. 1579:3-1582:13; DTX 3133; *see also* D.I. 143 at 32-34 and D.I. 147 at ¶¶ 168-225.)

(1)     Adenoscan® Entered the Pharmacological Stressor
Market at a Fortuitous Time

Plaintiffs describe the sales gained by Adenoscan® as a triumph over adversity because Fujisawa

was a new player in the pharmacological stress market selling a new product that would soon face

competition from the soon-to be-generic, and therefore lower-priced, dipyridamole.  (D.I. 143 at 33-34.)

This picture is false.

First, Fujisawa had been working for years to secure FDA approval and launch Adenoscan.  (*See*,

*e.g.*, TX 1226 at AST0065726-727.)  In that time, the company developed countless strategic

relationships with physician advocates and sponsored the activities of the American Society of Nuclear

Cardiology ("ASNC"). (Tr. 1611:10-15; Tr. 1612:9-1613:4; Tr. 1252:17-25, 1339:4-15; TX 1078 at

AST0066744.)  Fujisawa was hardly the "new kid on the block."

Second, Fujisawa launched Adenoscan® at a propitious time in the pharmacological stressor

market.  (D.I. 147 at ¶¶ 169-180.)  Persantine®, the one other directly competing product, was nearing the

24

end of its patent protection. (*Id.* at ¶¶ 174, 177.) When Persantine® went generic in late 1996, its manufacturer, DuPont, ceased to promote the product. (*Id.* at 178.) Thus, not long after its launch, Adenoscan® had the good fortune to become the only product being advertised to the prescribers of pharmacological stress tests. (*Id.* at ¶ 180.) Furthermore, the audience for the Adenoscan® marketing message was relatively price insensitive. Prescribing physicians do not themselves pay for the product and expect that their patients will be covered by federal or private health insurance. (Tr. 1694:18-1695:9.) Adenoscan® has continued to benefit as the only product advertised in the pharmacological stress market up to the present day. (D.I. 147 at ¶ 180.)

> (2)    Fujisawa's Extensive Marketing and Promotion Drove The Adenoscan® Market Share Growth

Plaintiffs would have this Court believe that Fujisawa's promotion of Adenoscan® was "typical" in the industry. (D.I. 146 at ¶ 120.) The evidence shows otherwise. On cross-examination, Dr. Hay admitted that the 6% industry-standard average promotion-to-sales ratio that he relied on for his testimony that Fujisawa's spending was "typical" was essentially a concocted number and inappropriately applied to the pharmacological stress market. (Tr. 1760:19-24, 1761:3-9, 1763:15-18, 1764:1-1765:6.) Dr. Hay's 6% was not based on reliable data. Instead, without any basis in fact, Dr. Hay "calculated" this 6% ratio as the "midpoint" between two other numbers that are based on reliable data: the 12% industry average for drugs sold primarily in retail pharmacies and the 3.1% industry average for drugs sold primarily in hospitals. (Tr. 1761:12-1762:6.) Dr. Hay admitted that the appropriate average promotion-to-sales ratio for Adenoscan® is 3.1% because pharmacological stress products are sold primarily in hospitals and clinics, and not in retail pharmacies. (Tr. 1760:19-24; Tr. 1761:3-9; Tr. 1763:15-18; Tr. 1764:1-1765:6.) Dr. Hay also admitted that if a line were drawn at the 3% mark on the misleading demonstrative used to illustrate his testimony, it would be clear that Fujisawa's marketing and promotional spending would exceed the average in every single year from 1995 through 2005. (Tr. 1766:18-1777:12; DTX 2041.) In fact, Fujisawa's spending in at least the years 1996, 1999 and 2001 was roughly **twice** as high as the average promotional spending for hospital-dominated products in those years. (*Id.*) This is especially

remarkable given that the pharmacological stress market is very concentrated, requiring fewer resources to reach the marketing audience. (D.I. 147 at ¶¶ 182-186.) It is also remarkable in a market in which, as Plaintiffs contend, the consumers are "expert," and allegedly not swayed by product promotion. (D.I. 146 at 119.) The evidence suggests that the Adenoscan® promotion was substantial and effective.

