IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KING PHARMACEUTICALS RESEARCH AND DEVELOPMENT, INC., ASTELLAS US LLC, and ASTELLAS PHARMA US, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-337 SLR |
| SICOR INC. and SICOR PHARMACEUTICALS, INC. | ) ) ) | |
| Defendants. | ) ) ) ) | |

**DEFENDANTS SICOR INC. AND SICOR PHARMACEUTICALS INC.'S
RESPONSIVE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
  STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for Defendants SICOR INC. and
SICOR PHARMACEUTICALS, INC.

Dated:  June 19, 2007

## TABLE OF CONTENTS

Page

I.    PROPOSED ADDITIONAL FINDINGS OF FACT ....................................... 1
      A.    ADDITIONAL FACTUAL BACKGROUND .................................... 1
      B.    THE ASSERTED CLAIMS OF THE '877 PATENT .......................... 3
      C.    THE PRIOR ART DID NOT TEACH AWAY FROM THE USE OF
            ADENOSINE FOR MPI.......................................................... 4
            1.    Adenosine Was Known In The Art As A Potent Coronary
                  Vasodilator ............................................................. 4
            2.    The Prior Art Taught Doses Of Adenosine That Were Likely To
                  Work For MPI .......................................................... 4
            3.    In Arguing That The Prior Art Taught Away Or Was Inconsistent,
                  Plaintiffs Ignore The Significance Of Differences In Doses And
                  Methods of Administration ......................................... 5
            4.    Plaintiffs Ignore The Knowledge Of Ischemia In The Prior Art............... 6
            5.    None Of The References On Which Plaintiffs Rely Taught Away –
                  Either Alone or In Combination With Other Teachings In the Art ........... 7
      D.    PLAINTIFFS PRESENT NO SECONDARY CONSIDERATIONS
            THAT REBUT THE STRONG CASE OF OBVIOUSNESS ........................ 12
            1.    No Unexpected Results.............................................. 12
            2.    No Skepticism or Teaching Away ................................. 15
            3.    Sicor Has Shown That Any Alleged Commercial Success Is Due
                  To Economic Factors, Not To The Claimed Invention........................ 17
                  a.    There Is No Nexus Between Any Alleged Commercial
                        Success of Adenoscan® And Any Alleged Superiority Of
                        The Subject Matter Of The Asserted Claim ............................. 17
                        i.    Adenoscan® Entered the Pharmaceutical Stress
                              Market at a Fortuitous Time............................. 18
                        ii.   Fujisawa's Extensive Marketing and Promotion
                              Drove Adenoscan®'s Market Share Growth ................... 18
                        iii.  Adenoscan's Increasing Sales Were Also Due to the
                              General Growth of the Pharmacologic Stress
                              Market ......................................................... 20
                  b.    Dr. Hay's Analysis Is Unsound and His Testimony
                        Unreliable ...................................................... 21
                  c.    Dr. Leffler Is A Highly Qualified Expert ................................. 22
      E.    THE '296 PATENT AND/OR THE KAROLINSKA REQUEST
            DISCLOSE MORE THAN THE NAMED INVENTORS' PROTOCOL
            DISCLOSED AND ARE PRIOR ART........................................... 25
            1.    Example XIII Of The '296 Patent ........................................ 26
            2.    The Karolinska Request ..................................................... 26

II.   PROPOSED CONCLUSIONS OF LAW ....................................................... 27
      A.   CLAIMS 23(17), 23(18) AND 43 OF THE '877 PATENT ARE
           INVALID AS OBVIOUS ................................................................... 27
           1.   Sicor Has Shown Obviousness By Clear And Convincing Evidence ...... 27
           2.   The Secondary Considerations Argued By Plaintiff Do Not Rebut
                The Strong Prima Facie Case Of Obviousness........................................ 28
                a.   No Unexpected Results ............................................................. 29
                b.   No Credible Evidence Of Skepticism Or Surprise...................... 30
                c.   Copying, Even If Shown, Is Irrelevant In The ANDA
                     Context.................................................................................... 30
                d.   Any Commercial Success Enjoyed By Adenoscan® Does
                     Not Rebut Obviousness Here ..................................................... 31
                     i.    The sales levels achieved by Adenoscan Are
                           Explained By the Interplay of Economic Factors............. 31
                           (1)   Adenoscan® Entered The Pharmacologic
                                 Stress Market at at Fortuitous Time .................... 32
                           (2)   Fujisawa's Extensive Marketing and
                                 Promotion Drove Adenoscan®'s Market
                                 Share Growth ........................................................ 32
                           (3)   Adenoscan®'s Increasing Sales Were Also
                                 Due to the General Growth of the
                                 Pharmacologic Stress Market .............................. 33
                     ii.   Dr. Hay's Analysis Is Unsound and His Testimony
                           Unreliable ..................................................................... 34
                     iii.  Dr. Leffler is Highly Qualified to Serve as an
                           Expert in This Case........................................................ 34
                e.   The Lack Of Specific Suggestion Is Irrelevant............................ 35
                f.   Simultaneous Invention Suggests Obviousness........................... 36
      B.   CLAIMS 23(17), 23(18) AND 43 OF THE '877 PATENT ARE
           INVALID AS ANTICIPATED ........................................................... 36
           1.   The '296 Patent Is Prior Art ................................................................. 36
           2.   Claim 23(18) Is Anticipated By The '296 Patent .................................... 38

III.  CONCLUSION.............................................................................................. 38

## TABLE OF AUTHORITIES

**CASES**                                                                 Page

*Alpex Computer Corp. v. Nintendo Co.*,
   No. 86-1749, 1994 WL 681752 (S.D.N.Y. Dec. 5, 1994) ................................................... 30

*Aventis Pharma Deutschland GmbH v. Lupin Ltd.*,
   2006 WL 1008962 (E.D. Va. July 17, 2006) ....................................................................... 30

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001) ........................................................................................ 38

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) .......................................................................................... 36

*Cable Elec. Prods. v. Genmark, Inc.*,
   770 F.2d 1015 (Fed. Cir. 1985) ........................................................................................ 30

*In re Fla. Microsoft Antitrust Litig.*,
   2002 WL 31423620 (Fla. Cir. Ct. 2002)......................................................................23, 35

*Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*,
   693 F. Supp. 114 (D. Del. 1988) ...................................................................................... 33

*In re Fulton*,
   391 F.3d 1195 (Fed. Cir. 2004) ........................................................................................ 28

*In re GPAC Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995) .......................................................................................... 30

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ........................................................................................ 36

*ISCO Int'l, Inc. v. Conductus, Inc.*,
   279 F. Supp. 2d 489 (D.Del. 2003) .................................................................................. 37

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
   106 F.3d 1563 (Fed. Cir. 1997) ........................................................................................ 31

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) .......................................................................................... 27

*In re Koller*,
   613 F.2d 819 (C.C.P.A. 1980) ......................................................................................... 28

*Kridl v. McCormick*,
   105 F.3d 1446 (Fed. Cir. 1997) ........................................................................................ 36

*KSR Int'l Co. v. Teleflex, Inc.*,
   127 S.Ct. 1727 (2007) ........................................................... 35

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
   730 F.2d 1452 (Fed. Cir. 1984) .............................................. 36

*Mahurkar v. C.R. Bard Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996) ................................................ 36

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
   337 F.3d 1362 (Fed Cir. 2003) ............................................... 32

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) .............................................. 28

*Merck & Co., Inc. v. Teva Pharms USA, Inc.*,
   405 F.3d 1338 (Fed Cir. 2005) ............................................... 34

*Optivus Tech., Inc. v. Ion Beam Apps. S.A.*,
   469 F.3d 978 (Fed. Cir. 2006) ................................................ 27

*Pacifica Technica Corp. v. U.S.*,
   2 Cl.Ct. 170 (1983) .............................................................. 31

*In re Petering*,
   301 F.2d 676 (C.C.P.A. 1962) ................................................ 38

*Pfizer, Inc. v. Apotex, Inc.*
   480 F.3d 1348 (Fed. Cir. 2007) .......................................... 27, 29

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
   461 F. Supp. 2d 271 (D.N.J. 2006) ................................ 23, 31, 35

*Revlon, Inc. v. Carson Prods. Co.*,
   602 F. Supp. 1071 (S.D.N.Y. 1985) ........................................ 33

*In re Rouffet*,
   149 F.3d 1350 (Fed. Cir. 1998) .............................................. 29

*In re Soni*,
   54 F.3d 746 (Fed. Cir. 1995) .................................................. 29

*Speller v. U.S.*,
   14 Cl. Ct. 170 (1988) ............................................................ 31

*In re Stempel*,
   241 F.2d 755 (C.C.P.A. 1957) ................................................ 37

DB01:1797288.2                                        058956.1016

*Syntex LLC v. Apotex, Inc.*,
   407 F.3d 1371 (Fed. Cir. 2005) ...................................................................28, 35

*In re Tanczyn*,
   347 F.2d 830 (C.C.P.A. 1965) ........................................................................ 37

*Tec Air, Inc. v. Denso Manuf. Mich., Inc.*,
   192 F.3d 1353 (Fed. Cir. 1999) ...................................................................... 27

*U.S. v. Adams*,
   383 U.S. 39 (1966) ......................................................................................... 30

*Vandenberg v. Dairy Equip. Co.*,
   740 F.2d 1560 (Fed. Cir. 1984) ...................................................................... 34

*Wash. Legal Found. v. Legal Found. of Wash.*,
   271 F.3d 835 (9th Cir. 2001).................................................................. 23, 34-35

## STATUTES

35 U.S.C. § 103 ....................................................................................................... 37

DB01:1797288.2

058956.1016

Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. (collectively "Sicor") submit the following additional Proposed Findings of Fact and Conclusions Of Law in response to the Plaintiffs' Post-Trial Proposed Findings of Fact And Conclusions of Law Concerning U.S. Patent No. 5,070,877 ("Plaintiffs' Proposed Findings"). These Additional Proposed Findings of Fact and Conclusions of Law supplement Sicor's Proposed Findings of Fact and Conclusions of Law ("Sicor's Proposed Findings") dated May 9, 2007.