As described in detail in Defendants' Proposed Findings of Fact, Fujisawa's spending was devoted to extensive traditional and non-traditional marketing activities, including substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC"); support of physician advocates; provision of financial incentives such as trial product and pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and promotion of Adenoscan for new uses and user populations. (D.I. 147 at ¶¶ 181-208.) Such an extensive marketing and promotion program "obscure[s] any nexus that might have existed between the merits of the product and its commercial success." *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370 (Fed Cir. 2003) (affirming district court's discount of Plaintiffs' asserted evidence of commercial success); *see also Revlon, Inc. v. Carson Prods. Co.*, 602 F. Supp. 1071, 1096-97 (S.D.N.Y. 1985) (finding that the success of Defendant's product was due to advertising campaign, product packaging, and choice of target audience for the marketing message—not to any claimed advantage of the patented invention). In fact, "where the success of an invention is due to advertising, good business sense, the prior art, etc., rather than the advantages inherent in the discovery, it is **irrelevant** to a determination of obviousness." *Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*, 693 F. Supp. 114, 131 (D. Del. 1988) (emphasis added).

    (3)    Adenoscan®'s Increasing Sales Were Also Due to the General Growth of the Pharmacological Stress Market

Despite Plaintiffs' representations concerning relative market shares, Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market. (Tr. 1600:6-16, 1632:4-7; DTX 3132; DTX 3134; *see also* D.I. 147 at ¶ 218-220.) And, as discussed *supra*, although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of

the products.  (D.I. 147 at  ¶¶ 212-13)  Such a delay in the market's willingness to embrace Adenoscan® is not probative of commercial success.  *Friction Div. Prods.*, 693 F. Supp. at 131 ("More probative of nonobviousness [than sales, which may be attributable to  advertising increases] would be evidence of commercial success *immediately following* the patenting of the invention.") (emphasis added).  The fact is that dipyridamole retained significant usage upon the launch of Adenoscan and has experienced continuous growth since that time.  (Tr. 1599:12-1600:16; TX 21; DTX 3132; DTX 3134.)

The higher overall level of growth achieved by Adenoscan can be attributed to the company's extensive investment in marketing and promotion to expand the user population for the product.  (D.I. 147 at ¶¶ 198-202.)  It is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity.  (D.I. 147 at ¶ 215.)  As Plaintiffs' witness Mr. White pointed out, "rising water raises all the boats"—*i.e.*, dipyridamole as well as Adenoscan.  (Tr. 1257:11-12.)  But Adenoscan®'s success based on fortuitous market circumstances cannot be attributed to the claimed invention and thus is not probative of nonobviousness.  *See Merck & Co., Inc. v. Teva Pharms USA, Inc.*, 405 F.3d 1338, 1339 (Fed Cir. 2005) (Lourie, J., dissenting from order denying rehearing *en banc*) (stating that once commercial success is established, "the only other question is whether the success is attributable to the claimed invention ('nexus'), rather than to other factors such as market power, advertising, **demand for all products of a given type**, a rising economy that 'lifts all boats,' etc.") (emphasis added); *see also Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (concluding that any commercial success of the patented device could have been due to an increased use of herringbone milking systems, and not the claimed invention).

For the above reasons, to the extent that Adenoscan® succeeded in achieving sales in the pharmacological stressor market, these sales do not demonstrate a nexus between the claimed invention and the alleged Adenoscan® commercial success, and are not probative of non obviousness.

ii.    Dr. Hay's Analysis Is Unsound and His Testimony Is Unreliable

The testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was inaccurate in several important respects. First, as discussed *supra*, Dr. Hay relied on a concocted industry average that is inappropriate for the niche market of pharmacological stress agents.

Second, Dr. Hay conducted his analysis based not on the actual facts in this case, but on facts he either made up or was told by Plaintiffs' counsel to assume. For example, in response to questions about Fujisawa's 86-member sales force, which Dr. Hay had earlier disagreed was twice the size of the sales force of its competitor, DuPont, Dr. Hay admitted when pressed that he "[didn't] know exactly what [DuPont was] doing." (Tr. 1774:24-1776:19.) Despite this lack of knowledge, Dr. Hay testified on direct to an opinion on the relative detailing efforts of Fujisawa and DuPont. His testimony should be disregarded.