To the extent that any of the findings of fact set forth below or in Sicor's Proposed Findings is a conclusion of law, Sicor requests that it be adopted as such. To the extent that any of the proposed conclusions of law set forth below or in Sicor's Proposed Findings is a finding of fact, Sicor requests that it be adopted as such.

## I.    PROPOSED ADDITIONAL FINDINGS OF FACT

### A.    ADDITIONAL FACTUAL BACKGROUND

1.    The field of MPI was still new in the late 1970s. As Dr. Wackers testified, "the whole field was so new that you were still exploring." (Wackers, Tr: 997:15-998:5.)

2.    Gould 1978 described the first use of pharmacologic stress MPI in humans. (TX 38.) At that time, there was no particular need for a pharmacologic stress agent for MPI. (Wackers, Tr. 997:15-5; 1002:7-9.). There was no widespread interest in pharmacologic stress testing for MPI until at least seven years later, after publication of an article by Dr. Boucher in 1985. (Wackers, Tr. 997:10-14.)

3.    There is no evidence that adenosine was "passed over" as an alternative or that the prevailing view was "anything but adenosine" at the relevant time in late 1987 and/or early 1988. Plaintiffs do not cite any failed attempts to use adenosine for MPI in humans. Nor do Plaintiffs cite any specific statements in the prior art instructing against the use of adenosine for

MPI in humans.  The mere lack of mention of adenosine as an alternative in various texts is entirely consistent with the lack of particular interest pharmacologic stress MPI that Dr. Wackers acknowledged and is not an indicia of the non-obviousness of the asserted claim.

4.      The testimony of Gail Salzberg, a former Medco project manager, about her discussions with other investigators using adenosine for PSVT is not probative of non-obviousness.  Ms. Salzberg testified that she began working for Medco in February of 1987, and that she first discussed the use of adenosine for MPI sometime during the summer of 1987.  (Salzberg, Tr. 1836:14-16; Tr. 1840:23-1841:2.)  Ms. Salzberg also testified that she neither asked nor discussed other possible uses for adenosine with any other cardiology groups she visited during the months between February of 1987 and the summer of 1987.  (Salzberg, Tr. 1854:3-10.)

5.      The limited availability of adenosine in pharmaceutical grade is a factor that limited its widespread use before 1987.  Pharmaceutical grade adenosine for intravenous administration to humans had only recently become available in 1987.  (TX 52 at AST009465;Tr. 1023:22-1024:6.)  Medco, the original assignee of the '877 patent, was the only source of pharmaceutical grade adenosine at the time.  Tr. 1854:22-1855:16; *see also* Tr. 2119:7-2120:10.)

6.      One of the two named inventors on the '877 patent, Dr. Hilleman, told Medco in September 1987 that his group "would obviously like to ask for intravenous adenosine supplies to meet our needs to complete these studies."  (TX 1194.)  Both Dr. Hilleman and Medco project manager Gail Salzberg testified that this request was obvious because Medco was the only source of pharmaceutical grade adenosine at the time (Salzberg, Tr. 1854:22-1855:16; Hilleman, Tr. 2119:13-2120:10.)

7.    Obtaining adenosine in pharmaceutical grade from Medco was sufficiently valuable that it was the only consideration either named inventor received for assigning all rights to the '877 patent to Medco.  (Mohiuddin, Tr. 1896:9-18; 1897:9-14; Hilleman, 2148:5-23.)

8.    The importance of having a source of pharmaceutical grade drug product for use in humans was confirmed by Sicor's expert, Dr. Strauss.  Dr. Strauss testified that he used ethyl adenosine in the 1970s because it was made available to him by Abbott, and he expected to test the drug in animals then move to human use.  (Strauss, Tr. 654:3-10.)  Dr. Strauss stopped working with ethyl-adenosine when Abbott withdrew supplies such that he no longer had a source of sterile pyrogen-free pharmaceutical grade product (Strauss, Tr:654:11-16.)

**B.    THE ASSERTED CLAIMS OF THE '877 PATENT**

9.    At trial, Plaintiffs asserted only three claims of the '877 patent:  claim 23 as read through claim 17 ("claim 23(17)"); claim 23 as read through claim 18 ("claim 23(18)"); and claim 43.  (Tr. 600:7-13.)

10.    Claim 23(17) requires an amount of adenosine "sufficient to provide coronary artery dilation."  (TX 320 at claim 23(17).

11.    Claim 23(18) requires an adenosine infusion dose "of about 140 mcg/kg/minute." (*Id.* at claim 23(18).)

12.    Claim 43 requires a dose of "adenosine in order to provide coronary artery dilation."  (*Id.* at claim 43.)

13.    Maximal vasodilation is not a claim element of any of the asserted claims.  (*See id.*)

14.    An optimal level of vasodilation is not a claim element of any of the asserted claims.  (*See id.*)

15.    A balance or optimization of side effects and efficacy is not a claim element of any of the asserted claims.  (*See id.*)

16.    The '877 patent does not disclose any recognition that some amount of discomfort was necessary for adequate vasodilation.  (*See id.*)

17.    The asserted claims are directed to a method of detecting and assessing coronary artery disease in a human.  (*See id.* at col. 8, ll. 63-65; col. 10, ll. 8-9.)

18.    The asserted claims do not limit the human population to whom the claims apply.  (*See id.*)

19.    The asserted claims do not specify an age range.  (*See id.*)

20.    The asserted claims do not specify that the humans must be patients or members of any particular patient population.  (*See id.*)

## C.    THE PRIOR ART DID NOT TEACH AWAY FROM THE USE OF ADENOSINE FOR MPI

### 1.    *Adenosine Was Known In The Art As A Potent Coronary Vasodilator*

21.    A person of ordinary skill in the art would have known adenosine was a potent coronary vasodilator.  (Strauss, Tr. 705:19-706:4; *see also* Mohiuddin, Tr. 1858:5-12; Hilleman, Tr. 2131:4-8.)

22.    The 1985 edition of the textbook of pharmacology commonly used by students and physicians in 1985, Goodman and Gilman, states that "[a]denosine, which is released from the hypoxic myocardium, is a coronary vasodilator and appears to be an important signal for the autoregulation of coronary blood flow."  (TX 39 at 822.)

### 2.    *The Prior Art Taught Doses Of Adenosine That Were Likely To Work For MPI*

23.    The prior art included use of dipyridamole for MPI.  Dipyridamole was known to cause an increase in endogenous adenosine by inhibiting its uptake in the body, and this

endogenous adenosine was known to cause the vasodilation needed to perform MPI. (*See, e.g.*, Strauss, Tr. 679:16-680:7; Wackers, Tr. 908:19-24; TX 93, TX 39, TX 220, TX 275; D.I. 146 at ¶46.)

24. In light of the knowledge in the art concerning dipyridamole, a person of ordinary skill in the art would have known that there was necessarily an effective dose of adenosine that could cause vasodilation sufficient to perform MPI, because that person of skill in the art would have know that "if dipyridamole is selected as the vasodilator, that the effector drug, if you will, is adenosine . . . ." (Strauss, Tr. 670:12-23.)

25. The prior art disclosed the safe intravenous infusion of adenosine to humans at various doses. (*See* D.I. 147 at ¶¶ 68-110.) Based on the prior art, a person of ordinary skill in the art would have reasonably expected adenosine in the range of doses between 20 and 200 mcg/kg/min to work for MPI. (*See id.*)

26. Based on the prior art, including but not limited to Biaggioni 1986, Conradson, Fuller and Biaggioni 1987, a person of ordinary skill in the art would have reasonably expected that the majority of conscious humans can tolerate an intravenous infusion of adenosine at doses ranging from 100 to 140 mcg/kg/min. (*See* D.I. 147 at ¶¶ 86-106; *see also* TX 48, TX 220, TX 226; TX 1208.)

### 3. *In Arguing That The Prior Art Taught Away Or Was Inconsistent, Plaintiffs Ignore The Significance Of Differences In Doses And Methods of Administration*

27. A person of ordinary skill in the art in 1987 would have understood the difference between bolus injection and continuous intravenous infusion. (Strauss, Tr. 677:9-678:2.)

28. A person of ordinary skill in the art in 1987 would have understood that continuous intravenous infusion of adenosine would cause a stable effect during the infusion. (*Id.*)

- 5 -

29.    A person of ordinary skill in the art in 1987 would have known that adenosine has a short half-life.  (Strauss, Tr. 675:13-21.)