By way of further example, Dr. Hay insisted on using dollar-based market share as a preferred measure of the relative success of Adenoscan and dipyridamole. Yet Astellas' own Senior Vice President of Marketing, Richard White, testified that the preferred measure used internally by Astellas to gauge the success of its products is market share of procedures performed. (Tr. 1286:23-1287:9; Tr. 1777:11-1778:3.) Dr. Hay also inappropriately chose to use gross sales to calculate market shares and promotion-to-sales ratios, even though he admitted on cross examination that gross sales is an "inflated number" and that Mr. White testified that net sales "represents the money that the company actually takes in for the sales of its product" because it factors out "certain returns and allowances." (Tr. 1236:21-1237:3; Tr. 1788:2-15.)

Finally, at several points throughout his testimony, Dr. Hay was intent on criticizing Dr. Leffler's testimony even though he had either incorrectly heard the testimony or failed to listen to it altogether. (Tr. 1767:13-1768:14.)[8] In one instance, Dr. Hay was even forced to admit that his criticism on direct

---

[8]    In their Opening Brief, Plaintiffs touch on the testimony of Sicor's economic expert, Dr. Leffler, then refer to their Proposed Findings of Fact for details of that discussion. *See* D.I. 145 at 34 (citing D.I. 146 at ¶¶ 118-

examination of Dr. Leffler's calculation of a promotion-to-sales ratio was based on a calculation that Dr. Leffler had revised since his opening report and had not presented to the Court at trial. (Tr. 1773:25-1774:23.) Dr. Hay's apparent personal bias against Dr. Leffler and his disregard of the facts make him an unreliable source for this Court to rely on.

For all of the above reasons, this Court should disregard the conclusions that Plaintiffs ask this Court to draw in reliance on Dr. Hay's unsound analysis and unreliable testimony.

> ### d. Lack Of Specific Suggestion Is Irrelevant

Plaintiffs rely on a single case, *Hobbs v. Beach*, 180 U.S. 383 (1901), in an attempt to derive some relevance from the lack of specific mention of infusing adenosine for MPI prior to 1987. Neither the *Hobbs* decision nor the facts of this case support Plaintiffs' argument.

Even if *Hobbs* stood for what Plaintiffs contend it does – and it does not[9] – *Hobbs* is not the law. *Hobbs* was decided 65 years before the seminal obviousness case, *Graham v. John Deere Co.*, 383 U.S. 1 (1966). *Hobbs* therefore necessarily does not apply the obviousness analysis set out in *Graham*, and Plaintiffs cite to no authority to support lack of specific suggestion as a secondary indicia of non-obviousness under *Graham*. Moreover, *Hobbs* as characterized by Plaintiffs has no significance in view of *KSR*. As the Supreme Court recently made clear, the obviousness analysis using the *Graham* factors "need not seek out precise teachings directed to the specific subject matter of the challenged claim . . . ." *KSR*, 127 S.Ct. at 1741. Plaintiffs' reliance on *Hobbs* is nothing more than an attempt to require

---

130). Sicor disputes Plaintiffs' characterization of Dr. Leffler's testimony. Sicor's detailed response to the statements in Plaintiffs' Proposed Findings of Fact are contained in Sicor's Responsive Proposed Findings of Fact, submitted herewith, at ¶¶ 92-105.

[9]     Contrary to Plaintiffs' suggestion, *Hobbs* does not stand for the proposition that the mere passage of time without someone in the art specifically suggesting the claimed modification is persuasive evidence of non-obviousness. Rather, in *Hobbs* the passage of "many years" was one of many facts recited by a Court that acknowledged that, for other reasons, it was predisposed toward finding validity. 180 U.S. at 389-393. Among those reasons was that the patent at issue in *Hobbs* had been vigorously challenged in an interference proceeding and in previous litigation such that the Supreme Court, while recognizing the need to independently consider the question of anticipation, felt "bound to defer somewhat to [the] unanimity of opinion upon the part of so many learned and distinguished judges" who had already addressed the question. *See* 180 U.S. at 389.

adherence to the rigid teaching, motivation or suggestion analysis that has been soundly rejected by the Supreme Court.