30.    A person of ordinary skill in the art in 1987 would have understood that the short half-life of adenosine provided a safety benefit.  (*See, e.g.*, TX 1171 at 335, 345; Strauss, Tr. 672:17-673:2, 673:17-674:11, 675:13-21.)  The person of ordinary skill in the art in 1987 would have understood that the short half-life would enable any negative side effects to be terminated almost immediately upon termination of the infusion.  (Strauss, Tr. 742:2-18; *see also* Hilleman, Tr. 2137:22-2139:7.)  The person or ordinary skill in the art would have perceived this as a benefit over dipyridamole infusion in which the effects endured past the time necessary to complete the test.  (Strauss, Tr. 676:9-678:2, 742:2-18; *see also* Hilleman, Tr. 2137:22-2139:7.)

31.    By 1987, the art taught doses of adenosine that were likely to cause controlled hypotension in anesthetized humans undergoing cerebral aneurysm surgery.  (TX 112; TX 1169; TX 1171; D.I. 147 at ¶¶ 68-85.)  A person of ordinary skill in the art would have understood that doses of adenosine likely to be successful for MPI would be less than the doses needed to induce controlled hypotension for surgery.  (Strauss, Tr. 708:10-709:12, 705:19-707:2, 747:10-748:13, 748:22-749:20.)

### 4.    *Plaintiffs Ignore The Knowledge Of Ischemia In The Prior Art*

32.    The prior art, including Gould 1978 and Albro, taught use of dipyridamole infusion as a pharmacologic stress agent for MPI.  (TX 38; TX 93.)  Gould 1978 teaches that dipyridamole infusion can cause ischemia in a patient undergoing MPI.  (TX 38 at 286.)  Albro also teaches that dipyridamole infusion for MPI can cause myocardial ischemia.  (TX 93 at 756; Strauss, Tr. 672:17-674:11.)

33.     At trial Dr. Strauss placed the risk of ischemia in proper perspective:

> Now to put this in perspective, it's important to recognize that when patients are studied with exercise, that the patients always become ischemic, because it is the intent of stressing the person in that fashion.

(Strauss, Tr. 689:10-14.)  Although exercise stress necessarily causes ischemia in the heart patients undergoing MPI, exercise stress remains the preferred method of stress testing, even today.  (Wackers, Tr. 996:25-997:3.)

34.     The prior art taught that ischemia was less likely with pharmacologic stress MPI using dipyridamole (which was known to be acting through adenosine) than with exercise. (TX 38 at 285.)

35.     The  known characteristics of adenosine, in particular its short half-life which enabled negative side effects to cease almost immediately upon termination of administration, would have encouraged a person of skill in the art to use adenosine instead of dipyridamole for MPI because ischemia, if it occurred, could be reversed more rapidly after adenosine infusion. (Strauss, Tr. 673:17-674:11; 688:22-690:9.)

**5.     *None Of The References On Which Plaintiffs Rely Taught Away – Either Alone or In Combination With Other Teachings In the Art***

36.     The prior art as a whole did not teach away from the use of adenosine for MPI in 1987.

37.     Statements in a 1970 article (TX 214) would not have discouraged a person of ordinary skill in the art from using adenosine for MPI in 1987.  Plaintiffs cite to a 1970 article that stated that use of adenosine in cardiovascular therapy had been precluded.  (D.I. 146 at ¶ 38, citing TX 214 at 415.)  TX 214, a 1970 article, does not reflect the state of the art in 1987. TX 214 is not medical literature of any relevant time.  (*Compare* D.I. 146 at ¶ 38 with TX 214.) By 1983, the prior art reflected therapeutic use of adenosine for terminating tachycardia.

(TX 36.)  In addition, the 1970 statement in TX 214 concerned therapeutic, not diagnostic, use. (TX 214.)

38.     To the extent the prior art taught that adenosine could have systemic effects, such effects were at high doses and by bolus administration.  (Strauss, Tr. 790:18-23.)

39.     The 1983 publication *The Coronary Circulation in Health and Disease*, by Dr. Melvin Marcus ("Marcus 1983", TX 217) did not teach away from use of adenosine for MPI in 1987.  Marcus 1983 states that, "[b]ecause of the hypotensive effects of adenosine, it is not utilized clinically to produce maximal coronary dilation."  (*Id.* at 430.)  But Marcus 1983 described the use of adenosine in animals at very high doses.  (TX 217 at 430-31; Tr. 800:18-801:9.)  By the middle of 1987, several references in the art including Sollevi 1984, Sollevi 1986 and Owall had disclosed that lower doses of adenosine would achieve controlled hypotension in anesthetized humans than Marcus 1983 used in dogs.  (*See* TX 112; TX 1171; TX 1169.)  These references after Marcus 1983 described doses of 200 mcg/kg/min of adenosine, or more, to induce controlled hypotension in ***humans***.  (*See id.*)  Thus, in 1987 a person of skill in the art would not have been discouraged from using adenosine for MPI in humans at doses that were less than those that were known to produce hypotension in humans, which had been shown to be far below those described in the 1983 Marcus reference.  (*See* Strauss, Tr. 759:14-22.)

40.     A 1983 article entitled *Adenosine:  electrophysiologic effects and therapeutic use for terminating paroxysmal supraventricular* tachycardia, (TX 36, "DiMarco 1983") did not teach away from the use of adenosine for MPI in 1987.  DiMarco 1983 describes the use of adenosine to treat heart arrhythmias by inducing AV block.  (TX 36.)  The adenosine administration described in DiMarco 1983 is rapid bolus injection, not continuous intravenous

infusion.  (Strauss, Tr. 760:13-20; TX 36.)  DiMarco 1983 also described the advantages

associated with adenosine's rapid clearance from the system, including the lack of persistent

drug effect and rapid clearance that would allow a physician to titrate the adenosine dose

individually, "gradually increasing the dose until the arrhythmia is stopped."  (TX 36 at 1261.)

A person of skill in the art in 1987 would have understood the distinction between rapid bolus

injection, which is an all-at-once method of application appropriate for rapidly halting an in-

process cardiac arrhythmia, and continuous IV infusion used to create a stable effect for the

duration of the infusion.  (Strauss, Tr. 677:9-678:2.)  DiMarco 1983 would not have discouraged

that person of ordinary skill in the art from using adenosine for MPI in 1987.  (Strauss, Tr.

760:13-20.)

     41.     A 1985 article entitled, *Diagnostic and Therapeutic Use of Adenosine in Patients*

*With Supraventricular Tachyarrhythmias* ("DiMarco 1985", TX 45) did not teach away from

the use of adenosine for MPI in 1987.  Like DiMarco 1983, DiMarco 1985 describes

intravenous bolus doses of adenosine.  (TX 45 at 418.)  A person of ordinary skill in the art

would understand the difference between bolus injections and continuous infusions.  (Strauss,

Tr. 677:9-678:2.)  In addition, DiMarco 1985 states that "*overdosage*" of adenosine leads to

hypotension.  (TX 45 at 423.) (emphasis added).  By 1987, the prior art taught what doses of

adenosine were necessary to induce hypotension in anesthetized patients.  (*See* TX 112; 1169;

1171.)  A person of ordinary skill in the art would have reasonably expected that doses below

the range of doses that cause hypotension would work for MPI.  (*See* Strauss, Tr. 708:10-

709:12.)

     42.     Biaggioni 1986 taught toward, not away from, the use of adenosine for MPI.

(TX 48).  Biaggioni 1986 cites art from 1930 and 1933 concerning the effect of "large boluses

of the drug." (TX 48 at 2229.) Although this early work may have "discouraged further research" for some period of time in the past, by the publication of Biaggioni 1986 that era had ended. Biaggioni 1986 describes two areas in which adenosine was already being used clinically in 1986 – the treatment of PSVT and for controlled hypotension during anesthesia. (TX 48 at 2229.) Biaggioni 1986 itself describes the results of research concerning the cardiovascular effects of adenosine in conscious subjects. (*See* TX 48.) The disclosures of the Biaggioni 1986 reference would have taught a person of ordinary skill in the art that continuous intravenous infusion of adenosine at a dose of 140 mcg/kg/min would likely be tolerated by a majority of subjects (5 of the 7 subjects in the study), would result in vasodilation, but would not cause hypotension. (Strauss, Tr. 717:22-719:18; TX 48.)

43.    Biaggioni 1986 also notes that intravenous infusion of adenosine had already been shown to be useful in inducing a "sustained" hypotensive effect. (*Id.*) A person of ordinary skill in the art in 1987 would have known that continuous infusion, as opposed to rapid bolus injection, of adenosine would result in a sustained effect. (Strauss, Tr. 677:9-678:2.) This reference and other teachings in the art such as Sollevi 1984 demonstrate that it was known in the art before 1987 that continuous infusion of adenosine would result in a stable effect during the infusion. (Strauss, Tr. 692:12-694:7; TX 112.)

44.    When the entire article is considered in context, Biaggioni 1986 teaches directly toward using adenosine infusion at a dose up to about 140 mcg/kg/min for MPI.