<em>e.    Simultaneous Invention Suggests Obviousness</em>

Near simultaneous invention may be an indication of obviousness. *See Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1460-61 (Fed. Cir. 1984). Example XIII of the '296 patent was added in a continuation-in-part application filed on December 27, 1987, after the date of Plaintiffs' Protocol, but prior to Plaintiffs' conception or reduction to practice of any specific dose or range of doses of adenosine for MPI. As discussed below, Example XIII is prior art and anticipates and/or renders obvious the asserted claims. If, however, Example XIII of the '296 patent were not prior art to the '877 patent, it would still provide evidence of obviousness because it reflects near-simultaneous invention. The logical implication of the near-simultaneous invention disclosed in Example XIII of the '296 patent is that, in light of the knowledge in the art such as the information disclosed in the remainder of the '296 patent (which has an earlier priority date) and/or the Sollevi 1986 article, using adenosine for MPI was obvious.

**B.    THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED**

Two separate documents, the '296 patent and the Karolinska request, describe the use of continuous adenosine infusion for MPI at doses within the range of doses claimed in the '877 patent. Each of these documents is prior art to the '877 patent, and the asserted claims of the '877 patent are anticipated and/or rendered obvious by these prior art references.

**1.    *The '296 Patent Is Prior Art***

There is no dispute that the priority date for Example XIII of the '296 patent is December 28, 1987. TX 275; D.I. 145 at 37-38.

The original application that led to issuance of the '877 patent, Application Serial No. 231,117, was filed on August 11, 1988. TX 59; TX 320. Accordingly, on the face of the '877 patent, the earliest possible priority date is August 11, 1988 – well after the priority date of Example XIII. *See* TX 320, TX 275. Plaintiffs rely on an asserted earlier invention date for the '877 patent to argue that Example XIII is

30

not prior art. D.I. 145 at 37. Plaintiffs, however, have not met their burden of proving that the '877

patent is entitled to an priority date antedating the '877 patent application date. *See Mahurkar v. C.R.*

*Bard Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996).

Plaintiffs rely on a protocol entitled "Clinical Utility of Adenosine in Radionuclide Myocardial

Imaging" ("the Protocol," TX 57) in an attempt to establish prior conception of the subject matter of the

claims of the '877 patent. The attempt fails because the Protocol lacks every limitation of the asserted

'877 patent invention. "Conception is the formation 'in the mind of the inventor of a definite and

permanent idea of the complete and operative invention, as it is therefore to be applied in practice.'"

*Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (citation omitted). "Conception must include

every feature or limitation of the claimed invention." *Id.* However, Plaintiffs' own expert, Dr. Wackers,

conceded that the evidence of "conception" on which Plaintiffs rely, the Protocol (TX 57), does not show

conception of a specific dose of adenosine for use with MPI. Tr. 1013:13-22; 1015:15-1016:1.

Accordingly, Plaintiffs cannot establish an earlier conception date based on the Protocol.

Plaintiffs also contend that the Protocol allows them to antedate the '296 patent because it shows

that the alleged inventors had "conceived of equivalent subject matter" to Example XIII. D.I. 145 at 37.

Specifically, Plaintiffs assert that they need only show prior possession of as much as what was disclosed

in Example XIII in order to antedate the '296 patent. D.I. 145 at 38; (*citing In re Stempel*, 241 F.2d 755,

759 (C.C.P.A. 1957)). Plaintiffs further argue that they need not show prior possession of a dose of about

140 mcg/kg/min in order to antedate Example XIII because that dose is not disclosed in Example XIII.

D.I. 145 at 38. Plaintiffs cannot establish the requirements of *Stempel,* however, because the Protocol

demonstrates that Plaintiffs were not in possession of as much of the claimed invention as was disclosed

in Example XIII of the '296 patent.

*In re Stempel* concerned the validity of a patent directed to a genus of chemical compounds. 241

F.2d 755, 756-57 (C.C.P.A. 1957). The Court of Customs and Patent Appeals ("C.C.P.A.") held that the

patentee could antedate an earlier reference that disclosed a species of the claimed genus through

evidence showing the patentee was in possession of that species prior to the effective date of the

reference. *Id.* at 759. Subsequent decisions have explained that *Stempel* is only instructive when a

patentee is attempting to antedate a reference disclosing a species of the claimed genus. *See In re*

*Tanczyn*, 347 F.2d 830, 831-33 (C.C.P.A. 1965) (holding that *In re Stempel* is valid "*as applied to the*