45.    Example XIII of the '296 patent *expressly* teaches an adenosine dose range of 10 to 150 mcg/kg/min for MPI. (TX 275 at col.21, ll.59-61; *see also* Strauss, Tr. 750:2-22.) The '296 patent does not teach away from any dose within this disclosed range of doses.

- 10 -

46.     The prior art, taken as a whole, demonstrates a surge of interest in adenosine use in humans during the early and mid 1980s.  Sicor refers to Sicor's Proposed Findings for a discussion of the Sollevi 1984, Sollevi 1986, Owall, Biaggioni 1986, Conradson, Fuller and Biaggioni 1987 articles as well as the '296 patent.  (*See* D.I. 147 at ¶¶ 68-119.)  These references demonstrate that persons of skill in the art were not dissuaded from using adenosine in humans, even in human patients undergoing surgery.

47.     Publications after 1988 are not prior art and should not be considered as to whether they teach away from the use of adenosine for MPI.  Even if the later publications are considered, they did not teach away from the use of adenosine for MPI in 1987.

48.     In a 1995 chapter entitled "Myocardial Imaging During Adenosine Infusion," authors Dr. Mario Verani and John J. Mahmarian stated "it is interesting to speculate" as to why adenosine usage for MPI evolved as it did.  (TX 240, Wackers, Tr. 953:17-24; 954:13-17.)  Dr. Verani's passing speculation in 1995 is not a relevant or probative assessment of the state of the art in 1987.  The evidence also establishes that in 1987 Dr. Verani was not skeptical that adenosine should be used for MPI.  Dr. Verani stated in a research protocol in 1987 that given "present knowledge" of adenosine, the benefits from investigating adenosine for MPI "clearly outweigh the unlikely possibilities of side effects or complications."  (TX 52 at AST0009468; Wackers, Tr. 1023:6-7; 1024:24-1025:11.)  The 1995 statements neither suggest nor establish teaching away in 1987.

49.     The 1990 articled entitled "Effects of Adenosine on Human Coronary Arterial Circulation" by Robert F. Wilson and others ("Wilson," TX 46) also did not teach away as of 1987 and does not reflect that the state of the art in 1987 "taught away" from use of adenosine.  Wilson refers to concerns that he states "hampered" use of adenosine in humans, but he does not

state when use of adenosine had been "hampered" or when that ended. This comment in the 1990 Wilson publication does not establish that a person of skill in the art would have been discouraged from using adenosine in 1987.

50.    The 1990 Editorial Comment entitled "Adenosine, Renewed Interest in an Old Drug" (the "Editorial," TX 47) did not teach away from adenosine use in 1987. Plaintiffs have cited to the portion of the Editorial that states that adenosine "never achieved clinical usefulness . . ." (*See* D.I. 145 at 7.) From context, "never" in the Editorial can only mean the time from 1929 until sometime unspecified time before the date of the Editorial in 1990. The Editorial also states "[h]owever, adenosine is now becoming a clinically relevant compound. There is increasing interest in 1) its application in the diagnosis and treatment of supraventricular arrhythmias, 2) its potential importance in the evolution and treatment of myocardial ischemia, and 3) its use as an ultrashort-acting coronary vasodilator." (TX 47 at 1854.) At a minimum, "never" as used in the Editorial must have ended by 1983 when DiMarco 1983 was published, and the statements in the Editorial are not credible evidence that in 1987 the state of the art taught away from using adenosine in humans.

51.    The teachings in the prior art at the relevant time suggested the use of adenosine for MPI. The prior art did not teach away from this use.

**D.    PLAINTIFFS PRESENT NO SECONDARY CONSIDERATIONS THAT REBUT THE STRONG CASE OF OBVIOUSNESS**

**1.    *No Unexpected Results***

52.    The result of adenosine infusion within the claimed dosages ranges was expected based on the teachings in the prior art. The evidence does not show any unexpected results for an adenosine infusion dose at any rate, including a rate of 140 mcg/kg/min.

53.    There is no evidence that a dose of about 140 mcg/kg/min provides any unexpected or unpredictable benefits.

54.    The named inventors of the '877 patent did not identify any unexpected or unpredictable results from the use of a dose of about 140 mcg/kg/min of adenosine for MPI.

55.    Nothing in the '877 patent supports the proposition that the invention included the recognition that some discomfort may accompany the use of adenosine as a pharmacologic stress agent.  (*See* TX 320.)  Tolerable side effects of adenosine at an infusion dose of 140 mcg/kg/min were known in the art in 1987.  (*See, e.g.,* TX 48 at 2233; TX 1208 at 311.)  The side effects of dipyridamole were known by those of ordinary skill in the art to be similar to those reported in art for adenosine, and a person of ordinary skill in the art would have expected these types of effects from adenosine infusion.  (Strauss, Tr. 720:11-14.)

56.    There is also no evidence in the record that "about 140" mcg/kg/min results in any better images or any greater accuracy than any other dose between 60 and 120 mcg/kg/min.

57.    There is no evidence that the named inventors of the '877 patent made any determination that a dose of about 140 mcg/kg/min provided any better image quality than any other dose.  The named inventor's first set of infusions of adenosine to humans was to normal volunteers.  (*See* TX 295.)  Dr. Mohiuddin did not remember why a dose of 140 mcg/kg/min was chosen, but he thought it was based on experience with side effects of adenosine. (Mohiuddin, Tr. 1878:2-18.)  The written record of the infusion to healthy volunteers shows that the dose of 140 mcg/kg/min was infused to each of the volunteers.  (TX 295 at AST0004333.) There is no evidence that the inventors compared the image quality at 140 mcg/kg/min in these healthy volunteers with the image quality at any other dose prior to their use of adenosine for MPI in heart patients.

58.    The named inventors later infused adenosine to 15 different patients at doses from 60 to 140 mcg/kg/min.  (Wackers, Tr. 1018:2-17; TX 296 at 4357.)  The dose of 140 mcg/kg/min was used in only two of the 15 patients described in the study.  (Wackers, Tr: 1018:13-17; TX 296 at 4357.)  The study results show that doses of 60, 100 and 120 mcg/kg/min also resulted in successful identification of myocardial dysfunction in those patients, as occurred in the case of the 140 dose  (Wackers, Tr: 1017:14-1018:12; TX 296 at 4357, 4364.)  The evidence of record concerning what doses of adenosine will work for MPI demonstrates that doses of 60, 100 or 120 mcg/kg/min will work.  (*See id.*)

59.    The Wilson study on which Plaintiffs rely shows only a minor difference in coronary blood flow reserve between the dose of 100 mcg/kg/min and 140 mcg/kg/min.  (TX 46 at 1601, Table 4 and Figure 4.)  The insignificance of the difference is also shown in the later published textbook Clinical Nuclear Cardiology, a text that cites to Wilson in support of a graph showing the coronary flow reserve at 100 and 140 mcg/kg/min of adenosine as equal.  (TX 5011 at 235, figure 14.1; Tr. 1030:4-12.)

60.    The data in Wilson does not include results for intravenous doses of either 120 or 160 mcg/kg/min of adenosine.  (*See generally* TX 46.)  Wilson does not compare, describe or discuss the quality of myocardial perfusion images at any dose.  *Id.*)  The data show no significant difference between doses of 100 and 140.  (*Id.*)  Neither Wilson nor anything else in the record suggests that a dose of "about 140" mcg/kg/min of adenosine had unexpected or unpredictable results when used for MPI.

2.    *No Skepticism or Teaching Away*

61.    Plaintiffs have not demonstrated any skepticism by persons skilled in the art during the relevant time.

62.    Nothing in the December 31, 1987 letter from Dr. Carl W. White to Gail R. Salzberg of Medco shows skepticism in the art.  (TX 53.)  Dr. White states, "I am not certain how effective and safe adenosine would be as a coronary vasodilator for this purpose but would be interested in discussing this further."  (TX 53.)  Dr. White was sufficiently interested in using adenosine and sufficiently convinced that adenosine was *likely* to work that he went on to state in the same letter:

> We would definitely be interested in studying adenosine with our Doppler catheter to measure coronary flow reserves.  I am certain that a protocol could be easily worked out comparing papaverine and adenosine.  There are also other uses of intracoronary adenosine which we can envision that might also be of considerable interest to you.

(TX 53.)  This offer to work out a protocol and devote research time as of December 1987 does not suggest that the author was skeptical about whether adenosine would work.

63.    The letter to the editor published in a June 1990 journal does not suggest skepticism.  (TX 169.)  The letter notes the report of two instances of heart block in connection with a study concerning the use of adenosine for MPI that was published in December of 1989.  (*See id.*)  The letter asks for more detail about the two instances and expresses the need for more study and for caution during that study.  (*See id.*)  At most, this letter raises questions.  It does not express disbelief that adenosine worked as described.

64.    For many of the same reasons that they did not "teach away", none of the Wilson article, the Editorial, or the 1995 Verani chapter support a finding of about the use of adenosine for MPI, either in 1990 or before.  In fact, the Editorial concludes that "adenosine holds promise

- 15 -

as a safe and effective coronary vasodilator that could be useful in studying the normal and abnormal coronary circulation in humans."  (TX 47 at 1856.)