*facts in Stempel* where the reference showed a species of the generic invention being claimed in the

appealed claims") (emphasis added). Importantly, the patentee in *Stempel* was able to antedate the

invalidating reference by showing "completion of the claimed invention." *Id.* at 832. In fact, "[t]he mere

fact that an applicant has previously produced that which is disclosed by a reference, however, may have

no bearing on the problem of whether he made his invention or a patentable portion of it before the date

of the reference." *Id.* What Plaintiffs must show here is either possession of the whole invention as

claimed or something falling within the claim. *Id.* at 833. Plaintiffs cannot show either, as the Protocol

does not show prior possession of any adenosine dose. Tr. 1010:12-18.

Here, Example XIII explains the relationship of dipyridamole's action with adenosine's

vasodilatory properties, and teaches that adenosine *can be used* in place of dipyridamole as a

pharmacologic stress agent for MPI. TX 275 at col. 21, ll. 25-61. Example XIII also teaches that, for

purposes of MPI, adenosine "will normally have to be titrated individually but should lie in the range of

10 to 150 micrograms per kilogram per minute." TX 275 at col. 21, ll. 59-61; Tr. 750:12-22. According

to Plaintiffs, this disclosure is "no more than a proposal to conduct a titration experiment." D.I. 145 at 37.

What Plaintiffs ignore is that Example XIII teaches that adenosine will work as a vasodilator for purposes

of MPI. In addition, Example XIII teaches a person of ordinary skill in the art that each dose lying

between 10 and 150 mcg/kg/min should be an effective dose, depending on the individual titration in each

patient. *See* TX 275 at col. 21, ll. 52-61. Moreover, the '296 patent contains twelve other examples that

disclose uses of adenosine at varying doses for different purposes. TX 275. In short, Example XIII is an

unequivocal statement that adenosine can be used as a pharmacologic stress agent for MPI and is likely to

work at doses between 10 and 150 mcg/kg/min.

In sharp contrast, the Protocol on which Plaintiffs rely in their attempt to antedate Example XIII

is nothing more than a call for experimentation. *See* TX 57; Tr. 1013:4-7; Tr. 1015:15-22. Plaintiffs

admit as much, stating in their brief that the inventors "proposed a testing protocol." D.I. 145 at 37.

Plaintiffs' own expert, Dr. Wackers, admitted that the Protocol did not constitute conception of any specific dose of adenosine for MPI. Tr. 1013:13-22; 1015:15-1016:1. A mere testing protocol does not satisfy Plaintiffs' burden to prove conception. *See Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994) (holding that conception cannot be founded on "a general goal or research plan [the inventor] hopes to pursue").

Plaintiffs further contend that the Protocol teaches more than Example XIII because it discloses titration to one of three endpoints, whereas Example XIII does not explicitly disclose an endpoint. Notably, however, none of the three endpoints proposed in the Protocol specifies an endpoint related to whether sufficient vasodilation for effective MPI was achieved. TX 57 at AST0001046; Tr. 1013:1-12. By contrast, a person of ordinary skill in the art would understand from the '296 patent and Example XIII that the endpoint of titration would be sufficient coronary vasodilation to perform MPI in that particular patient. TX 275 at col. 21, ll. 59-61; Tr. 839:8-17. The specific disclosure in Example XIII of a range of adenosine doses that should work for MPI is far more specific and instructive than the general research proposal in the Protocol. In other words, on this point as well, Example XIII discloses more, not less, than the Protocol. Accordingly, Plaintiffs are not entitled to the earlier priority date and Example XIII therefore qualifies as prior art. *Cf. In re Stempel*, 241 F.2d at 759.

Even if Plaintiffs were correct and Example XIII were not prior art for purposes of an anticipation analysis, the same does not hold true for obviousness. Indeed, a "different situation may prevail when the rejection is based on 35 U.S.C. § 103." *Tanczyn*, 347 F.2d at 832. In such situations, *In re Stempel* is not controlling and a different standard should be applied. *See ISCO Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 495 n.3 (D.Del. 2003). For obviousness, Plaintiffs must show they were in possession of the "whole invention" prior to the conception date in order to antedate Example XIII reference. *Id.* at 495 n.3, 496. For the reasons discussed above, Plaintiffs cannot make such a showing here.