65.    The hearsay testimony from one sales representative that some customers were concerned about the use of Adenoscan® even as of its launch in 1995 also does not support skepticism.  (*See* D.I. 145 at 17-18.)  None of these customers appeared as witnesses.  The only testimony presented was from one sales representative with a limited sales area.  (*See* D.I. 145 at 17-18; Tr. 1535:11-1537:1.)  That same sales representative testified that she was still trying to convince doctors within her sales area to switch from dipyridamole to adenosine as late as 2003. (*See* Tr. 1542:10-21.)  Plaintiffs have not contended that the purported skepticism endured until 2003 – to do so would contradict their argument as to the commercial success of Adenoscan®. Ms. Klose's testimony is insufficient to demonstrate skepticism at any time.

66.    The hearsay statement, which is based on Dr. Wackers' testimony as to what he believes Dr. Marcus said at a conference almost twenty years ago, is not evidence of skepticism. Even assuming Dr. Marcus made the statement, it was in the context of a meeting where the general response was "great interest" in and "general excitement" about using adenosine for MPI.  (Tr. 946:24-947:11; 1027:21-25.)  Dr. Wackers did not recall Dr. Marcus's exact words. (Tr. 1026:23-1027:12.)  Whatever Dr. Marcus may have said was, at most, a caution, not a statement that Dr. Marcus did not think the drug would work.  (*Id.*; *see also* Tr. 1027:13-20.)

67.    The fact that the audience attending the cardiology meeting in 1989 responded to a presentation concerning the use of adenosine for MPI with "great interest" and that  "[p]eople were very interested in this alternative way of doing stress testing" is strong evidence that there was no skepticism in the art.  (Wackers, Tr. 946:16-947:3.)  Instead, there was there was "a

general excitement and interest" in the adenosine protocol at that 1989 meeting, which is far from skepticism. (Wackers, Tr. 1027:21-1028:3.)

68.    Finally, Dr. Strauss' testimony that he titrated up to a dose of 140 mcg/kg/min when he began using adenosine for MPI in 1991 does not show skepticism. (*See* Strauss, Tr. 779:23-780:14.) The salient fact is that Dr. Strauss was actually *infusing adenosine* into humans for purposes of MPI. (*See* TX 314.) This is not evidence of skepticism.

### 3.    *Sicor Has Shown That Any Alleged Commercial Success Is Due To Economic Factors, Not To The Claimed Invention*

    a.    There Is No Nexus Between Any Alleged Commercial Success of Adenoscan® And Any Alleged Superiority Of The Subject Matter Of The Asserted Claim

69.    The sales levels achieved by Adenoscan® are explained by the interplay of four economic factors and do not demonstrate any particular value of the claimed invention that would suggest that the '877 patent was not obvious at the relevant time:

    (1)    There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

    (2)    Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

    (3)    Extensive marketing and promotion of Adenoscan® by Fujisawa; and

    (4)    Growth in demand for pharmacological stress testing unrelated to the asserted inventions

(Leffler, Tr. 1579:3-1582:13; DTX 3133; *see also* D.I. 143 at 32-34 and D.I. 147 at ¶¶ 168-225.)

70.    The sales levels achieved by Adenoscan® are explained by these factors, not any particular value of the claimed invention. (*See* D.I. 147 at ¶¶ 168-225.)

i.    Adenoscan® Entered the Pharmaceutical Stress Market at a Fortuitous Time

71.    Fujisawa had been working for years to secure FDA approval for and launch Adenoscan.  (*See*, *e.g.*, TX 1226 at AST0065726-727.)  In that time, the company developed countless strategic relationships with physician advocates and sponsored the activities of the American Society of Nuclear Cardiology ("ASNC").  (Leffler, Tr. 1611:10-15, 1612:9-1613:4; White, Tr. 1252:17-25, 1339:4-15; TX 1078 at AST006674.)  Fujisawa was hardly the "new kid on the block."  (*See generally*, D.I. 147 at ¶¶ 181-208.)

72.    Fujisawa launched Adenoscan® in the pharmacological stressor market at a propitious time.  (D.I. 147 at ¶¶ 169-180.)  Because the manufacturer of Persantine®, the only other directly-competing product, ceased promotion spending after Persantine® went generic in late 1996, Adenoscan® had the good fortune, not long after its launch, to become the only product being advertised to the prescribers of pharmacological stress tests.  (*See id.*)

73.    The audience for the Adenoscan® marketing message was relatively price insensitive.  The prescribing physicians do not themselves pay for the product and expect that their patients will be covered by federal or private health insurance.  (Leffler, Tr. 1691:11-1692:4.)

ii.    Fujisawa's Extensive Marketing and Promotion Drove Adenoscan®'s Market Share Growth

74.    The evidence shows that Fujisawa's promotion of Adenoscan was **not** "typical" in the industry.  (D.I. 147 at ¶¶ 181-208.)  Fujisawa's spending was devoted to extensive traditional and non-traditional marketing activities, including substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC");

- 18 -

support of physician advocates; provision of financial incentives such as trial product and pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and promotion of Adenoscan® for new uses and user populations.  (*See id.*)

75.     On cross-examination, Dr. Hay admitted that the 6% industry-standard average promotion-to-sales ratio that he relied on for his testimony that Fujisawa's spending was "typical" was essentially a concocted number and inappropriately applied to the pharmacological stress market.  (Hay, Tr. 1760:19-24, 1761:3-9, 1763:15-18, 1764:1-1765:6.)

76.     Dr. Hay's 6% was not based on reliable data; without any basis in fact, Dr. Hay  "calculated" this 6% ratio as the "midpoint" between two other numbers that are based on reliable data: the 12% industry average for drugs sold primarily in retail pharmacies and the 3.1% industry average for drugs sold primarily in hospitals.  (Hay, Tr. 1761:12-1762:6.)

77.     Dr. Hay admitted that the appropriate average promotion-to-sales ratio for Adenoscan® is 3.1% because pharmacological stress products are sold primarily in hospitals and clinics, and not in retail pharmacies.  (Hay, Tr. 1760:19-24; Tr. 1761:3-9, 1763:15-18, 1764:1-1765:6.)

78.     Dr. Hay also admitted that if a line were drawn at the 3% mark on the misleading demonstrative used to illustrate his testimony, it would be clear that Fujisawa's marketing and promotional spending would exceed the average in every single year from 1995 through 2005.  (Hay, Tr. 1766:18-1777:12; DTX 2041.)

79.     Fujisawa's advertising and promotional spending in at least the years 1996, 1999 and 2001 was in fact roughly twice as high as the average promotional

spending for hospital-dominated products in those years. (Hay, Tr. 1766:18-1777:12; DTX 2041.) This is especially remarkable given that the pharmacological stress market is very concentrated, requiring fewer resources to reach the marketing audience. (D.I. 147 at ¶¶ 182-186.) It is also remarkable in a market in which, as Plaintiffs argue, the consumers are "expert," and therefore "not swayed" by product promotion. (D.I. 146 at 119.)

                iii.    Adenoscan's Increasing Sales Were Also Due to the General Growth of the Pharmacologic Stress Market

80.    Despite Plaintiffs' representations concerning relative market shares, Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market. (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132; *see also* D.I. 147 at ¶ 218-220.)

81.    Although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of the products. (D.I. 147 at ¶¶ 212-13.)

82.    The higher overall level of growth achieved by Adenoscan® can be attributed to the company's extensive marketing and promotion investment in creating and capturing additional user populations for the product. (D.I. 147 at ¶¶ 198-202.)

83.    The higher overall growth level is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity. (D.I. 147 at ¶ 215.) As Plaintiffs' witness

Mr. White pointed out, "rising water raises all the boats"—*i.e.*, dipyridamole as well as Adenoscan®.  (White, Tr. 1257:11-12.)

84.    Adenoscan®'s success is thus based on a fortuitous market occurrence and is not probative of non-obviousness.  (*See also* D.I. 147 at ¶¶ 168-225.)

                    b.    Dr. Hay's Analysis Is Unsound and His Testimony Unreliable

85.    As demonstrated *infra*, the testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was inaccurate.

86.    A discussed *supra*, Dr. Hay relied on a concocted industry average that is inappropriate for the niche market of pharmacological stress agents.

87.    In addition, Dr. Hay did not conduct his analysis based on the actual facts in this case.  For example, in response to questions about Fujisawa's 86-member sales force, which Dr. Hay had earlier disagreed was twice the size of the sales force of its competitor, DuPont, Dr. Hay admitted when pressed that he "[didn't] know exactly what DuPont was doing."  (Hay, Tr. 1774:24-1776:19.)  Despite this lack of knowledge, Dr. Hay testified on direct to an opinion on the relative detailing efforts of Fujisawa and DuPont.  (*Id.*)

88.    Dr. Hay also used dollar-based market share as a preferred measure of the relative success of Adenoscan® and dipyridamole (Hay, Tr. 1777:11-1778:3) even though Astellas's own Senior Vice President of Marketing, Richard White, testified that the preferred measure used internally by Astellas to gauge the success of its products is market share of procedures performed.  (White, Tr. 1286:23-1287:9.)

89.    Market share of procedures performed is a more appropriate measure of relative demand in a market because if one product is generic, and therefore lower-

priced (*e.g.*, dipyridamole) and another is branded, and therefore priced much higher

than the generic (*e.g.*, Adenoscan®), then even if both products sell just one unit, the

branded product will appear to have a much higher dollar-based market share even

though the products' respective market shares of procedures performed are **equal**.  (Hay,

Tr. 1779:2-7.)