## 2.     *The Karolinska Request Is Prior Art*

The use of adenosine as a pharmacologic stress agent with MPI is also taught in a proposal that was submitted to the Karolinska Institute in Sweden in or around December of 1987 (the "Karolinska Request"). TX 1193 at SIC010937. Like Example XIII of the '296 patent, the Karolinska Request discloses that adenosine could be used to replace dipyridamole as the pharmacologic stress agent for MPI. TX 1193 at SIC010943-44; Tr. 754:9-22. The dose described in the Karolinska Request is 60 mcg/kg/min. TX 1193 at SIC010944; Tr. 755:6-14. The Karolinska Request therefore points to a specific dose of adenosine for MPI and necessarily teaches more than the Protocol.

The Karolinska Request was publicly available and is valid prior art to the '877 patent. *See* TX 1193 at SIC010937. Plaintiffs rely on a stipulation concerning the testimony of Mr. Mattson, a patent attorney practicing in Sweden, for the proposition that the Karolinska Request was not publicly available. *See* TX Court11; D.I. 145 at 40. However, Mr. Mattson testified that he has no personal knowledge as to how the Karolinska request was kept or whether it was publicly available. TX Court 11 at ¶¶ 12-15.[10] The copy of the Karolinska Request on which Sicor relies is attached to a submission that was made to the European Patent Office ("EPO") by an entity unrelated to Sicor. *See* TX 1193. The cover letter to the EPO states that this type of request is "generally available to the public." *Id.* at SIC010937. Mr. Mattson's litigation-inspired opinion, based on no personal knowledge of the facts of the Karolinska Requests' availability, does not refute the public availability of the document. *See id.*; TX Court11 at ¶¶ 12-15.

## 3.     *Claims 23(17) and 43 Are Anticipated By The '296 Patent And The Karolinska Request*

Claims 23(17) and 43 describe the continuous intravenous infusion of about 20 to about 200 mcg/kg/min of adenosine sufficient to cause vasodilation, the injection of a radiopharmaceutical (more specifically thallium 201), and performing MPI (or more generally scintigraphy) to detect the presence and assess the severity of coronary artery disease. Plaintiffs apparently concede that, if either Example

---

[10]     The parties submitted Mr. Mattson's testimony in the form of a Stipulation dated February 9, 2007.

XIII or the Karolinska request is prior art to the '877 patent, then claims 23(17) and 43 are anticipated. *See* D.I. 145 at 34-40 (arguing only that claim 23(18) is not anticipated).

### 4.    Claim 23(18) Is Anticipated By The '296 Patent

Example XIII of the '296 patent discloses every element of claim 23(18). Example XIII discloses a range of adenosine doses from 10 to 150 mcg/kg/min, which could be referred to as a genus of adenosine doses for MPI. TX 275 at col. 21, ll. 59-61. "[T]he disclosure of a small genus may anticipate the species of that genus even if the species are not themselves recited." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1380 (Fed. Cir. 2001) (citing *In re Petering*, 301 F.2d 676, 682 (C.C.P.A. 1962)). The number of species in a given genus is not dispositive in determining whether the disclosure of a genus anticipates a particular species; rather, the court must also consider the "total circumstances involved." *Petering*, 301 F.2d at 681-82. A genus may anticipate a species if a person of ordinary skill in the art can look at a genus in light of a pattern of preferences disclosed in the reference and "envisage each member of this limited class." *Id.*

Example XIII represents a pattern of adenosine dose preferences for purposes of MPI that discloses each dose lying in the range of 10-150 mcg/kg/min. Example XIII teaches that, for purposes of MPI, adenosine "will normally have to be titrated individually but should lie in the range of 10 to 150 micrograms per kilogram per minute." TX 275 at col. 21, ll. 59-61; Tr. 750:12-22. A person of ordinary skill in the art would be able to envisage each dose disclosed in the range in Example XIII as many doses "should" work depending on the individual patient. *See* TX 275 at col. 21, ll. 59-61; Tr. 752:2-19. Therefore, the genus of 10-150 mcg/kg/min anticipates the dose of about 140 mcg/kg/min and renders it invalid.[11]

## III.    EVIDENTIARY ISSUES

### A.    RESPONSE TO PLAINTIFFS' EVIDENTIARY OBJECTIONS

Plaintiffs have asked this Court to exclude Dr. Strauss's testimony concerning two specific experiments described in Sollevi 1986. D.I. 145 at 40. There is no basis for excluding any of Dr.