90.    Dr. Hay also inappropriately chose to use gross sales to calculate market

shares and promotion-to-sales ratios, even though he admitted on cross examination that

gross sales is an "inflated number" and that Mr. White testified that net sales "represents

the money that the company actually takes in for the sales of its product" because it

factors out "certain returns and allowances."  (White, Tr. 1236:21-1237:3; Hay, Tr.

1788:2-15.)

91.    At several points throughout his testimony, Dr. Hay was intent on

criticizing Dr. Leffler's testimony even though he had either incorrectly heard the

testimony or had failed to listen to it altogether.  (Hay, Tr. 1767:13-1768:14.)  In one

instance, Dr. Hay was forced to admit that his criticism on direct examination of Dr.

Leffler's calculation of a promotion-to-sales ratio was based on a calculation that Dr.

Leffler had revised since his opening report and had been not presented to the Court at

trial.  (Hay, Tr. 1773:25-1774:23.)  Dr. Hay's apparent personal bias against Dr. Leffler

and his disregard of the facts make him an unreliable source for this Court to rely on.

(*See id.*).

c.    Dr. Leffler Is A Highly Qualified Expert

92.    The trial record contradicts Plaintiffs' attempt to characterize Dr. Leffler

as anything less than a highly qualified and credible expert witness in this case.

93.     Dr. Leffler is an Associate Professor of Economics at the University of Washington, and he has been a practicing economist for over 32 years since receiving his Ph.D. in economics from the University of California at Los Angeles in 1977. (Leffler, Tr. 1562:2-11, 17-18.)

94.     Dr. Leffler's teaching and research focus is the government regulation of business, which includes antitrust issues, patent issues, and contract issues. (Leffler, Tr. 1562:19-24.)

95.     Dr. Leffler has extensive expertise in the economics of the pharmaceutical industry owing to work he completed in support of his doctoral thesis, a still frequently-cited article he wrote on the role of advertising and promotion in the success of pharmaceutical products, a position as a resident scholar at Pfizer Pharmaceuticals, and consulting projects he has performed over the years for various pharmaceutical companies. (Leffler, Tr. 1564:4-1566:10, 1568:7-23.)

96.     In addition to serving as a consultant to the Department of Justice, Dr. Leffler has been qualified as an expert witness in federal and state courts as well as before state agencies and federal regulatory agencies such as the Federal Trade Commission. (Tr. 1563:7-12, 1564:2-3.)

97.     Dr. Leffler's qualifications have been specifically acknowledged, and his economic analyses adopted, by several federal and state courts. *See, e.g.*, *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271 (D.N.J. 2006); *In re Fla. Microsoft Antitrust Litig.*, 2002 WL 31423620 (Fla. Cir. Ct. 2002).

98.    Plaintiffs complain about a typographical error on one of the demonstrative exhibits that Dr. Leffler discussed during his testimony, (D.I. 146 at ¶ 126), but Dr. Leffler clearly explained to the Court that the data the exhibit (DTX 3131) was meant to display was also before the Court in DTX 3132 and DTX 3134, which did not contain the typographical error.  (Leffler, Tr. 1697:13-1698: 23.)

99.    Plaintiffs also complain that Dr. Leffler used IMS data to calculate a promotion-to-sales ratio and considered IMS data in other sections of his economic analysis (D.I. 146 at ¶ 128), but Dr. Leffler openly acknowledged that because there is a certain level of underreporting in IMS sales figures, IMS data is not the most appropriate source of data for the calculation of a promotion-to-sales ratio, and he certainly did not present such a calculation to the Court.  (Leffler, Tr. 1673:9-12.)

100.    Dr. Leffler also educated the Court as to why IMS data is appropriate for the purpose of comparing the relative sales performance and market shares of the pharmaceutical products of concern in this suit.  (Leffler, Tr. 1586:4-23, 1587:9-1589:7.) Other data sources, such as Astellas' internal sales figures and measures of scans performed in the market, are not sufficient for this purpose.  (Leffler, Tr. 1589:8-19.)

101.    Plaintiffs assert that Dr. Leffler "disavowed" his conclusion that there was a slowing of the revenue growth rate from the late 1990s through mid-2000 (D.I. 146 at ¶ 127), but this is not true.

102.    First, Dr. Leffler pointed out that the gross sales figures on which Plaintiffs rely are not real numbers, but rather "accounting numbers" that do not include price concessions, returns, and other allowances and therefore do not truly reflect the

amount of money the company has generated from a product. (Leffler, Tr. 1700:24-1701:6.)

103. Second, Dr. Leffler explained that when looking at the net sales data, one sees a so-called "second wind" in or about mid-2000, which reflects "a therapeutic category explosion," resulting in an increasing, rather than declining, growth rate from that point forward. (Leffler, Tr. 1701:7-1702:17.)

104. Dr. Leffler further pointed out that Adenoscan®'s growth following mid-2000 was in part due to its ability to benefit from the category explosion to a greater extent than its competitor since it was the only product being promoted in the market. (Leffler, Tr. 1702:22-1703:3.)

105. Plaintiffs also attempt to discredit Dr. Leffler by asserting that "Dr. Leffler never consulted any physicians" about what product qualities or benefits drive their purchasing decisions, (D.I. 146 at ¶ 125), but as an economist, it would have been inappropriate for Dr. Leffler to engage in research to determine whether or not Adenoscan® is or is not in fact a superior product. (Leffler, Tr. 1570:23-1571:21, 1631:5-11.)

**E.    THE '296 PATENT AND/OR THE KAROLINSKA REQUEST DISCLOSE MORE THAN THE NAMED INVENTORS' PROTOCOL DISCLOSED AND ARE PRIOR ART**

106. In an attempt to antedate certain prior art, including Example XIII of the '296 patent, Plaintiffs rely on a protocol entitled "Clinical Utility of Adenosine in Radionuclide Myocardial Imaging" in order to prove a conception date prior to Dec. 28, 1987 ("the Protocol", TX 57).

107. The protocol is a research proposal that calls for routine experimentation to determine an adequate dose of adenosine for MPI. (*See* TX 57; Wackers, Tr. 1013:4-7.; *see*

*also* D.I. 145 at 37 referring to the Protocol as "a testing protocol.")  Dr. Wackers testified that

the Protocol did not constitute conception of any specific dose of adenosine for MPI.  (Wackers,

Tr. 1013:13-22; 1015:15-1016:1.)

108.    None of the three endpoints proposed in the Protocol specifies an endpoint related

to whether sufficient vasodilation for effective MPI was achieved.  (TX 57 at AST0001046;

Wackers, Tr. 1013:1-12.)

### 1.    *Example XIII Of The '296 Patent*

109.    Example XIII disclosed more to a person of skill in the art than did the Protocol.

110.    Example XIII teaches that, for purposes of MPI, adenosine will work as a

vasodilator for MPI and will "normally have to be titrated individually but should lie in the

range of 10 to 150 micrograms per kilogram per minute."  (TX 275 at col. 21, ll. 59-61; Strauss,

Tr. 750:12-22.)  The '296 patent discloses twelve other examples teaching adenosine at varying

doses for different purposes.  (*See* TX 275.)  Example XIII therefore teaches that each dose in

the range of 10 to 150 mcg/kg/min will work for MPI, depending on the patient.  (*See* Strauss,

Tr. 750:12-22.)

111.    A person of ordinary skill in the art would understand from the '296 patent and

Example XIII that the endpoint of titration would be sufficient coronary vasodilation to perform

MPI in that particular patient.  (TX 275 at col. 21, ll. 59-61; Strauss, Tr. 839:8-17.)

112.    Example XIII of the '296 patent is prior art to the '877 patent.

### 2.    *The Karolinska Request*

113.    The Karolinska Request discloses that adenosine could be used to replace

dipyridamole as the pharmacologic stress agent for MPI at a dose of 60 mcg/kg/min.  (TX 1193

at SIC010943-44; Strauss, Tr. 754:9-13, 755:6-14.)

114.    The Karolinska Request discloses more than was disclosed in the Protocol.

115.    The Karolinska Request was publicly available and is valid prior art to the '877 patent.  (*See* TX 1193 at SIC010937.)

II.    **PROPOSED CONCLUSIONS OF LAW**

    A.    **CLAIMS 23(17), 23(18) AND 43 OF THE '877 PATENT ARE INVALID AS OBVIOUS**

1.    The Court must determine whether Sicor "has met its burden by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee."  *See Pfizer, Inc. v. Apotex, Inc.* 480 F.3d 1348, 1360 (Fed. Cir. 2007); *see also Tec Air, Inc. v. Denso Manuf. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) ("'Whether the evidence presented [by patentee] suffices to rebut the *prima facie* case is part of the ultimate conclusion of obviousness and is therefore a question of law.'" (quoting *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998))) (emphasis in original).

2.    Sicor has proved obviousness of the asserted claims by clear and convincing evidence.  Plaintiffs' evidence of certain secondary indicia of non-obviousness is insufficient to rebut Sicor's showing of obviousness.  Accordingly, Claims 23(17), 23(18) and 43 of the '877 patent were obvious in light of the prior art at the time of the invention.