Strauss's testimony concerning Sollevi 1986 because Sollevi 1986 was cited and discussed in Dr. Strauss's Expert Report. *See* TX 246.

Plaintiffs cannot even begin to meet the legal standard for the exclusion of this expert evidence. The "exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Tracinda Corp. v. DaimlerChrysler AG*, 362 F.Supp.2d 487, 506 (D. Del. 2005) (citations omitted). In considering whether to exclude evidence, this Court should consider factors such as (1) prejudice or surprise to Plaintiffs; (2) the ability of Plaintiffs to cure any prejudice; and (3) bad faith or willfulness in failing to comply with the Court's order. *See id.* Plaintiffs have not even argued that any of these three factors are satisfied here. *See* D.I. 145 at 40-41. Certainly Plaintiffs cannot have been surprised that Dr. Strauss relied on the Sollevi 1986 article – not only was the article cited in Dr. Strauss's report (TX 246), but it was also identified in Sicor's statement of facts submitted in connection with the pretrial order and in Sicor's 35 U.S.C. § 282 identification of prior art. Neither can Plaintiffs credibly claim any bad faith or willfulness when Dr. Strauss relied on the article in question in his initial expert report. *See* TX 246.

In his initial expert report (TX 246), Dr. Strauss relied on Sollevi 1986 as one of the references that supported his opinion that the claims of the '877 patent are invalid as obvious. In that expert report, Dr. Strauss noted that Sollevi 1986 "discusses various infusion rates, in conscious and anesthetized patients, sufficient to cause vasodilation in humans." TX 246 at ¶ 56. Dr. Strauss's expert report also specifically cites the summary chart at the end of the Sollevi 1986 article which states, among other things, that a dose of 20-50 mcg/kg/min of adenosine may be used for "preferential myocardial vasodilation." *See id.* The more detailed description that supports this statement in the summary chart is one of the two descriptions that Plaintiffs now assert should be excluded from Dr. Strauss's testimony. D.I. 145 at 40. The second of the two descriptions is also within the same Sollevi 1986 article, and the dose of 80 mcg/kg/min discussed in that description is within the 50-150 dosage range in the summary

---

[11]     Sicor has not argued that claim 23(18) is anticipated by the Karolinska Request.

chart that Dr. Strauss cited in his report.  D.I. 145 at 40; TX 246 at ¶ 56.  In short, Dr. Strauss relied on

Sollevi 1986 in his expert report and, during his testimony at trial, he properly explained how Sollevi

1986 supports his opinions.

Moreover, the portion of Dr. Strauss's deposition testimony on which Plaintiffs' rely concerns a

different question.   Dr. Strauss's expert report appropriately addressed the question of whether, based on

the *prior art*, a person of ordinary skill in the art would have had a *reasonable expectation* that adenosine

within the claimed dose ranges would work for MPI.  *See generally* TX 246; *see also Pfizer,* 480 F.3d at

1364 ("The expectation of success need only be reasonable, not absolute.").  The deposition testimony

that Plaintiffs introduced at trial and on which Plaintiffs rely in their brief was given in response to a very

different question.  *See* D.I. 145 at 40; Tr. 843:15-845:19.  At deposition, Dr. Strauss was asked whether

he found any references "having to do with what would be the appropriate dose for maximal

vasodilation."  Tr. 843:23-844:4.  The claims of the '877 patent are not limited to "maximal vasodilation."

*See* TX 320.  Moreover, rather than asking whether Dr. Strauss had located any references providing the

basis for a reasonable expectation of what dose of adenosine would work for MPI, at deposition Plaintiffs

asked whether Dr. Strauss had found proof of what dose causes maximal vasodilation.  This is an entirely

different question which has no bearing on the obviousness analysis that was the proper subject of Dr.

Strauss' expert testimony.  Under these circumstances, there is no basis for excluding any portion of Dr.

Strauss's testimony concerning the Sollevi 1986 reference.