    1.    *Sicor Has Shown Obviousness By Clear And Convincing Evidence*

3.    Sicor has demonstrated that, when the prior art is considered as a whole, a person of ordinary skill in the art in 1987 would have been motivated to use adenosine for MPI.

4.    A reference may teach away from the claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *Optivus Tech., Inc. v. Ion Beam Apps. S.A.*, 469 F.3d 978, 989 (Fed. Cir. 2006) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).  Whether a reference "teaches away"

- 27 -

should be considered based on the teachings of the prior art as a whole, and should not be based on isolated statements taken out of context. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166 (Fed. Cir. 2006) ("[T]he prior art must be considered *as a whole* for what it teaches.") (emphasis in original).

5.    Whether the prior art teaches away from, or motivates toward, a combination is a question of fact. *In re Fulton*, 391 F.3d 1195, 1199-1200 (Fed. Cir. 2004).

6.    The Federal Circuit has provided some guidance as to the types of things that do not "teach away." Disclosure in the prior art of variety of alternatives, without specific dissuasion from a particular choice, does not constitute teaching away from any one of the alternatives. *Id.* at 1201. In addition, a reference "that does not specifically refer to one element of a combination does not, per se, teach away." *Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).

7.    The prior art as a whole did not teach away from the use of adenosine for MPI in 1987.

8.    Reference that are not prior art may be used only in limited circumstances to show the state of the art at the relevant time. *See In re Koller*, 613 F.2d 819, 824 (C.C.P.A. 1980).

9.    The use of adenosine for MPI, at the doses identified in the asserted claims, including within the range of 20-200 mcg/kg/min and at a dose of about 140 mcg/kg/min would have been obvious to a person of ordinary skill in the art in 1987. (*See* D.I. 147 at ¶¶64-119.)

### 2.    *The Secondary Considerations Argued By Plaintiff Do Not Rebut The Strong Prima Facie Case Of Obviousness*

10.    Secondary considerations of nonobviousness may include any of (1) copying; (2) long-felt but unresolved need; (3) failure of others; (4) commercial success; (5) unexpected results; (6) unexpected properties of the claimed invention: (7) licensing showing industry

- 28 -

respect for the invention; and (8) skepticism of skilled artisans before the invention.  *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998).

<div align="center">a.    No Unexpected Results</div>

11.    One way to rebut a showing of obviousness "is to make a showing of 'unexpected results,' *i.e.,* to show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the art would have found surprising or unexpected."  *See In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995).  Plaintiffs have made no showing of any unexpected results from any dose of adenosine for MPI.

12.    "[B]y definition, any superior property must be *unexpected* to be considered as evidence of non-obviousness."  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007) (emphasis in original).  Accordingly, to properly consider what properties were unexpected, the Court must consider what properties were expected.  *Id.*  Plaintiffs here have failed to prove that any results of any dose of adenosine infusion for MPI were unexpected.

13.    The evidence supports that all results of using adenosine for MPI, including adenosine at a dose of about 140 mcg/kg/min, were expected.

14.    The fact that adenosine infusion within the claimed dosage range, including at about 140 mcg/kg/min, caused vasodilation was known in the art, so it was expected.  (Strauss, Tr. 717:22-719:18; *see also* TX 48.)

15.    The types of side effects from adenosine use within the claimed dosage range, including at about 140 mcg/kg/min, were known in the art, so they were expected.  (Strauss, Tr. 719:19-720:10; *see also* TX 48.)

16.    The fact that any side effects from adenosine could be terminated almost immediately upon termination of infusion was known in the art, so that too was expected.  (Strauss, Tr. 742:2-18; *see also* Hilleman, Tr. 2137:22-2139:7.)

<div align="center">- 29 -</div>

17.     Plaintiffs have not shown any unexpected results.

    b. No Credible Evidence Of Skepticism Or Surprise

18.     In connection with the obviousness inquiry, relevant skepticism is skepticism or doubt as to whether the invention will work as described or intended. *See U.S. v. Adams*, 383 U.S. 39, 44 (1966) (concerning skepticism as to feasibility).

19.     Relevant skepticism is skepticism of a person of ordinary skill in the art. *See Alpex Computer Corp. v. Nintendo Co.*, No. 86-1749, 1994 WL 681752, at *30 (S.D.N.Y. Dec. 5, 1994), ("[I]n the absence of a showing that the skeptics were people of ordinary skill in the art, evidence of their skepticism should be accorded little weight in the obviousness determination."), *aff'd in rel. part*, *rev'd in part*, 102 F.3d 1214 (Fed. Cir. 1996).

20.     Plaintiffs have not offered any evidence of actual skepticism.

    c. Copying, Even If Shown, Is Irrelevant In The ANDA Context

21.     "'[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue.'" *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (*quoting Cable Elec. Prods. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985)). This is because there could be many reasons for copying that are unrelated to any purported nonobviousness of the invention. *See Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985), *overruled on other grounds by Midwest Ind. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).

22.     Evidence of copying is particularly weak in the context of an ANDA litigation such as this one. *See Aventis Pharma Deutschland GmbH v. Lupin Ltd.*, 2006 WL 1008962, at *45 (E.D. Va. July 17, 2006). "[T]he ANDA process allows a generic drug company to challenge a drug patent by alleging the patent is invalid." *Id.* "[G]iven that there is a statute in

place that encourages generic drug companies to challenge patents," a copying argument in the ANDA context is weak. *Id.*

23.    Evidence of copying in this context is not persuasive.

        d.    Any Commercial Success Enjoyed By Adenoscan® Does Not Rebut Obviousness Here

24.    The sales levels achieved by Adenoscan® are the product of various economic factors and without more do not demonstrate any superiority of this drug that would suggest that the '877 patent was not obvious. *Pfizer Inc. v. Teva Pharms. USA, Inc.,* 461 F. Supp. 2d 271, 274 (D.N.J. 2006) (commercial success alone does not demonstrate non-obviousness and must be the result of the product's features rather than other factors such as advertising.)

        i.    The sales levels achieved by Adenoscan Are Explained By the Interplay of Economic Factors

25.    The sales levels achieved by Adenoscan® are explained by economic and demographic factors, not by any unexpected or unknown feature of adenosine infusion. To be probative of non-obviousness, the commercial success must have some nexus with the asserted innovation, not merely with features that were known in the prior art. *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

26.    In assessing commercial success , a court should

> "not be blinded to other factors which may contribute to the commercial success of an invention, such as extensive advertising campaigns, price discounts for the patented item, or promotional schemes which enhance the commercialization of the invention without in any way evidencing a long-felt need for the device."

*Speller v. U.S.*, 14 Cl. Ct. 170, 174 n.5 (1988) (quoting *Pacifica Technica Corp. v. U.S.*, 2 Cl.Ct. 170, 173 (1983)). As described at length in Defendants' opening brief and proposed and responsive findings of fact, the sales levels achieved by Adenoscan® were driven by the interplay of four economic factors:

(1)     There was only one other FDA-approved competitor in the
        pharmacological stress-testing market at the time of Adenoscan®
        entry;

(2)     Adenoscan® became the only promoted product in the
        pharmacological stress testing market shortly after its entry;

(3)     Extensive marketing and promotion of Adenoscan® by Fujisawa;
        and

(4)     Growth in demand for pharmacological stress testing unrelated to
        the asserted inventions.

(Leffler, Tr. 1579:3-1582:13; DTX 3133; *see also* D.I. 143 at 32-34 and D.I. 147 at ¶¶ 168-225.)

(1)     Adenoscan® Entered The Pharmacologic Stress
        Market at at Fortuitous Time

27.     For reasons described in Defendants' Proposed Findings  (D.I. 147 at ¶¶ 169-
180), shortly after its launch, Adenoscan® found itself the only product being promoted in a
concentrated, relatively price-insensitive market.  This benefit as the only product advertised in
the pharmacological stress market as continued up to the present day.  (D.I. 147 at ¶ 180.)

(2)     Fujisawa's Extensive Marketing and Promotion
        Drove Adenoscan®'s Market Share Growth

28.     As described in detail in Defendants' Proposed Findings of Fact, Fujisawa's
spending was devoted to extensive traditional and non-traditional marketing activities, including
substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC");
support of physician advocates; provision of financial incentives such as trial product and
pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and
promotion of Adenoscan® for new uses and user populations.  (D.I. 147 at ¶¶ 181-208.)

29.     Such an extensive marketing and promotion program "obscure[s] any nexus that
might have existed between the merits of the product and its commercial success."  *McNeil-
PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370 (Fed Cir. 2003) (affirming district court's

discount of Plaintiffs' asserted evidence of commercial success); *see also Revlon, Inc. v. Carson Prods. Co.*, 602 F. Supp. 1071, 1096-97 (S.D.N.Y. 1985) (finding that the success of Defendant's product was due to advertising campaign, product packaging, and choice of target audience for the marketing message – not to any claimed advantage of the patented invention).

30.     "[W]here the success of an invention is due to advertising, good business sense, the prior art, etc., rather than the advantages inherent in the discovery, it is ***irrelevant*** to a determination of obviousness." *Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*, 693 F. Supp. 114, 131 (D. Del. 1988) (emphasis added).

> (3)     Adenoscan®'s Increasing Sales Were Also Due to the General Growth of the Pharmacologic Stress Market

31.     Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market.