Plaintiffs also ask this Court to exclude the document referred to as the Karolinska Request, TX

1193, on grounds of hearsay and authenticity.  *See* D.I. 145 at 41.  The copy of the Karolinska Request

offered by Sicor is a copy obtained from the file history of a European Patent Application, as reflected in

the cover letter that is attached as part of TX 1193.  *See* TX 1193 at SIC0109037.  The Karolinska

Request should not be excluded as hearsay because it is being offered as prior art – in other words, not for

the truth of what it says, but only for the fact that the statements were made in the document at the time.

Moreover, even if the document itself is not admitted as an exhibit, Dr. Strauss's opinion concerning the

Karolinska Request remains admissible.  *See* Fed. R. Evid. 703.  Finally, Plaintiffs should not be

permitted to have it both ways with this document.  If TX 1193 is deemed inadmissible, then Sicor

requests that the Court strike the portions of Plaintiffs' argument that rely on the same document.  *See*

D.I. 145 at 27-28.

> **B.**    **OBJECTIONS TO EVIDENCE ON WHICH PLAINTIFFS HAVE RELIED**

Plaintiffs seek to rely on three publications from after 1987 as evidence of teaching away and/or

skepticism in the art.  *See* D.I. 145 at 7-8 (*citing* TX 46, TX 47, TX 240).  These publications are not prior

art, and Plaintiffs have not offered for any appropriate prior art use.  Rather, Plaintiffs seek to rely on

these later publications for the truth of the statements therein.  *See id.*  Specifically, Plaintiffs quote

statements from each of the publications reflecting the authors' thoughts on adenosine use in humans.  *Id.*

As out of court statements offered for their truth, the statements in these three publications are hearsay

and should be excluded.  Fed. R. Evid. 802.

In their description of the background of MPI, Plaintiffs also rely on other references that are not

prior art.  *See* D.I. 145 at 4-5 (citing TX 103; TX 138).  These references from 1994 and 2003 do not

reflect the state of the art in 1987, and are therefore irrelevant to the obviousness inquiry.  *See* TX 103,

TX 138.  Dr. Wackers conceded at trial that TX 138, a chapter that he authored, does not reflect the state

of the art in 1987.  Plaintiffs reliance on these materials to describe the background of MPI is, at best,

misleading as they do not create an accurate impression of the state of the art at the relevant time.  The

references should be excluded as irrelevant and as hearsay.  Fed. R. Evid. 402, 802.

Finally, the purported quote of a statement from Dr. Marcus at a 1989 conference should be

excluded as hearsay.  *See* D.I. 146 at ¶ 86.  The quote is based on Dr. Wackers' uncorroborated memory

about what he believes Dr. Marcus said out of court, not under oath, at a conference almost 20 years ago.

*Id.* (citing Tr. 946:11-947:11).  Dr. Wackers admitted at trial that he did not recall Dr. Marcus's exact

words.  Tr. 1026:23-1027:12.  And, even if Dr. Wackers could have remembered Dr. Marcus's exact

words, Sicor still had no opportunity to question Dr. Marcus about what the statement meant.  This is

classic hearsay, subject to the vagaries of memory, and it should be excluded.

IV.     **CONCLUSION**

When the evidence is considered in its entirety, there can be no question that Sicor has proved obviousness of the asserted claims by clear and convincing evidence.  Plaintiffs' evidence of secondary indicia is insufficient to rebut Sicor's strong showing of obviousness.  Moreover, as Plaintiffs cannot antedate Example XIII of the '296 patent or the Karolinska Request, each of which describes the use of adenosine as a pharmacologic stress agent for MPI, the asserted claims are also invalid as anticipated by one or both of those reference.

Respectfully submitted,

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
   STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated:  June 19, 2007

<u>**CERTIFICATE OF SERVICE**</u>

I, Karen E. Keller, Esquire, hereby certify that on June 19, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Paul Crawford, Esquire
Connolly Bove Lodge & Hutz
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207

Richard K. Herrmann, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306

I further certify that on June 19, 2007, I caused copies of the foregoing document to be served by hand on the above-listed counsel and on the following in the manner indicated:

<u>**BY E-MAIL ON JUNE 19, 2007 AND FEDERAL EXPRESS ON JUNE 20, 2007**</u>

Charles E. Lipsey, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675

Susan H. Griffen, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

Brian M. Poissant, Esquire
Jones Day
222 East 41st Street
New York, NY 10017

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*