32.     Although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of the products. Such a delay in the market's willingness to embrace Adenoscan® is simply not probative of commercial success. *Friction Div. Prods.*, 693 F. Supp. at 131 ("More probative of nonobviousness [than sales, which may be attributable to advertising increases] would be evidence of commercial success **immediately following** the patenting of the invention.") (emphasis added).

33.     Dipyridamole retained significant usage upon the launch of Adenoscan® and has experienced continuous growth since that time.

34.     The higher overall level of growth achieved by Adenoscan® can be attributed to the company's extensive marketing and promotion investment in creating and capturing additional user populations for the product.

35.     It is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity.  But Adenoscan®'s success based on a fortuitous market occurrence cannot be attributed to the claimed invention and thus is not probative of nonobviousness.  *See Merck & Co., Inc. v. Teva Pharms USA, Inc.*, 405 F.3d 1338, 1339 (Fed Cir. 2005) (Lourie, J., dissenting from order denying rehearing *en banc*) (stating that once commercial success is established, "the only other question is whether the success is attributable to the claimed invention ('nexus'), rather than to other factors such as market power, advertising, **demand for all products of a given type**, a rising economy that 'lifts all boats,' etc.") (emphasis added); *see also Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (concluding that any commercial success of the patented device could have been due to an increased use of herringbone milking systems, and not the claimed invention).

> ii.     Dr. Hay's Analysis Is Unsound and His Testimony Unreliable

36.     The testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was unsound.

> iii.     Dr. Leffler is Highly Qualified to Serve as an Expert in This Case

37.     Dr. Leffler is a highly qualified and credible expert witness in this case.

38.     Dr. Leffler's qualifications have been specifically acknowledged, and his economic analyses adopted, by several federal and state courts.  *See, e.g., Wash. Legal Found. v.*

*Legal Found. of Wash.*, 271 F.3d 835, 859 (9th Cir. 2001) (en banc); *Pfizer Inc. v. Teva Pharms.*

*USA, Inc.*, 461 F. Supp. 2d 271, 274-75 (D.N.J. 2006);  *In re Florida Microsoft Antitrust Litig.*,

2002 WL 31423620, at *6-7 (Fla. Cir. Ct. 2002).

      39.    Plaintiffs incorrectly criticize Dr. Leffler by complaining that "Dr. Leffler never

consulted any physicians" about what product qualities or benefits drive their purchasing

decisions.  However, as an economist, it would have been "inappropriate" for Dr. Leffler to

engage in this research.  *Pfizer*, 461 F. Supp. 2d at 275.

      40.    Even if therapeutic advantages of Adenoscan® over dipyridamole could be shown

by such an analysis, "this would not obviate [Dr. Leffler's] ultimate conclusion that factors such

as marketing and promotion, not these therapeutic benefits, were ultimately responsible for [the

product's] commercial success" if the evidence were to bear out this conclusion.  *Id.*  The

evidence does, indeed, bear out this conclusion, and no efforts on the part of Plaintiffs to

discredit Dr. Leffler can change that fact.

        e.     The Lack Of Specific Suggestion Is Irrelevant

      41.    The absence of a precise teaching or specific reference is not, by itself, an

indication of non-obviousness.  *See KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1741 (2007),

(obviousness analysis "need not seek out precise teachings directed to the specific subject matter

of the challenged claim"); *see also Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1381 (Fed. Cir.

2005) ("[T]he fact that octoxynol 40 was not one of the surfactants mentioned does not, without

more, support the contention that the use of octoxynol 40 is nonobvious.").

      42.    Even if the lack of specific reference could be an indicia of non-obviousness, it is

not persuasive evidence in this case in light of, *inter alia*, the history of development of

pharmacologic stress MPI and adenosine availability.

f.    Simultaneous Invention Suggests Obviousness

43.    Near simultaneous invention may be an indication of obviousness.  *See Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1460-61 (Fed. Cir. 1984).

44.    Example XIII of the '296 patent was added in a continuation-in-part application filed on December 27, 1987, before Plaintiffs' invention date.  If, however, Example XIII of the '296 patent were not prior art to the '877 patent, it would still provide evidence of obviousness because it reflects near-simultaneous invention of the use of adenosine for MPI.

**B.    CLAIMS 23(17), 23(18) AND 43 OF THE '877 PATENT ARE INVALID AS ANTICIPATED**

1.    *The '296 Patent Is Prior Art*

45.    Plaintiffs have the burden of antedating prior art references dated before their patent application date.  *See Mahurkar v. C.R. Bard Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996).

46.    Plaintiffs attempt to antedate Example XIII of the '296 patent by arguing that the Protocol demonstrates prior conception.

47.    "Conception is a legal conclusion premised on various underlying facts." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005).

48.    "Conception is the formation 'in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is therefore to be applied in practice.'"  *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (citation omitted).  "Conception must include every feature or limitation of the claimed invention."  *Id.*

49.    A research plan that does not describe the full invention does not establish conception.  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)

(holding that conception cannot be founded on "a general goal or research plan [the inventor] hopes to pursue").

50.    Plaintiffs have not proved prior conception of the scope of the asserted claims.

51.    A patent may antedate an earlier reference that disclosed a species of the claimed genus through evidence showing the patentee was in possession of that species prior to the effective date of the reference.  *See In re Stempel*, 241 F.2d 755 (C.C.P.A. 1957).  *Stempel* applies only when the patentee is attempting to antedate a reference disclosing a species of the claimed genus.  *See In re Tanczyn*, 347 F.2d 830, 831-33 (C.C.P.A. 1965) (holding that *In re Stempel* is valid "*as applied to the facts in Stempel* where the reference showed a species of the generic invention being claimed in the appealed claims") (emphasis added).

52.    Plaintiffs have not proved that they were in possession of as much of the claimed invention as was disclosed in Example XIII of the '296 patent before December 27, 1987.

53.    Even if Example XIII were not prior art for anticipation purposes, it is prior art that may be considered in the obviousness analysis.  *See ISCO Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 495 n.3 (D.Del. 2003); *see also  Tanczyn*, 347 F.2d at 832 ("A different situation may prevail when the rejection is based on 35 U.S.C. § 103.").  For obviousness, Plaintiffs must show they were in possession of the "whole invention" prior to the conception date in order to antedate Example XIII reference.  *ISCO*, 279 F. Supp. 2d at 495 n.3, 496 (holding that, for obviousness, the patentee must show possession of the whole invention prior to the conception date).

54.    Plaintiffs have not shown that they were in possession of the whole invention as claimed in the asserted claims of the '877 patent prior to the December 27, 1987 priority date for Example XIII of the '296 patent.

### 2. *Claim 23(18) Is Anticipated By The '296 Patent*

55.     Example XIII of the '296 patent discloses every element of claim 23(18). (TX 275.)

56.      Example XIII discloses a range of adenosine doses from 10 to 150 mcg/kg/min, which could be referred to as a genus of adenosine doses for MPI.  (TX 275 at col. 21, ll. 59-61.)

57.     "[T]he disclosure of a small genus may anticipate the species of that genus even if the species are not themselves recited." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1380 (Fed. Cir. 2001) (citing *In re Petering*, 301 F.2d 676, 682 (C.C.P.A. 1962)).

58.     The number of species in a given genus is not dispositive in determining whether the disclosure of a genus anticipates a particular species; rather, the court must also consider the "total circumstances involved." *Petering*, 301 F.2d at 681-82  A genus may anticipate a species if a person of ordinary skill in the art can look at a genus in light of a pattern of preferences disclosed in the reference and "envisage each member of this limited class." *Id.*

59.     A person of ordinary skill in the art would be able to envisage each dose disclosed in the range in Example XIII as many doses "should" work depending on the individual patient. (*See* TX 275 at col. 21, ll. 59-61; Strauss, Tr. 752:2-19.)  Here, a genus of 10-150 mcg/kg/min anticipates the dose of about 140 mcg/kg/min and renders it invalid.

60.     Example XIII of the '296 patent anticipates Claim 23(18) of the '877 patent.

## III.    <u>CONCLUSION</u>

Sicor respectfully asks the Court to adopt the foregoing findings of fact and conclusions of law, as well as the findings of fact and conclusions of law contained in Sicor's Proposed

Findings dated May 9, 2007, and enter judgment that the asserted claims of the '877 are invalid

as obvious or anticipated, or both.

<div style="margin-left: 40%">

Respectfully submitted,


/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
  STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Attorneys for SICOR INC. and
SICOR PHARMACEUTICALS, INC.

</div>

Dated:  June 19, 2007

058956.1016

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on June 19, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Paul Crawford, Esquire
Connolly Bove Lodge & Hutz
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207

Richard K. Herrmann, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306

I further certify that on June 19, 2007, I caused copies of the foregoing document to be served by hand on the above-listed counsel and on the following in the manner indicated:

### BY E-MAIL ON JUNE 19, 2007 AND FEDERAL EXPRESS ON JUNE 20, 2007

Charles E. Lipsey, Esquire
Finnegan, Henderson, Farabow,
   Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675

Susan H. Griffen, Esquire
Finnegan, Henderson, Farabow,
   Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

Brian M. Poissant, Esquire
Jones Day
222 East 41st Street
New York, NY 10017

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*